

THE
WEISER
LAW FIRM
WWW.WEISERLAWFIRM.COM

| PENNSYLVANIA | CALIFORNIA |
|---|---|
| 22 CASSATT AVE | 12707 HIGH BLUFF DRIVE, SUITE 200 |
| BERWYN, PA 19312 | SAN DIEGO, CA 92130 |
| TELEPHONE: (610) 225-2677 | TELEPHONE: (858) 794-1441 |
| FACSIMILE: (610) 408-8062 | FACSIMILE: (858) 794-1450 |

November 4, 2014

**VIA ECF**
Honorable Paul A. Engelmayer
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Re:   *In re Sanofi Securities Litigation*, No. 13 Civ. 8806 (PAE);
       *AG Funds, L.P. v. Sanofi*, No. 14 Civ. 2211 (PAE).

Dear Judge Engelmayer:

During the October 31, 2014 hearing, the Court requested authority for the proposition that while it may take judicial notice of the fact of the existence of certain documents or statements outside of the class period, it may not accept these documents or statements for the truth of the matters asserted therein.  To that end, attached please find a copy of an opinion in *In re Bear Stearns Companies, Inc. Securities, Derivative, and ERISA Litigation*, 763 F. Supp. 2d 423, 487, 581-582  (S.D.N.Y. 2011).

Respectfully submitted,

/s/ Christopher L. Nelson
       Christopher L. Nelson

cc:     All counsel of record (via ECF and e-mail)



763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**



United States District Court,
S.D. New York.
In re BEAR STEARNS COMPANIES, INC. SECURI-
TIES, DERIVATIVE, AND ERISA LITIGATION.
This Document Relates To: Securities Action, 08 Civ.
2793 Derivative Action, 07 Civ. 10453 ERISA Action, 08
Civ. 2804.

No. 08 MDL 1963.
Jan. 19, 2011.

**Background:** Investors in bank's stock and former em-
ployees who held stock as participants in employee stock
ownership plan (ESOP) brought class action against bank,
its officers and directors, and accounting firm that per-
formed audits to recover for defendants' alleged violations
of provisions of federal securities laws, as well as for
breach of fiduciary duties allegedly owed under the Em-
ployee Retirement Income Security Act (ERISA). De-
fendants moved to dismiss for failure to state claim.

**Holdings:** The District Court, Sweet, J., held that:
(1) allegations in investors' complaint, regarding bank's
continued valuation of mortgage-backed assets using
outdated models, stated securities fraud claim;
(2) investors also stated insider trading and control liability
claims against officer and director defendants;
(3) allegations of "red flags," when coupled with allega-
tions of violations of generally accepted auditing standards
(GAAS), stated securities fraud claim against accountants;
(4) allegations in shareholders' complaint failed to invoke
fraud exception to Delaware's "continuous ownership"
rule, so as to allow shareholders to pursue their derivative
claims after merger;
(5) shareholders failed to state viable double derivative
claim;
(6) cause of action challenging the adequacy of consider-

ation paid in connection with merger was barred by res
judicata effect of state court judgment;
(7) allegations in complaint filed by participants in em-
ployee stock ownership plan (ESOP) against plan admin-
istrator and other alleged fiduciaries thereof were insuffi-
cient to overcome *Moench* presumption that plan fiduci-
aries had properly fulfilled their duties;
(8) ESOP fiduciaries had no fiduciary duty under ERISA
to advise plan participants of employer's precarious finan-
cial condition;
(9) adequate claim for breach of fiduciary duty of loyalty
was necessary predicate for claim alleging conflicts of
interest on part of ERISA fiduciaries; and
(10) ERISA claim for breach of duty to monitor or for
co-fiduciary liability required antecedent fiduciary breach
to be viable.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A** ☞636

170A Federal Civil Procedure
   170AVII Pleadings
      170AVII(A) Pleadings in General
        170Ak633 Certainty, Definiteness and Particu-
larity
           170Ak636 k. Fraud, mistake and condition of
mind. Most Cited Cases

    Generally, in pleading fraud claim, plaintiff may not
rely on blanket references to acts or omissions by all de-
fendants; rather, each defendant named in complaint is
entitled to be appraised of circumstances surrounding the
fraudulent conduct with which he individually stands
charged. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A** ☞636

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

170A Federal Civil Procedure
   170AVII Pleadings
     170AVII(A) Pleadings in General
       170Ak633 Certainty, Definiteness and Particularity
        170Ak636 k. Fraud, mistake and condition of mind. Most Cited Cases

Heightened pleading standards for allegations of fraud do not require the pleading of detailed evidentiary matter in securities litigation. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[3]** Securities Regulation 349B ⬅⬅60.40

349B Securities Regulation
   349BI Federal Regulation
     349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
       349Bk60.39 Persons Liable
        349Bk60.40 k. In general; control persons. Most Cited Cases

Securities Regulation 349B ⬅⬅60.51(1)

349B Securities Regulation
   349BI Federal Regulation
     349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
      349Bk60.50 Pleading
       349Bk60.51 In General
        349Bk60.51(1) k. In general. Most Cited Cases

Under "group pleading doctrine," plaintiff may circumvent the general pleading rule that fraudulent statements must be linked directly to party accused of fraud with respect to claims premised on allegedly fraudulent statements in group-published documents, such as Securities and Exchange Commission (SEC) filings and press releases; as long as individual defendants are all alleged to have had direct involvement in everyday business of company, plaintiff may rely on presumption that statements in prospectuses, registration statements, annual reports, press releases, and other group-published documents are the collective work of those individuals with direct involvement in everyday business of company. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[4]** Securities Regulation 349B ⬅⬅60.51(2)

349B Securities Regulation
   349BI Federal Regulation
     349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
      349Bk60.50 Pleading
       349Bk60.51 In General
        349Bk60.51(2) k. Scienter. Most Cited Cases

Securities Regulation 349B ⬅⬅60.53

349B Securities Regulation
   349BI Federal Regulation
     349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
      349Bk60.50 Pleading
       349Bk60.53 k. Misrepresentation. Most Cited Cases

Under the Private Securities Litigation Reform Act (PSLRA), a securities fraud plaintiff asserting a claim for money damages must specify each misleading statement, set forth facts on which belief that statement is misleading was formed, and state with particularity facts giving rise to strong inference that defendant acted with required state of mind. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4; 17 C.F.R. § 240.10b-5.

**[5]** Securities Regulation 349B ⬅⬅60.53

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

349B Securities Regulation
   349BI Federal Regulation
      349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
         349Bk60.50 Pleading
            349Bk60.53 k. Misrepresentation. Most Cited Cases

    To state a securities fraud claim with particularity required by the Private Securities Litigation Reform Act (PSLRA), plaintiff must: (1) specify the statements that plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when statements were made, and (4) explain why statements were fraudulent. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4; 17 C.F.R. § 240.10b-5.

**[6] Federal Civil Procedure 170A** ⟜**1832**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
      170AXI(B)5 Proceedings
         170Ak1827 Determination
            170Ak1832 k. Matters considered in general. Most Cited Cases

    While court, in considering motion to dismiss, is normally required to look only at allegations upon face of complaint, court may consider any written instrument attached to securities fraud complaint, statements or documents incorporated into complaint by reference, legally required public disclosure documents filed with the Securities and Exchange Commission (SEC), and documents possessed by or known to plaintiff and upon which it relied in bringing suit. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[7] Federal Civil Procedure 170A** ⟜**1832**

170A Federal Civil Procedure

170AXI Dismissal
      170AXI(B) Involuntary Dismissal
      170AXI(B)5 Proceedings
         170Ak1827 Determination
            170Ak1832 k. Matters considered in general. Most Cited Cases

**Federal Civil Procedure 170A** ⟜**1835**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
      170AXI(B)5 Proceedings
         170Ak1827 Determination
            170Ak1835 k. Matters deemed admitted; acceptance as true of allegations in complaint. Most Cited Cases

    If allegations of securities fraud conflict with the plain language of the publicly filed disclosure documents, these disclosure documents control, and court need not accept allegations of complaint as true when ruling on motion to dismiss. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[8] Federal Civil Procedure 170A** ⟜**1832**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
      170AXI(B)5 Proceedings
         170Ak1827 Determination
            170Ak1832 k. Matters considered in general. Most Cited Cases

    On motion to dismiss securities fraud complaint as failing to state claim for relief, court may consider matters that are subject to judicial notice. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[9] Securities Regulation 349B** ⟜**60.27(5)**

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

349B Securities Regulation
 349BI Federal Regulation
  349BI(C) Trading and Markets
   349BI(C)7 Fraud and Manipulation
    349Bk60.17 Manipulative, Deceptive or
Fraudulent Conduct
     349Bk60.27 Misrepresentation
      349Bk60.27(5) k. Forecasts, estimates,
predictions or projections. Most Cited Cases

 While allegation that defendants failed to accurately predict the impact of subprime mortgage crisis in connection with representations that they made regarding their mortgage-backed securities would not support securities fraud claim against them, defendants' mere incantation of fraud-by-hindsight would not defeat allegations of misrepresentations and omissions that were misleading and false at time they were made. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[10] Securities Regulation 349B ☞60.28(2.1)**

349B Securities Regulation
 349BI Federal Regulation
  349BI(C) Trading and Markets
   349BI(C)7 Fraud and Manipulation
    349Bk60.17 Manipulative, Deceptive or
Fraudulent Conduct
     349Bk60.28 Nondisclosure; Insider
Trading
      349Bk60.28(2) Duty to Disclose or
Refrain from Trading
       349Bk60.28(2.1) k. In general.
Most Cited Cases

 To state a claim for insider trading under the Securities Exchange Act, plaintiff must: (1) plead a predicate insider trading violation, and (2) allege sufficient facts showing that defendant traded the security at issue contemporaneously with plaintiff. Securities Exchange Act of 1934, §

20A, 15 U.S.C.A. § 78t-1.

**[11] Securities Regulation 349B ☞60.51(1)**

349B Securities Regulation
 349BI Federal Regulation
  349BI(C) Trading and Markets
   349BI(C)7 Fraud and Manipulation
    349Bk60.50 Pleading
     349Bk60.51 In General
      349Bk60.51(1) k. In general. Most
Cited Cases

 Insider trading claims under the Securities Exchange Act must comply with the heightened pleading standards both of the Federal Rule of Civil Procedure governing fraud claims and of the Private Securities Litigation Reform Act (PSLRA). Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[12] Securities Regulation 349B ☞35.15**

349B Securities Regulation
 349BI Federal Regulation
  349BI(C) Trading and Markets
   349BI(C)1 In General
    349Bk35.15 k. Controlling persons. Most
Cited Cases

 To establish prima facie case of control liability under the Securities Exchange Act, plaintiff must show: (1) a primary violation by a controlled person; (2) control of primary violator by defendant; and (3) that the defendant was in some meaningful sense a culpable participant in primary violation. Securities Exchange Act of 1934, § 20(a), 15 U.S.C.A. § 78t(a).

**[13] Securities Regulation 349B ☞60.51(1)**

349B Securities Regulation

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

349BI Federal Regulation

349BI(C) Trading and Markets

349BI(C)7 Fraud and Manipulation

349Bk60.50 Pleading

349Bk60.51 In General

349Bk60.51(1) k. In general. Most Cited Cases

Pleading of loss causation in securities fraud action is governed by notice pleading standards, such that plaintiff need only provide defendant with some indication of loss and causal connection that plaintiff has in mind. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[14]** Securities Regulation 349B ⌐60.47

349B Securities Regulation

349BI Federal Regulation

349BI(C) Trading and Markets

349BI(C)7 Fraud and Manipulation

349Bk60.43 Grounds of and Defenses to Liability

349Bk60.47 k. Causation; existence of injury. Most Cited Cases

To adequately allege loss causation in securities fraud action, plaintiff must allege that company's share price fell significantly after the truth became known. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[15]** Securities Regulation 349B ⌐60.53

349B Securities Regulation

349BI Federal Regulation

349BI(C) Trading and Markets

349BI(C)7 Fraud and Manipulation

349Bk60.50 Pleading

349Bk60.53 k. Misrepresentation. Most Cited Cases

Allegations in investors' complaint, regarding bank's continued valuation of mortgage-backed assets using outdated models that failed to account for downturns in housing and in subprime mortgage markets, regarding bank's false statements that it regularly evaluated and enhanced its valuation models at time when it had done nothing to address deficiencies previously noted by the Securities and Exchange Commission (SEC), and when its risk management department was in shambles, regarding bank's delay in writing down value of collateral which, given the subprime mortgage crisis, it knew or should have known was worthless, and regarding bank's false assurances that it was not experiencing liquidity crisis at time when $500 million loan had not been renewed and another $2 billion loan was unlikely to be renewed, and when highly leveraged nature of its investments necessitated its reliance on overnight repo lending of roughly $102 billion per day, sufficiently set forth statements that were all materially false and misleading, as required to state securities fraud claim. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[16]** Securities Regulation 349B ⌐60.28(2.1)

349B Securities Regulation

349BI Federal Regulation

349BI(C) Trading and Markets

349BI(C)7 Fraud and Manipulation

349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct

349Bk60.28 Nondisclosure; Insider Trading

349Bk60.28(2) Duty to Disclose or Refrain from Trading

349Bk60.28(2.1) k. In general. Most Cited Cases

Duty to speak the full truth arises when issuer of securities undertakes a duty to say anything. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

**[17] Securities Regulation 349B** ⌨**60.28(13)**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
          349Bk60.28 Nondisclosure; Insider Trading
            349Bk60.28(10) Matters to Be Disclosed
              349Bk60.28(13) k. Particular matters. Most Cited Cases

Although issuer of securities is under no duty to disclose every fact or assumption underlying a prediction, it must disclose material, firm-specific adverse facts that affect validity or plausibility of that prediction. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[18] Securities Regulation 349B** ⌨**60.27(6)**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
          349Bk60.27 Misrepresentation
            349Bk60.27(6) k. Financial or periodic reports; accounting data and valuations. Most Cited Cases

To extent that bank, in valuing its mortgage-backed assets, knowingly used flawed models which would produce unreliable and skewed results, or recklessly disregarded such flaws, the results produced by those models and reported to investors were misstatements actionable under federal securities law. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. §

240.10b-5.

**[19] Securities Regulation 349B** ⌨**60.27(5)**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
          349Bk60.27 Misrepresentation
            349Bk60.27(5) k. Forecasts, estimates, predictions or projections. Most Cited Cases

"Safe harbor" and "bespeaks caution" doctrines apply only to forward-looking statements whose truth cannot be ascertained until some time after they are made, not to statements of existing or historical fact. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[20] Securities Regulation 349B** ⌨**60.27(5)**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
          349Bk60.27 Misrepresentation
            349Bk60.27(5) k. Forecasts, estimates, predictions or projections. Most Cited Cases

To extent that bank, in valuing its mortgage-backed assets in documents disseminated to potential investors, used outdated models that failed to account for downturns in housing and in subprime mortgage markets, and falsely reported that it regularly evaluated and enhanced its valuation models at time when it had done nothing to address deficiencies previously noted by the Securities and Exchange Commission (SEC) and when its risk management department was in shambles, its misstatements were

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

statements of present fact and not forward-looking predic-
tions regarding future events of kind protected under the
"safe harbor" and "bespeaks caution" doctrines. Securities
Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17
C.F.R. § 240.10b-5.

**[21] Securities Regulation 349B** 🗝60.27(5)

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
     349BI(C)7 Fraud and Manipulation
      349Bk60.17 Manipulative, Deceptive or
Fraudulent Conduct
       349Bk60.27 Misrepresentation
        349Bk60.27(5) k. Forecasts, estimates,
predictions or projections. Most Cited Cases

Even assuming that some of false statements which
bank allegedly made with regard to valuation models that it
used to value its mortgage-based assets could be deemed
forward-looking, they still would not be protected under
"safe harbor" and "bespeaks caution" doctrines unless
accompanied by meaningful cautionary statements. Secu-
rities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b);
17 C.F.R. § 240.10b-5.

**[22] Securities Regulation 349B** 🗝60.27(5)

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
     349BI(C)7 Fraud and Manipulation
      349Bk60.17 Manipulative, Deceptive or
Fraudulent Conduct
       349Bk60.27 Misrepresentation
        349Bk60.27(5) k. Forecasts, estimates,
predictions or projections. Most Cited Cases

For cautionary statements to be "meaningful" under
the "safe harbor" and "bespeaks caution" doctrines, they
must discredit alleged misrepresentations to such an extent

that risk of any real deception drops to nil; true cautionary
language must warn investors of exactly the risk which
plaintiff claims was not disclosed. Securities Exchange Act
of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. §
240.10b-5.

**[23] Securities Regulation 349B** 🗝60.27(5)

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
     349BI(C)7 Fraud and Manipulation
      349Bk60.17 Manipulative, Deceptive or
Fraudulent Conduct
       349Bk60.27 Misrepresentation
        349Bk60.27(5) k. Forecasts, estimates,
predictions or projections. Most Cited Cases

Under the "safe harbor" and "bespeaks caution" doc-
trines, warnings of specific risks do not shelter defendants
from liability, if they fail to disclose hard facts critical to
appreciating magnitude of risks described. Securities Ex-
change Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17
C.F.R. § 240.10b-5.

**[24] Securities Regulation 349B** 🗝60.27(5)

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
     349BI(C)7 Fraud and Manipulation
      349Bk60.17 Manipulative, Deceptive or
Fraudulent Conduct
       349Bk60.27 Misrepresentation
        349Bk60.27(5) k. Forecasts, estimates,
predictions or projections. Most Cited Cases

To extent that bank, as alleged in securities fraud
complaint, had provided general boilerplate risk warnings
that valuation models that it used to value its mort-
gage-backed assets might not accurately predict the future
when, at time it provided these boilerplate warnings, it

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

allegedly knew, but withheld from investors, that these valuation models were fundamentally flawed, as failing to account for downturn in housing and subprime mortgage markets, and did not include accumulating evidence of market downturn and default risk in its disclosures, bank would not be protected from liability under federal securities laws by the "safe harbor" and "bespeaks caution" doctrines. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[25] Securities Regulation 349B** ⟡**60.28(11)**

349B Securities Regulation
   349BI Federal Regulation
     349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
       349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
        349Bk60.28 Nondisclosure; Insider Trading
         349Bk60.28(10) Matters to Be Disclosed
          349Bk60.28(11) k. Materiality.
Most Cited Cases

**Securities Regulation 349B** ⟡**60.46**

349B Securities Regulation
   349BI Federal Regulation
     349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
       349Bk60.43 Grounds of and Defenses to Liability
        349Bk60.46 k. Materiality of violation.
Most Cited Cases

**Securities Regulation 349B** ⟡**60.70**

349B Securities Regulation
   349BI Federal Regulation
     349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation

       349Bk60.70 k. Questions of law or fact; jury questions. Most Cited Cases

In securities fraud action, question regarding materiality of defendant's false statements is mixed question of law and fact, and complaint may not be dismissed upon ground that alleged misstatements or omissions are not material unless they are so obviously unimportant to reasonable investor that reasonable minds could not differ on question of their importance. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[26] Securities Regulation 349B** ⟡**60.46**

349B Securities Regulation
   349BI Federal Regulation
     349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
       349Bk60.43 Grounds of and Defenses to Liability
        349Bk60.46 k. Materiality of violation.
Most Cited Cases

In assessing materiality of securities issuer's false statements in cause of action under Rule 10b-5, courts consider both quantitative factors, regarding financial magnitude of misstatement, and qualitative factors, such as (1) concealment of unlawful transaction, (2) significance of misstatement in relation to company's operations, and (3) management's expectation that misstatement will result in significant market reaction. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[27] Securities Regulation 349B** ⟡**60.46**

349B Securities Regulation
   349BI Federal Regulation
     349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
       349Bk60.43 Grounds of and Defenses to

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Liability

349Bk60.46 k. Materiality of violation.
Most Cited Cases

Quantitative and qualitative factors considered by courts when assessing materiality of securities issuer's false statements are intended to assist in evaluating whether misstatements significantly altered total mix of information available to investors. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[28] Securities Regulation 349B ☞60.51(2)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 In General
                        349Bk60.51(2) k. Scienter. Most Cited Cases

Under the Private Securities Litigation Reform Act (PSLRA), securities fraud plaintiff must plead with particularly facts that give rise to strong, i.e., a powerful or cogent, inference of fraudulent intent. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4; 17 C.F.R. § 240.10b-5.

**[29] Securities Regulation 349B ☞60.51(2)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 In General
                        349Bk60.51(2) k. Scienter. Most Cited Cases

Strong inference of scienter, of kind required by the Private Securities Litigation Reform Act (PSLRA), can be established by alleging facts either: (1) showing that defendants had both motive and opportunity to commit alleged fraud, or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4; 17 C.F.R. § 240.10b-5.

**[30] Securities Regulation 349B ☞60.51(2)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 In General
                        349Bk60.51(2) k. Scienter. Most Cited Cases

In determining whether the pleaded facts give rise to strong inference of scienter, of kind required by the Private Securities Litigation Reform Act (PSLRA), court must take into account plausible opposing inferences, such that reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference which one could draw from facts alleged. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u-4; 17 C.F.R. § 240.10b-5.

**[31] Securities Regulation 349B ☞60.51(2)**

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.50 Pleading
                    349Bk60.51 In General
                        349Bk60.51(2) k. Scienter. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

To adequately plead scienter on "motive and opportunity" theory, it is not enough for securities fraud plaintiff to allege motives that are generally possessed by most corporate directors and officers; plaintiff must allege a concrete and personal benefit to individual defendants resulting from the fraud. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[32] Securities Regulation 349B** ⟨⟩60.51(2)

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
      349Bk60.50 Pleading
      349Bk60.51 In General
        349Bk60.51(2) k. Scienter. Most Cited Cases

Unusual or suspicious insider trading activity supports inference of scienter in securities fraud action. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[33] Securities Regulation 349B** ⟨⟩60.51(2)

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
      349Bk60.50 Pleading
      349Bk60.51 In General
        349Bk60.51(2) k. Scienter. Most Cited Cases

Allegations in investors' class securities fraud complaint, that individual officers and directors sold over 800,000 of their shares in company for total realized value of over $90 million during class period, were insufficient to support inference of fraudulent intent on "motive and opportunity" theory, where class-period sales corre-

sponded to officers' and directors' pre-class-period sales, where they occurred after announced losses by company, where they accounted for only a minority of officers and directors holdings in company, where they were consistent with legitimate purpose of generating sums to pay tax liabilities, and where officers and directors lost roughly $1.1 billion as result of their retained holdings when company collapsed. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[34] Securities Regulation 349B** ⟨⟩60.51(2)

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
      349Bk60.50 Pleading
      349Bk60.51 In General
        349Bk60.51(2) k. Scienter. Most Cited Cases

An egregious refusal to see the obvious, or to investigate the doubtful, can support an inference of recklessness and satisfy intent element of securities fraud claim. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[35] Securities Regulation 349B** ⟨⟩60.51(2)

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
      349Bk60.50 Pleading
      349Bk60.51 In General
        349Bk60.51(2) k. Scienter. Most Cited Cases

Allegations in investors' complaint, regarding bank's continued valuation of mortgage-backed assets using outdated models that failed to account for downturns in housing and in subprime mortgage markets even after bank

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

had been advised of flaws in these valuation models by the Securities and Exchange Commission (SEC), and regarding bank's delay in writing down value of collateral which, given the subprime mortgage crisis, it knew or should have known was worthless, sufficiently alleged scienter, of kind required for Rule 10b-5 claim, on "conscious misbehavior or recklessness" theory. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[36]** Securities Regulation 349B ⚖ 60.47

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)7 Fraud and Manipulation
                349Bk60.43 Grounds of and Defenses to Liability
                    349Bk60.47 k. Causation; existence of injury. Most Cited Cases

Allegation that, as result of bank's continued valuation of mortgage-backed assets using outdated models which failed to account for downturns in housing and in subprime mortgage markets, of its delay in writing down value of collateral which, given the subprime mortgage crisis, it knew or should have known was worthless, and of its false denials that it was facing any liquidity crisis at time when $500 million loan had not been renewed and another $2 billion loan was unlikely to be renewed, and when highly leveraged nature of its investments necessitated its reliance on overnight repo lending of roughly $102 billion per day, price of bank's stock was artificially inflated at time of investors' purchase, with foreseeable result that investors would experience loss when truth was revealed and price at which stock was trading precipitously declined, adequately pled the loss causation element of Rule 10b-5 securities fraud claim. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[37]** Securities Regulation 349B ⚖ 60.28(4)

349B Securities Regulation

349BI Federal Regulation
    349BI(C) Trading and Markets
        349BI(C)7 Fraud and Manipulation
            349Bk60.17 Manipulative, Deceptive or Fraudulent Conduct
                349Bk60.28 Nondisclosure; Insider Trading
                    349Bk60.28(2) Duty to Disclose or Refrain from Trading
                        349Bk60.28(4) k. Corporate officers or directors; insiders. Most Cited Cases

Allegations in investors' class complaint, regarding sales by officers and directors of some of their stock in bank at time when they were aware of material, adverse, and nonpublic information regarding the bank, including bank's use of outdated models that did not account for recent downturns in housing and subprime mortgage markets when valuing its mortgage-backed assets, and regarding lead investor's purchase of stock in bank within five trading days of sales by officers and directors, sufficiently pled both a predicate violation of insider trading laws and contemporaneous sale and purchase of securities by parties and stated insider trading claim. Securities Exchange Act of 1934, § 20A, 15 U.S.C.A. § 78t-1.

**[38]** Securities Regulation 349B ⚖ 35.15

349B Securities Regulation
    349BI Federal Regulation
        349BI(C) Trading and Markets
            349BI(C)1 In General
                349Bk35.15 k. Controlling persons. Most Cited Cases

Control over primary violator may be established, for purposes of making control liability claim under provision of the Securities Exchange Act, by showing that defendant possessed power to direct or cause the direction of management and policies of person, whether through ownership of voting securities, by contract, or otherwise. Securities Exchange Act of 1934, § 20(a), 15 U.S.C.A. § 78t(a).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

**[39] Securities Regulation 349B** ⬦**60.40**

349B Securities Regulation
   349BI Federal Regulation
     349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
       349Bk60.39 Persons Liable
        349Bk60.40 k. In general; control persons.
Most Cited Cases

Uncontested allegations in investors' complaint, that individual defendants, by virtue of their positions as directors and high-ranking officers of bank with authority to approve issuance of statements on its behalf, as well as their ownership of bank stock, had ability to control primary violators, sufficiently pled defendants' status as controlling persons, and together with allegations of scienter, stated claim against these individual defendants under control liability provision of the Securities Exchange Act. Securities Exchange Act of 1934, § 20(a), 15 U.S.C.A. § 78t(a).

**[40] Securities Regulation 349B** ⬦**60.51(2)**

349B Securities Regulation
   349BI Federal Regulation
     349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
      349Bk60.50 Pleading
       349Bk60.51 In General
        349Bk60.51(2) k. Scienter. Most Cited Cases

Plaintiff sufficiently pleads facts supporting an inference of scienter, of kind required to state a securities fraud claim against accounting firm for false statements or certifications made in connection with audit, by alleging that firm's accounting practices were so deficient that audit was no audit at all, or an egregious refusal to see the obvious or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable

accountant would have made same decisions if confronted with the same facts. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[41] Securities Regulation 349B** ⬦**60.51(2)**

349B Securities Regulation
   349BI Federal Regulation
     349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
      349Bk60.50 Pleading
       349Bk60.51 In General
        349Bk60.51(2) k. Scienter. Most Cited Cases

Allegations of "red flags," when coupled with allegations of violations of generally accepted accounting practices (GAAP) and generally accepted auditing standards (GAAS), are sufficient to support strong inference of scienter, of kind required to state securities fraud claim against auditor for false statements or certifications made in connection with audit. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[42] Securities Regulation 349B** ⬦**60.51(2)**

349B Securities Regulation
   349BI Federal Regulation
     349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
      349Bk60.50 Pleading
       349Bk60.51 In General
        349Bk60.51(2) k. Scienter. Most Cited Cases

Allegations in investors' complaint, regarding accounting firm's violation of generally accepted auditing standards (GAAS) in failing to properly test outdated valuation models upon which bank relied in valuing mortgage-based assets which comprised one-third of its total assets and in ignoring significant red flags that should have put conscientious auditor on notice that models did

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

not account for adverse changes in housing and subprime mortgage markets, and regarding firm's failure to account for and disclose loss contingencies regarding bank's related party loan transactions, sufficiently pled firm's reckless disregard of duties that it owed as auditor in issuing "clean opinion" on bank to support inference of scienter, of kind required to state a securities fraud claim against firm. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[43] Accountants 11A** ⚷**9**

11A Accountants
  11Ak9 k. Duties and liabilities to third persons. Most Cited Cases

By certifying public reports that collectively depict a corporation's financial status, independent auditor assumes a public responsibility transcending any employment relationship with client.

**[44] Accountants 11A** ⚷**9**

11A Accountants
  11Ak9 k. Duties and liabilities to third persons. Most Cited Cases

Independent certified public accountant cannot be content with corporation's representations that its financial statements are adequate; auditor is ethically and professionally obligated to ascertain for himself as far as possible whether corporation's financial statements have been accurately stated.

**[45] Securities Regulation 349B** ⚷**60.51(2)**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.50 Pleading

349Bk60.51 In General
  349Bk60.51(2) k. Scienter. Most Cited Cases

While size of fraud alone does not create inference of scienter, of kind required to state securities fraud claim against auditor for false statements or certifications made in connection with audit, enormous amounts at stake, coupled with detailed allegations regarding nature and extent of client's fraudulent accounting and auditor's failure to conduct a thorough and objective audit, create strong inference that auditor was reckless in not knowing that his audit opinions materially misrepresented company's financial state. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[46] Securities Regulation 349B** ⚷**60.56**

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.50 Pleading
          349Bk60.56 k. Conduct of accountants or attorneys. Most Cited Cases

To sufficiently plead materiality of false certifications that accounting firm made in "clean opinions" that it issued in connection with its audit of bank, securities fraud plaintiffs did not have to quantify the extent to which bank's asset values were overstated as result of outdated valuation models that it used to value its mortgage-backed assets or as result of bank's failure to timely write down value of collateral which had become worthless as result of subprime mortgage crisis; it was enough that plaintiffs alleged that misstatements related to bank's risk exposure and asset values, two pieces of information which investors would find material, and that misstatements purportedly led to bank's collapse when truth regarding its asset values and risk exposure were made public. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

**[47]** Securities Regulation 349B ⊷60.47

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.43 Grounds of and Defenses to Liability
          349Bk60.47 k. Causation; existence of injury. Most Cited Cases

In securities fraud action against accounting firm for false statements and certifications allegedly made in connection with its audit of bank which, despite "clean opinions" from firm, had allegedly grossly overstated value of its mortgage-backed assets and understated its risk exposure, neither a restatement of financial statements nor an admission of wrongdoing was necessary in order to establish requisite loss causation. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[48]** Securities Regulation 349B ⊷60.56

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.50 Pleading
          349Bk60.56 k. Conduct of accountants or attorneys. Most Cited Cases

For investors to survive motion to dismiss their securities fraud claims against accounting firm that had conducted audit of bank and failed to discover alleged flaws in valuation models used by bank to value its mortgage-based assets, it was not necessary for investors to "disentangle" or apportion losses which resulted from firm's misstatements and false certifications regarding accuracy of bank's financial statements and those losses that resulted from wider market downturn. Securities Exchange Act of 1934,

§ 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[49]** Securities Regulation 349B ⊷60.47

349B Securities Regulation
  349BI Federal Regulation
    349BI(C) Trading and Markets
      349BI(C)7 Fraud and Manipulation
        349Bk60.43 Grounds of and Defenses to Liability
          349Bk60.47 k. Causation; existence of injury. Most Cited Cases

Investors' securities fraud complaint against accounting firm that issued "clean opinions" on which they allegedly relied in purchasing bank's stock sufficiently alleged requisite loss causation by identifying risks that were concealed by firm's false audit opinions and the losses suffered when those risks materialized. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b-5.

**[50]** **Corporations and Business Organizations 101** ⊷2030

101 Corporations and Business Organizations
  101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
    101VIII(A) In General
      101k2027 Persons Entitled to Sue or Defend; Standing
        101k2030 k. Time of stock ownership in general. Most Cited Cases
    (Formerly 101k207)

Delaware's "continuous ownership" rule requires that shareholder-plaintiff own stock in corporation continuously, from time of alleged wrong until termination of litigation, in order to assert a single derivative claim under Delaware law.

**[51]** **Corporations and Business Organizations 101**

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

🔑**2031**

101 Corporations and Business Organizations
   101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
      101VIII(A) In General
         101k2027 Persons Entitled to Sue or Defend; Standing
            101k2031 k. Effect of merger, acquisition, reorganization, or dissolution. Most Cited Cases
    (Formerly 101k207)

Under fraud exception to "continuous ownership" rule, Delaware courts will not dismiss a single derivative action brought by former shareholder of corporation that has ceased to exist as result of merger, upon ground that, due to merger, shareholder no longer holds stock in the corporation, if merger was perpetrated merely to deprive shareholders of standing to bring derivative action.

**[52] Corporations and Business Organizations 101** 🔑**2048**

101 Corporations and Business Organizations
   101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
      101VIII(A) In General
      101k2045 Pleading
         101k2048 k. Allegations as to interest of or injury to plaintiff. Most Cited Cases
    (Formerly 101k211(2))

Fraud exception to Delaware's "continuous ownership" rule is narrow one, which must be pled with particularized facts in order for one who, as result of merger, is no longer a shareholder in corporation to pursue a single derivative claim.

**[53] Corporations and Business Organizations 101** 🔑**2081**

101 Corporations and Business Organizations

101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
   101VIII(B) Derivative Actions by Shareholders Against Directors, Officers, or Agents
      101k2077 Persons Entitled to Sue or Defend; Standing
         101k2081 k. Effect of merger, acquisition, reorganization, or dissolution. Most Cited Cases
    (Formerly 101k320(4))

Allegation that, in connection with merger which eliminated shareholders' interest in the acquired corporation and thus their standing to pursue a single derivative action against its former officers and directors, acquiring company paid an allegedly insufficient price and entered into agreement to indemnify these officers and directors was insufficient, without more, to invoke fraud exception to Delaware's "continuous ownership" rule, so as to allow shareholders to pursue their derivative action even after merger.

**[54] Corporations and Business Organizations 101** 🔑**2031**

101 Corporations and Business Organizations
   101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
      101VIII(A) In General
         101k2027 Persons Entitled to Sue or Defend; Standing
            101k2031 k. Effect of merger, acquisition, reorganization, or dissolution. Most Cited Cases
    (Formerly 101k207)

Under Delaware law, once one company acquires another company, the acquiror/parent obtains right to bring suit on behalf of the acquired company, meaning that shareholder of acquiring company obtains ability to bring such a suit double derivatively.

**[55] Corporations and Business Organizations 101** 🔑**2097**

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

101 Corporations and Business Organizations
   101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
      101VIII(B) Derivative Actions by Shareholders Against Directors, Officers, or Agents
         101k2095 Pleading
            101k2097 k. Allegations as to corporate right of action. Most Cited Cases
      (Formerly 101k320(8))

While it appeared that shareholders who had lost their interest in an acquired corporation as result of its being merged into an acquiring corporation, as stockholders in this acquiring corporation at time their derivative complaint was filed, had ability under Delaware law to pursue a double derivative action against former officers and directors of this acquired company, their failure to sufficiently allege how the acquiring corporation was harmed by former officers' and directors' alleged misconduct, in entering into commitments that foreclosed sale of the acquired corporation's stock other than to the acquiring corporation, with result that sale was conducted at allegedly inadequate price, prevented them from stating viable double derivative claim.

**[56]  Corporations  and  Business  Organizations  101**
🔑 **2028**

101 Corporations and Business Organizations
   101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
      101VIII(A) In General
         101k2027 Persons Entitled to Sue or Defend; Standing
            101k2028 k. In general. Most Cited Cases
      (Formerly 101k207)

Double derivative suit is based upon injury suffered indirectly by parent corporation, in which plaintiff-shareholder does have interest, as result of injury to subsidiary.

**[57]  Corporations  and  Business  Organizations  101**
🔑 **2023**

101 Corporations and Business Organizations
   101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
      101VIII(A) In General
         101k2022 Nature and Form of Remedy
            101k2023 k. In general. Most Cited Cases
      (Formerly 101k202)

It is fundamental requirement of a double derivative suit under Delaware law that injury to subsidiary must also cause injury to corporate parent, in which plaintiff-shareholder holds stock.

**[58]  Corporations  and  Business  Organizations  101**
🔑 **2087**

101 Corporations and Business Organizations
   101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
      101VIII(B) Derivative Actions by Shareholders Against Directors, Officers, or Agents
         101k2085 Demanding Action and Refusal of Corporation, Directors, or Officers to Act
            101k2087 k. Necessity of demand. Most Cited Cases

**Corporations  and  Business  Organizations  101**
🔑 **2101**

101 Corporations and Business Organizations
   101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
      101VIII(B) Derivative Actions by Shareholders Against Directors, Officers, or Agents
         101k2095 Pleading
            101k2101 k. Allegations of excuse for failure to demand; futility. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Under Delaware law, shareholders who had lost their interest in acquired corporation as result of its being merged into acquiring corporation could not pursue double derivative action against former officers and directors of the acquired company without first making demand on board of directors of the acquiring corporation or alleging why such a demand would be futile, something which they failed to do simply by alleging that two of twelve directors on acquiring company's board had "significant ties" with former officers and directors of the acquired company, that acquiring company had agreed to indemnify former officers and directors of acquired company, or that shareholders' claims, based on officers' and directors' alleged misconduct in tying the acquired corporation to sale of its stock to acquiring company, with result that allegedly inadequate price was obtained, would require acquiring company to admit that it had underpaid for the acquired company's stock; derivative complaint did not accuse directors of acquiring company of any misconduct, and they were independent of allegedly misbehaving officers and directors.

**[59]** **Corporations and Business Organizations 101**
⊶2037

101 Corporations and Business Organizations
    101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
        101VIII(A) In General
            101k2035 Demanding Action and Refusal of Corporation, Directors or Officers to Act
                101k2037 k. Necessity of demand. Most Cited Cases

**Corporations   and   Business   Organizations   101**
⊶2040(1)

101 Corporations and Business Organizations
    101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
        101VIII(A) In General
            101k2035 Demanding Action and Refusal of

Corporation, Directors or Officers to Act
                101k2040 Excuse for Failure to Demand; Futility
                    101k2040(1) k. In general. Most Cited Cases

Before asserting shareholder derivative claim under Delaware law, shareholder must either: (1) make pre-suit demand, presenting allegations to corporation's directors and requesting that they bring suit; or (2) plead facts showing that such a demand upon corporate board would have been futile.

**[60]** **Corporations and Business Organizations 101**
⊶2040(1)

101 Corporations and Business Organizations
    101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
        101VIII(A) In General
            101k2035 Demanding Action and Refusal of Corporation, Directors or Officers to Act
                101k2040 Excuse for Failure to Demand; Futility
                    101k2040(1) k. In general. Most Cited Cases
        (Formerly 101k206(4))

Under Delaware law, shareholder-plaintiff need not make a demand on corporation's board of directors prior to bringing derivative action where he alleges facts demonstrating that demand would have been futile.

**[61]** **Corporations and Business Organizations 101**
⊶2087

101 Corporations and Business Organizations
    101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
        101VIII(B) Derivative Actions by Shareholders Against Directors, Officers, or Agents
            101k2085 Demanding Action and Refusal of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Corporation, Directors, or Officers to Act
        101k2087 k. Necessity of demand. Most Cited Cases

**Corporations   and   Business   Organizations   101**
**⌇2090(1)**

101 Corporations and Business Organizations
    101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
        101VIII(B) Derivative Actions by Shareholders Against Directors, Officers, or Agents
            101k2085 Demanding Action and Refusal of Corporation, Directors, or Officers to Act
                101k2090 Excuse for Failure to Demand; Futility
                    101k2090(1) k. In general. Most Cited Cases

    Under Delaware law, in order to double derivative action against officers or directors of subsidiary of corporation in which he owns stock, shareholder-plaintiff must plead demand futility, or make pre-suit demand, only at the parent level.

**[62]  Corporations  and  Business  Organizations  101**
**⌇2051**

101 Corporations and Business Organizations
    101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
        101VIII(A) In General
            101k2045 Pleading
                101k2051 k. Allegations of excuse for failure to demand; futility. Most Cited Cases
        (Formerly 101k211(5))

    Shareholder-plaintiff who has failed to make any demand on corporation's board of directors prior to commencing derivative action must plead facts with particularity showing that demand would have been futile.

**[63]  Corporations  and  Business  Organizations  101**
**⌇2051**

101 Corporations and Business Organizations
    101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
        101VIII(A) In General
            101k2045 Pleading
                101k2051 k. Allegations of excuse for failure to demand; futility. Most Cited Cases

**Corporations   and   Business   Organizations   101**
**⌇2101**

101 Corporations and Business Organizations
    101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
        101VIII(B) Derivative Actions by Shareholders Against Directors, Officers, or Agents
            101k2095 Pleading
                101k2101 k. Allegations of excuse for failure to demand; futility. Most Cited Cases

    To plead futility of pre-suit demand with requisite particularity, shareholder commencing derivative action must provide particularized allegations raising a reasonable doubt as to whether: (1) a majority of directors were disinterested and independent, or (2) where specific decision of board is challenged, that the decision was product of valid exercise of business judgment.

**[64]  Corporations  and  Business  Organizations  101**
**⌇2051**

101 Corporations and Business Organizations
    101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
        101VIII(A) In General
            101k2045 Pleading
                101k2051 k. Allegations of excuse for failure to demand; futility. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

**Corporations and Business Organizations 101** ⟜**2101**

101 Corporations and Business Organizations
   101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
      101VIII(B) Derivative Actions by Shareholders Against Directors, Officers, or Agents
      101k2095 Pleading
         101k2101 k. Allegations of excuse for failure to demand; futility. Most Cited Cases

In order to establish that a demand on corporation's board of directors should be excused as futile, shareholder filing derivative action may allege facts that create reasonable doubt that majority of the board would be disinterested or independent in making decision on such a demand: specific factual allegations that a director faces substantial likelihood of liability may establish such a reasonable doubt, as may allegation of facts supporting a reasonable inference that director is so beholden to an interested party that his discretion would be sterilized.

**[65] Corporations and Business Organizations 101** ⟜**2040(1)**

101 Corporations and Business Organizations
   101VIII Derivative Actions; Suing or Defending on Behalf of Corporation
      101VIII(A) In General
      101k2035 Demanding Action and Refusal of Corporation, Directors or Officers to Act
         101k2040 Excuse for Failure to Demand; Futility
           101k2040(1) k. In general. Most Cited Cases
      (Formerly 101k206(4))

Shareholder-plaintiff is not required to prove success on merits in order to show, for purposes of pursuing derivative suit in absence of pre-suit demand upon corporation's board of directors, that such a demand would have been futile.

**[66] Judgment 228** ⟜**584**

228 Judgment
   228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
      228k584 k. Nature and elements of bar or estoppel by former adjudication. Most Cited Cases

Res judicata gives binding effect to judgment of court of competent jurisdiction and prevents parties to action, and those in privity with them, from subsequently relitigating any questions that were necessarily decided therein.

**[67] Judgment 228** ⟜**587**

228 Judgment
   228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
      228k587 k. Theory of action or recovery. Most Cited Cases

**Judgment 228** ⟜**589(1)**

228 Judgment
   228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded
      228k589 Nature and Form of Remedy
         228k589(1) k. In general. Most Cited Cases

Under New York law, once claim is brought to a final conclusion, all other claims arising out of same transaction or series of transactions are barred, even if based on different theories or if seeking a different remedy.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

**[68]** Judgment 228 ☞569

228 Judgment
   228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(A) Judgments Operative as Bar
      228k569 k. Judgment on motion or summary proceeding in general. Most Cited Cases

    Under New York law, summary judgment dismissal is considered a "decision on the merits," for res judicata purposes.

**[69]** Judgment 228 ☞580

228 Judgment
   228XIII Merger and Bar of Causes of Action and Defenses
      228XIII(A) Judgments Operative as Bar
      228k580 k. Pendency of appeal. Most Cited Cases

    Under New York law, judgment entered by trial court is "final," for purposes of res judicata, even though appeal is pending from trial court's judgment.

**[70]** Judgment 228 ☞828.14(8)

228 Judgment
   228XVII Foreign Judgments
      228k828 Effect of Judgments of State Courts in United States Courts
      228k828.14 Persons Concluded
      228k828.14(8) k. Represented parties; class actions. Most Cited Cases

Judgment 228 ☞828.22

228 Judgment
   228XVII Foreign Judgments

      228k828 Effect of Judgments of State Courts in United States Courts
      228k828.22 k. Pleading, evidence and enforcement. Most Cited Cases

    Shareholder class upon whose behalf a federal cause of action was brought challenging the adequacy of consideration paid in connection with merger, which included shareholders who had previously appeared as plaintiffs in prior New York state court action that likewise challenged adequacy of payment made by acquiring corporation in connection with merger, had to be regarded as standing in privity with these earlier state court plaintiffs, for res judicata purposes, where class representatives did not challenge defendants' contention that they should be deemed to have authorized plaintiffs in the New York state court action to litigate on their behalf.

**[71]** Judgment 228 ☞675(1)

228 Judgment
   228XIV Conclusiveness of Adjudication
      228XIV(B) Persons Concluded
      228k675 Persons Participating in or Promoting Action or Defense
      228k675(1) k. In general. Most Cited Cases

Judgment 228 ☞677

228 Judgment
   228XIV Conclusiveness of Adjudication
      228XIV(B) Persons Concluded
      228k677 k. Persons represented by parties. Most Cited Cases

Judgment 228 ☞681

228 Judgment
   228XIV Conclusiveness of Adjudication
      228XIV(B) Persons Concluded
      228k681 k. Successive estates or interests. Most Cited Cases

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

**Judgment 228 ☞704**

228 Judgment
   228XIV Conclusiveness of Adjudication
     228XIV(B) Persons Concluded
       228k704 k. Coplaintiffs or codefendants. Most Cited Cases

"Privity" of parties, of kind required under New York law for prior judgment to have res judicata effect, extends to parties who are successors to a property interest, to those who control action though not formal parties to it, and to those whose interests are represented by party to prior action, and possibly co-parties to prior action.

**[72] Judgment 228 ☞678(1)**

228 Judgment
   228XIV Conclusiveness of Adjudication
     228XIV(B) Persons Concluded
      228k678 Privity in General
       228k678(1) k. In general. Most Cited Cases

Under New York law, there is no bright line rule for determining when parties are in privity, for res judicata purposes; rather, privity is legal determination for trial court as to whether relationship between parties is sufficiently close to support claim preclusion.

**[73] Judgment 228 ☞677**

228 Judgment
   228XIV Conclusiveness of Adjudication
     228XIV(B) Persons Concluded
      228k677 k. Persons represented by parties. Most Cited Cases

It is general rule of New York law that, if interests of non-party are represented by party to litigation who is vested with authority of representation, non-party may be bound by judgment.

**[74] Judgment 228 ☞828.9(1)**

228 Judgment
   228XVII Foreign Judgments
     228k828 Effect of Judgments of State Courts in United States Courts
      228k828.9 Nature of Judgment
       228k828.9(1) k. In general. Most Cited Cases

**Judgment 228 ☞828.15(1)**

228 Judgment
   228XVII Foreign Judgments
     228k828 Effect of Judgments of State Courts in United States Courts
      228k828.15 Identity of Cause of Action or Relief Sought
       228k828.15(1) k. In general. Most Cited Cases

Federal class action that challenged adequacy of consideration paid for acquired company's stock in connection with its merger into acquiring company involved same claim as earlier state court suit brought by former shareholders of acquired company against officers and directors who, by allegedly tying company to sale of its stock only to the acquiring corporation, caused state court plaintiffs to receive inadequate consideration for their stock, though federal action included bad faith claim that was not aggressively pursued in state litigation, as well as previously unraised claim of unjust enrichment and more detailed allegations of self-dealing; accordingly, state court's grant of summary judgment was res judicata and prevented class representatives from pursuing cause of action based on alleged inadequacy of merger price in federal action.

**[75] Judgment 228 ☞585(2)**

228 Judgment

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

228XIII Merger and Bar of Causes of Action and Defenses

228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded

228k585 Identity of Cause of Action in General

228k585(2) k. What constitutes identical causes. Most Cited Cases

**Judgment 228 ☞587**

228 Judgment

228XIII Merger and Bar of Causes of Action and Defenses

228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded

228k587 k. Theory of action or recovery. Most Cited Cases

**Judgment 228 ☞589(1)**

228 Judgment

228XIII Merger and Bar of Causes of Action and Defenses

228XIII(B) Causes of Action and Defenses Merged, Barred, or Concluded

228k589 Nature and Form of Remedy

228k589(1) k. In general. Most Cited Cases

Under New York law, claim is the "same" as claim adjudicated in prior action, for res judicata purposes, when it arises from same set of facts and seeks the same remedy, despite the different legal theories advanced, or when it arises out of same transaction or series of transactions.

**[76] Judgment 228 ☞634**

228 Judgment

228XIV Conclusiveness of Adjudication

228XIV(A) Judgments Conclusive in General

228k634 k. Nature and requisites of former adjudication as ground of estoppel in general. Most Cited Cases

Doctrine of collateral estoppel may be invoked when issue of law or fact in subsequent proceeding has been litigated and determined by valid and final judgment.

**[77] Federal Courts 170B ☞3045(6)**

170B Federal Courts

170BXV State or Federal Laws as Rules of Decision; Erie Doctrine

170BXV(B) Application to Particular Matters

170Bk3022 Procedural Matters

170Bk3045 Judgment; Orders

170Bk3045(6) k. Conclusiveness; res judicata and collateral estoppel. Most Cited Cases

(Formerly 170Bk420)

New York state law applied in determining collateral estoppel effect in federal court of prior New York state court judgment.

**[78] Judgment 228 ☞713(1)**

228 Judgment

228XIV Conclusiveness of Adjudication

228XIV(C) Matters Concluded

228k713 Scope and Extent of Estoppel in General

228k713(1) k. In general. Most Cited Cases

**Judgment 228 ☞715(1)**

228 Judgment

228XIV Conclusiveness of Adjudication

228XIV(C) Matters Concluded

228k715 Identity of Issues, in General

228k715(1) k. In general. Most Cited Cases

**Judgment 228 ☞724**

228 Judgment

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

228XIV Conclusiveness of Adjudication
228XIV(C) Matters Concluded
228k723 Essentials of Adjudication
228k724 k. In general. Most Cited Cases

Under New York law, collateral estoppel may be invoked to preclude a party from raising an issue: (1) identical to issue already decided, (2) in previous proceeding in which that party had full and fair opportunity to litigate, (3) when the issue that was raised previously is decisive of present action.

**[79] Judgment 228 ⬤═475828.9(1)**

228 Judgment
228XVII Foreign Judgments
228k828 Effect of Judgments of State Courts in United States Courts
228k828.9 Nature of Judgment
228k828.9(1) k. In general. Most Cited Cases

**Judgment 228 ⬤═475828.16(1)**

228 Judgment
228XVII Foreign Judgments
228k828 Effect of Judgments of State Courts in United States Courts
228k828.16 Issues or Questions Presented
228k828.16(1) k. In general. Most Cited Cases

Prior determination by New York state court judge, in granting officers' and directors' motion for summary judgment on breach of fiduciary duty claims asserted against them, that business judgment rule protected directors' decision to approve merger of company into acquiring corporation upon terms negotiated, and that officers and directors did not act out of self-interest or violate their duties of candor or loyalty, foreclosed representatives of shareholder class, on collateral estoppel grounds, from relitigating issues decided in prior state court action.

**[80] Labor and Employment 231H ⬤═475475**

231H Labor and Employment
231HVII Pension and Benefit Plans
231HVII(C) Fiduciaries and Trustees
231Hk475 k. Duties in general. Most Cited Cases

To state claim for breach of fiduciary duty under ERISA, plaintiff must at minimum allege: (1) that defendant was fiduciary who, (2) was acting within his capacity as fiduciary, and (3) breached his fiduciary duty. Employee Retirement Income Security Act of 1974, § 409, 29 U.S.C.A. § 1109.

**[81] Labor and Employment 231H ⬤═475473**

231H Labor and Employment
231HVII Pension and Benefit Plans
231HVII(C) Fiduciaries and Trustees
231Hk472 What Activities Are in Fiduciary Capacity
231Hk473 k. In general. Most Cited Cases

Threshold question in every action alleging breach of an ERISA fiduciary duty is whether defendant was acting as fiduciary when taking the action subject to complaint. Employee Retirement Income Security Act of 1974, § 409, 29 U.S.C.A. § 1109.

**[82] Labor and Employment 231H ⬤═475475**

231H Labor and Employment
231HVII Pension and Benefit Plans
231HVII(C) Fiduciaries and Trustees
231Hk475 k. Duties in general. Most Cited Cases

ERISA liability arises only from actions taken or duties breached in performance of ERISA obligations. Em-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

ployee Retirement Income Security Act of 1974, § 409, 29 U.S.C.A. § 1109.


**[83] Labor and Employment 231H** ⚞⚟**657**

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(K) Actions
        231HVII(K)3 Actions to Enforce Statutory or Fiduciary Duties
            231Hk657 k. Questions of law or fact. Most Cited Cases


Fiduciary status can be determined as matter of law at motion to dismiss stage based on allegations in ERISA complaint. Employee Retirement Income Security Act of 1974, § 409, 29 U.S.C.A. § 1109.


**[84] Federal Civil Procedure 170A** ⚞⚟**1832**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
        170AXI(B)5 Proceedings
        170Ak1827 Determination
            170Ak1832 k. Matters considered in general. Most Cited Cases


On motion to dismiss claims asserted by participants in corporation's employee stock ownership plan (ESOP) against corporate officers and directors for alleged breach of their fiduciary duties under ERISA, district court could consider plan documents, where these documents were integral to complaint and were specifically referenced therein. Employee Retirement Income Security Act of 1974, § 409, 29 U.S.C.A. § 1109.


**[85] Labor and Employment 231H** ⚞⚟**461**

231H Labor and Employment
    231HVII Pension and Benefit Plans

        231HVII(C) Fiduciaries and Trustees
        231Hk460 Who Are Fiduciaries
            231Hk461 k. In general. Most Cited Cases


**Labor and Employment 231H** ⚞⚟**491(2)**

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(C) Fiduciaries and Trustees
        231Hk487 Investments and Expenditures
        231Hk491 Investments in Securities or Property of Sponsor
            231Hk491(2) k. Employee stock ownership plans. Most Cited Cases


Mere fact that employee stock ownership plan (ESOP) committee was named as plan administrator in plan agreement did not make it an ERISA fiduciary for all purposes, and where committee had no authority to diversify or divest plan assets, such authority having been granted exclusively to individual participants in plan, it could not be held liable for failing to take such action in order to protect plan participants from precipitous decline in value of company's stock. Employee Retirement Income Security Act of 1974, § 409, 29 U.S.C.A. § 1109.


**[86] Labor and Employment 231H** ⚞⚟**491(2)**

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(C) Fiduciaries and Trustees
        231Hk487 Investments and Expenditures
        231Hk491 Investments in Securities or Property of Sponsor
            231Hk491(2) k. Employee stock ownership plans. Most Cited Cases


Even assuming that employer's ability to make contributions to employee stock ownership plan (ESOP) in either cash or stock established that it was plan fiduciary, its ability to make contributions to plan did not render it a fiduciary responsible for unrelated duty of divesting plan

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

of its ownership of employer's stock prior to precipitous decline in value thereof, and no breach fiduciary of fiduciary duty claim could be pursued against employer based on plan's failure to divest, especially where, pursuant to plan documents, authority to divest belonged exclusively to plan participants. Employee Retirement Income Security Act of 1974, § 409, 29 U.S.C.A. § 1109.

**[87] Labor and Employment 231H ⟳461**

231H Labor and Employment
  231HVII Pension and Benefit Plans
    231HVII(C) Fiduciaries and Trustees
      231Hk460 Who Are Fiduciaries
        231Hk461 k. In general. Most Cited Cases

    Employer cannot be a de facto administrator of an ERISA benefit plan, where employer has named plan administrator. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[88] Labor and Employment 231H ⟳491(2)**

231H Labor and Employment
  231HVII Pension and Benefit Plans
    231HVII(C) Fiduciaries and Trustees
      231Hk487 Investments and Expenditures
        231Hk491 Investments in Securities or Property of Sponsor
          231Hk491(2) k. Employee stock ownership plans. Most Cited Cases

    *Moench* presumption arises when a fiduciary under an employee stock ownership plan (ESOP) that does not absolutely require fiduciary to invest in employer's stock nonetheless invests in such stock; under these circumstances, ESOP fiduciary is entitled to presumption that he acted consistently with ERISA by virtue of that decision. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[89] Labor and Employment 231H ⟳491(2)**

231H Labor and Employment
  231HVII Pension and Benefit Plans
    231HVII(C) Fiduciaries and Trustees
      231Hk487 Investments and Expenditures
        231Hk491 Investments in Securities or Property of Sponsor
          231Hk491(2) k. Employee stock ownership plans. Most Cited Cases

    *Moench* presumption, that fiduciary under employee stock ownership plan (ESOP) has acted consistently with ERISA by using plan assets to invest in employer's stock, even though plan does not absolutely require him to purchase only employer's stock, may overcome by establishing that fiduciary abused his discretion by investing in employer securities. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[90] Labor and Employment 231H ⟳649**

231H Labor and Employment
  231HVII Pension and Benefit Plans
    231HVII(K) Actions
      231HVII(K)3 Actions to Enforce Statutory or Fiduciary Duties
        231Hk649 k. Pleading. Most Cited Cases

    In order to overcome the *Moench* presumption that fiduciaries of employee stock ownership plan (ESOP) had acted in manner consistent with their fiduciary duties under ERISA by investing in employer's stock, and to preclude dismissal of complaint premised on fiduciaries' failure to divest plan's holdings of employer's stock before stock declined precipitously in value, ESOP participants had to allege that fiduciaries could not have reasonably believed that continued adherence to the ESOP's direction was in keeping with settlor's expectations as to how prudent fiduciaries would operate. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

**[91] Labor and Employment 231H ⬯491(2)**

231H Labor and Employment
   231HVII Pension and Benefit Plans
      231HVII(C) Fiduciaries and Trustees
         231Hk487 Investments and Expenditures
            231Hk491 Investments in Securities or Property of Sponsor
               231Hk491(2) k. Employee stock ownership plans. Most Cited Cases

**Labor and Employment 231H ⬯649**

231H Labor and Employment
   231HVII Pension and Benefit Plans
      231HVII(K) Actions
         231HVII(K)3 Actions to Enforce Statutory or Fiduciary Duties
            231Hk649 k. Pleading. Most Cited Cases

*Moench* presumption, that fiduciary under employee stock ownership plan (ESOP) has acted consistently with ERISA by using plan assets to invest in employer's stock, even though plan does not absolutely require him to purchase only employer's stock, is a substantial shield, which requires a plaintiff asserting claim against ESOP fiduciaries for failing to divest plan of its holdings of employer's stock to plead persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest, and not merely that defendants were aware of circumstances that might impair value of company stock. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[92] Labor and Employment 231H ⬯649**

231H Labor and Employment
   231HVII Pension and Benefit Plans
      231HVII(K) Actions
         231HVII(K)3 Actions to Enforce Statutory or Fiduciary Duties

231Hk649 k. Pleading. Most Cited Cases

When *Moench* presumption applies, to establish rebuttable bar to pursuit of breach of fiduciary duty claim against administrator of employee stock ownership plan (ESOP) for using plan assets to invest in employer's stock, it can be overcome only by allegations that company stock was at risk of being rendered effectively worthless. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[93] Labor and Employment 231H ⬯649**

231H Labor and Employment
   231HVII Pension and Benefit Plans
      231HVII(K) Actions
         231HVII(K)3 Actions to Enforce Statutory or Fiduciary Duties
            231Hk649 k. Pleading. Most Cited Cases

Allegations in complaint filed by participants in employee stock ownership plan (ESOP) against plan administrator and other alleged fiduciaries thereof, for not seeing that plan divested itself of its holdings of employer's stock prior to collapse of stock's price when full extent of employer's risk exposure due to decline in housing and subprime mortgage markets was made public, did not sufficiently allege facts suggesting to reasonable fiduciary that company stock was at risk of becoming worthless, as opposed to facts suggesting that plan fiduciaries, due to their inside information regarding company's business, were aware of circumstances that might impair value of company stock, and were insufficient to overcome *Moench* presumption that plan fiduciaries had properly fulfilled their duties under ERISA in not divesting; while, as more information about employer's business was revealed, stock lost vast majority of its value, stock did not in fact become worthless, but was eventually sold, as part of merger, for $10 per share. Employee Retirement Income Security Act of 1974, § 409, 29 U.S.C.A. § 1109.

**[94] Labor and Employment 231H ⬯491(2)**

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

231H Labor and Employment
   231HVII Pension and Benefit Plans
     231HVII(C) Fiduciaries and Trustees
      231Hk487 Investments and Expenditures
        231Hk491 Investments in Securities or
Property of Sponsor
          231Hk491(2) k. Employee stock owner-
ship plans. Most Cited Cases

    While, to extent that fiduciaries of employee stock
ownership plan (ESOP) chose to communicate information
to plan participants, they had duty to do so truthfully,
ESOP fiduciaries had no fiduciary duty under ERISA
to advise plan participants of employer's precarious financial
condition, though this directly impacted value of employer
stock held by plan participants; requiring ESOP fiduciaries
to keep plan participants advised of employer's financial
condition would transform them into investment advisors,
despite fact that they had no duty to give investment ad-
vice. Employee Retirement Income Security Act of 1974, §
409, 29 U.S.C.A. § 1109.

**[95] Labor and Employment 231H ⚷482**

231H Labor and Employment
   231HVII Pension and Benefit Plans
     231HVII(C) Fiduciaries and Trustees
      231Hk479 Notice and Disclosure Requirements
        231Hk482 k. Misrepresentations or omis-
sions in general. Most Cited Cases

    When ERISA fiduciary voluntarily discloses infor-
mation to plan participants, ERISA mandates that such
disclosures are to be truthful. Employee Retirement In-
come Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001
et seq.

**[96] Labor and Employment 231H ⚷482**

231H Labor and Employment
   231HVII Pension and Benefit Plans

231HVII(C) Fiduciaries and Trustees
     231Hk479 Notice and Disclosure Requirements
      231Hk482 k. Misrepresentations or omis-
sions in general. Most Cited Cases

    Statements which bank's directors and executive
committee members made in filings with the Securities and
Exchange Commission (SEC) or in press releases, re-
garding impact of housing and subprime mortgage crisis
on value of bank's mortgage-backed assets and regarding
bank's rumored liquidity problems, were made in their
capacity as representatives of bank, and not as fiduciaries
of its employee stock ownership plan (ESOP), and did not
trigger fiduciary duty on part of directors and executive
committee members to plan participants to make sure that
any such statements were truthful, where plan agreement
established ESOP committee as plan administrator re-
sponsible for general operation of plan. Employee Re-
tirement Income Security Act of 1974, § 409, 29 U.S.C.A.
§ 1109.

**[97] Labor and Employment 231H ⚷486**

231H Labor and Employment
   231HVII Pension and Benefit Plans
     231HVII(C) Fiduciaries and Trustees
      231Hk486 k. Conflicts of interest in general.
Most Cited Cases

    Adequate claim for breach of fiduciary duty of loyalty
was necessary predicate for claim alleging conflicts of
interest on part of ERISA fiduciaries; absent any valid
claim for breach of duty of loyalty, allegations that ERISA
fiduciaries had placed themselves into a conflict situation
were not independently actionable. Employee Retirement
Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. §
1001 et seq.

**[98] Labor and Employment 231H ⚷475**

231H Labor and Employment
   231HVII Pension and Benefit Plans

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

231HVII(C) Fiduciaries and Trustees
231Hk475 k. Duties in general. Most Cited Cases

**Labor and Employment 231H** ⚷**486**

231H Labor and Employment
231HVII Pension and Benefit Plans
231HVII(C) Fiduciaries and Trustees
231Hk486 k. Conflicts of interest in general. Most Cited Cases

While ERISA fiduciary must discharge his duties with respect to plan solely in interest of plan participants and beneficiaries, fiduciary may have financial interests adverse to beneficiaries and may act in ways that harm beneficiaries when not acting in his fiduciary role. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[99] Labor and Employment 231H** ⚷**491(2)**

231H Labor and Employment
231HVII Pension and Benefit Plans
231HVII(C) Fiduciaries and Trustees
231Hk487 Investments and Expenditures
231Hk491 Investments in Securities or Property of Sponsor
231Hk491(2) k. Employee stock ownership plans. Most Cited Cases

Mere fact that fiduciaries of employee stock ownership plan (ESOP) also held equity interests in employer did not give rise to any conflict of interest, such as might support cause of action against them for breach of duty of loyalty to plan participants and beneficiaries in causing plan to invest in employer's stock and in not divesting these stock holdings before stock precipitously declined in value; if company stock ownership or compensation through company stock alone presented conflict of interests, ERISA's statutory scheme allowing company officers and directors, who were often stock holders and were com-

pensated with stock, to serve as fiduciaries would be contradictory. Employee Retirement Income Security Act of 1974, § 408(c)(3), 29 U.S.C.A. § 1108(c)(3).

**[100] Labor and Employment 231H** ⚷**475**

231H Labor and Employment
231HVII Pension and Benefit Plans
231HVII(C) Fiduciaries and Trustees
231Hk475 k. Duties in general. Most Cited Cases

ERISA claim for breach of duty to monitor required antecedent fiduciary breach to be viable, such that, where participants in employee stock ownership plan (ESOP) failed to state viable breach of fiduciary duty claim, their failure to monitor claim had to be dismissed as well. Employee Retirement Income Security Act of 1974, § 409, 29 U.S.C.A. § 1109.

**[101] Labor and Employment 231H** ⚷**497**

231H Labor and Employment
231HVII Pension and Benefit Plans
231HVII(C) Fiduciaries and Trustees
231Hk495 Persons Liable
231Hk497 k. Co-fiduciaries; successor fiduciaries. Most Cited Cases

ERISA claim for co-fiduciary liability required antecedent breach of fiduciary duty by co-fiduciaries to be viable, so that, where participants in employee stock ownership plan (ESOP) failed to state viable breach of fiduciary duty claim, their claim for co-fiduciary liability had to be dismissed as well. Employee Retirement Income Security Act of 1974, § 409, 29 U.S.C.A. § 1109.

**[102] Federal Civil Procedure 170A** ⚷**1101**

170A Federal Civil Procedure
170AVII Pleadings

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

170AVII(N) Striking Pleading or Matter Therein
170Ak1101 k. In general. Most Cited Cases

Motion to dismiss was not a "pleading," within meaning of Federal Rule of Civil Procedure that authorized the filing of motion to strike any insufficient defense, or any redundant, immaterial, impertinent or scandalous material, from "pleading." Fed.Rules Civ.Proc.Rules 7(a), 12(f), 28 U.S.C.A.

**[103] Federal Civil Procedure 170A ⟨⟩1832**

170A Federal Civil Procedure
170AXI Dismissal
170AXI(B) Involuntary Dismissal
170AXI(B)5 Proceedings
170Ak1827 Determination
170Ak1832 k. Matters considered in general. Most Cited Cases

Allegedly extraneous documents attached to defendants' motions to dismiss securities complaint against them, inasmuch as they consisted of Securities and Exchange Commission (SEC) filings, general news articles, several journal and industry reports, Congressional testimony and speeches, and other documents of which court could take judicial notice for information that they contained, without accepting documents for truth of the matters asserted therein, would not be stricken in exercise of court's inherent authority to strike any filed paper which it determined to be abusive or otherwise improper.

**[104] Evidence 157 ⟨⟩11**

157 Evidence
157I Judicial Notice
157k11 k. Historical facts. Most Cited Cases

**Evidence 157 ⟨⟩43(1)**

157 Evidence

157I Judicial Notice
157k43 Judicial Proceedings and Records
157k43(1) k. In general. Most Cited Cases

**Evidence 157 ⟨⟩48**

157 Evidence
157I Judicial Notice
157k48 k. Official proceedings and acts. Most Cited Cases

On motion to dismiss, courts may take judicial notice of fact that press coverage, prior lawsuits, or regulatory filings contain certain information, without regard to truth of their contents. Fed.Rules Evid.Rule 201(b), 28 U.S.C.A.

**\*439** Keller Rohrback LLP, by: David S. Preminger, Esq., New York, NY, by: Lynn L. Sarko, Esq., Derek W. Loeser, Esq., Erin M. Riley, Esq., Gretchen S. Obrist, Esq., Seattle, WA, Barroway Topaz Kessler Meltzer Check LLP, by: Joseph H. Meltzer, Esq., Edward W. Ciolko, Esq., Peter H. LeVan Jr., Esq., Shannon O. Lack, Esq., Radnor, PA, for the Securities Plaintiffs.

Dealy & Silberstein, LLP, by: Milo Silberstein, Esq., New York, NY, for the Securities Plaintiffs.

Berman Devalerio, by: Jeffrey C. Block, Esq., Patrick T. Egan, Esq., Justin Saif, Esq., Boston, MA, by: Joseph J. Tabacco, Jr., Esq., Julie J. Bai, Esq., San Francisco, CA, Labaton Sucharow LLP, by: Thomas A. Dubbs, Esq., James W. Johnson, Esq., Michael W. Stocker, Esq., New York, NY, for Lead Securities Plaintiff State of Michigan Retirement Systems.

Brower Piven, P.C., by: David A.P. Brower, Esq., New York, NY, Robbins Umeda LLP, by: Marc M. Umeda, Esq., George C. Aguilar, Esq., Shane P. Sanders, Esq., Gregory E. Del Gaizo, Esq., San Diego, CA, for the Derivative Plaintiff.

Barroway Topaz Kessler Meltzer Check LLP, by: Joseph

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

H. Meltzer, Esq., Edward W. Ciolko, Esq., Julie Siebert–Johnson, Esq., Peter H. LeVan Jr., Esq., Shannon O. Lack, Esq., Mark K. Gyandoh, Esq., James A. Maro, Jr., Esq., Radnor, PA, Keller Rohrback LLP, by: David S. Preminger, Esq., New York, NY, by: Lynn L. Sarko, Esq., Derek W. Loeser, Esq., Erin M. Riley, Esq., Gretchen S. Obrist, Esq., Seattle, WA, for the ERISA Plaintiffs.

Dealy & Silberstein, LLP, by: Milo Silberstein, Esq., New York, NY, for ERISA Plaintiffs.

Paul, Weiss, Rifkind, Wharton & Garrison LLP, by: Eric. S. Goldstein, Esq., Brad S. Karp, Esq., Lewis R. Clayton, Esq., Douglas M. Pravda, Esq., New York, NY, Steptoe & Johnson LLP, by: Paul J. Ondrasik, Jr., Esq., F. Michael Kail, Esq., Washington, DC, for Defendants The Bear Stearns Companies Inc., JPMorgan Chase & Co., Michael Minikes, Kathleen Cavallo, Stephen Lacoff, and Robert Steinberg.

Kramer Levin Naftalis & Frankel LLP, by: David S. Frankel, Esq., New York, NY, for Defendant James E. Cayne.

**\*440** Skadden, Arps, Slate, Meagher & Flom LLP, by: Jay B. Kasner, Esq., Susan Saltzstein, Esq., New York, NY, for Defendant Alan D. Schwartz.

Simpson Thacher & Bartlett LLP, by: Michael Chepiga, Esq., William T. Russell, Jr., Esq., New York, NY, for Defendant Samuel L. Molinaro, Jr.

Schulte Roth & Zabel LLP, by: Ronald Richman, Esq., Jill

L. Goldberg, Esq., New York, NY, for Defendant Alan C. Greenberg.

Wachtell, Lipton, Rosen & Katz, by: David B. Anders, Esq., Meredith L. Turner, Esq., New York, NY, for Defendant Warren J. Spector.

Greenberg Traurig, LLP, by: Richard A. Edlin, Esq., Ronald D. Lefton, Esq., New York, NY, for Defendant Jeffrey Mayer.

Gibson, Dunn & Crutcher LLP, by: Randy M. Mastro, Esq., Robert F. Serio, Esq., New York, NY, for Defendants Henry S. Bienen, Carl D. Glickman, Michael Goldstein, Donald J. Harrington, Frank T. Nickell, Paul A. Novelly, Frederic V. Salerno, Vincent Tese and Wesley S. Williams, Jr.

Wiggin & Dana LLP, by: Scott D. Corrigan, Esq., Jeffrey P. Wade, Esq., New York, NY, for Defendant Michael Alix.

Willkie Farr & Gallagher LLP, by: Michael R. Young, Esq., Antonio Yanez, Jr., Esq., New York, NY, for Defendant Jeffrey M. Farber.

Cravath, Swaine & Moore LLP, by: Max R. Shulman, Esq., New York, NY, for Defendant Deloitte & Touche LLP.

*OPINION*

SWEET, District Judge.

*TABLE OF CONTENTS*

**I. PRIOR PROCEEDINGS**                                             443

**II. THE MOTION OF THE BEAR STEARNS DEFENDANTS TO DISMISS THE SECURITIES       443
    COMPLAINT IS DENIED**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

|   |   |   |   |
|---|---|---|---|
| A. | The Parties | | 443 |
| B. | Summary of the Securities Complaint | | 444 |
| | 1. | *Bear Stearns History* | 445 |
| | 2. | *Bear Stearns Securitization* | 447 |
| | 3. | *Leveraging* | 448 |
| | 4. | *The Hedge Funds* | 448 |
| | 5. | *Valuation and Risk* | 450 |
| | 6. | *False and Misleading Statements* | 453 |
| | 7. | *Accounting Standards Violations* | 467 |
| | | **a) GAAP Overview** | 467 |
| | | **b) Fraud Risk Factors** | 468 |
| | | **c) Audit Risk Alerts** | 469 |
| | | **d) Internal Controls** | 470 |
| | | **e) Financial Statements** | 472 |
| | 8. | *Banking Regulations Violations* | 477 |
| | | **a) Capital Requirements** | 477 |
| | | **b) Incorrect Marks** | 478 |
| | | **c) VaR Misrepresentations** | 479 |
| | 9. | *Scienter* | 479 |
| | 10. | *Loss Causation* | 483 |
| | 11. | *Additional Allegations* | 484 |
| C. | The Applicable Standards | | 484 |
| | 1. | *Pleading Scienter* | 485 |
| | 2. | *Pleading Liability under Exchange Act § 20A* | 487 |
| | 3. | *Pleading Control Person Liability under Exchange Act § 20(a)* | 488 |
| | 4. | *Pleading Loss Causation* | 488 |
| D. | The Allegations of Materially False and Misleading Statements by the Bear Stearns Defendants Are Adequate | | 488 |
| | 1. | *Statements Regarding Asset Values* | 488 |
| | 2. | *Statements Regarding Risk Management* | 489 |
| | 3. | *Statements Regarding the BSAM Write-downs* | 495 |

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

| | | | |
|---|---|---|---|
| | *4.* | *Statements Regarding Bear Stearns' Liquidity* | 497 |
| E. | | The Alleged Misstatements by the Bear Stearns Defendants are Material | 497 |
| F. | | The Securities Complaint Has Adequately Pleaded Scienter Against the Bear Stearns Defendants | 499 |
| | *1.* | *Motive and Opportunity* | 499 |
| | *2.* | *Conscious Misbehavior or Recklessness* | 501 |
| G. | | The Allegations of Loss Causation are Adequate | 505 |
| H. | | The Securities Complaint Has Adequately Pleaded a § 20A Claim | 508 |
| I. | | The Securities Complaint Has Adequately Pleaded Control Person Liability under § 20(a) | 509 |

**III. THE MOTION BY DELOITTE TO DISMISS THE SECURITIES COMPLAINT IS DENIED**   510

| | | | |
|---|---|---|---|
| A. | | The Allegations | 510 |
| B. | | The Applicable Standard | 511 |
| C. | | The Securities Complaint Has Adequately Alleged Deloitte's Misstatements and Scienter | 511 |
| | *1.* | *Valuation Models and Fair Value Measurements* | 512 |
| | *2.* | *The Hedge Funds* | 516 |
| | *3.* | *The Collapse of Bear Stearns Is Evidence Of Scienter* | 517 |
| | *4.* | *Reckless Disregard Rather Than Hindsight* | 518 |
| D. | | The Securities Complaint Has Adequately Alleged Material Misstatements | 518 |
| E. | | The Securities Complaint Has Adequately Alleged Loss Causation | 520 |

**IV. THE MOTION TO DISMISS THE DERIVATIVE COMPLAINT IS GRANTED**   522

| | | | |
|---|---|---|---|
| A. | | The Parties | 522 |
| B. | | Summary of the Derivative Complaint | 523 |
| | *1.* | *Bear Stearns' Acquisition of Encore Credit Corp.* | 524 |
| | *2.* | *The Hedge–Fund Collapse* | 524 |
| | *3.* | *Individual Defendants' Allegedly False and Misleading Statements Issued During the Relevant Period* | 524 |
| | *4.* | *The Improper Buyback and Insider Selling* | 525 |
| | *5.* | *Bear Stearns' Subprime Disclosures and Their Aftermath* | 525 |
| | *6.* | *The Acquisition of Bear Stearns by JPMorgan* | 526 |
| | *7.* | *The Counts* | 528 |

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

| | | | |
|---|---|---|---|
| C. | | Derivative Plaintiff Does Not Have Standing | 535 |
| | 1. | *Derivative Plaintiff Does Not Come within the "Fraud Exception"* | 535 |
| | 2. | *Derivative Plaintiff Fails to Establish a Double Derivative Suit* | 537 |
| D. | | The Derivative Claims Fail to Satisfy Rule 23.1(b)(3)'s Demand Requirement | 539 |
| | 1. | *Derivative Plaintiff Fails to Establish the Futility of a Demand on the JPMorgan Board* | 541 |
| E. | | The Class Claim is Dismissed on Res Judicata and Collateral Estoppel Grounds | 543 |
| | 1. | *Count XIII is Dismissed Under Res Judicata* | 543 |
| | 2. | *Count XIII is Dismissed through Collateral Estoppel* | 546 |
| F. | | The Derivative Defendants' Motion to Dismiss the § 10b, § 20A, § 20(a), and Common Law Claims Is Not Reached | 547 |

**V. THE MOTION TO DISMISS THE ERISA COMPLAINT IS GRANTED** — 547

| | | | |
|---|---|---|---|
| A. | | The Parties | 547 |
| B. | | The Plan | 549 |
| C. | | Summary of the ERISA Complaint | 551 |
| | 1. | *The Counts* | 551 |
| | 2. | *Bear Stearns Stock was an Imprudent Investment* | 555 |
| | 3. | *Notice of Excessive Risk* | 555 |
| | 4. | *Concealment of Risk* | 561 |
| | 5. | *Failure to Provide Complete and Accurate Information* | 562 |
| | 6. | *Conflicts of Interest* | 563 |
| | 7. | *Causation* | 564 |
| D. | | The Applicable Standard | 564 |
| E. | | The ERISA Complaint Fails to State a Prudence Claim in Count I | 564 |
| | 1. | *The Plan Agreement Does Not Establish a Duty to Divest the Plan of Bear Stearns Stock* | 565 |
| | 2. | *The ESOP Committee Does Not Have the Fiduciary Duty to Diversify or Divest Plan Investments* | 566 |
| | 3. | *Bear Stearns is Not a Fiduciary of the Plan* | 567 |
| | | a) **Bear Stearns' Ability to Make Contributions to the Plan in Stock or Cash Does Not Establish a Duty of Prudence** | 568 |
| | | b) **Bear Stearns is Not Liable as an ERISA Fiduciary Through the Fiduciary Duties of its Employees** | 568 |

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

|  |  |  |  |
|---|---|---|---|
| 4. | *Bear Stearns Had No Discretion and Duty to Divest the ESOP of Bear Stearns Stock* | | 570 |
| 5. | *The ERISA Complaint Fails to Overcome the Moench Presumption* | | 570 |
| 6. | *Defendants Had No Duty to Disclose and No Liability for Misleading Statements* | | 575 |
|  | a) | **Defendants Had No Duty to Disclose Bear Stearns' Financial Condition** | 575 |
|  | b) | **Defendants Were Not Acting as Plan Fiduciaries When They Allegedly Made Affirmative Misrepresentations** | 577 |
| F. | The ERISA Complaint Fails to State a Claim for Conflicts of Interest in Count II | | 578 |
| G. | There Is No Liability for Defendants' Duty to Monitor and No Co–Fiduciary Liability | | 580 |

**VI. LEAD PLAINTIFF'S MOTIONS TO MODIFY THE STAY AND STRIKE EXTRANEOUS DOCUMENTS ARE DENIED**      581

| A. | Lead Plaintiff's Motion to Modify the Stay of Discovery is Denied as Moot | 581 |
|---|---|---|
| B. | Lead Plaintiff's Motion to Strike Extraneous Documents is Denied | 581 |

**VII. CONCLUSION**      584

**\*442** By Order dated August 18, 2008, the MDL Panel assigned a number of actions filed in United States District Courts for the Southern and Eastern Districts of New York to this Court. An Order dated January 6, 2009 consolidated the actions, appointed lead counsel, and scheduled the filing of consolidated complaints in the actions captioned *In re Bear Stearns Companies, Inc. Securities, Derivative and ERISA Litigation.*

These actions arose out of the March 2008 collapse of Bear Stearns, a well-regarded investment bank founded in 1923. This was an early and major event in the turmoil that has affected the financial markets and the national and world economies.

Motions to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) have been made by the Defendants with respect to each of the three consolidated **\*443** complaints. The motions to dismiss the Securities Complaint are denied, and the motions to dismiss the Derivative Complaint and the ERISA Complaint are granted. The Lead Securities Plaintiff's motions to modify the

PSLRA stay and to strike certain documents are denied.

**I. PRIOR PROCEEDINGS**

The Consolidated Class Action Complaint for Violations of the Federal Securities Laws (hereinafter "Securities Complaint" or "Sec. Compl.") and the Verified Amended Third Derivative and Class Action Complaint (hereinafter "Derivative Complaint" or "Deriv. Compl.") were both filed on February 27, 2009. The Corrected Amended Consolidated Complaint for Violations of the Employee Retirement Income Security Act (hereinafter "ERISA Complaint" or "ERISA Compl.") was filed on July 21, 2009.

Defendants The Bear Stearns Companies Inc. ("Bear Stearns" or the "Company"), James E. Cayne, Alan D. Schwartz, Warren J. Spector, Alan C. Greenberg, Samuel L. Molinaro, Jr., Michael Alix, Jeffrey M. Farber (collectively, the "Bear Stearns Defendants"), and Deloitte & Touche LLP ("Deloitte") have moved to dismiss the Securities Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Defendants Henry S. Bienen, James E. Cayne, Carl D. Glickman, Michael Goldstein, Alan C. Greenberg, Donald J. Harrington, Frank T. Nickell, Paul A. Novelly, Frederic V. Salerno, Alan D. Schwartz, Vincent Tese, Wesley S. Williams, Jr., Jeffrey M. Farber, Jeffrey Mayer, Michael Minikes, Samuel L. Molinaro, and Warren J. Spector, and Nominal Defendants Bear Stearns and JPMorgan Chase & Co. ("JPMorgan") have moved to dismiss the Derivative Complaint pursuant to Federal Rules of Civil Procedure 9(b), 12(b)(6), and 23.1.

Defendants Bear Stearns, Henry S. Bienen, James E. Cayne, Carl D. Glickman, Michael Goldstein, Alan C. Greenberg, Donald J. Harrington, Frank T. Nickell, Paul A. Novelly, Frederic V. Salerno, Alan D. Schwartz, Vincent Tese, Wesley S. Williams, Jr., Jeffrey Mayer, Samuel L. Molinaro, Warren J. Spector, Kathleen Cavallo, Stephen Lacoff, and Robert Steinberg have moved to dismiss the ERISA Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

The State of Michigan Retirement System, Lead Plaintiff in the Securities Action, has moved to modify the automatic stay of discovery imposed by the PSLRA, 15 U.S.C. § 78u–4(b)(3)(B) and to strike certain documents submitted by the Bear Stearns and Deloitte Defendants.

The motion to strike was marked fully submitted on July 14, 2009. The motions to dismiss the Securities and Derivative Complaints and the motion to modify the automatic stay were marked fully submitted on July 30, 2009. The motion to dismiss the ERISA Complaint was marked fully submitted on April 28, 2010.

## II. THE MOTION OF THE BEAR STEARNS DE-FENDANTS TO DISMISS THE SECURITIES COMPLAINT IS DENIED

What follows is a description of the parties, a summary of the allegations of the Securities Complaint, the standards applicable to the motion, and the conclusions reached with respect to the adequacy of the allegations of false and misleading statements, materiality, scienter and loss causation.

### A. *The Parties*

The Lead Plaintiff, State of Michigan Retirement Systems ("Securities Lead **\*444** Plaintiff") serves four systems: the Public School Employees Retirement System; the State Employees' Retirement System; the State Police Retirement System; and the Judges Retirement System. With combined assets of nearly $64 billion, the Securities Lead Plaintiff is the fourteenth largest public pension system in the United States, the twentieth-largest pension system in the United States, and the thirty-ninth largest pension system in the world. (Sec. Compl. ¶ 19.)

The Securities Lead Plaintiff purchased Bear Stearns common stock on the open market during the class period from December 14, 2006 to March 14, 2008 (the "Class Period") and has alleged damages as a result of conduct alleged in the Securities Complaint. (Sec. Compl. ¶ 20.)

Bear Stearns was a leading publicly traded financial services institution. (Sec. Compl. ¶ 21.) Prior to its acquisition by JPMorgan on May 30, 2008, its principal business lines included institutional equities, fixed income, investment banking, global clearing services, asset management, and private client services. (Sec. Compl. ¶ 22.)

The individual Defendants were directors and/or officers of Bear Stearns before the JPMorgan merger. They are James E. Cayne, Bear Stearns' former Chief Executive Officer (CEO) and Chairman of the Board ("Cayne"); Alan D. Schwartz, former President and co-COO, and, beginning January 2008, CEO ("Schwartz"); Warren J. Spector, former co-President and co-Chief Operating Officer (COO) until August 2007 ("Spector"); Alan C. Greenberg, former Chairman of the Executive Committee ("Greenberg"); Samuel L. Molinaro, Jr., former Chief Financial Officer (CFO), and, beginning August 27, 2007, COO ("Molinaro"); Michael Alix, former Global Head of Credit Risk Management ("Alix"); and Jeffrey M. Farber, former Controller and Principal Accountant ("Farber") (collectively, the "Individual Defendants"). (Sec. Compl. ¶¶

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

23–29.)

Deloitte was the independent outside auditor for Bear Stearns and provided audit, audit-related, tax and other services to Bear Stearns during the Class Period, including the issuance of unqualified opinions on the Company's financial statements for fiscal years 2006 and 2007. Deloitte also allegedly certified the Company's 10–Q Forms for the first through third quarters of 2007. (Sec. Compl. ¶ 32).

B. *Summary of the Securities Complaint*

The Securities Complaint consists of 834 numbered paragraphs in 218 pages, plus two exhibits. It contains three counts supported by allegations set forth in the following twelve sections:

1. Nature and Summary of the Action (Sec. Compl. ¶¶ 1–14)

2. Jurisdiction and Venue (Sec. Compl. ¶¶ 15–18)

3. Parties (Sec. Compl. ¶¶ 19–32)

4. Factual Background and Substantive Allegations (Sec. Compl. ¶¶ 33–452)

5. Defendants' Scienter (Sec. Compl. ¶¶ 453–506)

6. Additional Allegations Supporting the Officer Defendants' Scienter (Sec. Compl. ¶¶ 507–522)

7. Deloitte's Deficient Audits of Bear Stearns' Financial Statements (Sec. Compl. ¶¶ 523–588)

8. Defendants' Materially False and Misleading Statements (Sec. Compl. ¶¶ 589–794)

9. Loss Causation (Sec. Compl. ¶¶ 795–802)

**\*445** 10. Class Action Allegations (Sec. Compl. ¶¶

803–808)

11. Presumption of Reliance (Sec. Compl. ¶¶ 809–811)

12. Inapplicability of Statutory Safe Harbor (Sec. Compl. ¶ 812).

The Securities Complaint contains the following three claims for relief: violation of Section 10(b) of the Exchange Act and Rule 10b–5 against all the Defendants (Count I) (Sec. Comp. ¶¶ 813–822); violation of Section 20(a) of the Exchange Act against certain officer Defendants (Count II) (Sec. Compl. ¶¶ 823–827); and violations of Section 20(a) of the Exchange Act against Defendants Cayne, Schwartz, Spector, Molinaro, Greenberg, and Farber (the "Section 20(a) Defendants") (Count III) (Sec. Compl. ¶¶ 828–834).

*1. Bear Stearns History*

Bear Stearns was the fifth largest investment bank in the world and until December 2007 had never posted a loss and was known to be conservative in its approach to risk. (Sec. Compl. ¶ 33.)

As a registered broker-dealer, Bear Stearns was subject to the "Broker–Dealer Risk Assessment Program" created in 1990, under which the Division of Trading and Markets ("TM") of the Securities & Exchange Commission ("SEC") monitored the financial markets. During the Class Period, TM reviewed in detail the filings of the seven most prominent firms, including Bear Stearns, which participated in the SEC's Consolidated Supervised Entity ("CSE") program. (Sec. Compl. ¶¶ 34–35.)

Bear Stearns experienced rapid growth through the 1990s and became larger and more profitable with its business model of trading, mortgage underwriting, prime brokerage and private client services. By mid–2000, the Company increased its debt securitization, pooling and repackaging of cash flow-producing financial assets into securities that are sold to investors termed asset-backed securities ("ABS"). Bear Stearns purchased and originated

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

mortgages to securitize and sell, and maintained billions of dollars of these assets on its own books, using them as collateral and to finance daily operations. (Sec. Compl. ¶¶ 36, 38.)

In 2005 and again in 2006, the SEC advised the Company of deficiencies in models it used to value mortgage-backed securities ("MBS") due to its failure to assess the risk of default or incorporate data about such risk, and further advised that its value at risk ("VaR") models did not account for key factors such as changes in housing prices. (Sec. Compl. ¶¶ 4, 92, 100–105, 107.)

When two hedge funds overseen by Bear Stearns collapsed in the spring of 2007, the Company's exposure to the growing housing crisis increased as it absorbed nearly two billion dollars of the hedge funds' subprime-backed assets, which were worthless within weeks. (Sec. Compl. ¶¶ 7, 205–206, 212.)

By the late fall of 2007, the Company began to write down billions of dollars of its devalued assets. The Company's lenders became unwilling to lend it the vast sums necessary for its daily operations. (Sec. Compl. ¶¶ 8, 218.) In its public statements in December 2007 and January 2008, the Company offered the public misleading accounts of its earnings and asset values. (Sec. Compl. ¶¶ 8–9.) Major shareholders began questioning Cayne's leadership and, on January 8, 2008, the Company announced that Cayne would step down as CEO. (Sec. Compl. ¶ 255.)

On March 10, 2008, rumors began to circulate on Wall Street that Bear Stearns was facing a liquidity problem, which was denied by the Company and, on March 12, 2008, by Schwartz. (Sec. Compl. ¶ 272.) **\*446** The Company's liquidity fell to $2 billion on March 13, 2008 and Schwartz and JPMorgan CEO Jamie Dimon ("Dimon") began negotiations for Bear Stearns to be given access to the Federal Reserve's "window," a credit facility available to the nation's commercial banks, but not to investment banks. JPMorgan and Bear Stearns contemplated that the Company could get the facility through JPMorgan as part

of a transaction in which JPMorgan bought Bear Stearns. (Sec. Compl. ¶¶ 280–284.)

On March 14, 2008, it was announced that JPMorgan would provide short-term funding to Bear Stearns while the Company worked on alternative forms of financing. Bear Stearns' stock fell on the news from $57 per share to $30 per share, a 47% one-day drop. (Sec. Compl. ¶ 11.)

On March 16, 2008, Dimon stated that Bear Stearns faced $40 billion in credit exposure, including mortgage liabilities, and made an offer to purchase the Company at a $2 per share, a price that Dimon claimed was necessary to protect JPMorgan. (Sec. Compl. ¶ 12.)

On March 17, 2008, news of Bear Stearns' exposure led the stock to close at $4.81 per share, an 85% drop from its previous close. (Sec. Compl. ¶¶ 14, 294.)

JPMorgan renegotiated the price after it discovered that a mistake in the language of its guaranty agreement with Bear Stearns obligated JPMorgan to guarantee Bear Stearns' trades even if the Company's shareholders voted down the acquisition deal. (Sec. Compl. ¶¶ 295–296.) Shareholders approved the sale to JPMorgan on May 29, 2008. Under the terms of the merger, shareholders received $10 of JPMorgan shares for every Bear Stearns share they held as of the date of the merger. (Sec. Compl. ¶ 299.)

In June 2008 the Department of Justice, through the U.S. Attorney for the Eastern District of New York, indicted Ralph Cioffi ("Cioffi"), the originator of the hedge funds, charging that he had misled investors regarding the value of MBS and collateralized debt obligations ("CDOs") containing MBS owned by the hedge funds, and had caused $1.8 billion in losses to investors. On the same day, the SEC filed a civil complaint against Cioffi. (Sec. Compl. ¶¶ 300–301.)

By July 3, 2008 the assets of Maiden Lane LLC, a holding company created to hold Bear Stearns ABS following the JPMorgan merger, had decreased in value from

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

$30 billion to $28.9 billion. By October 22, 2008, the value of the assets had dropped another $2.1 billion, to $26.8 billion, 10.6% less than the value provided by Bear Stearns. (Sec. Compl. ¶ 302.)

After Bear Stearns' March 2008 collapse, the SEC's Office of the Inspector General ("OIG") was asked to analyze the SEC's oversight of the CSE firms, with a special emphasis on Bear Stearns. (Sec. Compl. ¶ 74.)

The OIG issued its conclusions in a September 25, 2008 Report, titled "SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program" (the "OIG Report"), which stated that "[b]y November of 2005 the Company's ARM business was operating in excess of allocated limits, reaching new highs with respect to the net market value of its positions" and that the large concentration of business in this area left the Company exposed to declines in the riskiest part of the housing market. (Sec. Compl. ¶¶ 74–76.) Certain conclusions of the OIG Report are cited throughout the Securities Complaint, constituting allegations of the Bear Stearns history and practices, including details about Bear Stearns' **\*447** VaR, mortgage valuation models, and its treatment of asset values.

*2. Bear Stearns Securitization*

Mortgages packaged together for securitization are referred to as mortgage-backed securities ("MBS"), and when the mortgages are residential, those securities are referred to as residential mortgage-backed securities ("RMBS"). RMBS are, in turn, divided into layers based on the credit ratings of the underlying assets. (Sec. Compl. ¶¶ 39–41.)

The "B–Pieces" of an RMBS, its riskier parts, were pooled together to form a collateralized debt obligation ("CDO") divided by the issuer into different tranches, or layers, based on gradations in credit quality. While the top tranche of a CDO may be rated "AAA," CDOs formed from RMBS are rated BBB or lower. Lower-rated tranches of CDOs, such as the "mezzanine" tranches, bear even

greater risk of loss. The "equity" tranche bears the first risk of loss. (Sec. Compl. ¶¶ 42–44.)

Mezzanine CDOs made up more than 75% of the total CDO market by April 2007 and contained cash flows from especially risky types of residential mortgage loans, termed "subprime" or "Alt–A" made to borrowers with a heightened risk of default, such as those who have a history of loan delinquency or default. Alt–A loans were made to borrowers with problems including lack of documentation of income and assets, high debt-to-income ratios, and troubled credit histories. Subprime and Alt–A mortgages are termed "nonprime" mortgages. Between 2003 and 2007, the total proportion of nonprime loans wrapped into the majority of all mezzanine CDOs increased dramatically market-wide. (Sec. Compl. ¶¶ 45–48.)

Bear Stearns originated and purchased home loans, packaged them into RMBS, collected these RMBS to form CDOs, sold CDOs to investors and thereby acquired a large exposure to declines in the housing and credit markets. (Sec. Compl. ¶ 49.)

It originated loans through two wholly-owned subsidiaries, the Bear Stearns Residential Mortgage Corporation ("BEARRES") and later through Encore Credit Corporation ("ECC"), which the Company purchased in early 2007. ECC specialized in providing loans to borrowers with compromised credit. BEARRES made Alt–A loans to borrowers with somewhat better, but still compromised credit. The Company actively encouraged its loan originator subsidiaries to offer loans even to borrowers with poor credit scores and troubled credit histories and to originate riskier loans that "cut corners" with respect to credit scores or loan to value ("LTV") ratios. While the national rejection rate of applications was 29% in 2006, the BEARRES rejection rate was 13%. (Sec. Compl. ¶¶ 50–55.)

In 2006, BEARRES and ECC originated 19,715 mortgages, worth $4.37 billion, which were securitized by Bear Stearns. Bear Stearns also purchased loans originated

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

by other companies through its EMC Mortgage Corporation ("EMC") subsidiary, which from 1990 until 2007 purchased more than $200 billion in mortgages. (Sec. Compl. ¶¶ 55–57.) In late 2006 and early 2007, because of the potential for profits from securitizing these loans, Bear Stearns managers failed to enforce basic underwriting standards and ignored due diligence findings that borrowers would be unable to pay. (Sec. Compl. ¶¶ 58–60.)

Bear Stearns also funded and purchased closed-end second-lien ("CES") loans and home-equity lines of credit ("HELOCs") made to borrowers with poor credit secured by secondary liens on the home, which were to be paid after the first mortgage was satisfied and were at risk of not being paid in full if the value of the home *448 dropped. By the end of 2006, EMC had purchased $1.2 billion of HELOC and $6.7 billion of CES loans. (Sec. Compl. ¶ 61.)

Through EMC, Bear Stearns also purchased mortgages already in default, so-called "scratch and dent" loans, to securitize and sell to investors. Because of its underwriting standards, the loans that the Company purchased to package into RMBS and CDOs were especially vulnerable to declines in housing prices. (Sec. Compl. ¶¶ 61–63.)

Individual nonprime home loans were wrapped into an RMBS, sold to investors, and packaged into CDOs. Especially risky tranches of RMBS were kept on the Company's books as retained interests ("RI"). The amount of RI grew throughout the Class Period, from $5.6 billion on November 30, 2006 to $9.6 billion on August 31, 2007. (Sec. Compl. ¶¶ 64–65.)

Nearly all CDOs Bear Stearns structured during the Class Period were backed by a combination of RMBS and derivatives, or "synthetic securities." These synthetic securities were effectively insurance contracts in which the party buying the insurance paid a premium equivalent to the cash flow of an underlying RMBS that it was copying, and the counterparty insured against a decline or default in the underlying RMBS. Such CDOs were called "Synthetic

CDOs," and a CDO backed by other CDO notes was called a "CDO squared." (Sec. Compl. ¶¶ 66–67.)

To sell the largest possible CDOs, the Company retained on its books increasing amounts of the CDOs it packaged. By August 2007, this figure had reached $2.072 billion. (Sec. Compl. ¶¶ 68–69.)

During the Class Period, the Company's growing accumulation of subprime-backed RMBS and CDOs, combined with its leveraging practices, left it extraordinarily vulnerable to declines in the housing market. (Sec. Compl. ¶ 70.) Before the Class Period began, on multiple occasions the amount of mortgage securities held by the Company exceeded its internal concentration limits. (Sec. Compl. ¶ 71.)

### 3. Leveraging

In leveraging, a company takes out a loan secured by assets in order to invest in assets with a greater rate of return than the cost of interest for the loan. The potential for loss is greater if the investment becomes worthless, because of the loan principal and all accrued interest. A 4–to–1 leverage ratio increases loss potential by about 15%, while a 35–to–1 leverage ratio increases loss potential by more than 100%. (Sec. Compl. ¶¶ 77–78.)

In 2005, Bear Stearns was leveraged at a ratio of approximately 26.5–to–1. By November 2007, the Company had leveraged its net equity position of $11.8 billion to purchase $395 billion in assets, a ratio of nearly 33–to–1. Because of the interest charges required to support this leverage ratio, the amount of cash the Company needed to finance its daily operations increased dramatically during the Class Period. By the close of the Class Period, Bear Stearns' daily borrowing needs exceeded $50 billion. (Sec. Compl. ¶¶ 79–80.)

### 4. The Hedge Funds

In October 2003, Cioffi started the High Grade Structured Credit Strategies Fund, LP (the "High Grade Fund") as part of Bear Stearns Asset Management

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

("BSAM"), which was under the supervision of Spector. The High Grade Fund consisted of a Delaware partnership to raise money from investors in the United States and a Cayman Island corporation to raise money from foreign investors. (Sec. Compl. ¶ 82.)

In August 2006, Cioffi created the High Grade Structured Credit Strategies Enhanced Leverage Fund, LP ("the High **\*449** Grade Enhanced Fund") (the High Grade Fund and the High Grade Enhanced Fund are collectively referred to as the "Hedge Funds"), which was structured similarly to the High Grade Fund, but with greater leverage to increase potential returns. (Sec. Compl. ¶ 83.)

Bear Stearns Securities Corporation, a wholly-owned subsidiary of the Company, served as the prime broker for the Hedge Funds, and PFPC Inc., another Bear Stearns subsidiary, was the Hedge Funds' administrator. BSAM was the investment manager for the Hedge Funds. Spector was responsible for the business of both funds. (Sec. Compl. ¶¶ 84–85.)

Because of BSAM's role as an asset manager, Bear Stearns was one of the few repurchase lenders willing to take the Hedge Funds' CDOs as collateral for short term lending facilities. The Hedge Funds, through BSAM, entered into repurchase agreements on favorable terms with Bear Stearns as the counterparty. By offering cash to the Hedge Funds in exchange for subprime mortgage-backed CDOs of questionable value, Bear Stearns increased it exposure to declines in the subprime market. (Sec. Compl. ¶¶ 89–91.)

BSAM misrepresented the Hedge Funds' subprime exposure to hedge fund investors in "Preliminary Performance Profiles" ("PPPs") by disclosing only the Hedge Funds' direct subprime RMBS holdings. The Hedge Funds also held large amounts of subprime RMBS indirectly through purchased CDOs. Returns in the subprime CDOs, and CDOs backed by CDO-squares, diminished, resulting in diminishing yield spreads, and accelerating losses for the Hedge Funds. The High Grade Enhanced Fund experienced its first negative return in February 2007. Declines in the High Grade Fund soon followed, resulting in its first negative return in March 2007. (Sec. Compl. ¶¶ 193–196.)

The Hedge Funds began to experience difficulties with margin calls and failed to disclose Bear Stearns' exposure to the declining value of the subprime-backed Hedge Fund assets it held as collateral on its own books. (Sec. Compl. ¶¶ 198–199.) They continued to deteriorate throughout the spring of 2007. On April 19, 2007, Matthew M. Tannin, COO of the Hedge Funds ("Tannin"), reviewed a credit model that showed increasing losses on subprime linked assets. On May 13, 2007, Tannin stated that the High Grade Enhanced Fund had to be liquidated. (Sec. Compl. ¶¶ 200–201.)

To avoid a forced "fire sale" of the thinly-traded CDOs held by the Hedge Funds, which would have required acknowledging huge declines in the value of the subprime-backed assets Bear Stearns held as collateral and would have revealed the Company's gross overvaluation of its thinly-traded assets, Spector decided to extend a line of credit to the High Grade Fund to allow it to liquidate in an orderly way by gradually selling assets into the market. This was done to avoid having other assets seized by repurchase agreement counterparties, who would mark the assets to their true value. Spector permitted the High Grade Enhanced Fund to fail, because its high leverage ratios left it virtually unsalvageable. (Sec. Compl. ¶¶ 202–204.)

On June 22, 2007, Bear Stearns announced that it was entering into a $3.2 billion securitized financing agreement with the High Grade Fund in the form of a collateralized repurchase agreement. In exchange for lending the funds, Bear Stearns received as collateral CDOs backed by subprime mortgages allegedly worth between $1.7 and $2 billion. Pursuant to the agreement, Bear Stearns gave **\*450** up the right to collect all of the upside in the event that the collateral saw an increase in value. Molinaro stated that the Hedge Funds' problems with their subprime-backed assets did not extend to the securities that Bear Stearns itself held, but failed to disclose that even prior to the $3.2 billion securitized financing agreement, Bear Stearns held large

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

amounts of the Hedge Funds' toxic debt as collateral. During a June 22, 2007 conference call, Molinaro made false statements with respect to asset value and stated that the value levels attributed to the collateral it had received from the Hedge Funds "are a reflection of the market value levels that we're seeing from our street counterparties." In fact, the market for such securities had become highly illiquid, providing no basis for Molinaro's statements. (Sec. Compl. ¶¶ 205–209.)

On June 26, 2007, Cayne denied any material change in the risk profile. However, because of worthless sub-prime-backed collateral, the risk exposure had grown substantially. (Sec. Compl. ¶¶ 210–211.)

By the end of June 2007, asset sales had reduced the loan balance to $1.345 billion, but the estimated value of the collateral securing the loan had deteriorated by nearly $350 million, approximately the value of the loan Bear Stearns had given the High Grade Fund. Any further declines in the value of the assets that Bear Stearns held as collateral would be borne directly by Bear Stearns. Instead of immediately reflecting its assumption of the declining collateral in its books, the Company delayed for months, according to the OIG Report, "to delay taking a huge hit to capital." (Sec. Compl. ¶¶ 212–213.)

On July 18, 2007, Bear Stearns informed investors in the Hedge Funds that they would get little money back after "unprecedented declines" in the value of AAA-rated securities used to invest in subprime mortgages. The more than $1.3 billion in collateral drawn from the Hedge Funds' subprime-backed assets, which the Company had effectively taken onto its books by assuming the assets as collateral just a month earlier, was nearly worthless as well. Bear Stearns did not make the actual book entries until the fall of 2007, months after the losses were actually incurred by the Company. The Company ultimately only wrote off a fraction of the worthless collateral it held and had originally valued at $1.3 billion. (Sec. Compl. ¶¶ 214–216.)

*5. Valuation and Risk*

The valuation of assets is governed by Statement of Financial Accounting Standards No. 157, Fair Value Measurements ("SFAS 157"). Although SFAS 157 took effect on November 15, 2007, Bear Stearns opted to comply with the standard beginning January 2007. SFAS 157 required that Bear Stearns classify its reported assets into one of three levels depending on the degree of certainty about the assets' underlying value. Assets traded in an active market were classified as Level 1 ("mark-to-market"). Level 2 ("mark-to-model") assets consisted of financial assets whose values are based on quoted prices in inactive markets, or whose values are based on models, inputs to which are observable either directly or indirectly for substantially the full term of the asset or liability. Level 3 assets, thinly traded or not traded at all, have values based on valuation techniques that require inputs that are both unobservable and significant to the overall fair value measurement. To value Level 3 assets, companies rely on models developed by management. The information supplied by valuation models is incorporated into other models used to assess risk and hedge investments, such as *451 the models measuring VaR. (Sec. Compl. ¶¶ 94–99.)

Before the Class Period began, the Company knew that declining housing prices and rising default rates were not reflected in the mortgage valuation models that were critical to the valuation of its Level 3 assets. According to the OIG Report, prior to the Company's approval as a CSE in November of 2 005, "Bear Stearns used outdated models that were more than ten years old to value mortgage derivatives and had limited documentation on how the models worked." As a result, during the 2005 CSE application process, TM told Bear Stearns that "[w]e believe that it would be highly desirable for independent Model Review to carry out detailed reviews of models in the mortgage area." (Sec. Compl. ¶¶ 100–102.)

According to the OIG Report, in November 2005, the SEC Office of Compliance Inspections and Examinations ("OCIE") found that "Bear Stearns did not periodically evaluate its VaR models, nor did it timely update inputs to its VaR models." (Sec. Compl. ¶ 123.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Bear Stearns was warned of these deficiencies in a December 2, 2005 memorandum from OCIE to Farber, the Company's Controller and Principal Accountant. According to the OIG Report, "Bear Stearns' VaR models did not capture risks associated with credit spread widening." (Sec. Compl. ¶¶ 124–125.)

In September 2006, TM concluded after a meeting with Bear Stearns risk managers that the Company still had failed to improve the accuracy of the models it used to hedge against risk. As the housing crisis spread during the Class Period, the Company knew that fundamental indicators of housing market decline, including falling housing prices and rising delinquency rates, were not reflected in the VaR figures it disclosed to the public. (Sec. Compl. ¶¶ 126–128.)

According to the OIG Report, in 2006, Bear Stearns' trading desks had gained ascendancy over the Company's risk managers, TM found that model review at Bear was less formalized than at other CSE firms and had devolved into a support function and Bear Stearns reported different VaR numbers to OIG regulators than its traders used for their own internal hedging purposes. (Sec. Compl. ¶¶ 129–131.)

Traders were able to override risk manager marks and enter their own, more generous, marks for some assets directly into the models used for valuation and risk management by manipulating inputs into Bear Stearns' WITS system—which was the repository for raw loan data, including such crucial information as a borrower's credit score, prepayments, delinquencies, interest rates and foreclosure history—and did so to alter the value of pools of loans to enhance their profit and loss positions. (Sec. Compl. ¶ 132.) According to TM memoranda, the risk management department was persistently understaffed, and the head of the Company's model review program "had difficulty communicating with senior managers in a productive manner." (Sec. Compl. ¶ 134.)

According to the OIG Report, TM, in the fall of 2006, concluded that Bear Stearns' "model review process lacked coverage of mortgage-backed and other asset-backed securities," that "the sensitivities to various risks implied by the models did not reflect risk sensitivities consistent with price fluctuations in the market," and that TM's discussions with risk managers in 2005 and 2006 indicated that Bear Stearns' pricing models for mortgages "focused heavily on prepayment risks" but that TM documents did not reflect "how the Company**\*452** dealt with default risks." (Sec. Compl. ¶¶ 103–105.)

Though Cayne and Molinaro were aware of the SEC's concerns about Bear Stearns' risk management program, the Company made no effort to revise its mortgage valuation models to reflect declines in the housing market. The head of the Company's mortgage trading desk was "vehemently opposed" to the updating of the Company's mortgage valuation models. (Sec. Compl. ¶¶ 106–107.)

As the housing market declined throughout 2007 and into 2008, Bear Stearns continued to rely on its flawed valuation models. Level 3 assets, including retained interests in RMBS and the equity tranches of CDOs, made up 6–8% of the Company's total assets at fair market value in 2005, and increased to 20–29% of total assets between the fourth quarter of 2007 and the first quarter of 2008. According to the Company's Form 10–K for the period ending November 30, 2007, the majority of the growth in the Company's Level 3 assets in 2007 came from "mortgages and mortgage-related securities," the assets that the Company was valuing using misleading models. As of August 31, 2007, the Company carried $5.8 billion in Level 3 assets backed by residential mortgages, a figure that grew close to $7.5 billion by November 30, 2007. (Sec. Compl. ¶¶ 110–111.)

Risk is defined as the degree of uncertainty about future net returns, and is commonly classified into four types: (1) credit risk, relating to the potential loss due to the inability of a counterpart to meet its obligations; (2) operational risk, taking into account the errors that can be made in instructing payments or settling transactions, and in-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

cluding the risk of fraud and regulatory risks; (3) liquidity risk, caused by an unexpected large and stressful negative cash flow over a short period; and (4) market risk, estimating the uncertainty of future values, due to changing market conditions. The most prominent of these risks for investment bankers is market risk, since it reflects the potential economic loss caused by the decrease in the market value of a portfolio. Because of the crucial role that market losses can play in the financial health of investment banks, they are required to set aside capital to cover market risk. (Sec. Compl. ¶¶ 113–114.)

VaR is a method of quantifying market risk, defined as the maximum potential loss in value of a portfolio of financial instruments with a given probability over a certain horizon. If the company's VaR is high, it must increase the amount of capital it sets aside in order to mitigate potential losses or reduce its exposure to high risk positions. (Sec. Compl. ¶¶ 115–117.)

The Basel Committee on Banking Supervision, an international banking group that advises national regulators (the "Basel Committee"),[FN1] determined that investors and regulators needed more accurate ways to gauge the amount of capital that firms needed to hold in order to cover risks. The Basel Committee allowed Bear Stearns and other Wall Street figures to use their internal VaR numbers for this purpose. This use of VaR was incorporated into the requirements for CSE program participants when the CSE program was **\*453** launched in 2004. Companies participating in the program were required to regularly supply their VaR numbers to federal regulators and to the public. (Sec. Compl. ¶¶ 118–121.)

> FN1. The Basel Committee on Banking Supervision is an institution created by the central bank Governors of the Group of Ten nations. It was created in 1974 and meets regularly four times a year. The Basel Committee on Banking Supervision provides a forum for regular cooperation on banking supervisory matters. Its objective is to enhance understanding of key supervisory issues and improve the quality of banking supervision worldwide. *See* http:// www. bis. org/ bcbs.

The resignation of the head of model review at the Company in March 2007 gave trading desks more power over risk managers and by the time a new risk manager arrived in the summer of 2007, the department was in a shambles and risk managers were operating in "crisis mode." (Sec. Compl. ¶¶ 134–135.) By October 2007, the entire model valuation team had evaporated, except for one remaining analyst. (Sec. Compl. ¶ 136.)

According to the OIG Report, it was not until "towards the end of 2007" that Bear Stearns "developed a housing led recession scenario which it could incorporate into risk management and use for hedging purposes." The mortgage-backed asset valuation inputs to the VaR models employed by the Company were never updated during the Class Period and remained a "work in progress" at the time of the Company's March 2008 collapse. (Sec. Compl. ¶¶ 106–109.)

### 6. False and Misleading Statements

The Securities Complaint describes allegedly materially false and misleading statements with which the Director Defendants are charged. They include statements relating to fiscal year 2006 and fourth quarter 2006 (Sec. Compl. ¶¶ 589), including the December 14, 2006 press release (Sec. Compl. ¶¶ 590–591), the fourth quarter 2006 earnings conference call (Sec. Compl. ¶¶ 592–605), the Form 10–K for fiscal year 2006 (Sec. Compl. ¶¶ 589–629); statements relating to fiscal year 2007 and fourth quarter 2007, including the first quarter press release (Sec. Compl. ¶¶ 630–637), the first quarter conference call (Sec. Compl. ¶¶ 638–645), the first quarter 2007 Form 10–Q (Sec. Compl. ¶¶ 646–661), the second quarter 2007 press release (Sec. Compl. ¶¶ 662–665), the second quarter 2007 conference call (Sec. Compl. ¶¶ 669–671), the June 22, 2007 press release (Sec. Compl. ¶¶ 672–675), the second quarter 2007 Form 10–Q (Sec. Compl. ¶¶ 676–695), the August 3, 2007 press release and conference call (Sec. Compl. ¶¶ 696–703), the third quarter 2007 press release (Sec. Compl. ¶¶ 704–710), the third quarter 2007 conference call (Sec. Compl. ¶¶ 711–715), the third quarter 2007 Form

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

10–Q (Sec. Compl. ¶¶ 719–735), the November 14, 2007 statements (Sec. Comp. ¶¶ 736–739), the fourth quarter and fiscal year 2007 press release (Sec. Comp. ¶¶ 740–748), the fourth quarter 2007 conference call (Sec. Comp. ¶¶ 749–754), and the fiscal year 2007 Form 10–K (Sec. Comp. ¶¶ 755–781); and the 2008 statements (Sec. Comp. ¶¶ 782–794).

Beginning in early 2006, record numbers of subprime loans began to go bad as borrowers failed to make even their first payment ("First Payment Default" or "FPD"), or failed to make their first three payments ("Early Payment Default" or "EPD"). During 2005, only one in every 10,000 subprime loans experienced an FPD. During the first half of 2006, the FPD rate had risen by a multiple of 31; nationwide, about 31.5 out of every 10,000 subprime loans originated between January and June 2006 had a delinquency on its first monthly payment, according to Loan Performance, a subsidiary of First American Real Estate Solutions. (Sec. Comp. ¶¶ 138–140.)

Bear Stearns was well aware of the growth in EPDs. In April 2006, Bear Stearns' EMC Mortgage, reputed to be a primary EPD enforcer, sued subprime originator Mortgage IT over approximately $70 million in EPD buyback demands. (Sec. Comp. ¶ 141.)

**\*454** In May 2006, the California Association of Realtors lowered expectations for California home sales from a 2% decline (2006 sales vs.2005 sales) to a 16.8% decline. Between April and June 2006, the Company faced repeated crises in its United Kingdom subsidiary as a result of poor performance of U.K. loans due to weak underwriting standards. As a result, the Company was left holding some $1.5 billion in unsecuritized whole loans and commitments from this subsidiary. Management at Bear Stearns was deeply concerned about the U.K. developments, and Spector made calls to investigate the crisis. However, the Company did not "use this experience to add a meltdown of the subprime market to its risk scenarios." (Sec. Comp. ¶¶ 141–145.)

In May 2006, after recent data demonstrated dramatically slowing sales, the highest inventory of unsold homes in decades, and stagnant home prices, the chief economist for the National Association of Realtors ("NAR"), admitted that "hard landings" in certain markets were probable. The monthly year-over-year data provided by the NAR showed that by August 2006, year-over-year home prices had in fact declined for the first time in 11 years. Sales of existing homes were down 12.6% in August from a year earlier, and the median price of homes sold dropped 1.7% over that period. Sales of new homes were down 17.4% in August 2006. As 2006 progressed, data aggregated in the NAR's monthly statistical reports on home sales activity, home sales prices, and home sales inventory revealed (1) accelerating declines in the numbers of homes sold during 2006, which continued and deepened throughout 2007; (2) steadily decreasing year-over-year price appreciation in early 2006, no year-over-year price appreciation by June 2006, and nationwide year-over-year price declines beginning in August 2006 and continuing thereafter; and (3) steadily rising amounts of unsold home "inventory," expressed in the form of the number of months it would take to sell off that inventory, rising 50% by August 2006 and doubling by late 2007. (Sec. Comp. ¶¶ 145–147.)

By the end of 2006, EPD rates for 2006 subprime mortgages had risen to ten times the mid–2006 FPD rate; 3% of all 2006 subprime mortgages were going bad immediately. The 2006 subprime mortgages from First Franklin Financial, Long Beach Savings, Option One Mortgage Corporation and Countrywide Financial had EPD rates of approximately 2%; those originated by Ameriquest, Lehman Brothers, Morgan Stanley, New Century and WMC Mortgage had EPD rates of 3–4%; and those originated by Fremont General had EPD rates higher than 5%. (Sec. Comp. ¶¶ 145–148.)

On December 14, 2006, Bear Stearns issued a press release regarding its fourth quarter and year end results for the fiscal year 2006, which closed on November 30, 2006.[FN2] The release reported diluted earnings per share of $4.00 for the fourth quarter ended November 30, 2006, up 38% from $2.90 per share for the fourth quarter of 2005. It

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

stated that net income for the fourth quarter of 2006 was $563 million, up 38% from $407 million for the fourth quarter of 2005. It is alleged that the Company achieved these results by using valuation models that ignored declining housing prices and rising default rates. These inaccurate models enabled the Company to avoid taking losses on its Level 3 assets, thereby increasing revenues and earnings per share and allegedly falsely inflating the value of its stock. (Sec. Comp. ¶¶ 150–151.)

> FN2. The Company's fiscal year ran from December 1 to November 30.

**\*455** At the time of the statements, the Company's Level 3 assets represented 11% of its total assets held at market value, or a total of about $12.1 billion. Because these assets were highly leveraged, even a small decline in value would have been vastly magnified. Accordingly, the values the Company assigned to this large group of assets were significantly higher than they should have been, violating GAAP. (Sec. Comp. ¶¶ 589–596.)

Bear Stearns also announced its fiscal year 2006 results In the same press release, Bear Stearns reported that its earnings per share (diluted) for the 2006 fiscal year were a record $14.27, its net income was $2.1 billion and its net revenues were $9.2 billion. These figures were allegedly false and misleading for the same reasons set forth above. (Sec. Comp. ¶ 590.)

On December 14, 2006, Bear Stearns held its fourth quarter 2006 earnings conference call, conducted by Molinaro. During the call, Molinaro repeated the financial results set out in the Securities Complaint at ¶ 590 and made statements that are alleged to be materially false and misleading when made, because the Company understood that the unusually risky loans it continued to purchase through its EMC subsidiary were not limited to any particular "vintage." (Sec. Comp. ¶¶ 598, 601.)

During a press conference on the same day, Molinaro was asked whether the increased defaults threatened to make the securitization of those mortgages, which were increasingly being originated by Bear Stearns, a risky business. Molinaro responded "Well, I don't—no, it doesn't. Because essentially we're originating and securitizing." This statement is alleged to be false, as the Company faced significant exposure through the retained CDO tranches it kept on its books and the agreements it maintained with counterparties and CDOs. Based on the Company's artificially inflated results and the allegedly false assurances by Molinaro, the Company's stock rose by $4.07, closing at $159.96. (Sec. Comp. ¶¶ 150–153.)

Molinaro understated Bear Stearns' exposure to increasing defaults in the subprime market because Bear Stearns retained on its books $5.6 billion of the riskiest tranches of subprime-backed RMBS on its books. (Sec. Comp. ¶ 65.) Bear Stearns' underwriting standards were not higher in 2006 than in previous years, and the Company understood that the loans it was continuing to purchase through its EMC subsidiary during the latter part of 2006 and the beginning of 2007 were unusually risky, and in fact EMC was not tightening its underwriting standards. (Sec. Comp. ¶¶ 602–605.)

The Asset Backed Securities index ("ABX"), launched in January 2006, and the TABX index, standardized tranches of ABX indices, introduced in February 2007, synthesized subprime mortgage performance, refinancing opportunities, and housing price data into efficient market valuation of CDOs' primary assets—subprime RMBS tranches, via the ABX and mezzanine CDO tranches, via the TABX—providing observable market indicators of CDO value. In February 2007, the ABX, which tracked CDOs on certain risky subprime loans (those rated BBB), declined from above 90 in early February to 72,71 on February 22, 2007, and down to 69.39 on February 23, 2007. TABX tranches also materially declined upon launch, indicating that the value of many CDOs had plunged. The Senior TABX Tranche dropped from a price of nearly $100 in mid-February 2007 to around $85 by the end of February 2007. The TABX continued to fall significantly in the months after February 2007. (Sec. Comp. ¶¶ 154–157.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

**\*456** Nonetheless, Bear Stearns continued to expand its subprime business aggressively. On February 12, 2007, the Company completed its acquisition of ECC, a major originator of subprime loans. (Sec. Comp. ¶¶ 158–159.)

On February 13, 2007, Bear Stearns filed its Form 10–K for the annual and quarterly period ended November 30, 2006. The 10–K was signed by, among others, Defendants Greenberg, Cayne, Schwartz, Spector and Farber. It is alleged that the Form 10–K made misrepresentations regarding the Company's financial results, risk management practices, exposure to market risk, compliance with banking capital requirements, and internal controls. Finally, the 2006 Form 10–K contained allegedly false and misleading statements by the Company's auditor, Deloitte, relating to its review and certification of the Company's reported financial results. As a result, on February 13, 2007, Bear Stearns' stock closed at $160.10 per share, up from a close of $157.30 per share the day before. The following day, February 14, 2007, Bear Stearns' shares closed at $165.81. (Sec. Comp. ¶¶ 606–607.)

The financial results, including revenues, earnings, and earnings per share reported by the Company in the Form 10–K for 2006 were misleading for the same reasons set forth above, relating to the Company's announced results for fiscal year 2006. Moreover, the Company's assertions about the value of assets corresponding to Level 3 were allegedly materially false and misleading. (Sec. Comp. ¶¶ 608–609.)

As set forth above, by the date of this statement, the Company's Principal Accountant and Controller had already been informed that the models the Company used to value the mortgage-backed securities in this asset category failed to reflect dramatic declines in the housing market. (Sec. Comp. ¶¶ 606–610.)

It is alleged that Bear Stearns' 2006 Form 10–K also misled investors with respect to the Company's use of its VaR models and the accuracy of its valuation models for assets linked to subprime mortgages. Bear Stearns' 2006 Annual Report to Stockholders, attached as an Exhibit to the Form 10–K, misrepresented Bear Stearns' risk control philosophy when it stated that "the Company's Risk Management Department and senior trading managers monitor exposure to market and credit risk for high yield positions and establish limits and concentrations of risk by individual issuer." (Sec. Comp. ¶¶ 611–616).

Bear Stearns' 2006 Form 10–K also misled investors with respect to the Company's risk management procedures by stating that "comprehensive risk management procedures have been established to identify, monitor and control [its] major risks." (Sec. Comp. ¶ 617.)

Bear Stearns' 2006 Form 10–K also stated that "[t]he Treasurer's Department is independent of trading units and is responsible for the Company's funding and liquidity risk management ... [m]any of the independent units are actively involved in ensuring the integrity and clarity of the daily profit and loss statements," and that:

> The Risk Management Department is independent of all trading areas and reports to the chief risk officer ... [t]he department supplements the communication between trading managers and senior management by providing its independent perspective on the Company's market risk profile."

As set forth above, in this period Bear Stearns' risk managers had little independence from its trading desk, and no ability to rein in the Company's accumulation of risk. (Sec. Compl. ¶¶ 619–620.)

**\*457** Because of the deficiencies in its VaR models, the Company's representation in its 2006 Form 10–K that it had an aggregate VaR of just $28.8 million, which was far lower than its peers, was materially false and misleading. In fact, the Company knew that its VaR numbers failed to reflect its exposure to declining housing prices. (Sec. Comp. ¶¶ 160–161, 621–624.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

In its 2006 Form 10–K Bear Stearns stated that "the Company is in compliance with CSE regulatory capital requirements." This statement was allegedly materially false and misleading when made because the Company had misled regulators into believing that it was meeting capital requirements only by repeatedly violating banking regulations relating to the appropriate calculation of net capital. (*See* Sec. Compl. ¶¶ 427–452.) As set forth above, Defendants Cayne and Molinaro each made allegedly false and misleading statements when they executed Sarbanes–Oxley Act of 2002 ("Sarbanes–Oxley Act") certifications, annexed as an exhibit to the Form 10–K filing.

The Company also asserted in its Form 10–K that it marked all positions to market on a daily basis and independently verified its inventory pricing and assessed the value of its Level 3 assets as $12.1 billion. The Company allegedly knew that the models it used to value its Level 3 mortgage-backed assets were badly out of date and did not reflect crucial data about housing prices and default rates and that its risk managers had little power to provide any independent review of these figures. Because of the failure to take appropriate losses on its Level 3 assets, the revenues and earnings per share it reported in its 2006 Form 10–K are alleged to be false and misleading. Cayne and Molinaro executed a certification of these statements, and knew of the Company's improper risk management and valuation practices, and the harmful consequences this deception would have on investors. As a result of the Company's continuing misrepresentations about its 2006 results and its VaR exposure, its stock rose $5.71 on February 14, 2007, to close at $165.81. (Sec. Compl. ¶¶ 168–171.)

The Company's auditor, Deloitte, certified Bear Stearns' 2006 Form 10–K as required by the Sarbanes–Oxley Act and, in so doing, knowingly and recklessly offered a materially misleading opinion as to the financial statements' accuracy. (Sec. Compl. ¶ 629.)

On March 15, 2007, Bear Stearns issued a press release regarding its first quarter 2007 results. As a result, on March 15, 2007, Bear Stearns' stock closed at $148.50 per share, up from a close of $145.29 per share the day before. The following day, March 16, 2007, Bear Stearns' shares closed at $145.48. The press release allegedly misstated Bear Stearns' earnings per share, net income, and net revenues, and falsely inflated the financial results for the Company's Capital Markets division, specifically Fixed Income. These statements were allegedly false and misleading because Bear Stearns achieved these results by using misleading mortgage valuation models to value its Level 3 assets as described above. (Sec. Comp. ¶¶ 631–634.)

At the time of the statements, the Company's Level 3 assets represented 11.64% of the its total assets held at market value, or a total of about $15 billion. For the reasons set forth above, the highly-leveraged nature of these assets would have magnified even a small decline in value. Accordingly, the values assigned to these assets were artificially inflated by the accounting violations described above. (Sec. Comp. ¶¶ 173–174, 635, 637.)

During the March 15, 2007 conference call, Molinaro repeated the financial results and it is alleged these statements **\*458** were false and misleading (Sec. Comp. ¶¶ 633–636). During the latter part of 2006 and the beginning of 2007 EMC was "buying everything" without regard for the risk of the loan and Bear Stearns' origination platforms were seriously flawed and were not accurately measuring the risk of the loans issued. (Sec. Comp. ¶¶ 638–640.)

Molinaro also made allegedly false and misleading statements regarding the Company's exposure to risk connected with the Hedge Funds. When asked to give details regarding Bear Stearns' exposure to subprime CDOs, Molinaro refused, saying "I think that we feel like we've got the situation in hand. We think it's well hedged." This statement was alleged to be false and misleading, in that Molinaro was aware that the VaR and valuation models, essential to meaningful hedging of risk, failed to reflect key data about housing declines. (Sec. Comp. ¶¶ 641–645.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

On March 15, 2007, Molinaro also stated that there would be no change in trends in the Company's VaR, that the subprime market was a small part of Bear Stearns' overall business, that the Company had reduced the number of subprime mortgages it was purchasing and securitizing and that it was well-hedged in the market for subprime-backed securities, all of which were allegedly false. As a result of these statements and quarterly results, Bear Stearns' share price rose $2.10, to close at $148.50. (Sec. Comp. ¶¶ 172–179.)

On April 9, 2007, Bear Stearns filed its Form 10–Q for the quarter ending February 28, 2007 and again made various representations concerning Bear Stearns' risk management and mortgage-related operations. The Form 10–Q was false and misleading because, as set forth above, Bear Stearns was able to achieve these results only by avoiding taking losses on its Level 3 assets, by using misleading valuation models that did not accurately reflect declines in the housing market. This avoidance of loss permitted the Company to increase its revenues and asset values, inflating the value of its stock. Because the Level 3 assets the Company reported for the period stood at $15.64 billion, the Company's leveraging practices magnified its knowing use of materially deficient models, which did not reflect key declines in the market, to value assets. (Sec. Comp. ¶¶ 180, 647–650.)

The first quarter 2007 10–Q also stated that the Company's net revenues for Capital Markets increased 15.4% to $1.97 billion for the quarter and that its total assets at February 28, 2007 increased to $394.5 billion from $350.4 billion at November 30, 2006. These statements are alleged to be false and misleading, because the Company only avoided taking losses on its Level 3 assets by using improper valuation models. Cayne and Molinaro once again certified these statements. (Sec. Compl. 1186.)

The first quarter 2007 Form 10–Q also misled investors with respect to its assessment of risk exposure by asserting that "[t]he Company regularly evaluates and enhances such VaR models in an effort to more accurately measure risk of loss." Bear Stearns reported the reassur-

ingly low VaR numbers it had calculated for the first quarter of 2007, including an aggregate risk of just $27.9 million—far lower than its peers. This statement was misleading, in that the Company knew that its VaR modeling failed to reflect its exposure to declining housing prices. (Sec. Comp. ¶¶ 651–654.) In the same filing, Bear Stearns misrepresented its risk control philosophy for the reasons set forth above, when it stated that "the Company's Risk Management Department and senior trading managers monitor exposure to market and credit risk for high yield positions and establish limits and concentrations of risk **\*459** by individual issuer." (Sec. Comp. ¶¶ 654–656). In addition, its statement that "the Company is in compliance with CSE regulatory capital requirements" was also allegedly materially false and misleading when made because Bear Stearns was only able to meet the CSE program's minimum capital requirements by repeatedly violating CSE rules relating to the appropriate calculation of net capital. (Sec. Comp. ¶ 657).

Cayne and Molinaro each made allegedly false and misleading statements when they executed Sarbanes–Oxley Act certifications, annexed as an exhibit to the first quarter 2007 Form 10–Q. These statements are alleged to have been false and misleading, because the Company had made no effort to address deficiencies that went to the heart of the its ability to assess the value of its assets and its exposure to risk, despite repeated warnings from the SEC. Moreover, the encouraging revenue growth and earnings per share Bear Stearns reported in its certified statements were only made possible by the fact that Bear Stearns was avoiding taking losses by relying on misleading valuation models that failed to reflect the declining value of its highly illiquid Level 3 assets. (Sec. Compl. ¶¶ 658–660).

Deloitte again certified Bear Stearns' first quarter 2007 Form 10–Q and, in so doing, knowingly and recklessly falsely offered an opinion as to the financial statement's accuracy. As set forth above, it is alleged that Deloitte knew or recklessly disregarded that these statements and certifications were materially false and misleading when made, and perpetrated a fraud on Bear Stearns investors as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

a result. (Sec. Compl. ¶ 661.)

On June 14, 2007, Bear Stearns issued a press release regarding its second quarter 2007 results. The following day, June 15, 2007, Bear Stearns' shares closed at $150.09. In the press release, Bear Stearns allegedly misrepresented its earnings per share, net income, and net revenues—specifically its financial results for Capital Markets. These statements were allegedly misleading and false because Bear Stearns achieved these results by using misleading mortgage valuation models to value its Level 3 assets, as described above. (Sec. Compl. ¶¶ 662–665.)

At the time of the statements, the Company's Level 3 assets represented 10.55% of the Company's total assets held at market value, or a total of about $14.39 billion. Because these assets were highly leveraged, even a small decline in value would be vastly magnified. (Sec. Compl. ¶¶ 77–80, 666.)

In its report for the second quarter of 2007, signed by Farber, the Company materially misrepresented its financial results, its exposure to risk, its compliance with regulatory capital requirements, its internal controls, and the effects of its repurchase agreement with the High Grade Fund. Deloitte also filed an allegedly materially false and misleading certification in connection with the Form 10–Q. As a result, on July 10, 2007, Bear Stearns' stock closed at $137.96 per share, down from a close of $143.89 per share the day before. The following day, July 11, 2007, Bear Stearns' shares closed at $138.03. (Sec. Compl. ¶¶ 676–677.)

These statements are alleged to be false and misleading as set forth above. Bear Stearns avoided taking losses on its Level 3 assets by using misleading mortgage valuation models, which did not accurately value its Level 3 assets. At the time, the Level 3 assets the Company reported for the period stood at $14.38 billion. Just four months later, the residential mortgage component of the Company's Level 3 assets stood at $5.8 billion. The Company's assertion that its Level 3 assets stood **\*460** at $14.38 billion was itself allegedly materially false and misleading, given that it was a product of a valuation model that did not reflect key declines in the market. (Sec. Compl. ¶¶ 676–682.)

The second quarter 2007 Form 10–Q misled investors with respect to its assessment of risk exposure because Bear Stearns' VaR models failed to include critical variables such as "housing price appreciation, consumer credit scores, patterns of delinquency rates, and potential other data." In the Form 10–Q Bear Stearns reported the reassuringly low VaR numbers it had calculated for the second quarter of 2007, including an aggregate risk of just $28.7 million—far lower than its peers. This statement was materially misleading, in that the Company knew that its VaR modeling failed to reflect its exposure to declining housing prices. (Sec. Compl. ¶¶ 683–686.)

The second quarter 2007 Form 10–Q also misled investors with respect to Bear Stearns' risk control philosophy when it stated that "the Company's Risk Management Department and senior trading managers monitor exposure to market and credit risk for high yield positions and establish limits and concentrations of risk by individual issuer." (Sec. Compl. ¶¶ 687–688.) In the same filing, Bear Stearns' statement that "the Company is in compliance with CSE regulatory capital requirements" was allegedly materially false and misleading for the reasons set forth above. (Sec. Compl. ¶ 689.)

Cayne and Molinaro each made allegedly false and misleading statements when they executed Sarbanes–Oxley Act certifications, annexed as an exhibit to the second quarter 2007 Form 10–Q filing. (Sec. Compl. ¶¶ 690–691.)

The encouraging revenue growth and earnings per share Bear Stearns reported in its certified statements were only possible because Bear Stearns was avoiding taking losses by relying on misleading valuation models that failed to reflect the declining value of its highly illiquid Level 3 assets. (Sec. Compl. ¶ 692.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

The second quarter 2007 Form 10–Q also contained allegedly false and misleading information about the financial impact of Bear Stearns' support of the High Grade Fund because Bear Stearns' management knew that the High Grade Fund did not have sufficient assets available to fully collateralize the facility and the collateral that Bear Stearns took in the repurchase agreement were the same CDOs that had lost so much value, causing other lenders to make the margin calls that severely threatened the hedge fund's liquidity. (Sec. Compl. ¶¶ 693–694.) Again, Deloitte certified these results and, in doing so, allegedly knew or recklessly disregarded that the statements and certifications in the filing were materially false and misleading when made. (Sec. Compl. ¶ 695.)

On June 14, 2007, Bear Stearns held its second quarter 2007 earnings conference call, conducted by Molinaro. During the call, Molinaro repeated the allegedly false and misleading financial results described above. (Sec. Compl. ¶¶ 669–671.)

On June 22, 2007, the Company issued a press release and held a conference call to announce its repurchase agreement with the High Grade Fund in which the Company would provide a $1.6 billion credit line to the fund, secured by collateral worth more than $1.6 billion. Bear Stearns reported that asset sales had reduced the loan balance to $1.345 billion. However, by the time of this statement the estimated value of the collateral securing the loan had deteriorated by nearly $350 million—that is, to approximately the value of the loan Bear Stearns had given the High Grade Fund. Moreover, the High Grade **\*461** Fund had no assets other than the collateral Bear Stearns already held. (Sec. Compl. ¶¶ 672–673.)

At the same time, the Company shifted its funding model from unsecured to secured financing, using its mortgage-backed assets as collateral. In May 2007, Bear Stearns' short term borrowing was 60% secured. Just four months later, in September 2007, it was 74% secured. By March 2008 it was 83% secured. (Sec. Compl. ¶¶ 218–219.)

Bear Stearns' principal source of secured financing was the market for repurchase or "repo" agreements. By the end of the Class Period, Bear Stearns was funding its $50 billion daily needs by using 71% of its mortgage-backed assets as collateral for repo agreements. Because the Company's mortgage-backed assets were serving to prop up the cash needs of the entire Company, Bear Stearns could not afford to reveal that they were rapidly losing value. (Sec. Compl. ¶¶ 220–221.)

According to the OIG Report, mark disputes between Bear Stearns and its counterparties became more common beginning in the summer of 2007. According to the OIG Report, during July 2007, shortly after the $3.2 billion Hedge Fund financing agreement, Bear Stearns told the SEC that there were two large dealers with whom it had mark disputes in excess of $100 million each. Because Bear Stearns knew its assets were overvalued, it was frequently obliged to settle these disputes by paying money to its repo counterparties. Nonetheless, because it could not afford to reveal the declining value of its mortgage-backed collateral was rapidly declining in value, Bear Stearns continued to carry the assets on its books at full value even while privately acknowledging the declining value to its counterparties. (Sec. Compl. ¶¶ 222–225.)

By failing to record the assets at the lower compromise price, the Company was able to hide from investors the extent of its losses on the value of its mortgage-backed assets. (Sec. Compl. ¶¶ 218–226.)

On July 31, 2007, Standard & Poor's analysts downgraded the Company's stock because, among other things, "widening credit spreads and increasing risk aversion may cause a slowdown in its investment banking operation." The Company's stock fell $6.03 as a result, closing at $121.22. (Sec. Compl. ¶ 227.)

On August 3, 2007, Standard & Poor's Ratings Services said it had revised its outlook on Bear Stearns from

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

stable to negative. Notwithstanding the Company's denials, the ratings firm explained that

> Bear Stearns has material exposure to holdings of mortgages and mortgage-backed securities (MBS), the valuations of which remain under severe pressure. It also has exposure to debt it has taken up as a result of unsuccessful leveraged finance underwritings, and it has significant further underwriting commitments.

That same day, Bear Stearns denied the impact of these events and any broader implications. (Sec. Compl. ¶¶ 228–231.)

On a conference call the same day, Alix, Bear Stearns' Chief Risk Officer and head of the Company's Global Risk Management division, made false and misleading statements in which he denied that the VaR models the company employed to assess risk and hedge purchases failed to reflect the reality of the collapsing real estate market and failed to admit that the Company had not revised or updated its defective models in years. At the time of the call, Alix and the Company had already been informed that Bear Stearns' "risk analytics" did not take into account crucial information on risk of default and volatility in housing prices and, as a result of the Hedge Fund financing agreement, Bear **\*462** Stearns had just assumed as collateral more than a billion dollars worth of subprime-backed CDOs that were virtually worthless. As the Company only held approximately $11 billion in highly-leveraged net equity at the time, this was a very significant new exposure. During the same conference call, Molinaro made allegedly false and misleading statements regarding the collateral that Bear Stearns took in the repurchase agreement with the High Grade Fund, which reflected Bear Stearns' inaccurate valuation models for the Hedge Funds' subprime-backed collateral. (Sec. Compl. ¶¶ 230–232, 700–703.)

On September 20, 2007, Bear Stearns posted its results for the third quarter, ending August 31, 2007 (closing stock price $108.66), signed by Farber. It reported net income for the quarter of $171.3 million, or $1.16 a share, down from $438 million, or $3.02 a share, in the period a year earlier. Net revenue for the Company, or total revenue minus interest costs, fell 37% to $1.33 billion, while net revenue at the fixed-income division dropped 88%, to $118 million from $945 million in the third quarter of 2006. Return on equity stood at 5.3%, compared with 16% a year earlier. Again, these statements were allegedly false and misleading because Bear Stearns relied on misleading mortgage valuation models to value its Level 3 assets, as described above. (Sec. Compl. ¶¶ 704–706).

At the time of the statements, the Company's Level 3 assets represented 13% percent of its total assets held at market value, or a total of about $16.6 billion. Accordingly, the values the Company assigned to this large group of assets were significantly higher than they should have been, violating relevant GAAP. (Sec. Compl. ¶¶ 324–423.) Because the Company was not reflecting these losses on its books, its revenues, earnings, and earnings per share were overstate d as well. (Sec. Compl. ¶¶ 707–710.)

Molinaro conducted Bear Stearns' third quarter 2007 earnings conference call on the same day. During the call, Molinaro repeated the financial results set out above and made statements regarding Bear Stearns' valuation methodology, which were allegedly false and misleading for the reasons set forth above. (Sec. Compl. ¶¶ 711–713.)

During the call, Molinaro made statements regarding risk and write downs, all of which are alleged to have been false and misleading, because they relied on Bear Stearns' improper avoidance of losses through valuation methods that artificially boosted the values of the Company's Level 3 assets. (Sec. Compl. ¶¶ 235–240.) He stated that Bear Stearns would take "$200 million of losses associated with the failure of the high-grade funds, representing the write-off of our investment and fees receivable, losses from the liquidation of the $1.6 billion repo facility." The Company did not disclose the full amount of its losses on the collateral for fear that its lenders and counterparties would realize that it had been consistently overvaluing its assets. By the Company's own estimates regarding the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

write-downs associated with the Hedge Fund, the numbers revealed to investors in September 2007 were misleading. According to the OIG Report, the Company's internal documents reflect that it took a $500 million write down in connection with the bailout at some time in the fall of 2007 which was not disclosed to investors for fear that it would telegraph to the market the decline in the value of the other subprime-backed assets it carried on its books. (Sec. Compl. ¶¶ 711–718.)

In addition, the statement that the Company recognized "approximately $700 million in net inventory markdowns during **\*463** the 2007 quarter primarily related to losses experienced in the mortgage-related and leveraged finance areas" is alleged to be false and misleading because it grossly underrepresented the Company's true losses, including its losses on the collateral it had received under the repurchase agreement with the High Grade Fund and the devalued and illiquid retained interests that it continued to carry on its books, as set out above. (Sec. Compl. ¶ 724.)

The third quarter 2007 Form 10–Q is also alleged to have misled investors with respect to Bear Stearns' risk control philosophy and, specifically, its risk exposure assessment, as the Company knew its VaR modeling failed to reflect accelerating exposure to declining housing prices. (Sec. Compl. ¶¶ 725–728.) The filing also stated that "the Company is in compliance with CSE regulatory capital requirements," which is alleged to be materially false and misleading when made it reflected Bear Stearns' violation of CSE rules relating to the appropriate calculation of net capital. (Sec. Compl. ¶ 731.)

As in previous filings, Cayne and Molinaro made allegedly false and misleading statements when they executed Sarbanes–Oxley Act certifications (Sec. Compl. ¶ 732), and Deloitte's knowingly and recklessly falsely offered an opinion as to the financial statements' accuracy when it certified the results in the filing. (Sec. Compl. ¶¶ 523–588, 735.)

On October 10, 2007, Bear Stearns filed its Form 10–Q for the quarterly period ended August 31, 2007, which included the same misleading financial results it reported on September 20, 2007, At the time this statement was made, the Company had been repeatedly warned that its mortgage valuation models were outdated and inaccurate, but had refused to revise them. (Sec. Compl. ¶ 241–243.)

The Company repeated the same allegedly false and misleading statements regarding its VaR models, when it stated that it "regularly evaluates and enhances [its] VaR models in an effort to more accurately measure risk of loss," and that its aggregate VaR was still only $35 million, well below its competitors. (Sec. Compl. ¶¶ 244–245.)

On November 14, 2007, Molinaro announced that Bear Stearns would write down $1.2 billion of its assets in the fourth quarter and that while Bear Stearns still bore more than a billion dollars of subprime exposure in the form of the collateral it had received from the failed High Grade Fund, it had reduced its CDO holdings to $884 million as of November 9, down from $2.07 billion at the end of August. Molinaro stated that during the period between August 31, 2007 and November 9, 2007, the Company significantly increased its short subprime exposures, reducing its reported August 31, 2007 net exposure of approximately $1 billion to a negative $52 million net exposure as of November 9, 2007. Molinaro stated that the balances were continuing to show improvement although the Company still had more than a billion dollars in subprime backed collateral from its Hedge Fund financing agreement to write down, and the Company's hedging efforts failed to use accurate models to assess risk. (Sec. Compl. ¶¶ 246–247, 480, 736–738.)

Molinaro's statements were also alleged to be false and misleading because the Company's faulty VaR models could not permit it to effectively hedge against risk in the subprime market. Less than a month later, the Company announced an additional $700 million write-down on its mortgage-backed assets. (Sec. Compl. ¶¶ 739.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

**\*464** On December 21, 2007, Bear Stearns announced that it would take the first quarterly loss in the Company's 84–year history (quarter closing on November 30, 2007 at $99.70 per share). It reported that its fiscal fourth-quarter loss after paying preferred dividends was $859 million, or $6.90 per share, compared to a profit of $558 million, or $4 per share, a year earlier. The Company had negative net revenue of $379 million, compared to revenue of $2.41 billion a year earlier. The Company also announced on December 21, 2007 that it would write down $1.9 billion of its holdings in mortgages and mortgage-based securities—more than $700 million more than it had announced on November 14, 2007. On December 21, 2007, Bear Stearns' stock closed at $89.95 per share, down from a close of $91.42 per share the day before. (Sec. Compl. ¶¶ 250–252, 740–741.)

In its press release, Bear Stearns misrepresented its earnings per share, net income, and net revenues. The Company's losses in Capital Markets, specifically Fixed Income, were also understated. At the time of the statements, the Company's Level 3 assets represented 19.9% of the Company's total assets held at market value, or a total of about $24.41 billion. However, these results were achieved through the use of misleading mortgage valuation models to value its Level 3 assets, as described above. The Company also continued to fail to disclose the effect of the market downturn and the true extent of Bear Stearns' exposure from the repurchase collateral taken from the High Grade Fund. Beyond the $100 million write down in hedge fund collateral in the quarter ending August 31, 2007, the Company had disclosed no further write-downs of the $1.2 billion of toxic hedge fund assets it still held on its books. (Sec. Compl. ¶¶ 747–748.)

During Bear Stearns' conference call on December 20, 2007, Molinaro repeated the financial results described above. These statements were allegedly false and misleading for the same reasons set out above. Molinaro further stated, "[o]verall this franchise is strong; smaller and more focused on restructuring than origination going forward, but our top talent is in place and we are confident in

the underlying earnings potential of the mortgage business," thereby failing to disclose the Company's undisclosed losses from the hedge fund collateral on its books. The losses were also minimized by the reliance on same misleading valuation models discussed above. Moreover, the lack of any schedule giving details regarding the nature of the write-downs left investors with no information about the Company's true exposure, and such omissions compounded Molinaro's false and misleading statements. (Sec. Compl. ¶¶ 749–754.)

On January 29, 2008, Bear Stearns filed its Form 10–K for the annual and quarterly periods ended November 30, 2007. The Form 10–K, which was signed by Defendants Greenberg, Cayne, Schwartz, Farber and Molinaro, among others, allegedly misrepresented the Company's financial results, risk management practices, exposure to market risk, compliance with banking capital requirements and internal controls. (Sec. Compl. ¶ 755.) The 2007 Form 10–K also contained allegedly false and misleading statements by the Company's auditor, Deloitte, relating to its review and certification of the Company's reported financial results.

As a result of the filing, on January 29, 2008, Bear Stearns' stock closed at $91.58 per share, up from a close of $91.10 per share the day before. The following day, January 30, 2008, Bear Stearns' shares closed at $88.26. (Sec. Compl. ¶ 755, 757.)

**\*465** The Company stated that it held $24.4 billion in Level 3 assets, as of November 30, 2006. This statement was allegedly false and misleading because, by January 2008, the Company had been informed that the models it used to value the more than $7.5 billion in mortgage-backed securities in this asset category failed to reflect dramatic declines in the housing market. (Sec. Compl. ¶¶ 755–759.)

Bear Stearns' 2007 Annual Report to Stockholders, attached as an Exhibit to the Form 10–K, misled investors with respect to Bear Stearns' risk control philosophy when

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

it stated that "the Company's Risk Management Department and senior trading managers monitor exposure to market and credit risk for high yield positions and establish limits and concentrations of risk by individual issuer." (Sec. Compl. ¶ 764.)

The 2007 Form 10–K misled investors with respect to Bear Stearns' risk management procedures when it stated that "Comprehensive risk management procedures have been established to identify, monitor and control each of [the] major risks." (Sec. Compl. ¶ 766.) The filing also stated that "The Treasurer's Department is independent of trading units and is responsible for the Company's funding and liquidity risk management ... [m]any of the independent units are actively involved in ensuring the integrity and clarity of the daily profit and loss statements." Despite the crucial deficiencies in the models Bear Stearns used to value the Company's Level 3 assets, the Company stated in its Form 10–K that it was "marking all positions to market on a daily basis" and that it had "independent verification of inventory pricing." (Sec. Compl. ¶¶ 768–771.)

The 2007 Form 10–K also mislead investors with respect to the Company's exposure to "market risk" because of the declines in assets in light of deficiencies in its VaR and mortgage valuation models, as discussed above. Furthermore, because of the deficiencies in it VaR models, the Company was allegedly false and misleading in its 2007 Form 10–K representation that it had an aggregate VaR of just $69.3 million—still far lower than its peers. (Sec. Compl. ¶¶ 772–775.)

The Form 10–K's statement that "the Company is in compliance with CSE regulatory capital requirements" was allegedly materially false and misleading as set forth above. (Sec. Compl. ¶ 776.) Cayne and Molinaro each made allegedly false and misleading statements when they executed Sarbanes–Oxley Act certifications, annexed as an exhibit to the Form 10–K filing. (Sec. Compl. ¶ 777–780.) In addition, Deloitte certified Bear Stearns' 2007 Form 10–K, as required by the Sarbanes–Oxley Act, and, in so doing, is alleged to have knowingly and recklessly falsely

offered an opinion as to the financial statement's accuracy. Deloitte knew or recklessly disregarded that these statements and certifications were allegedly materially false and misleading when made. (Sec. Compl. ¶¶ 523–588, 781.)

On January 31, 2008, Bear Stearns published a letter it had written to John Cash, Accounting Branch Chief of the SEC's Division of Corporate Finance, in response to certain concerns the SEC raised about Bear Stearns' exposure to subprime loans in its fiscal year 2006 Form 10–K. These statements made were materially false and misleading for the reason set forth above with respect to similar statements. (Sec. Compl. ¶¶ 782–784.)

On March 6, 2008, Rabobank Group, one of Bear Stearns' European lenders, stated that it would not renew a $500 million loan coming due later that week, indicating that it was unlikely to renew an additional $2 billion credit agreement set to expire the following week. Analyst reports released the same day predicted that the Company's**466** quarterly results would be negatively impacted by problems stemming from its fixed income business; the Company's stock lost more than $5, to close at $69.90. As a result, on Friday, March 7, 2008, the cost of credit default swaps on Bear Stearns' debt surged. (Sec. Compl. ¶¶ 260–262.)

In a March 10, 2008 press release, the Company said that "[t]here is absolutely no truth to the rumors of liquidity problems that circulated today in the market" and suggested that the Company had some $17 billion in cash. The same day, Greenberg claimed during an interview with CNBC that the Company had no liquidity problems, calling such an assertion "ridiculous, totally ridiculous." (Sec. Compl. ¶ 263.)

The morning of March 11, 2008, Goldman Sachs' ("Goldman") credit derivatives group sent its hedge fund clients an e-mail announcement about Bear Stearns stating that, at least temporarily, it would not step in for Bear Stearns derivatives deals. (Sec. Compl. ¶ 266.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Hedge funds flooded Credit Suisse's brokerage unit with requests to take over trades opposite Bear Stearns. In a mass e-mail sent out that afternoon, Credit Suisse stock and bond traders were told that all such "novation" requests involving Bear Stearns and any other "exceptions" to normal business required the approval of credit-risk managers. (Sec. Compl. ¶ 268.)

Bear Stearns' counterparties began to back away from the Company. Early in the morning on Tuesday, March 11, 2008, ING Groep NV ("ING") informed Bear Stearns that it was pulling about $500 million in financing. The same day, analysts suggested that Bear Stearns' future profits were likely to be squeezed by its exposure to "esoteric securities." The Company's stock dropped $3.75 as a result, closing at $62.97. By the end of March 11, 2008, the banks simply refused to issue any further credit protection on the Company's debt. These developments had a devastating effect on the Company's liquidity. (Sec. Compl. ¶¶ 266–272.)

On March 12, 2008, Schwartz appeared on CNBC and said that the Company's liquidity position and balance sheet had not weakened at all. "We finished the year, and we reported that we had $17 billion of cash sitting at the bank's parent company as a liquidity cushion," he said. "As the year has gone on, that liquidity cushion has been virtually unchanged." Schwartz added that "We don't see any pressure on our liquidity, let alone a liquidity crisis." Schwartz's statement is alleged to be false, in that the day before his assertion that the Company's liquidity position was unchanged Bear Stearns' liquidity pool already had fallen to an adjusted level of $15.8 billion. Moreover, as Schwartz spoke on March 12, 2008, its liquidity pool stood at nearly $5 billion less than it had on Monday, March 10, 2008, and some $13 billion of the Company's cash was evaporating. Moreover, Schwartz specifically denied that the Company's risk had scared away any counterparties. At the time he made this statement, Schwartz, as the Company's CEO, allegedly would have been aware that ING had pulled nearly half a billion in financing and that Goldman, once a principal source of cash for the Compa-

ny, had at least temporarily halted covering any more Bear Stearns risk. (Sec. Compl. ¶¶ 274–277.)

According to the OIG Report, the Company informed TM on March 12, 2008, the same day as Schwartz's statement, that "Bear Stearns paid out $1.1 billion in disputes to numerous counterparties in order to squelch rumors that Bear Stearns could not meet its margin calls." On March 12, **\*467** 2008 Bear Stearns' stock closed at $61.58 per share, down from a close of $62.97 per share the day before. The following trading day, March 13, 2008, Bear Stearns' shares closed at $57. (Sec. Compl. ¶¶ 788–794.)

According to a March 20, 2008 letter from SEC Chairman Cox to the Chairman of the Basel Committee on Banking Regulation, on March 11, 2008, the Company's liquidity pool stood at $15.8 billion, "adjusted for the customer protection rule." By March 13, 2008, according to the letter, the pool stood at $2 billion—a loss of more than $13 billion in two days. (Sec. Compl. ¶¶ 273, 782–784.)

*7. Accounting Standards Violations*

Despite its public statements to the contrary, throughout the Class Period the Company is alleged to have suffered from a pervasive weakness in its internal controls, and repeatedly and systematically violated Generally Accepted Accounting Principles ("GAAP"). (Sec. Compl. ¶ 324.)

a) GAAP Overview

SEC Regulation S–X, 17 C.F.R. § 210.4–01(a)(1), provides that financial statements filed with the SEC that are not presented in conformity with GAAP will be presumed to be misleading, despite footnotes or other disclosures. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB") and the American Institute of Certified Public Accountants ("AICPA"). GAAP consist of a hierarchy of authoritative literature, the FASB Statements of Financial Accounting Standards ("FAS"),

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

followed by FASB Interpretations ("FIN"), FASB Staff Positions ("FSP"), Accounting Principles Board Opinions ("APB"), AICPA Accounting Research Bulletins ("ARB"), AICPA Statements of Position ("SOP"), and AICPA Industry Audit and Accounting Guides ("AAG"). GAAP provide other authoritative pronouncements including, among others, the FASB Concept Statements ("FASCON"). The AICPA issues industry specific Audit & Accounting Guides ("AAG") to provide guidance in preparing financial statements in accordance with GAAP. The AAG for Depository and Lending Institutions ("D & L AAG") was applicable to Bear Stearns with respect to its mortgage banking activities, including mortgage originations, securitizations, and holdings of investments in debt securities. The D & L AAG interpreted GAAP pronouncements on the proper methods to assess fair value for financial instruments and Retained Interests ("RIs"). In addition, there was an AAG that was applicable to Brokers and Dealers in Securities ("B & D AAG"). Among other applications, the B & D AAG provided guidance on GAAP related to Bear Stearns' trading of financial instruments. Bear Stearns was also expected to adhere to fundamental accounting principles requiring a Company's financial statements to be presented in a manner that, among other things, should:

(a) Provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions. (FASCON 1 ¶ 34.)

(b) Provide information about an enterprise's economic resources, obligations, and owners' equity. That information helps investors, creditors, and others identify the enterprise's financial strengths and weaknesses and assess its liquidity and solvency. (FASCON ¶ 140.)

(c) Provide information about an enterprise's financial performance during a period. "Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment**\*468** and credit decisions reflect investors' and creditors' expectations about future enterprise perfor-

mance, those expectations are commonly based at least partly on evaluations of past enterprise performance." (FASCON ¶ 142.)

(d) Include explanations and interpretations to help users understand financial information because management knows more about the enterprise and its affairs than investors, creditors, or other "outsiders" and can often increase the usefulness of financial information by identifying certain transactions, other events, and circumstances that affect the enterprise and explaining their financial impact on it. (FASCON 1 ¶ 54.)

(e) Be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting. (FASCON 2 ¶¶ 58–59.)

(f) Be complete, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions. (FASCON 2 ¶ 79.)

(g) Be verifiable in that it provides a significant degree of assurance that accounting measures represent what they purport to represent. (FASCON 2 ¶ 81.)

(h) Reflect that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. (FASCON 2 ¶¶ 95, 97.)

(Sec. Compl. ¶¶ 325–330.)

b) Fraud Risk Factors

Bear Stearns was subject to risk factors associated with depository and lending institutions. As set forth in the D & L AAG, one risk factor was "significant declines in customer demand and increasing business failures in either the industry or overall economy," including "deteriorating economic conditions ... within industries or geographic regions in which the institution has significant credit con-

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

centrations." (Ch. 5, Audit Considerations and Certain Financial Reporting Matters, Ex. 5–1, Fraud Risk Factors). Another AICPA risk factor set forth in the D & L AAG is "[u]nrealistically aggressive loan goals and lucrative incentive programs for loan originations," as shown by, among other things, "relaxation of credit standards," and "excessive concentration of lending." Bear Stearns' 2006 Form 10–K disclosed that, "Mortgage-backed securities revenues increased during fiscal 2006 when compared with fiscal 2005 on higher origination volumes from asset-backed securities, adjustable rate mortgage ("ARM") securities ...." (Sec. Compl. ¶¶ 331–333.)

Bear Stearns did not disclose critical information until January 2008 pursuant to the SEC's efforts to seek expanded disclosure from the Company. These "2/28 ARMs" (*see* Sec. Compl. ¶¶ 346–347, 579) carried a particularly high degree of risk of misstatement, and constituted the types of risk highlighted by the D & L AAG. Bear Stearns delayed efforts to adopt stricter underwriting standards related to non-agency loan originations until the quarter ended August 31, 2007. (Sec. Compl. ¶ 334.)

Another source of industry-specific risk occurs when an institution has "assets, liabilities, revenues, or expenses based on significant estimates that involve subjective judgments or uncertainties that are difficult to corroborate (significant estimates generally include ... fair value determinations)"**\*469** and when "material amounts of complex financial instruments and derivatives held by the institutions that are difficult to value." (Sec. Compl. ¶ 335.)

The AAG identifies another risk factor for lenders as occurring when "[v]acant staff positions remain unfulfilled for extended periods, thereby preventing the proper segregation of duties," and when there exists an "[u]nderstaffed accounting or information technology department, inexperienced or ineffective accounting or information technology personnel, or high turnover." (Sec. Compl. ¶ 336; *see also* Sec. Compl. ¶¶ 129–136.)

Due to Bear Stearns' role in trading financial instru-

ments, the Company was subject to special risk factors applicable to brokers and dealers in securities, including those described in Ch. 5, Appendix A, ¶ 5.195, Part 1 of *Fraudulent Financial Reporting.* Among the risk factors the AICPA identifies for brokers and dealers are "concentration in a particular type of financial instrument" and "a failure by management and those charged with governance to set parameters (for example, trading limits, credit limits, and aggregate market risk limits) and to continuously monitor trading activities against those parameters." According to the OIG Report, Bear Stearns repeatedly exceeded its own internal limits on concentration in mortgage-backed securities, invoking this risk. The AICPA identifies as a further risk factor for broker dealers "a failure by management to have an adequate understanding of the entity's trading and investment strategies as conducted by the entity's traders, including the types, characteristics, and risks associated with the financial products purchased and sold by the entity." As set out above, throughout the Class Period the Company persisted in using valuation and VaR models it knew to be faulty in an effort to avoid disclosing its losses to the public. (Sec. Compl. ¶¶ 337–339.)

As set forth above, according to the OIG Report, during much of the Class Period the Company's risk management department was virtually deserted, preventing the department from functioning effectively. (Sec. Compl. ¶¶ 134–135.) The Company delayed taking a huge charge against capital (*see* Sec. Compl. ¶¶ 212–213), invoking the B & D AAG's assessment of risk associated with "intercompany transactions designed to improperly manage earnings." Finally, the B & D AAG warned accountants regarding the "[u]se of different valuations of same product in two related companies," making relevant the practice of booking assets at full value after making price concessions to counterparties in mark disputes and the knowledge that similar holdings of its hedge funds were without value. (*See* Sec. Compl. ¶¶ 222–226.)

c) Audit Risk Alerts

The AICPA issues Audit Risk Alerts ("ARAs") that are particularized by the financial industry in which Bear

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Stearns participated. The ARAs are used to address areas of concern and identify the significant business risks that may result in the material misstatement of the financial statements. The factors highlighted in the ARAs are most often summaries of existing industry-specific considerations such as those provided by, for example, the Office of the Comptroller of the Currency, the Federal Reserve, or the National Association of Realtors. It was also typical practice for the audit quality departments of major accounting firms such as Deloitte to integrate the ARAs into firm memoranda for purposes of disseminating that information to applicable clients and firm professionals. The ARAs are included**\*470** in the AICPA's annual Audit and Accounting Manual ("AAM").

The 2006 ARA observed the following risk factors that were relevant to Bear Stearns' financial statements:

(a) "Customers holding adjustable rate mortgages may not be able to make payments if interest rates rise significantly." The ARA continued to say "Upon foreclosure, these financial institutions may not be able to liquidate underlying assets without absorbing significant losses ...." (2006 ARA 8050.37.)

(b) Any increase in originations of risky loan products, such as ARMs and Pay Option ARMs posed particular risks for entities that had not "developed appropriate risk management policies ...." (2006 AAM 8050.35.)

(c) The value of these non-conforming products was often predicated on an assumption that home prices would continue to rise, which it observed was an assumption unlikely to be sustainable: "[S]ome of these [ARM] products assume a continued rise in home prices that may not continue." (2006 AAM 8050.35.)

The 2007 ARA reiterated the factors observed in the 2006 ARA and expanded on the following risk factors:

(a) "This quarter's foreclosure starts rate is the highest in the history of the survey, with the previous high being

last quarter's rate." (2007 AAM 8050.27.)

(b) The "American Banker recently reported that home resales hit a 4–year low due to continued price decline. Many in the housing industry believe the decline in resales signifies a protracted housing slump. Another issue contributing to sluggish home sales is the rising number of foreclosures of properties financed with subprime debt." (2007 AAM 8050.30.)

(c) "[O]n June 29, 2007, the federal financial regulatory agencies (Board of Governors of the Federal Reserve System, FDIC, NCUA, 0CC, and OTS) issued the Statement on Subprime Mortgage Lending to address issues related, to ARMs.... The agencies' primary concern is the possibility of 'rate or payment shock' to the borrower that may result from the expiration of a fixed introductory rate to an adjustable variable rate for the duration of the loan." (2007 AAM 8050.48.)

It is alleged that Bear Stearns, with its access to material inside information regarding its specific high-risk environment, had an obligation to ensure that its certifications regarding the effectiveness of its internal control over financial reporting, as well as the assertions it made in its financial statements, reflected appropriate consideration of these issues. (Sec. Compl. ¶ 348.)

d) Internal Controls

Throughout the Class Period, Bear Stearns is alleged to have falsely asserted in its public filings that it maintained effective internal controls over financial reporting, in clear violation of SEC rules. The lack of effective internal controls at Bear Stearns facilitated its efforts to mislead investors because without those controls it was able to represent that: it was exposed to significantly less risk than was truly inherent in the assets it possessed; its risk management personnel and procedures were effective and reliable; it had properly recorded reserves for, and made adequate and complete disclosures about, its failed hedge funds; it made reasonable estimates of the fair value of its financial instruments, when it knew at least its

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

mortgage-*471 related models were deficient; the write-downs of the fair value of the Company's financial instruments and other securitization-related assets were adequate; and its reported revenue, earnings, and earnings-per-share were artificially inflated. (Sec. Compl. ¶ 349.)

Bear Stearns' 2007 Form 10–K filing asserted management's responsibility over internal controls using the criteria established in 'Internal Control–Integrated Framework' issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). (Sec. Compl. ¶ 350.)

COSO defines "internal control" in Chapter 1 of its Framework as follows:

Internal control is a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (i) Effectiveness and efficiency of operations; (ii) Reliability of financial reporting; (iii) Compliance with applicable laws and regulations.

The COSO Framework Executive Summary identifies the pervasive influence that the control environment has on the Company. In addition, the second chapter of the COSO Framework establishes that management's philosophy and operating style directly affects the manner in which the company is managed, the amount of risk that the company accepts and ultimately the success of the company. (Sec. Compl. ¶¶ 351–53.)

Section 404 of the Sarbanes–Oxley Act of 2002 requires management to assess the effectiveness of a company's internal control structure and financial reporting procedures. Further, SEC rules require management to report publicly all material weaknesses in the Company's internal controls. Beginning in 2002, the Officer Defendants were required under Rule 302 of the Sarbanes–Oxley Act to provide assurances relating to the Company's "in-

ternal control over financial reporting." (Sec. Compl. ¶¶ 354–56.)

As set forth above, in connection with the Company's 2006 Form 10–K, Cayne and Molinaro executed the applicable Rule 302 certification. Management's reports on internal control over financial reporting, required by Rule 302 of the Sarbanes–Oxley Act are alleged to be materially false and misleading because Bear Stearns' internal controls were ineffective. (Sec. Compl. ¶¶ 356–58.)

Management's assessment of internal control over financial reporting was a critical metric for investors because it provided assurance that the Company's financial statements were reliable and in compliance with applicable laws. However, during the Class Period, as set forth above, Bear Stearns did not properly assess its internal controls over financial reporting, thus it violated the "Internal Control–Integrated Framework" issued by COSO and various other requirements found in the SEC regulations and the Sarbanes–Oxley Act. (Sec. Compl. ¶¶ 359–360.)

The Company's assertion that it maintained effective internal control is alleged to be materially false and misleading as set forth above.

According to the OIG Report, "Bear Stearns VaR models did not capture risks associated with credit spread widening.... These fundamental factors include housing price appreciation, consumer credit scores, patterns of delinquency rates, and potentially other data. These fundamental factors do not seem to have been incorporated into Bear Stearns' models at the time Bear Stearns became a CSE." (Sec. Compl. ¶ 125.)

*472 e) Financial Statements [FN3]

FN3. The failures described herein apply to Bear Stearns' annual and interim financial statements. APB No. 28, Interim Financial Reporting ("APB 28"), states "Interim financial information is essential to provide investors and others with timely

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

information as to the progress of the enterprise." (APB 28 ¶ 9) In addition, in interim periods "Contingencies and other uncertainties that could be expected to affect the fairness of presentation of financial data at an interim date should be disclosed in interim reports in the same manner required for annual reports. Such disclosures should be repeated in interim and annual reports until the contingencies have been removed, resolved, or have become immaterial." (APB 28 ¶ 22) Bear Stearns' interim financial reporting was required to be on the same basis as its annual financial reporting (APB 28 ¶ 10).

### (1) Hedge Funds

As described above, it is alleged that Bear Stearns knew that the assets provided by the Hedge Funds as collateral was clearly insufficient to guarantee the value of the loans it had extended and that the Hedge Funds were otherwise incapable of repaying those loans. (Sec. Compl. ¶¶ 371–374.)

Statement of Financial Accounting Standards No. 5, Accounting for Contingencies ("SFAS 5") sets forth the standards Bear Stearns was required to adhere to in order to properly account for loss contingencies.

In view of the disclosure on July 18, 2007 to Hedge Fund investors that "unprecedented declines" in the value of the investments had been sustained and that there was "effectively no value left" in the High Grade Enhanced Fund and "very little value left" in the High Grade Fund, it is alleged that Bear Stearns should have taken an immediate loss on the remaining value of the loan of $1.345 billion in the quarter ended August 31, 2007. (Sec. Compl. ¶¶ 375–377.)

### (2) Related Party Disclosure

Related party transactions include transactions between affiliates, which are defined as "a party that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an enterprise." FAS 57 ¶ 1.

Under FAS 57, related party transactions were to be evaluated with a high degree of professional skepticism. Guidance as to specific disclosure requirements and audit procedures are contained in SAS 45 and AU section 334, entitled Related Parties. Bear Stearns' related party transactions included the loans it provided to its failing High Grade Fund. Accordingly, it is alleged that with respect to that transaction, Bear Stearns was required to disclose the nature of the relationships involved, a description of the transactions for each of the periods for which income statements were presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements, the dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period, and amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement. FAS 57 ¶ 2.

Bear Stearns' financial statements failed to comply with GAAP because investors were inappropriately left in the dark about how the losses on the remaining $845 million exposure were ultimately recorded, or if those losses were in fact ever recognized prior to its collapse. (Sec. Compl. ¶¶ 381–388.)

### (3) Retained Interest Disclosures

Statement of Financial Accounting Standards No. 140, Accounting for Transfers **\*473** and Servicing of Financial Assets and Extinguishment of Liabilities ("SFAS 140") set forth "the standards for accounting for securitizations and other transfers of financial assets and collateral." In particular, SFAS 140 sets forth the standards to properly assess the fair value for RIs. For purposes of Bear Stearns' financial statements, RIs were components of the revenue line item Principal Transactions and reported on the balance sheet as a component of financial instruments at fair value. Once RIs were initially recorded, Bear Stearns was required to determine the fair value of the RIs in each

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

subsequent quarter. (Sec. Compl. ¶¶ 389–90.)

For purposes of its 2006 financial statements, the methods prescribed by SFAS 140 for measuring the fair value of financial assets and liabilities were similar to those in SFAS 157, which required that the valuation assumptions be consistent with those that market participants would use in their estimates of values, including assumptions about interest rates, default, prepayment, and volatility. FAS 140, ¶¶ 68–70. SFAS 157 defined the fair value requirements for purposes of the 2007 financial statements. (Sec. Compl. ¶ 390.)

In all periods from the quarter ended February 28, 2007 to February 29, 2008, Bear Stearns reported with respect to RIs that "[t]he assumptions used for pricing variables are based on observable transactions in similar securities and are further verified by external pricing sources, when available." This disclosure indicates that RIs were classified by Bear Stearns as Level 2 assets. Bear Stearns' valuation of its RI from securitizations was a critical metric for investors because it indicated the financial health of the Company, given that the valuation of its RI was directly linked to Principal Transactions revenue and, ultimately, net income. (Sec. Compl. ¶¶ 389–391.)

In the fall of 2006, Bear Stearns represented to the SEC that it was (i) "moving away from holding residuals in its portfolio; (ii) attempting to sell aging residuals, and (iii) aware that its residuals on second lien mortgage securitizations were very risky." Nevertheless, Bear Stearns' holdings of RIs continued to increase during this period, rising from $5.6 billion as of November 30, 2006 to $7.1 billion as of February 28, 2007. (Sec. Compl. ¶ 392.)

By February 2007, Bear Stearns had been forced to write-down nearly 30% of a portion of its RIs that were worth $300 million. In the following quarter, losses on RIs rose to a total of $168 million on second lien inventory and $240 million on RMBS and structured products. According to the OIG Report, Bear Stearns had been unable to predict these losses and had failed to make any disclosure

of these losses in its Form 10–Q for the quarter ended May 31, 2007 or any other SEC filing. (Sec. Compl. ¶ 393.)

In its May 2007 Form 10–Q, Bear Stearns stated that "[a]ctual credit losses on retained interests have not been significant," which is alleged to be misleading. Bear Stearns repeated this disclosure through the time of its collapse. (Sec. Compl. ¶ 394.)

Bear Stearns' holdings of RIs continued to grow in the quarters ended May 31, 2007 and August 31, 2007, ultimately reaching $9.6 billion. As an originator of the mortgages underlying the RIs, Bear Stearns knew that valuation of the RIs was at serious risk because it was contingent on the assumption of home prices staying level or in any event not decreasing. The ability to refinance rested on the continued availability of nonprime financing or an accumulation of equity in the home. (Sec. Compl. ¶¶ 395, 398.)

**\*474** Bear Stearns knew that (1) losses would rise higher into the RMBS tranche structures than initially expected; (2) RMBS (and CDO) credit ratings were no longer valid, because each tranche was not as far removed from real loss as its originally-assigned ratings indicated; and (3) the consequences would actually be most drastic for RIs (i.e., the aspect of the structured financing closest to encroaching mortgage losses). The market for residential mortgage-related securities in these periods was in systematic decline by February of 2007. Moreover, at least until the quarter ended May 31, 2007, Bear Stearns continued to originate non-agency related mortgages pursuant to its relaxed lending standards. Accordingly, when the balance of RIs grew from November 2006 through May 2007, the resulting RIs generated were of the highest risk of loss. (Sec. Compl. ¶¶ 399–400.)

In addition to the general economically adverse valuation factors for RIs, Bear Stearns' pricing models for mortgage securities, which would have included RIs, were not reliable, and yielded overstated valuations. In particular, its "Non–Investment Grade" RIs, which included those

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

RIs with credit ratings below BBB-, were overstated (i.e., amounts of at least $1.3 billion in all periods from February 28, 2007 onwards). Bear Stearns reported in February 2008 that it held $2.0 billion of retained interest in sub-prime ARM loans. Nevertheless, the Non–Investment Grade RIs totaled only $1.3 billion. Therefore, Bear Stearns attributed Investment Grade or higher credit ratings to at least $700 million of subprime RIs. (Sec. Compl. ¶ 401.)

(4) Valuation of Financial Interests

In December 1993, the FASB issued SFAS No. 115, Accounting for Certain Investments in Debt and Equity ("SFAS 115"). SFAS 115 addresses the accounting and reporting for all investments in debt securities. Those investments are to be classified in three categories: (1) trading, (2) available-for-sale, and (3) held for investment. SFAS 115 ¶ 6. The accounting treatment for the specific investments depended upon its classification. Bear Stearns treated its financial instruments as trading securities. (Sec. Compl. ¶¶ 402–03.)

As a result, Bear Stearns was required to report its financial instruments at fair value and included all unrealized gains and losses in earnings. SFAS 115 ¶ 12. Bear Stearns reported the periodic fluctuations in the fair value of its financial instruments in its income statements within the revenue line-item Principal Transactions. In the MD & A portion of its SEC filings, Bear Stearns further stratified revenue from Principal Transactions into (a) Fixed Income and (b) Equities. Bear Stearns reported revenue from mortgage securitizations as well as the unrealized gains and losses from the fluctuations in the fair value of its financial instruments in the Fixed Income component of Principal Transactions. (Sec. Compl. ¶ 403.)

When the fair value of an investment is not readily available, there are several methods available to financial statement preparers to determine the fair value, including the use of pricing models. FASB Staff Implementation Guide for SFAS 115, Question 59. SFAS 115 noted that "some depository institutions have failed, or experienced impairment of earnings or capital, because of speculative securities activities and that other institutions have experienced an erosion of the liquidity of their securities portfolios as a result of decreases in the market value of those securities. In a liquidity shortage, the fair value of investments, rather than their amortized cost, is the amount available to cover an **\*475** enterprise's obligations." SFAS 115 ¶ 41. (Sec. Compl. ¶¶ 404–05.)

In September 2006, the FASB issued SFAS No. 157, Fair Value Measurements ("SFAS 157"). In its 2006 Form 10–K, Bear Stearns disclosed that it would adopt SFAS 157 early in the first quarter of fiscal 2007. SFAS 157 established a definition of fair value within GAAP as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." SFAS 157 ¶ 5. This standard also clarified that a fair value measurement assumes that the asset or liability is exchanged in an orderly transaction between market participants to sell the asset or transfer the liability at the measurement date. This standard also established a framework for measuring fair value and required enhanced disclosures about fair value measurements and required companies to disclose the fair value of their financial instruments according to a fair value hierarchy. (Sec. Compl. ¶ 406–08.)

In its 2006 Form 10–K, Bear Stearns disclosed that it did not expect the adoption of SFAS 157 to have a material impact on the consolidated financial statements of the Company. (Sec. Compl. ¶ 410.)

Throughout the Class Period, "Financial instruments owned, at fair value" was the largest balance sheet line item in Bear Stearns' financial statements, typically comprising one third of the Company's total assets. "Mortgages, mortgage—and asset-backed" securities, in turn, were the largest component of financial instruments owned, making up at least thirty percent of the Company's financial instruments from the first quarter of 005 onwards. This proportion peaked at 39.1% of Bear Stearns' total financial instruments, or about $57.5 billion, as of February 28, 2007. (Sec. Compl. ¶ 412.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

It is alleged that Bear Stearns' leverage caused its fair value measurements to have significant implications for its financial instruments. During all periods from the first quarter of 2006 to the second quarter of 2007, Bear Stearns' revenue from Principal Transactions ranged from $1.1 billion to $1.5 billion. These amounts were critically important to Bear Stearns' reported revenues during these periods, typically one-third of amounts reported. However, if the fair value of only its mortgage-related financial instruments were reduced by even 3%, all of its reported Principal Transactions revenue would have been wiped out. Any adverse adjustment to the fair value of mortgage-related securities in excess of 3% would have caused reported revenue from Principal Transactions to turn negative. (Sec. Compl. ¶ 413.)

As a percentage of total financial instruments, the Company's total Level 3 assets grew rapidly from 11% in the fourth quarter of 2006 to 29% by the first quarter of 2008. Throughout the Class Period, Bear Stearns was valuing at least 11%, and up to 29%, of its financial instruments using valuation models devised by the Company and' dependent upon significant assumptions established by management. Bear Stearns revealed for the first time in its quarterly results for the fourth quarter of 2007 that mortgage securities, valued using the Company's mortgage valuation models, comprised approximately 70% of all its Level 3 financial instruments. Level 3 residential mortgage-related assets totaled at least $5.8 billion and $7.5 billion as of August 31, 2007 and November 30, 2007, respectively. (Sec. Compl. ¶¶ 414–15.)

In addition, in all periods from the first quarter of 2007 through its collapse in March 2008, Bear Stearns reported that Level 2 assets were in excess of $60 billion and comprised at least 50% of reported financial instruments owned. Since the **\*476** reported fair value of Level 2 assets was also significantly dependent on valuation models, any flaws in those models had potentially devastating ripple effects. As of November 30, 2007, Bear Stearns reported that it held $28.9 billion of Level 2 mortgage-related securities. (Sec. Compl. ¶ 416.)

As described above, Bear Stearns' mortgage valuation models, among other things, failed to incorporate indicators of declines in the housing market. In light of these defects and the downturn of the housing market during the Class Period, an overstatement of these assets, especially those Level 3 assets, occurred. (Sec. Compl. ¶ 417.)

(5) Risk Disclosure

Bear Stearns was also required to provide disclosure about risk and uncertainties related to its financial statements. These disclosures were guided in part by the AICPA's Statement of Position 94–6, Disclosure of Certain Significant Risks and Uncertainties ("SOP 94–6"). In particular, Bear Stearns was required to disclose any vulnerability or risk inherent in its financial statements as a result of concentrations of risk. SOP 94–6 ¶ 20. The concentrations highlighted include "revenue from particular products, services, or fund-raising events. The potential for the severe impact can result, for example, from volume or price changes or the loss of patent protection for the particular source of revenue." SOP 94–6 ¶ 22. These concentrations of risk disclosures related to Bear Stearns' holdings of mortgage-related securities, and specifically subprime and CDO-related securities. (Sec. Compl. ¶¶ 418–19.)

The Company's 2006 Form 10–K stated that Bear Stearns' "Maximum Exposure to Loss" to CDOs was $211.1 million. In its Form 10–Q for the first quarter of 2007, Bear Stearns reported that its maximum exposure to CDOs had been reduced to $174.2 million. At the end of the second quarter of 2007 the Company's Form 10–Q still only quantified $270.6 million of exposure to CDOs. By the third quarter of 2007, simultaneous to the initial public disclosure of its valuation markdowns, Bear Stearns stated that its maximum exposure to loss on CDOs had risen to $631 million, even after $700 million of markdowns to mortgage-related assets had been recorded in the quarter ended August 2007. In contrast to its quantifications of reported maximum exposure, the Company recorded write-downs of $2.3 billion in the fourth quarter of 2007, of which CDOs were a "large component." It is alleged that Bear Stearns understated its disclosed exposure to CDOs

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

by a factor of two (i.e., $631 million maximum exposure at August 31, 2007 and a $1.2 billion write-down). After those write-downs, Bear Stearns reported that its maximum remaining exposure to CDOs as of November 30, 2007 was $409 million. Bear Stearns thus allegedly failed to provide meaningful disclosures of the concentrations of risk it had to the subprime and CDO market in light of the failures of its hedge funds, which focused on CDO and CDO-related investments. (Sec. Compl. ¶¶ 420–23.)

In September 2007, the SEC reviewed Bear Stearns' Form 10–K for 2006 and requested that Bear Stearns provide the SEC with certain "material information" not disclosed in the 2006 Form 10–K filing, including "a comprehensive analysis of your exposure to subprime loans." 2006 Form 10–K comment letter. (Sec. Compl. ¶¶ 314–15.)

The SEC also requested information regarding Bear Stearns' investments in subprime-backed securities that the Company had not made available in its public filings and asked that Bear Stearns supply it with previously undisclosed information regarding**477** its exposure to the special purpose entities that it created to purchase subprime loans and issue securities, as well as its exposure related to warehouse lines and reverse repurchase agreements involving subprime loans. (Sec. Compl. ¶¶ 316–17.)

Bear Stearns did not file its promised response until January 31, 2008—after it filed its 10–K for fiscal year 2007. The Company failed to incorporate any of the additional information sought by the SEC into its 2007 Form 10–K. (Sec. Compl. ¶ 319.)

The Company allegedly falsely asserted in its Form 10–K filed January 29, 2008 that there were no "unresolved staff comments" in connection with its financial disclosures. (Sec. Compl. ¶ 320.)

According to the OIG Report, the Inspector General concluded that the information regarding subprime exposure and risk management philosophy that the Company

had omitted from its 2006 and 2007 Forms 10–K was "material information" that investors could have used "to make well-informed investment decisions." (Sec. Compl. ¶ 323.)

### (6) MD & A

Bear Stearns was required to provide additional information in the Management's Discussion & Analysis ("MD & A") section of its SEC filings. Regulation S–K § 229.303(a). The SEC instructed, among other things, that "[t]he registrant's discussion and analysis shall be of the financial statements and of other statistical data that the registrant believes will enhance a reader's understanding of its financial condition, changes in financial condition and results of operations." Instr. 1. The SEC also instructed that "[t]he purpose of the discussion and analysis shall be to provide to investors and other users information relevant to an assessment of the financial condition and results of operations of the registrant." Instr. 2. Companies are also required to "focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition." (Sec. Compl. ¶¶ 424–425.)

Bear Stearns' MD & A included disclosures of the amounts it reported as VaR as well as certain accompanying details, which were materially misleading because the Company's VaR models were defective. Thus, it is alleged that Bear Stearns' VaR failed to comply with SEC Regulations. (Sec. Compl. ¶ 426.)

### 8. Banking Regulations Violations

In its Forms 10–K filed for fiscal years 2006 and 2007, Bear Stearns stated that "the Company is in compliance with CSE regulatory capital requirements." This statement is alleged to be materially false and misleading. While Bear Stearns offered regulators data showing that it apparently met the CSE program's 10% minimum net capital requirements, the Company was only able to achieve this result by repeatedly violating regulatory requirements relating to the appropriate calculation of net capital. According to the OIG Report, the Company violated these

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

rules by (i) failing to take appropriate capital charges related to its collapsed hedge funds; (ii) inflating its profit and its capital by using inflated marks on assets subject to mark disputes; and (iii) falsely inflating its net capital by using misleading VaR models to calculate capital requirements. (Sec. Compl. ¶¶ 427–428.)

### a) Capital Requirements

Net capital is the value of a firm's assets less the value of its liabilities. The principal sources of loss are market risks, credit risks and operational risks. Capital requirements provide that a certain amount **\*478** be set aside to cover potential risk for each kind of loss. These amounts, taken together with adjustments for hedging or diversification, are called capital charges. If the total capital charge is greater than the firm's minimum required net capital, the firm needs either to raise more capital or reduce some of its risk. (Sec. Compl. ¶¶ 429–30.)

Registered broker-dealers are subject to the Net Capital Rule (Rule 15c3–l) under the Exchange Act. Under the Net Capital Rule, Bear Stearns was required to maintain a minimum net capital ratio of 10%—that is, Bear Stearns was required to maintain at least ten percent of its assets in cash or in securities that could be easily converted to cash. (Sec. Compl. ¶¶ 431–32.)

Upon Bear Stearns' approval as a CSE on December 1, 2005, the SEC permitted Bear Stearns to use a specified alternative method for calculating net capital in exchange for Bear Stearns' compliance with requirements of the CSE program. According to the SEC's Release No. 34–49830, "[u]nder the alternative method, firms with strong internal risk management practices may utilize mathematical modeling methods already used to manage their own business risk, including value-at-risk ("VaR") models and scenario analysis, for regulatory purposes." The release explained that the purpose of the alternative method of computing net capital is "to permit regulated companies to align their supervisory risk management practices and regulatory capital requirements more closely." The conditions of Bear Stearns' participation in the program and the alternative manner in which it was permitted to calculate

net capital are set out in Appendices E and G to the Net Capital Rule. Appendices E and G permit the calculation of capital charges for market risk and derivative-related credit risk based on mathematical models, in a manner "consistent with the standards ('Basel Standards') adopted by the Basel Committee on Banking Supervision ('Basel Committee')". (Sec. Compl. ¶¶ 433–435.)

According to the OIG Report, Bear Stearns' treatment of its hedge fund financing agreement failed to meet the Basel II standards relating to capital charges. In light of Appendix E's adoption of this standard, the Company's treatment of the hedge fund financing agreement is alleged to have violated the SEC's Net Capital Rule 1 as well. Basel II requires that "[w]hen a bank has been found to provide implicit support to a securitization, it will be required to hold capital against all of the underlying exposures associated with the structure as if they had not been securitized." (Sec. Compl. ¶¶ 436–437.)

According to the OIG Report, the High Yield Fund was financially distressed, the terms of the repo agreement had resulted in the Bear Stearns' assumption of all of the risk, and none of the possible upside, relating to the collateral it had received in the transaction. Accordingly, the OIG Report concluded, "Bear Stearns' financing of the BSAM funds is conceptually similar to implicit support." (Sec. Compl. ¶ 438.)

By failing to include the Hedge Fund collateral on its books, Bear Stearns was able to avoid having to increase the amount of net capital it needed to maintain in order to meet the CSE's program's 10% ratio. (Sec. Compl. ¶ 441.)

### b) Incorrect Marks

According to the OIG Report, Bear Stearns' accounting treatment of certain assets subject to mark disputes resulted in violations of capital rules. These amounts were sometimes very-large, as in Company's March 12, 2008 payment of $1.1 billion to its counterparties detailed above. (Sec. Compl. ¶¶ 442–444.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

**\*479** According to the OIG Report, "it is inconsistent with the spirit of Basel II for two firms to use a mark dispute as an occasion to increase their combined capital, as would occur when both parties to a trade book profit at the expense of the other simply because they each mark positions favorably for themselves." As a result of its inflation of the value of the disputed assets, Bear Stearns was able to overstate its capital for the purposes of calculating its net capital requirement. (Sec. Compl. ¶¶ 445–447.)

#### c) VaR Misrepresentations

Appendix E to the Net Capital Rule required Bear Stearns to submit to the SEC, on a monthly basis, "[a] graph reflecting, for each business line, the daily intra-month VaR." Moreover, under Appendix E of the Net Capital Rule, Bear Stearns was obliged to review its VaR models both periodically and annually. The periodic review could be conducted by the broker's or dealer's internal audit staff, but the annual review had to be conducted by a registered public accounting firm. However, neither the Company nor its auditor, Deloitte, performed adequate reviews of key inputs into VaR during the Class Period. According to the OIG Report, "reviews of mortgage models that should have taken place before the subprime crisis erupted in February of 2007 appear to have never occurred." (Sec. Compl. ¶¶ 448–452.)

#### 9. Scienter

Defendant Cayne was allegedly aware that the Company had been warned by the SEC in 2005 and 2006 that its mortgage valuation and VaR modeling failed to reflect key indicators in the housing market and the Company's CEO was "intimately engaged in the risk management process." (Sec. Compl. ¶¶ 453–457.)

Throughout the Class Period, Cayne made a number of statements alleged to be materially false and misleading regarding Bear Stearns' ABS exposure, as well as the effectiveness of its risk monitoring procedures, and implemented a business strategy that required Bear Stearns to become an industry leader in the origination and securitization of ABS. Cayne knew Bear Stearns was increasing its exposure to risk without effective policies and controls

to ensure that its exposure to risk was accurately communicated to its investors in direct contrast to its public statements. He knew, or was reckless in not knowing, that Bear Stearns' risk control models were severely flawed and not up-to-date, that Bear Stearns had focused its investment strategy and that Bear Stearns' concentration of risky ABS was the highest in the investment banking community. (Sec. Compl. ¶¶ 458–460.)

Cayne knew of the toxic assets housed in the High Grade Fund and knew of, or recklessly disregarded, the need to take an immediate charge against net capital after Bear Stearns took the High Grade Fund's collateral onto its own books. (Sec. Compl. ¶ 461.)

Cayne also allegedly knew of Bear Stearns' stated reliance on GAAP accounting, and banking standards such as the Basel II Standards, but either ignored them or recklessly disregarded them. (Sec. Compl. ¶ 462.)

As CEO, Co–President, Co–COO, and Director of Bear Stearns, Defendant Schwartz participated in the issuance of, and signed and certified as accurate and complete as required by the Sarbanes–Oxley Act, Bear Stearns' allegedly materially false and misleading SEC filings issued during the Class Period. Schwartz became sole President on August 5, 2007, and remained in that position until January 2008, when he replaced Cayne as CEO. Throughout the Class Period, Schwartz **\*480** signed the Company's Forms 10–K for the 2006 and 2007 fiscal years, alleged to be false and misleading, and was "intimately engaged in the risk management process." Schwartz was aware that the Company had twice been warned by the SEC that its mortgage valuation and risk modeling failed to reflect key indicators in the housing market. Despite this knowledge, Schwartz signed SEC filings setting out, among other things, the value of Level 3 assets and the Company's VaR. (Sec. Compl. ¶¶ 464–465.)

Schwartz offered allegedly false reassurances to the public while the Company's liquidity plummeted the week of March 10, 2008. (Sec. Compl. ¶¶ 467–468.)

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Schwartz also knew, or was reckless in not knowing, that Bear Stearns' counterparties were deserting the Company. (Sec. Compl. ¶¶ 469–470.)

As CFO during the Class Period and, as of August 5, 2007, COO of Bear Stearns, Defendant Molinaro signed, certified as accurate and complete, and participated in the issuance of Bear Stearns' allegedly materially false and misleading SEC filings issued during the Class Period in the same fashion as did Cayne, described above with respect to the Forms 10–K for 2006 and 2007. (Sec. Compl. ¶ 471.)

Molinaro knew, or recklessly disregarded, that Bear Stearns' internal controls were virtually non-existent with respect to risk management of mortgage-backed securities valuation and VaR. The SEC concerns were communicated to the Company in the December 2, 2005 memorandum from OCIE to Farber. It is alleged that Molinaro could not have believed, or recklessly disregarded the truth of, his Sarbanes–Oxley Act certification of the Company's internal controls. During the Class Period, Molinaro signed and certified Bear Stearns' Forms 10–Q and 10–K, and throughout the Class Period conducted quarterly earnings conference calls with shareholders and investors, in which he made a number of materially false and misleading statements regarding Bear Stearns' ABS exposure as well as its risk-monitoring infrastructure. (Sec. Compl. Molinaro was aware of the Fair Value reporting requirements and had knowingly and recklessly caused Bear Stearns to issue and file financial statements and reports with the SEC that stated that Bear Stearns had implemented accounting standards in line with GAAP requirements when, in fact, Bear Stearns was not complying with GAAP through its failure to accurately value the mortgage-backed securities and CDOs it carried on its books. As CFO, Molinaro knew of Bear Stearns' stated reliance on GAAP accounting and banking standards such as the Basel II Standards but either ignored them or recklessly disregarded them. (Sec. Compl. ¶¶ 480–481.)

Molinaro knew, or was reckless in not knowing, that Bear Stearns was heavily exposed to deteriorating market conditions. (Sec. Compl. ¶¶ 478–479.)

Molinaro knew, or was reckless in not knowing, that Bear Stearns' valuation models could not accurately value the CDO and subprime exposure. Notwithstanding Molinaro's assurance just weeks before that the Company's hedging efforts had resulted in a net negative exposure to subprime assets, on December 20, 2007, the Company wrote down $1.9 billion of its holdings in mortgages and mortgage-based securities—over $700 million more than it had announced on November 14, 2007. On November 14, 2007, Molinaro knew this additional write down was necessary, or was reckless in not knowing. Molinaro also allegedly knew of Bear Stearns' stated reliance on GAAP accounting and banking standards such as the Basel II Standards **\*481** but either ignored them or recklessly disregarded them. (Sec. Compl. ¶¶ 480–81.)

As Co–President and Co–COO and a Director of Bear Stearns, Defendant Spector signed, certified as accurate and complete, and participated in the issuance of Bear Stearns' allegedly materially false and misleading SEC filings issued during the Class Period. Spector, due to his active involvement in the collapse of the Hedge Funds, resigned his position on August 5, 2007 but remained a Bear Stearns employee and held the title of Senior Managing Director. During his tenure as Co–President and Co–COO, all divisions of the firm other than investment banking reported to him, including the Hedge Funds. Throughout the Class Period, Spector made a number of allegedly materially false and misleading statements regarding Bear Stearns' ABS exposure as well as the effectiveness of its risk monitoring procedures. (Sec. Compl. ¶ 482.)

Spector, due to his position as Co–COO overseeing the Company's vertically-integrated mortgage business, understood the subprime mortgage market. Between April and June 2006, the Company faced repeated crises in its United Kingdom subsidiary as a result of poor performance of U.K. loans due to weak underwriting standards.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

(Sec. Compl. ¶ 483.) Spector oversaw BSAM, the subsidiary of Bear Stearns that managed the Hedge Funds, and was fully aware of the serious problems at the Hedge Funds being concealed from both the Hedge Funds' investors and Bear Stearns' investors. Spector knew at the time Bear Stearns entered into the High Grade Fund facility that the CDOs it had received as collateral were actually worth far less, and had become aware of serious flaws in Bear Stearns' valuation methodologies. Spector knew, or was reckless in not knowing, that Bear Stearns' risk control models were severely flawed and not up-to-date, and that Bear Stearns' own risk managers did not have any expertise in the ABS and mortgage-backed securities upon which Bear Stearns had focused its investment strategy. Spector knew, or was reckless in disregarding, the fact that Bear Stearns' VaR was far below the industry average, even as Bear Stearns' concentration of risky ABS was the highest in the investment banking community. (Sec. Compl. ¶¶ 484–486.)

As a director and Chairman of the Executive Committee of Bear Stearns, Defendant Greenberg participated in the issuance of Bear Stearns' allegedly materially false and misleading SEC filings issued during the Class Period. The Executive Committee ran the day-to-day operations of Bear Stearns and Greenberg participated in weekly meetings with the Company's risk managers during the Class Period, and knew or should have known that the Company had twice been criticized by the SEC for failing to review and update its inaccurate models. Throughout the Class Period, Greenberg made a number of allegedly materially false and misleading statements regarding the effectiveness of Bear Stearns' risk monitoring procedures, as stated in the Forms 10–K for 2006 and 2007 that he signed. (Sec. Compl. ¶¶ 487–489.)

On March 10, 2008, Greenberg, responding to the price liquidity rumors that caused shares of Bear Stearns to drop 10 percent in early trading, told CNBC that the liquidity rumors surrounding the Company were "totally ridiculous." Greenberg had been informed immediately before his announcement that "[a]ll of [Bear Stearns'] institutions are calling us, and we're in trouble." (Sec.

Compl. ¶ 490.)

While Defendants told shareholders and investors that Bear Stearns' growth and concomitant expanding risk were prudent and consistent with sound risk control **482 practices, Greenberg knew, or was reckless in not knowing, that Bear Stearns' risk control models had failed to reflect downturns in the housing industry. Moreover, Greenberg knew, or was reckless in not knowing, that Bear Stearns' own risk managers did not have expertise in the very assets upon which Bear had based its investment strategy. Further, Greenberg knew, or was reckless in disregarding, the fact that Bear Stearns' VaR was far below the industry average, even as Bear Stearns' concentration of risky ABS was the highest in the investment banking community. (Sec. Compl. ¶¶ 493–494.)

As Chief Risk Officer of Bear Stearns during the Class Period, Defendant Alix had an intimate understanding of the risk management tools and processes in place at the Company. Alix made allegedly materially false and misleading statements about Bear Stearns' risk management practices during an August 3, 2007 conference call. As Chief Risk Officer, Alix was ultimately responsible for the Company's VaR calculations. (Sec. Compl. ¶¶ 495–96.)

Alix knew, or was reckless in not knowing, that Bear Stearns' risk control models were seriously flawed and not up-to-date. Moreover, Alix knew, or was reckless in not knowing, that, according to the SEC Inspector General, Bear Stearns' own risk managers did not have expertise in the very assets upon which Bear Stearns had focused its investment strategy. Further, Alix knew or was reckless in disregarding the fact that Bear Stearns' VaR was outdated, and far below the industry average, even as Bear Stearns' concentration of risky ABS was the highest in the investment banking community. (Sec. Compl. ¶¶ 498–499.)

As Senior Vice President of Finance and Principal Accounting Officer since February 2007, and Controller of the Company since January 2004, Defendant Farber participated in the issuance of, and signed and certified as

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

accurate and complete, as required by the Sarbanes–Oxley Act, Bear Stearns' allegedly materially false and misleading SEC filings issued during the Class Period, including all Forms 10–Q and 10–K. The quarterly and annual reports signed by Farber falsely reported the Company's risk management, including its use of internally-developed models to derive the fair value of the Company's financial instruments. (Sec. Compl. ¶¶ 500–501.)

During the CSE application process, the SEC told Farber that, "[w]e believe that it would be highly desirable for independent Model Review to carry out detailed reviews of models in the mortgage area." These concerns were again communicated to the Farber in a December 2, 2005 memorandum from the SEC Office of Compliance Inspections and Examinations. (Sec. Compl. ¶ 502.)

Farber knew, or was reckless in not knowing, that Bear Stearns' risk control models were severely flawed and not up-to-date. Moreover, Farber knew, or was reckless in not knowing that Bear Stearns' own risk managers did not have an expertise in the very assets upon which Bear Stearns had focused its investment strategy. Further, Farber knew, or was reckless in disregarding, the fact that Bear Stearns' VaR was far below the industry average and failed to rise in tandem with the VaR reported by the Company's peers, even as Bear Stearns' concentration of risky ABS was the highest in the investment banking community. (Sec. Compl. ¶ 503.)

The cumulative knowledge of all its agents, such as that of Farber, Cayne, Alix and Molinaro described above, is imputed to Bear Stearns. (Sec. Compl. ¶¶ 504–506.)

**\*483** It is alleged that the Officer Defendants knew of the need to scrutinize mortgage-backed securities and mortgage risk management, were aware of the deteriorating conditions in the U.S. subprime mortgage market and the effect of these conditions on the value of securities linked to these mortgages and other asset backed securities, knew or recklessly disregarded that the materially false and misleading statements and omissions contained

in Bear Stearns' public statements would adversely affect the integrity of the market for Bear Stearns' common stock and would cause the price of Bear Stearns' common stock to be artificially inflated, and acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon Lead Plaintiff and other members of the Class. Each of the Officer Defendants either knew, or recklessly disregarded, the fact that the Company's disclosures relating to ABS were misleading and that billions of dollars in ABS exposure on Bear Stearns' balance sheets were unaccounted for due to Bear Stearns' inability to accurately value asset backed securities. (Sec. Compl. ¶¶ 507–515.)

The Class Period sales of Bear Stearns stock by Defendants Cayne, Greenberg, Molinaro, Schwartz, Spector and Farber are alleged to be highly unusual, and therefore suspicious, as measured by (1) the amount and percentage of shares sold, (2) comparison with these Defendants' own prior trading history and that of other insiders, and (3) the timing of the sales. (Sec. Compl. ¶ 516.)

It is alleged that the Class Period sales by the Officer Defendants were extremely large and unusual and constituted profits of approximately 86.3% on average and provide a strong inference of scienter. Greenberg's profit was 73%, while Spector's profit was 35%. (Sec. Compl. ¶¶ 521–522.)

*10. Loss Causation*

Throughout the Class Period, the market prices of Bear Stearns securities were allegedly artificially inflated as a direct result of Defendants' allegedly materially false and misleading statements and omissions. When the truth became known, the prices of Bear Stearns securities declined precipitously as the artificial inflation was removed from the prices of these securities, causing substantial damage to Lead Plaintiff and members of the Class. The chart contained in the Complaint shows the fluctuation of the price of Bear Stearns common stock leading up to and during the Class Period. During the Class Period, Bear Stearns' common stock traded as high as $171.57 per share as recently as January 12, 2007. (Sec. Compl. ¶¶ 795–796.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

By early March 2008, Bear Stearns common stock was trading at above $60 per share and its management was vigorously denying rumors that Bear Stearns had any liquidity problems. On March 10, 2008, Bear Stearns common stock fell $7.78, or 11%, to close the day at $62.30 on trading volume of 23 million shares. Despite the Company's attempts to reassure the market, Bear Stearns' stock price continued to fall by $5.30, or 8.5%, during the week as the rumors continued to intensify, eventually closing at $57.00 per share on March 13, 2008 on higher than normal volume. (Sec. Compl. ¶ 797.)

On March 14, 2008, Bear Stearns announced that its liquidity position had significantly deteriorated, requiring the Company to seek financing via a secured loan facility from JPMorgan. In response to this news, Bear Stearns' common stock price fell $27, or 47.3%, to close at $30.00 per share on particularly heavy trading volume of approximately 187 million shares (about eight times its three month average trading volume of 23 million shares). On **\*484** March 17, 2008, Bear Stearns' stock price fell an additional $25.19, or 84%, to close at $4.81 on heavy trading volume of about 166 million shares following Bear Stearns' announcement on Sunday, March 16, 2008, that the Company would be acquired by JPMorgan for $2 per share. (Sec. Compl. ¶ 798.)

In all, as a consequence of the revelation of the truth concerning Bear Stearns' finances and policies during the Class Period, Bear Stearns' common stock lost in excess of $19.8 billion in market capitalization. (Sec. Compl. ¶ 799.)

The adverse consequences of Bear Stearns' disclosures relating to its exposure to declines in the housing market, and the adverse impact of those circumstances on the Company's business going forward, were allegedly foreseeable to Defendants at all relevant times. Defendants' conduct, as alleged herein, proximately caused foreseeable losses and damages to Lead Plaintiff and members of the Class. (Sec. Compl. ¶ 801.)

As set forth above, the Company's failure to maintain effective internal controls, its substantially lax risk management standards, and its failure to report its 2006–2007 financial statements in accordance with GAAP not only were material, but also triggered foreseeable and grave consequences for the Company. The financial reporting that was presented in violation of GAAP conveyed the impression that the Company was more profitable, better capitalized, and would have better access to liquidity than was actually the case. The price of Bear Stearns' securities during the Class Period was affected by those omissions and allegedly false statements and was inflated artificially as a result thereof. Thus, the precipitous declines in value of the securities purchased by the Class were a direct, foreseeable, and proximate result of the corrective disclosures of the truth with respect to Defendants' allegedly materially false and misleading statements. (Sec. Compl. ¶ 802.)

*11. Additional Allegations*

Class action allegations are contained in Sec. Compl. ¶¶ 803–808. The presumption of reliance is set forth in Sec. Compl. ¶¶ 809–811. The inapplicability of statutory safe harbor is alleged in Sec. Compl. ¶ 812.

Count I for violation of Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder (against all defendants) is set forth in Sec. Compl. ¶¶ 813–822.

Count II for violation of Section 20(a) of the Exchange Act (against the Officer Defendants) is set forth in Sec. Compl. ¶¶ 823–827.

Count III for violations of Section 20A of the Exchange Act (against Defendants Cayne, Schwartz, Spector, Molinaro, Greenberg, and Farber) is set forth in Sec. Compl. ¶¶ 828–834.

C. *The Applicable Standards*

In deciding a motion to dismiss a complaint for failure to state a claim pursuant to Federal Rules of Civil Procedure 8(a) and 12(b)(6), the Court construes the complaint

Page 71

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

liberally and accepts as true the non-conclusory factual allegations in the complaint, and draws all reasonable inferences in the plaintiff's favor. *See Roth v. Jennings,* 489 F.3d 499, 501 (2d Cir.2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "A pleading that offers labels and conclusions or a formulaic recitation of elements of a cause of action will not do." *Iqbal,* 129 S.Ct. at 1949 (internal quotation marks and citation omitted). Dismissal of a complaint or cause of action for failure to state a claim is appropriate where the complaint fails to plead "enough facts to state a claim to relief that is plausible on **\*485** its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Rather, to survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Id.* The complaint must "possess enough heft to 'sho[w] that the pleader is entitled to relief' " by providing factual allegations "plausibly suggesting (not merely consistent with)" the required elements of the asserted cause of action. *Id.* at 557, 127 S.Ct. 1955. This *Twombly* standard applies to all civil actions. *Iqbal,* 129 S.Ct. at 1943.

[1][2] The Securities Plaintiffs' Section 10(b) claims are subject to the heightened pleading standards of both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). *See In re Scholastic Corp.,* 252 F.3d 63, 69–70 (2d Cir.2001). The PSLRA and Rule 9(b) require that fraud be pled with particularity. 15 U.S.C. § 78u–4(b)(2); Fed.R.Civ.P. 9(b). Furthermore, "a claim may not rely upon blanket references to acts or omissions by all of the defendants, for each defendant named in the complaint is entitled to be appraised of the circumstances surrounding the fraudulent conduct with which he individually stands charged." *In re Livent, Inc. Sec. Litig.,* 78 F.Supp.2d 194, 213 (S.D.N.Y.1999). However, Rule 9(b) does "not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.,* 252 F.3d 63, 72 (2d Cir.2001). Indeed, courts of this district have stated that "the application of Rule 9(b) ... must not abrogate the concept of notice pleading." *In re Van der Moolen,* 405 F.Supp.2d at 397 (citation omitted).

[3] For group-published documents, such as SEC filings and press releases, Plaintiffs need not plead misstatements on the part of the Bear Stearns Defendants individually. Under the "group pleading doctrine," Plaintiffs may "circumvent the general pleading rule that fraudulent statements must be linked directly to the party accused of the fraudulent intent." *In re BISYS Sec. Litig.,* 397 F.Supp.2d 430, 438 (S.D.N.Y.2005) (citation omitted). Here, the Individual Defendants "are all alleged to have had 'direct involvement in the everyday business of the company' and Plaintiffs are therefore entitled to 'rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.' " *In re American International Group, Inc. (AIG) 2008 Sec. Litig.,* 741 F.Supp.2d 511, 530 (S.D.N.Y.2010), *quoting In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 142 (S.D.N.Y.1999) (internal quotation marks omitted).[FN4] Because the Individual Defendants here are all Directors or Officers of Bear Stearns with direct involvement in the everyday affairs of the Company, the group pleading doctrine applies to group-published statements. *See Id.* (finding the group pleading doctrine applicable to AIG's executive and director defendants).

FN4. It should be noted that the group pleading doctrine does not establish scienter for those defendants. *See In re Citigroup, Inc. Sec. Litig.,* 330 F.Supp.2d 367, 381 (S.D.N.Y.2004) ("Although the group pleading doctrine may be sufficient to link the individual defendants to the allegedly false statements, Plaintiff must also allege facts sufficient to show that the Defendants had knowledge that the statements were false at the time they were made." (citation omitted)).

*1. Pleading Scienter*

[4][5] Additionally, under the PSLRA, in an action for money damages a plaintiff **\*486** must " 'specify' each misleading statement; ... set forth the facts 'on which [a] belief' that the statement is misleading was 'formed'; and

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

... 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 81–82, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006), *quoting Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 345, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); 15 U.S.C. § 78u–4(b)(2). Particularity requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Stevelman v. Alias Research, Inc.,* 174 F.3d 79, 84 (2d Cir.1999) (internal quotation marks and citation omitted); *Anatian v. Coutts Bank (Switzerland) Ltd.,* 193 F.3d 85, 88 (2d Cir.1999); *see also ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 199 (2d Cir.2009) ("At least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) 'benefitted in a concrete and personal way from the purported fraud'; (2) 'engaged in deliberately illegal behavior'; (3) 'knew facts or had access to information suggesting that their public statements were not accurate'; or (4) 'failed to check information they had a duty to monitor' "), *quoting Novak v. Kasaks,* 216 F.3d 300, 311 (2d Cir.2000).

[6][7][8] A court considering a motion to dismiss "is normally required to look only to the allegations on the face of the complaint." *Roth,* 489 F.3d at 509. However, "[i]n certain circumstances, the court may permissibly consider documents other than the complaint in ruling on a motion under Rule 12(b)(6)." *Id.* Courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007). "If ... allegations of securities fraud conflict with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true." *In re Optionable Sec. Litig.,* 577 F.Supp.2d 681, 692 (S.D.N.Y.2008). The

Court may also consider matters that are subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

The Bear Stearns Defendants have asserted that the Securities Complaint constitutes a "classic fraud by hindsight case", Defs'. Mem. at 37, and that the Securities Complaint simply alleged "that Bear Stearns did not predict the impact of the subprime mortgage crisis." *Id.* at 39. Present knowledge of the recession and its trigger, the subprime mortgages, their marketing and the housing crisis, is certainly received, if unhappy, wisdom, and Defendants are correct that if all the Complaint alleges is this present knowledge, the pleading would be inadequate.

*Novak v. Kasaks* held that "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did not suffice to make out a claim of securities fraud." *Id.* at 309; *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994) (rejecting plaintiff's attempt to demonstrate fraud by "record[ing] statements by defendants predicting a prosperous future and hold[ing] them up against the backdrop of what actually transpired"); **\*487**\**Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978) (allegations that defendants failed to predict that foreign governments and enterprises might encounter difficulties, that real estate investment trusts would run into serious trouble, and that New York City would come to the verge of bankruptcy do not constitute fraud). At the same time, the depth of the subprime crisis and the current recognition that negative developments were not given sufficient credence by the market may well indicate an intent to continue dancing as long as the music is playing even knowing that the ball may be over.[FN5]

> FN5. In 2007, Charles Prince, the CEO of Citibank, in reference to the emerging credit crisis, stated that: "As long as the music is playing, you've got to get up and dance." Michiyo Nakamoto and David Wighton, Citigroup Chief Stays Bullish on Buy-outs, *Financial Times,* July 9, 2007. Available at: http:// www. ft. com/ cms/ s/

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

0/ 80 e 2987 a– 2 e 50– 11 dc– 821 c– 0000779 fd
2 ac. html# axzz1AaHUamTw.

[9] The incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F.Supp.2d 474, 494–495 (S.D.N.Y.2004) (rejecting defendants' fraud-by-hindsight claim where plaintiffs' allegations that "the company failed to take into account information that was available to it" at the time it issued its incorrect financial results sufficiently pleaded fraud). *See also AIG Global Sec. Lending Corp. v. Banc of Am. Sec., LLC,* No. 01 Civ. 11448–JGK, 2005 WL 2385854, at *12 (S.D.N.Y. Sept. 26, 2005) (finding that amended complaint resolved fraud-by-hindsight concerns by new allegations that asset-backed securities collateral value "estimates were shown to be wrong in a subsequent report prepared by a third-party servicer" and that the asset value "was computed in a materially misleading way that was in fact wrong at the time it was issued"); *In re Vivendi Universal, S.A.,* No. 02 Civ. 05571, 2004 WL 876050, at *6 (S.D.N.Y. Apr. 22, 2004) (rejecting defendant's contention that "plaintiffs' allegations of a 'liquidity crisis' constitute pleading fraud by hindsight," as "the Second Circuit has explicitly recognized that plaintiffs may rely on post-class period data to confirm what a defendant should have known during the Class Period").

*2. Pleading Liability under Exchange Act § 20A*

[10][11] Where a plaintiff presents a claim for insider trading under § 20A of the Exchange Act, that plaintiff must (i) "plead a predicate insider trading violation of the Exchange Act" and (ii) "allege sufficient facts showing that the defendant traded the security at issue 'contemporaneously' with the plaintiff." *In re Take–Two Interactive Sec. Litig.,* 551 F.Supp.2d 247, 309 (S.D.N.Y.2008) (internal quotations and citations omitted); *see also Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.,* 32 F.3d 697, 703 (2d Cir.1994).[FN6] Furthermore, claims under § 20A must comply with the heightened pleading standards of Fed.R.Civ.P. 9(b) and the PSLRA. *Take–Two,* 551 F.Supp.2d at 310 n. 50.

FN6. In *In re Openwave Systems Sec. Litig.,* 528 F.Supp.2d 236, 255 (S.D.N.Y.2007), Judge Cote enumerated a three-part test under § 20A. The third element of that test requires allegations that the defendant possessed material, nonpublic information at the time of the trade. *Id.* However, the first element of the test enunciated in *Take–Two* "requires that the predicate violation have involved insider trading, [and] it effectively subsumes the third element of Judge Cote's test." *Take–Two,* 551 F.Supp.2d at 309 n. 49.

**\*488** *3. Pleading Control Person Liability under Exchange Act § 20(a)*

[12] Under Section 20(a) of the Exchange Act, a person exercising "control" over a person liable under § 10(b) is also liable, subject only to the defense of "good faith." 15 U.S.C. § 78t(a). "In order to establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *In re AIG,* 741 F.Supp.2d at 535, *citing Boguslavsky v. Kaplan,* 159 F.3d 715, 720 (2d Cir.1998).

*4. Pleading Loss Causation*

[13][14] The pleading of loss causation under Section 10(b) is governed by Rule 8 notice pleading standards under which Plaintiffs must plead "a short and plain statement of the claim showing that the pleader is entitled to relief." *In re Tower Auto. Sec. Litig.,* 483 F.Supp.2d 327, 348 (S.D.N.Y.2007), *quoting* Fed.R.Civ.P. 8. A complaint need only provide the defendant with "some indication of the loss and the causal connection that the pleader has in mind." *Dura Pharms., Inc.,* 544 U.S. at 347, 125 S.Ct. 1627. However, a complaint must allege that the Company's share price "fell significantly after the truth became known." *Id.*

The issue at this pleading stage is whether or not al-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

legations of securities violations as set forth above are adequate under the standards set forth above.

D. *The Allegations of Materially False and Misleading Statements by the Bear Stearns Defendants Are Adequate*

[15] Defendants' allegedly false and misleading statements regarding Bear Stearns' asset valuations, risk management and modeling, GAAP violations, BSAM write-downs, and liquidity are such that a reasonable investor would consider them to "significantly alter[ ] the 'total mix' of the information made available" about the Company and material to an investment decision. *In re Ambac Financial Group, Inc. Sec. Litig.,* 693 F.Supp.2d 241, 270 (S.D.N.Y.2010), *quoting TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). As noted above, the group pleading doctrine applies to Defendants' group-published documents, such as "prospectuses, registration statements, annual reports, and press releases." *In re AIG,* 741 F.Supp.2d at 530 (citation omitted).

*1. Statements Regarding Asset Values*

The Securities Complaint has alleged that Bear Stearns failed to properly disclose the valuation of its assets and its risk during the Class Period and that the Company had misrepresented its "market risk." (Sec. Compl. ¶¶ 621–624.) As alleged in the Securities Complaint described above, market risk is the risk that asset values might decline. (Sec. Compl. ¶¶ 113–114.) The Securities Complaint charges that Bear Stearns misled investors concerning its VaR, that is, the potential for loss in the value of the Company's assets. (Sec. Compl. ¶ 115.)

The paragraphs of the Securities Complaint listed in the summary above allege with particularity that the Company failed to disclose the losses in asset values and the risk associated with the decline in its asset values. For the reasons given in the Securities Complaint, the Bear Stearns Defendants allegedly knew or should have known that their VaR was inaccurate and outdated and inflated their asset values while underestimating their risk. Such misstatements are properly alleged to be **\*489** significant to the reasonable investor making an investment decision.

*See In re RAIT Fin. Trust Sec. Litig.,* No. 07–CV–03148 LDD, 2008 WL 5378164, at *6, 2008 U.S. Dist. LEXIS 103549, at *24–25 (E.D.Pa. Dec. 22, 2008) (denying motion to dismiss and stating: "[i]t is one thing to say that a company is unavoidably exposed to credit risk ..., while it is another thing to say [as plaintiffs do], that a company lacks the ability to detect the presence and extent of that risk" due to its inadequate monitoring processes); *In re AIG,* 741 F.Supp.2d at 530–31 (finding allegation that defendants were "expressing confidence at the December 5, 2007, investor conference in their estimates related to losses in the CDS portfolio despite a warning from PwC that the Company may have a material weakness in assessing that portfolio," was sufficient to survive a motion to dismiss); *In re Ambac,* 693 F.Supp.2d at 270 (finding company's "statements that Ambac's CDO portfolio was currently outperforming the market and relevant indices" to "convey something concrete and measurable about Ambac's financial situation, and a reasonable investor could certainly find them important to the 'total mix' ").[FN7]

FN7. In *Freidus v. ING Groep, N.V.,* 736 F.Supp.2d 816 (S.D.N.Y.2010), the Court held that the plaintiffs did not sufficiently allege that ING failed to disclose the details of its Alt–A and subprime assets. *Id.* at 829–32. Unlike here, the plaintiffs in that case failed to allege that ING's statements were false when made and that ING's assets specifically were troubled, as opposed to alleging troubles in the market at large. *Id.* at 830–32, 834–35. The Court in *Freidus* allowed claims to survive where the plaintiffs made allegations of ING-specific problems which linked ING's struggles to the rest of the market and showed the company's investments to be riskier than it had claimed. *Id.* at 838–41.

*2. Statements Regarding Risk Management*

The Securities Complaint, as described above, has alleged that the Bear Stearns Defendants made false statements about Bear Stearns' risk management functions and its use of valuation and risk models. *See, e.g.,* Sec. Compl. ¶ 162 ("The Company regularly evaluates and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

enhances such VaR models in an effort to more accurately measure risk."); Sec. Compl. ¶ 182 (in its first quarter 2007 10–Q, the Company represented that it was engaged in an "ongoing internal review of its valuations" and that "senior management from the Risk Management and Controllers Departments" are responsible for "ensuring that the approaches used to independently validate the Company's valuations are robust, comprehensive and effective."); Sec. Compl. ¶ 183 (in its first quarter 2007 10–Q, the Company reported that its VaR numbers had declined despite the fact that the housing market was in crisis); Sec. Compl. ¶ 231 (Alix, in responding to the S & P downgrade, stated, "we run risk analytics to demonstrate that the Firm is well protected against further deterioration in both the subprime and Alt–A sectors across both the whole loans and all securitization tranches."); Sec. Compl. ¶ 359 (as contained in Bear Stearns' 2006 and 2007 Form 10–K filings: "[M]anagement has concluded that the Company's internal controls over financial reporting was effective as of" the years ended November 30, 2006 and November 30, 2007.); Sec. Compl. ¶¶ 424–26 (Bear Stearns MD & A discussions were false and misleading as management failed to disclose "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or future financial condition.").

According to the Securities Complaint, the statements referred to above were falsely made because the Bear Stearns **\*490** Defendants knew from the SEC's feedback that their risk models were not properly updated to "predict [...] credit risk." (*See* Sec. Compl. ¶ 313.) Moreover, it is alleged that Bear Stearns knew that by October of 2007 its entire model review department had "evaporated." (Sec. Compl. ¶ 136.)

The Securities Complaint also alleges that the Bear Stearns Defendants knew, or were reckless in not knowing, that the SEC had stated that Bear Stearns' valuation and VaR models were seriously flawed and that the models were never updated to reflect the housing and subprime mortgage downturn, and, as a consequence, Defendants were well aware that they were not including material

information in their SEC filings and other public statements. (Sec. Compl. ¶¶ 104, 107, 109, 123, 126.)

In *In re Moody's Corp. Sec. Litig.,* 599 F.Supp.2d 493, 509–10 (S.D.N.Y.2009), the Honorable Shirley Kram held that Moody's statements about the information it incorporated in its mortgage-backed securities and CDO rating methodologies were actionable, material misstatements. There, the company had stated in 2003 and again in 2007 that it relied upon "originator and servicer quality" in its "analysis of loan performance." *Id.* at 509. However, the plaintiffs alleged that the company "did not even begin to use originator standards for assessing originators until after April of 2008." *Id.* at 510. Thus, the court concluded that the plaintiffs had "alleged sufficient facts to show that Moody's rating methodologies were not 'accurately disclosed' by alleging that Moody's did not even start to assess originator practices until well after it claimed that it had." *Id.*

Although the Defendants emphasize that the SEC's criticisms of Bear Stearns' mortgage and VaR models occurred before the Class Period commenced, the Securities Complaint alleges that Bear Stearns never adopted the necessary changes to its mortgage and VaR models, and that it was not until toward the end of 2007 that the Bear Stearns Defendants attempted to respond to the SEC's concerns. *See Zelman v. JDS Uniphase Corp.,* 376 F.Supp.2d 956, 971 (N.D.Cal.2005) ("facts relevant to scienter will ordinarily date from before any alleged misrepresentations").

The Securities Complaint also has alleged facts to establish the significance of the VaR numbers. In February 2007, Credit Suisse analysts noted that "management will continue to invest to grow revenues via new products and new geographies, rather than increasing VaR (the latter has been the most stable amongst peers)." (Sec. Compl. ¶ 169.) These same analysts noted in another report issued in February 2007: "VaR and Revenue Growth; RoE and Book Value ... Tying these elements together with valuation leads us to the conclusion that Bear ought to be a lower risk play in the brokerage group. From a business per-

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

spective, note that Bear's revenue growth has kept pace with peers, with far less VaR." (Sec. Compl. ¶ 170.)

[16][17] The Bear Stearns Defendants also assert that the Company disclosed its mortgage securitization and origination and the impact of the subprime crisis and had no duty to disclose further facts. *See* Defs.' Mem. at 53–54. This defense does not meet the charge that the asset evaluations were not adequately calculated for risk. Moreover, "a duty to speak the full truth arises when a defendant undertakes a duty to say anything. Although such a defendant is under no duty to disclose every fact or assumption underlying a prediction, he must disclose material, firm-specific adverse facts that affect the validity or plausibility of that prediction." *Lormand v. U.S. Unwired, Inc.,* 565 F.3d 228, 249 (5th Cir.2009) (citation omitted). *See,* ***491** e.g., Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, 1098 n. 7, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991); *Lichtenberg v. Besicorp Group Inc.,* 43 F.Supp.2d 376, 389 (S.D.N.Y.1999). *Accord Roeder v. Alpha Indus., Inc.,* 814 F.2d 22, 26 (1st Cir.1987); *Brumbaugh,* 416 F.Supp.2d at 250; *see also In re Ambac,* 693 F.Supp.2d at 271 ("given that Ambac's officers characterized the company's underwriting standards as 'rigorous' and 'conservative,' the failure to disclose a lowering of such standards was a material omission.").

*See also In re Fannie Mae 2008 Sec. Litig.,* 742 F.Supp.2d 382 (S.D.N.Y.2010), addressed allegations that Fannie Mae had made false or misleading statements with regard to its underwriting standards and risk management. The Court dismissed the claims against Fannie Mae's underwriting standards, finding that Fannie Mae had disclosed in detail the risks it had taken on by investing in subprime assets and the asset value fluctuations that were likely to result. *Id.* at 398–401. The Court then considered Fannie Mae's statements that their risk management operation was "appropriate." *Id.* at 404–05. The Court found that these statements were made despite the defendants' knowledge that their risk management system was inadequate for the new subprime assets they were purchasing, and that these were thus material misstatements sufficient to survive a motion to dismiss. *Id.* at 404–06. The allega-

tions against Bear Stearns' risk management disclosures are more forceful than the parallel allegations addressed in *Fannie Mae.*

The Bear Stearns Defendants have contended that all of the broker-dealer CSEs were being scrutinized by the SEC and were doing the same thing. *See* Defs.' Mem. at 26 & n. 57, 54–55. This line of defense was rejected in *SEC v. PIMCO Advisors Fund Mgmt. LLC,* 341 F.Supp.2d 454, 471–72 (S.D.N.Y.2004) ( "emphatically reject[ing]" defendant's attempt "to avoid liability by asserting what may be considered the 'everyone was doing it defense' [because defendant's alleged practices] were widespread in the industry .... If the conduct undertaken throughout the ... industry was in gross violation of the industry's duties towards investors, ... [defendant] cannot avoid liability simply by stating that he was one of many who did wrong, or that he is being unfairly singled out for punishment.").

[18] The Bear Stearns Defendants have also contended that "statements about [Bear Stearns'] valuation and risk models are non-actionable omissions as a matter of law" as matters of opinion rather than fact. Defs.' Mem. at 56, *citing In re Salomon Analyst Level 3 Litig.,* 373 F.Supp.2d 248, 252 (S.D.N.Y.2005). However, *Salomon* dealt not with a corporation's representations in SEC filings regarding its valuation of assets and risk models, but rather, with the valuation models that a stock analyst used to issue stock recommendations regarding two communications companies. The court held that valuation models and the predictions based on them qualify as opinions rather than facts and stated that an "analyst who sets out his own opinion of a stock's value based on the valuation model he finds most persuasive for that company does not omit a material fact by failing to note that others may have different opinions or analytic approaches." *In re Salomon,* 373 F.Supp.2d at 252; Defs.' Mem. at 56. As alleged here, the valuation and risk models are designed to provide a basis for accurate current values of Level 3 assets in accordance with GAAP—SFAS 157. (Sec. Compl. ¶¶ 94–98.) To the extent Bear Stearns knowingly used flawed models that would produce unreliable and skewed results, or recklessly disregarded ***492** such flaws, the results produced by those

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

models and reported to investors are actionable misstatements. *See, e.g., In re MoneyGram Int'l, Inc. Sec. Litig.,* 626 F.Supp.2d 947, 973–4, 980 (D.Minn.2009) (holding that complaint alleged actionable and materially false and misleading statements in alleging, inter alia, that company overstated the value and quality of mortgage-backed assets in its investment portfolio, understated its exposure to subprime and Alt–A collateral, and misrepresented its valuation processes and standards and internal controls); *In re AIG,* 741 F.Supp.2d at 530 (holding allegations of material misstatements were adequate where defendants were "repeatedly emphasizing the strength of the Company's risk controls when addressing investor concerns related to exposure to the subprime mortgage market, without disclosing that the CDS portfolio at AIGFP was in fact not subject to either the risk control processes that governed other divisions of the Company or the risk control processes that previously had been in place at AIGFP; [and] repeatedly pronouncing confidence in the Company's assessment of the risks presented by the CDS portfolio, despite knowledge that the Company's models were incapable of evaluating the risks presented"); *In re New Century,* 588 F.Supp.2d 1206, 1215, 1227 (C.D.Cal.2008) (where the defendant, a mortgage loan originator, reduced the value of its reserves to cover losses on mortgage loans it held for investment, in violation of GAAP, even as the number of delinquent loans that it held on its books was increasing, the court found that the complaint contained adequate factual allegations about the "declining loan performance, an increase in defaults, and a concomitant rise in repurchase claims that were baldly disregarded" by defendant); *In re Washington Mutual, Inc. Sec., Derivative & ERISA Litig.,* 259 F.R.D. 490, 507 (W.D.Wash.2009) (finding that defendant failed to take adequate reserves in violation of GAAP because its reserve calculation failed to account for other improper practices regarding its mortgage loan origination practice like inflated appraisals, deficient underwriting, and ineffective internal controls established by factual allegations in the complaint.).[FN8]

> FN8. In *ECA,* the Court held that the defendant's statements about its risk management program were "no more than puffery which does not give

rise to securities violations." 553 F.3d at 206. The Court found the alleged statements to be mere generalizations that investment companies routinely make and that a "reasonable investor" would not rely on. *Id.* The statements in that case, for example, that the company "set the standard" in risk management and was "highly disciplined and designed to preserve the integrity of the risk management process," were unlike those at issue here. Bear Stearns is alleged to have made detailed statements about its risk management approach such that reasonable investors would rely on them in making investment decisions.

Here, the Securities Complaint has repeatedly alleged that the Bear Stearns Defendants could not reasonably have believed that their risk exposure was only minimal and that nothing had changed despite the housing downturn and subprime mortgage crisis. *See In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 141 (S.D.N.Y.1999) (holding that statements based upon defendants' "beliefs" were actionable because there was "evidence that the defendants were aware of undisclosed facts that seriously undermined the accuracy of their alleged opinions or beliefs").

[19] The Bear Stearns Defendants have also contended that their statements about their VaR models are entitled to safe harbor protection. Defs.' Mem. at 56–57. The safe harbor and related "bespeaks caution" doctrines apply to "forward-looking **\*493** statements," not to statements of existing or historical fact. "As a general rule, statements whose truth cannot be ascertained until some time after the time they are made are 'forward-looking statements.' " *In re Aegon N.V. Sec. Litig.,* No. 03 Civ. 0603, 2004 WL 1415973, at \*12, 2004 U.S. Dist. LEXIS 11466, at \*32–33 (S.D.N.Y. June 23, 2004) (citation omitted); *see also In re Regeneron Pharms., Inc. Sec. Litig.,* No. 03 Civ. 3111, 2005 WL 225288, at \*13, 2005 U.S. Dist. LEXIS 1350, at \*39 (S.D.N.Y. Feb. 1, 2005) ("Statements that might arguably have some forward-looking aspect are unprotected by the PSLRA safe harbor provision to the extent that they are premised on representations of present fact.")[FN9]

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

FN9. In *In re Ambac,* the Court found that the "bespeaks caution" doctrine does not just apply to forward-looking statements. 693 F.Supp.2d at 280–81. It acknowledged a division of authority on the breadth of the doctrine, and found that the doctrine applies wherever "cautionary language precisely address[es] the allegedly undisclosed risk and is therefore adequate to invoke the protection of the bespeaks caution doctrine." *Id.* at 281 (internal citation and quotations omitted). The Court relied upon *Rubin v. MF Global, Ltd.,* 634 F.Supp.2d 459, 467–68 (S.D.N.Y.2009) for this proposition. However, the Second Circuit has recently expressly overruled the expansion of the "bespeaks caution" doctrine in *Rubin,* holding that it is limited to forward-looking statements and does not apply to statements of present or historical fact. *Iowa Public Employees' Retirement System v. MF Global, Ltd.,* 620 F.3d 137, 141–144 (2d Cir.2010).

[20] However, the allegedly misleading statements about VaR models and the results provided by the VaR models are statements of present risk factors, rather than forward-looking predictions about future events. *See, e.g., In re New Century,* 588 F.Supp.2d at 1225–7 (holding that plaintiffs adequately pled actionable false and misleading statements against subprime lender where complaint alleged that defendants misrepresented adequacy of company's reserves and risk valuations, employed outdated valuation models, overvalued its residual interests in securitizations, falsely certified adequacy of internal controls and quality of its loans, and failed to identify existing problems in its public filings); *see also Atlas v. Accredited Home Lenders Holding Co.,* 556 F.Supp.2d 1142, 1149 (S.D.Cal.2008) (finding similar statements regarding loan quality and underwriting to provide a basis for actionable securities law violations); *In re MoneyGram Int'l,* 626 F.Supp.2d at 980 n. 32 (defendants' alleged misrepresentations regarding valuation of mortgage-backed assets, exposure to subprime and Alt–A collateral, and adequacy of valuation processes, standards and controls related to

historical or then-current financial conditions are not protected under safe harbor); *In re AIG,* 741 F.Supp.2d at 531–32 (defendants' statements about company's present reserves, risk valuations, losses, risk assessment abilities, and scope of investments in risky assets are not protected under safe harbor); *Freidus,* 736 F.Supp.2d at 841 (finding that even where the company's disclosures "were extensive and described in some detail the risks that ING's subprime and Alt–A RMBS posed to the company's financial health," the effect of those disclosures was "undercut" by the company's misleading statements such that the Court could not conclude that "no reasonable investor would have found additional disclosures about the nature of ING's Alt–A and subprime RMBS immaterial as a matter of law.") (internal citation omitted).FN10

FN10. *See also ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.,* 957 F.Supp. 1308, 1324 (S.D.N.Y.1997).

As referenced above, the Securities Complaint has alleged that Defendants **\*494** made numerous false and misleading statements of existing/historical fact relating to risk management and models, such as: (1) statements that the Company "regularly evaluates and enhances [its] VaR models in an effort to more accurately measure the risk of loss," (Sec. Compl. ¶¶ 162, 184); (2) Molinaro's statement, when asked whether the Company had seen or had any issues or any kind of difficulties in "hedge fund-land," that "[w]e haven't seen any difficulties" despite the fact that the hedge funds' values had collapsed (Sec. Compl. ¶ 198); (3) Molinaro's statement that "[o]ur mortgage business has basically been not affected by [Bear Stearns' repurchase agreement with the High Grade Fund] and has not really been a part of this situation," (Sec. Compl. ¶ 207); (4) Bear Stearns' press release statement that concerns regarding the BSAM hedge funds are "unwarranted as these were isolated incidences and are by no means an indication of broader issues at Bear Stearns" (Sec. Compl. ¶ 229); (5) Alix's statement that "[w]e run risk analytics to demonstrate that the Firm is well protected against further deterioration in both the subprime and Alt–A sectors across both whole loans and all securitization tranches" (Sec.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Compl. ¶ 231); (6) Schwartz's March 12, 2008 statements that "[w]e don't see any pressure on our liquidity, let alone a liquidity crisis" (Sec. Compl. ¶ 274), "we're not being made aware of anybody who is not taking our credit as a counterparty" (Sec. Compl. ¶ 276), and "our counterparty risk has not been a problem" (*Id.*); (7) Molinaro's statement that "we believe our mortgage positions have been conservatively valued in light of current market conditions and expected levels of defaults and cumulative loss estimates" (Sec. Compl. ¶ 751); (8) the Company's statements regarding its earnings per share, net income, and revenues, which were artificially inflated by using misleading mortgage valuation models regarding its Level 3 assets (Sec. Compl. ¶¶ 589–93, 609, 631–34, 647–48, 662, 704–07, 740–43, 755–58); (9) statements that "the Company is in compliance with CSE regulatory capital requirements" (Sec. Compl. ¶¶ 625, 657); (10) the 2007 Form 10–K statement that "[c]omprehensive risk management procedures have been established to identify, monitor and control each of [the] major risks" (Sec. Compl. ¶ 766); and, (11) the March 10, 2008 statement that "[t]here is absolutely no truth to the rumors of liquidity problems that circulated today in the market" (Sec. Compl. ¶ 785). These allegations sufficiently detail statements alleged to be false and misleading.

The Bear Stearns Defendants have also cited Regulation S–K, Item 305, *Quantitative and Qualitative Disclosures About Market Risk,* under which VaR disclosures "are deemed to be forward looking statements under the federal securities laws". Defs. Mem. at 56, *citing* 17 C.F.R. § 229.305(d) and 15 U.S.C. § 78u–5(i)(B), (C). That regulation further provides, in subsection 305(d)(2)(i), that such information is considered forward-looking "except for historical facts such as the terms of particular contracts and the number of market risk sensitive instruments held during or at the end of the reporting period." 17 C.F.R. § 229.305(d)(2)(i). As the Company explained in filings with the SEC, VaR is a statistical model that provides "[a]n estimation of potential losses that could arise from changes in market conditions." The Bear Stearns Companies, Inc., Quarterly Report for the Quarterly Period ending August 31, 2007 (Form 10–Q) at 60 (attached as Ex. 5 to the Declaration of Eric S. Goldstein).

[21] However, to the extent that some of Defendants' statements relating to the VaR can be deemed forward-looking, they still are not shielded under the safe harbor **\*495** because they were not accompanied by meaningful cautionary statements and, as described above, the Securities Complaint alleges that Defendants knew their statements were false and misleading at the time they made them. *See In re Indep. Energy Holdings PLC Sec. Litig.,* 154 F.Supp.2d 741, 756 (S.D.N.Y.2001), abrogated on other grounds by *In re Initial Pub. Offering Sec. Litig.,* 241 F.Supp.2d 281, 296–97, 297 n. 187 (S.D.N.Y.2003) ("Merely inserting warnings into a[n] [SEC filing] does not insulate a party from all liability for alleged material misstatements and omissions.").

[22] To be "meaningful," a "cautionary statement must discredit the alleged misrepresentations to such an extent that the 'risk of real deception drops to nil.' " *In re Immune Response Sec. Litig.,* 375 F.Supp.2d 983, 1033 (S.D.Cal.2005), quoting *Virginia Bankshares,* 501 U.S. at 1097, 111 S.Ct. 2749. True cautionary language must "warn[ ] investors of *exactly* the risk that plaintiffs claim was not disclosed." *Indep. Energy Holdings,* 154 F.Supp.2d at 755, citing *Milman v. Box Hill Sys. Corp.,* 72 F.Supp.2d 220, 230 (S.D.N.Y.1999) (emphasis in original). *See also In re Prudential Sec. Ltd. P'ships Litig.,* 930 F.Supp. 68, 72 (S.D.N.Y.1996) ("Cautionary language ... must precisely address the substance of the specific statement or omission that is challenged.") (citation omitted).

[23] Here, Bear Stearns' cautionary language to investors was that "VaR has inherent limitations, including reliance on historical data, which may not accurately predict future market risk, and the quantitative risk information generated is not limited by the parameters established in creating the models .... [VaR is] not likely to accurately predict exposures in markets that exhibit sudden fundamental changes or shifts in market conditions or established trading relationships." Defs.' Mem. at 9. The Bear Stearns' cautionary statements did not inform inves-

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

tors that Bear Stearns' VaR models did not provide for downturns in the markets or account for default risk. "[W]arnings of specific risks ... do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *In re AIG,* 741 F.Supp.2d at 531, *quoting Credit Suisse First Boston Corp. v. ARM Financial Group, Inc.,* No. 99 Civ. 12046, 2001 WL 300733, at *8 (S.D.N.Y. Mar. 28, 2001). As this Court and others have noted, "to warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *In re Van der Moolen Holding N.V. Sec. Litig.,* 405 F.Supp.2d 388, 400 (S.D.N.Y.2005) (quotation omitted).

[24] The Securities Complaint has alleged that Bear Stearns provided general boilerplate risk warnings that its VaR models might not accurately predict the future when it allegedly knew, but withheld from investors, that its VaR models were fundamentally flawed and could never produce accurate information and failed to include the accumulating evidence of market downturn and default risk.

Based upon the conclusions and authorities set forth above, the Securities Complaint has adequately pleaded the falsity of the statements made regarding risk management.

### 3. Statements Regarding the BSAM Write-downs

The Securities Complaint alleges that Bear Stearns improperly delayed writing down the value of the High–Grade Fund collateral after it became nearly worthless and that the Bear Stearns Defendants then allegedly made material false and **\*496** misleading statements regarding those hedge fund assets and the effects of Bear Stearns taking them onto their books. Specifically, the Securities Complaint alleges that Molinaro stated that the company had not "seen any difficulties" with regard to its hedge funds (Sec. Compl. ¶ 198), and Cayne stated that Bear Stearns had not seen any material change in its risk profile despite having taken on billions of dollars of undisclosed toxic debt (Sec. Compl. ¶ 211). Plaintiffs allege that the above statements were materially false and mis-

leading because the Company should have taken on to its books the assets which had declined in value and taken a substantial charge to earnings and failed to do so with the intent to deceive investors.

According to the Bear Stearns Defendants, the Securities Complaint fails to allege any particularized facts showing the falsity of Bear Stearns' statement that it believed the High–Grade Fund had sufficient assets to cover the value of the Company's loans to the fund. They contend that the charge that the assets in the fund lacked value because they were later written down does not establish that the statement was false when it was made. *See In re Silicon Storage Tech., Inc. Sec. Litig.,* No. C 05–0295, 2006 WL 648683, at *7 (N.D.Cal. Mar. 10, 2006). *See also In re Fannie Mae,* 742 F.Supp.2d at 409 (holding that "the Court will not intervene in a business and accounting judgment simply because Plaintiffs allege that the write-down in the third quarter of 2008 should have occurred earlier. The fact that a financial item is accounted for differently, or in a later period, does not support an inference that a previously filed financial statement was fraudulent. This is an allegation of fraud by hindsight, which is insufficient to withstand a motion to dismiss." In rendering this holding, the Court noted that the plaintiffs had failed to allege any violations of GAAP and that Fannie Mae was "heavily regulated" and no government entity had found their accounting to be suspect. *Id.)*

However, the Securities Complaint does allege facts concerning the subprime market sufficient to establish that the Bear Stearns Defendants knew or should have known of the need for asset write down, including GAAP violations not alleged in *Fannie Mae.* (Sec. Compl. ¶¶ 238–240, 246, 252–254); *In re RAIT Fin. Trust Sec. Litig.,* No. 2:07 Civ. 3147, 2008 WL 5378164, at *7 (E.D.Pa. Dec. 22, 2008) (holding that that plaintiffs had stated a claim by alleging that the defendant had violated SFAS No. 115, which required RAIT to take "other-than-temporary, asset impairment charges" to certain securities and that the plaintiffs had alleged facts supporting the conclusion that RAIT knew about "other-than-temporary impairments" that it would have had to take on those securities had it

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

complied with the proper accounting policies, including RAIT insiders' knowledge that the securities' issuers were likely to default). *See Novak,* 216 F.3d at 312–13 (holding that plaintiffs' allegations of fraudulent delay in writing-down assets were adequately supported by "specific facts concerning the Company's significant write-off of inventory directly following the Class Period, which tends to support the plaintiffs' contention that inventory was seriously overvalued at the time the purportedly misleading statements were made.")

Whether these facts establish that Bear Stearns knew, as alleged, that major write downs of the collateral were required before the third quarter of 2007 is an issue for trial. *See Joffee v. Lehman Bros., Inc.,* No. 04 Civ. 3507, 2005 WL 1492101, at *6 (S.D.N.Y. June 23, 2005) (holding that factual disputes are "inappropriate for disposition on a motion to dismiss")

***497 4. Statements Regarding Bear Stearns' Liquidity**
The Securities Complaint alleges that on March 11, 2008, the Company's liquidity stood at $15.8 billion, and that by the end of March 13, 2008 its liquidity had plummeted to $2 billion, requiring Bear Stearns to obtain emergency funding from JPMorgan or file for bankruptcy. (Sec. Compl. ¶ 273). Notwithstanding, on March 10, 2008, it is alleged that Greenberg stated on CNBC that rumors of liquidity problems at Bear Stearns were "totally ridiculous," and on March 12, 2008, Schwartz similarly assured CNBC viewers that "[w]e don't see any pressure on our liquidity, let alone a liquidity crisis." (Sec. Compl. ¶ 274).

According to the Securities Complaint, Defendants made these assurances despite the fact that (1) on March 6, 2008, Rabobank Group refused to renew a $500 million loan and, thus, was unlikely to renew an additional $2 billion credit agreement set to expire the following week (Sec. Compl. ¶ 260); (2) Bear Stearns was leveraged at a ratio of more than 35–to–1 and relied on overnight repo lending of approximately $102 billion per day to keep the business functioning (Sec. Compl. ¶ 264); and (3) Bear Stearns' counterparties had begun to withdraw, as ING Groep NV joined Rabobank in informing Bear Stearns that

it was pulling $500 million in financing (Sec. Compl. ¶ 269). The Securities Complaint thereby alleges a sufficient basis to contend that the statements regarding liquidation were false and misleading, including Schwartz's March 12, 2008 statement regarding Bear Stearns' dealings with Goldman Sachs.

E. *The Alleged Misstatements by the Bear Stearns Defendants are Material*

[25][26][27] "Because materiality is a mixed question of law and fact, in the context of a Fed.R.Civ.P. 12(b)(6) motion, a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA,* 553 F.3d at 197; *In re Moody's,* 599 F.Supp.2d at 510 (same); *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 161 (2d Cir.2000) (same). *See also In re Regeneron Pharms.,* 2005 WL 225288, at *21, 2005 U.S. Dist. LEXIS 1350, at *62 ("Material facts include any fact that in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities.") (quotation omitted, emphasis in original). In assessing materiality, courts are instructed to look at both quantitative and qualitative factors. *ECA,* 553 F.3d at 197–98, *citing* SEC Staff Accounting Bulletin No. 99. Quantitative factors look to the "financial magnitude of the misstatement," while qualitative factors evaluate "*inter alia,* (1) concealment of an unlawful transaction, (2) significance of the misstatement in relation to the company's operations, and (3) management's expectation that the misstatement will result in a significant market reaction." *Id.* Such factors are intended to help evaluate "whether the misstatement significantly altered the 'total mix' of information available to investors." *Id.* at 198.

With regard to quantitative factors, Plaintiffs allege that Bear Stearns delayed taking a loss on $1.3 billion of the $1.7 to $2 billion in collateral it had taken as part of the hedge fund bailout, which quickly became "effectively worthless." (Sec. Compl. ¶¶ 205, 212–15.) Plaintiffs also allege that while Defendant Schwartz, in his capacity as

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

CEO, stated that Bear Stearns' liquidity position was "virtually unchanged," its liquidity pool had fallen by $1.2 billion over the prior months and lost **\*498** $13 billion the day he spoke. (Sec. Compl. ¶¶ 274–75.) Schwartz also allegedly stated that the Company was not facing issues with lenders while aware of the fact that ING had pulled approximately $500 million in financing and that same day Bear Stearns paid out $1.1 billion in counterparty disputes. (Sec. Compl. ¶¶ 276–78.) The amounts at issue in these alleged misstatements support Plaintiffs' allegations of materiality, though the bulk of Plaintiffs' contentions relate to the qualitative significance of Defendants' misstatements.

While Plaintiffs do not precisely state the amount of the Bear Stearns Defendants' other alleged misstatements, such as those pertaining to the VaR, asset valuations, earnings, and risk management practices, they adequately demonstrate the significance of Defendants' misstatements and establish that they clearly altered the "total mix" of information available to investors." *Id.* For example, Plaintiffs allege:

• Bear Stearns' valuation and VaR models were flawed and were never updated to reflect the housing and sub-prime mortgage downturn, and, as a result, Defendants were not including material information about the value of Bear Stearns' assets and its level of risk in their SEC filings and other public statements. (Sec. Compl. ¶¶ 104, 107, 109, 123, 126, 162, 184.)

• In 2007, Credit Suisse made statements suggesting that Bear Stearns' low VaR made it an less risky investment than its peers. (Sec. Compl. ¶¶ 169–170.)

• The Company's statements regarding its earnings per share, net income, and revenues, were artificially inflated by using misleading mortgage valuation models regarding its Level 3 assets (Sec. Compl. ¶¶ 589–93, 609, 631–34, 647–48, 662, 704–07, 740–43, 755–58);

• The Bear Stearns Defendants made misstatements

underestimating the effect of the hedge fund collapse and bail out on Bear Stearns' finances and risk profile. (Sec. Compl. ¶¶ 205–216, 229.)

• The Company issued statements detailing its risk management programs which inaccurately proclaimed their high-quality. (Sec. Compl. ¶¶ 162, 182, 183, 231, 359, 424–26, 766.)

• The Company was unable to meet its capital requirements without using inaccurate models to inflate asset values. (Sec. Compl. ¶¶ 427–52, 625, 657.)

• The Bear Stearns Defendants' made statements proclaiming that they faced no liquidity problems. (Sec. Compl. ¶¶ 274–277, 785.)

• Certain counterparties refused to renew financing to Bear Stearns when the Company relied on $102 billion per day in overnight repo lending to continue operations. (Sec. Compl. ¶¶ 260, 264, 269, 276.)

• As a consequence of the revelation of the truth concerning Bear Stearns' finances and policies during the Class Period, Bear Stearns' common stock lost in excess of $19.8 billion in market capitalization. (Sec. Compl. ¶ 799).

The Bear Stearns Defendants' alleged misstatements listed above inflated asset values, overestimated risk management, understated risk and losses, and denied a liquidity crisis to Bear Stearns investors. Such quantitatively and, particularly, qualitatively significant information goes to the heart of Bear Stearns' corporate value and financial stability, and it is far from being "obviously unimportant to a reasonable investor." [FN11] *ECA,* 553 F.3d at 197.

> FN11. This holding is reinforced by the OIG Report's repeated findings that Bear Stearns' alleged misstatements in their SEC filings "deprived" investors of "material information" that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

they could have used "to make well-informed investment decisions." (Sec. Compl. ¶¶ 323, 621, 772).

**\*499** F. *The Securities Complaint Has Adequately Pleaded Scienter Against the Bear Stearns Defendants*

[28][29] Under the PSLRA, "Congress required plaintiffs to plead with particularly facts that give rise to a 'strong'—i.e., a powerful or cogent-inference" of fraudulent intent. *Tellabs,* 551 U.S. at 323, 127 S.Ct. 2499; 15 U.S.C. § 78u–4(b)(2). In the Second Circuit, a "strong inference" of scienter can be established by alleging facts either "(1) showing that the defendants had both motive and opportunity to commit the [alleged] fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Communications,* 493 F.3d at 99.

[30] "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the Court must take into account plausible opposing inferences," such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 324, 127 S.Ct. 2499.

*1. Motive and Opportunity*

[31][32] The Bear Stearns Defendants contend that Plaintiffs do not adequately plead motive, but do not challenge Plaintiffs' claims that Defendants had the opportunity to commit fraud. Defs'. Mem. 39–44. According to the Supreme Court, "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs,* 551 U.S. at 325, 127 S.Ct. 2499. However, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *In re Ambac,* 693 F.Supp.2d at 266, *quoting Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir.2001); *see also In re Fannie Mae,* 742 F.Supp.2d at 395–97, 402–03 (same). Unusual or suspicious insider trading activity supports an inference of scienter. *See Stevelman v. Alias Research Inc.,* 174 F.3d 79, 85 (2d Cir.1999) (citations omitted). In *Stevelman,* the Second Circuit found the following with regard to unusual insider trading:

Some of the sales occurred after the representations were made, several officers made large sales, and a motive for inflation of the stock price can be inferred from these sales. Moreover, the statements that continued to be made after the sales that followed the earlier statements could well be probative of an intent to keep the stock price high in order to avoid detection of the alleged fraud.... When combined with the 'opportunity' embodied in the fact that the insider ... who benefitted from stock sales during the misrepresentation period actually made the misrepresentations, the elements of securities fraud have been made out.

*Id.* at 86, *citing Griffin v. McNiff,* 744 F.Supp. 1237, 1246 (S.D.N.Y.1990), *aff'd* 996 F.2d 303 (2d Cir.1993).

[33] The Securities Complaint alleges that the Defendants listed in Count III ("20A Defendants") sold over 800,000 shares for a total realized value of over $90 million during the Class Period. Average profits among these defendants were allegedly 86.3%. Plaintiffs also contend that the 20A Defendants suffered minor losses on their vested options, which Plaintiffs claim were responsible for the 20A Defendants' increase in holdings over the Class Period. **\*500** Plaintiffs further allege that the 20A Defendants' sales were suspiciously timed, often coming at the end of the year after the release of earnings statements.

Defendants offer a competing theory, contending that the selling behavior of the 20A Defendants was not unusual, but conformed to pre-Class Period behavior, and that the amount and timing of the Section 20A Defendants' stock sales during the Class Period were consistent with, and even less than, their sales during earlier periods, including Plaintiffs' "Control Period." Defs'. Mem. at 27–28, 42. The Section 20A Defendants retained the majority of their stock holdings during the Class Period, and actually increased their holdings during the Class Period. (*Id.* at 29–30, 40–41.) By retaining their holdings, the Section

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

20A Defendants lost approximately $1.1 billion during the Class Period. (*Id.* at 28–30, 41–42.) It is also contended that the Section 20A Defendants' sales were consistent with the legitimate purpose of paying tax liabilities triggered by the stock and option grants themselves. (*Id.* at 43–44.)

Although the Plaintiffs label the sales between December 18, and 22, 2006 and on December 2, 2007 "suspicious" because they occurred in the days immediately following public announcements of earnings (Opp. at 38–39), trading after the release of financial information has been held to be appropriate and commonplace. *Kairalla v. Advanced Med. Optics, Inc.,* No. CV 07–05569, 2008 WL 2879087, *10, 2008 U.S. Dist. LEXIS 76987, at *28 (C.D. Cal. June 6, 2008) (stock sales following the release of earnings statements are common, not suspicious); *City of Brockton Ret. Sys. v. Shaw Group Inc.,* 540 F.Supp.2d 464, 475 (S.D.N.Y.2008) (no inference of motive from sale of stock in trading window after issuance of financials).

Given that the Company reported on December 20, 2007 a quarterly loss for the first time in its history and a write down of $1.9 billion, the Section 20A Defendants' trading the next day (which is alleged to represent approximately 50 percent of all Class Period sales) does not establish scienter. The cases on which the Plaintiffs have relied found the timing of stock sales to be suspicious when Defendants sold stock after releasing positive information to the market. *See Brumbaugh v. Wave Sys. Corp.,* 416 F.Supp.2d 239, 254 (D.Mass.2006) (involving a positive public announcement "that caused the price of the stock to rise") (emphasis in original); *In re MicroStrategy, Inc. Sec. Litig.,* 115 F.Supp.2d 620, 646 (E.D.Va.2000) (involving sales in a single eight-day period following allegedly premature announcement of a "watershed event" for the company).

The Lead Plaintiff contends that the "unexercised shares" (presumably meaning options) were ultimately exchanged for shares in JPMorgan "in amounts and conversion prices similar in value to what they held with Bear Stearns" and that the Section 20A Defendants lost only $7,622.87 when they exchanged their vested Bear Stearns options for JPMorgan options. Pl. Mem. at 38. The public record documents submitted by the Bear Stearns Defendants belie these assertions. At the start of the Class Period, the intrinsic value of the Section 20A Defendants' vested, but unexercised, options was more than $90 million. At the close of the Class Period, all of these options had lost much of their value. After conversion to options to buy JPMorgan shares, these options were still far diminished in value because the exercise price of the options vastly exceeded JPMorgan's stock price at the time.

Finally, as noted above, the Section 20A Defendants suffered more than $1.1 billion **\*501** in losses when the Company collapsed. Defs'. Mem. at 41–42. That conduct negates fraudulent intent. *See Rombach v. Chang,* 355 F.3d 164, 177 (2d Cir.2004) (finding "no personal interest sufficient to establish motive" where defendants, all major shareholders, "share[d] the pain when the company failed"); *In re Keyspan Corp. Sec. Litig.,* 383 F.Supp.2d 358, 382–83 (E.D.N.Y.2003) (individuals holding onto the vast majority of their holdings undercuts any inference of scienter).

The trading by the 20A Defendants does not establish a sufficiently strong inference of the 20A Defendants' motive to inflate Bear Stearns' stock price.

### 2. Conscious Misbehavior or Recklessness

[34] The Securities Complaint also has alleged circumstantial evidence to establish a strong inference of scienter through conscious misbehavior or recklessness. "An egregious refusal to see the obvious, or to investigate the doubtful [can support] an inference of ... recklessness." *Chill v. General Elec. Co.,* 101 F.3d 263, 269 (2d Cir.1996) (citation omitted). In securities cases, the Second Circuit has defined recklessness as "at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " *Novak v. Kasaks,* 216 F.3d at 308, *quoting*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

*Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 47 (2d Cir.1978) (ellipsis in original). The Circuit has further specified that:

> [S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.

> *Novak,* 216 F.3d at 308.

[35] As discussed above, the Securities Complaint has alleged that the Bear Stearns Defendants willfully or recklessly disregarded warnings from the SEC regarding Bear Stearns' risk and valuation models which allegedly were designed to give falsely optimistic accounts of the Company's risk and finances during the Class Period. The Securities Complaint also alleges that the Bear Stearns Defendants improperly delayed taking the hedge fund collateral, thus intentionally or recklessly avoiding the revelation of losses and the consequent negative effect. These allegations are sufficient to create a strong inference of scienter, as required by *Tellabs,* 551 U.S. at 324, 127 S.Ct. 2499; *see In re Ambac,* 693 F.Supp.2d at 273 n. 38 ("both the scale of the alleged GAAP violations and the size of the write-down Ambac announced in January 2008 provide additional support for our finding of a strong inference of scienter.")

Defendants do not dispute that the SEC informed Bear Stearns in a November 2005 memorandum to Farber that the Company's risk and valuation models were flawed and that the SEC concluded in December 2006 that the Company's models still failed to incorporate key indicators of housing declines. Defs. Mem. at 45. According to the OIG Report, "the reviews of mortgage models that should have taken place before the subprime crisis erupted in February of 2007 appears [sic] to have never occurred." (Sec. Compl. ¶ 109.) Indeed, the Company did not even develop

a recession-led scenario that could be included in its models until "towards the end of 2007." (Sec. Compl. ¶ 126.) According to the Securities Complaint, the Company knew its mortgage valuation and VaR **502 models failed to reflect declines in the housing market, yet persisted in using these models to offer investors falsely optimistic accounts of the Company's risk and finances during the Class Period.

This court was presented with a similar fact pattern in *In re AIG.* There, the plaintiffs alleged that "Defendants knew ... that the Company had acquired billions of dollars' worth of exposure to RMBS through the CDS portfolio, and knew that, while their model could not properly evaluate the extent of the related risk, the portfolio carried considerable valuation risk and collateral risk as well as credit risk. Moreover, [Defendants] knew that risk controls had been weakened at AIGFP." 741 F.Supp.2d at 533. The court found that defendants' positive statements about asset values and risk management despite "various internal indicators to the contrary, including the Company's recognition of the weakness of the Gorton model; the resignation of [the Vice President of Accounting Policy; PwC's warning of a potential material weakness; and the multi-billion dollar collateral calls received from AIGFP's CDS counterparties" were sufficient to give rise to a strong inference of scienter. *Id.; see also In re Ambac,* 693 F.Supp.2d at 266–67 (holding plaintiffs' allegations "that the Exchange Act Officers (a) knew about Ambac's lowered underwriting standards-and affirmatively approved them-while publicly touting the company's "cautious" and "conservative" approach to underwriting, and (b) learned of the deterioration of Ambac's RMBS and CDO portfolios, while making public statements that Ambac was outperforming the market and would suffer only minimal losses" to be sufficient to support a strong inference of scienter.).

In *In re Fannie Mae,* 742 F.Supp.2d at 405–08, the Court similarly held that scienter was sufficiently alleged with regard to Fannie Mae's disclosures about its risk management. It found that Fannie Mae had knowingly "[p]roceed[ed] headlong into an unfamiliar market and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

[told] investors that risk controls [were] in place while working ... without the internal ability to analyze the risks associated with that market." *Id.* at 406. This conduct was held to be enough of "an extreme departure from the standards of ordinary care" to support an inference of scienter. *Id.* at 406.[FN12]

> FN12. In *In re Fannie Mae,* 742 F.Supp.2d at 404–04, the court also held that reduced underwriting standards did not support an inference of scienter where Fannie Mae had made several disclosures implying that their underwriting standards had declined. The Court noted that "[w]here a defendant's disclosures are only misleading by virtue of a lack of particularity, and where a motive is absent, an inference of fraud sufficient to satisfy the PSLRA and Rule 9(b) is lacking." *Id.* This is not the situation here, as Plaintiffs have alleged that the Bear Stearns Defendants disclosed that their risk management was robust when it had been compromised.

The OIG Report also concluded that the Company had avoided writing down its losses on the hedge fund collateral by long delaying taking that collateral onto its books. (Sec. Compl. ¶ 213); *see also* Deloitte Mem. at 4 (acknowledging "OIG's view that Bear Stearns should have more rapidly written down the assets that served as collateral for a loan to one of its hedge funds").

The Bear Stearns Defendants have noted that OIG's conclusions are countered by the TM's responses to the OIG Report's criticisms of TM, attached as an appendix to the OIG Report. Defs'. Mem. at 45. However, resolution of this factual dispute, in the absence of any discovery or evidentiary hearing, is not appropriate on a motion to dismiss. *See Joffee,* 2005 WL 1492101, at *6 (holding that factual disputes**503** are "inappropriate for disposition on a motion to dismiss"); *Doe v. Green,* 593 F.Supp.2d 523, 527 (W.D.N.Y.2009) (holding that when facts are sharply disputed by both sides, for purposes of a motion to dismiss the Court must accept the truth of plaintiffs' allegations).

The Bear Stearns Defendants have raised an additional factual dispute by arguing that the OIG Report does not prove that the Company used its misleading mortgage models for pricing. Defs.' Mem. at 25. However, even if this view of the OIG Report is adopted at this preliminary stage, it establishes that the Company used different methods to assess value for risk management purposes, which is alleged to be a misleading practice. Pl. Mem. at 34.

The Bear Stearns Defendants have described *In re PXRE Group, Ltd., Sec. Litig.,* 600 F.Supp.2d 510 (S.D.N.Y.2009), as a case in which the court found that the "allegations were insufficient because plaintiffs failed to identify any information available to the defendants 'specifically informing them of the flaws that allegedly existed in PXRE's loss estimation process.' " Defs.' Mem. at 46, *quoting In re PXRE Group,* 600 F.Supp.2d at 547–48. Here, the Securities Complaint alleges the SEC's warnings to the Company in the 2005 CSE application process, a 2005 memorandum sent to Defendant Farber, details of a 2006 meeting between the Company's risk managers and the SEC, and a letter that Bear Stearns sent to hedge fund investors revealing that the collateral it had received in the hedge fund bailout was essentially worthless constituted such information. (Sec. Compl. ¶¶ 102–05, 214.)

The Bear Stearns Defendants cite the OIG Report as clearing them of any capital or liquidity problems, by asserting that the Report concluded that the Company met its regulatory capital requirements during the Class Period. However, the Securities Complaint has alleged that the Company was only able to meet its regulatory capital requirements by manipulating its VaR numbers and by failing to record losses associated with the collateral it received in the hedge fund bailout. (Sec. Compl. ¶¶ 427–52, 625.) Moreover, the fact that the Company's Board agreed to the Company's sale at $2 per share contradicts Defendants' claim that the Company had experienced no capital crisis.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

The Bear Stearns Defendants have also cited *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, et al.,* 694 F.Supp.2d 287 (S.D.N.Y.2010), in which the Court granted defendants' motion to dismiss, citing the plaintiffs' failure to allege specific facts demonstrating that defendants had reason to know the falsity of their statements, including those regarding their VaR. Here, the Securities Complaint, as set forth above, has provided detailed allegations, including the OIG Report and confidential witness statements,[FN13] to allege **504** that the Defendants were aware or should have been aware of the falsity of their statements, and it has provided sufficiently detailed allegations regarding Bear Stearns' failure to maintain effective internal controls related to its financial reporting.

FN13. It is permissible for Plaintiffs to rely on confidential sources to satisfy the pleading requirements of the PSLRA and *Rule 9(b)*. *See Novak,* 216 F.3d at 314. In such a situation, the confidential sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* Plaintiffs here have met this burden for each of their confidential witnesses. (Sec. Compl. ¶¶ 54, 58–60, 107, 132, 143.) It should be noted that the Seventh Circuit has recently questioned the reliability of confidential witnesses, but this issue has not been raised in the Second Circuit and other district courts have similarly allowed the use of confidential witnesses. *See In re Ambac,* 693 F.Supp.2d at 267 n. 31; *In re PXRE,* 600 F.Supp.2d at 526 n. 18; *In re NovaGold Resources Inc. Sec. Litig.,* 629 F.Supp.2d 272, 298 n. 14 (S.D.N.Y.2009).

The Bear Stearns Defendants have asserted in connection with their denial of scienter that the Securities Complaint constitutes a "classic fraud by hindsight case", Defs'. Mem. at 37, and alleged "that Bear Stearns did not predict the impact of the subprime mortgage crisis." *Id.* at 39.

However, as discussed above, the incantation of fraud-by-hindsight will not defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made. *See In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.,* 324 F.Supp.2d 474, 494–495 (S.D.N.Y.2004) (rejecting defendants' fraud-by-hindsight claim where plaintiffs' allegations that "the company failed to take into account information that was available to it" at the time it issued its incorrect financial results sufficiently pleaded fraud). *See also AIG Global,* 2005 WL 2385854, at *12 (finding that amended complaint resolved fraud-by-hindsight concerns by new allegations that asset-backed securities' collateral value "estimates were shown to be wrong in a subsequent report prepared by a third-party servicer" and that the asset value "was computed in a materially misleading way that was in fact wrong at the time it was issued"); *In re Vivendi Universal,* 2004 WL 876050, at *6 (rejecting defendant's contention that "plaintiffs' allegations of a 'liquidity crisis' constitute pleading fraud by hindsight," as "the Second Circuit has explicitly recognized that plaintiffs may rely on post-Class Period data to confirm what a defendant should have known during the Class Period").

The issue at this pleading stage is whether or not allegations of scienter as set forth above are adequate. Defendants emphasize that "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences," such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 127 S.Ct. at 2509–10. As discussed above, Defendants contend that Plaintiffs' allegations of scienter are "far less compelling than the opposing inference that defendants—along with virtually every other major financial institution and government regulator—were unable to predict the severe, rapid, and unexpected market implosion that led to the Company's collapse," Defs'. Mem. at 37, and that Plaintiffs merely plead fraud-by-hindsight.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

However, the Securities Complaint has alleged that the Bear Stearns Defendants' made false and/or misleading statements and that the Bear Stearns Defendants knew or should have known the false and/or misleading nature of their statements when made, based on their position in the Company, warnings from the SEC, and other indicators. The adverse consequences of Bear Stearns' disclosures relating to its exposure to declines in the housing market, and the adverse impact of those circumstances on the Company's business going forward, are alleged to have been entirely foreseeable to Defendants at all relevant times.

In *In re Ambac,* the Court was presented with a similar competing inference of unpredictable market-wide collapse. The Court found that "defendants' arguments on this issue are premised on a convenient confusion of cause and effect. The conduct that plaintiffs allege, if true, would make **\*505** [defendants] an active participant in the collapse of their own business, and of the financial markets in general, rather than merely a passive victim." *In re Ambac,* 693 F.Supp.2d at 269. The same logic applies here, where Defendants' alleged misconduct was integral to the decline of Bear Stearns, and the financial markets with it. Defendants' competing inference of market implosion has not been demonstrated to overcome the strong inference of scienter developed by Plaintiffs.

In all, as a consequence of the revelation of the truth concerning Bear Stearns' finances and policies during the Class Period, Bear Stearns' common stock lost in excess of $19.8 billion in market capitalization. (Sec. Compl. ¶ 799.)

The allegations relating to false and misleading statements, including the VaR, asset valuation, and liquidity, coupled with the allegations of knowledge or recklessness constitute adequate allegations of scienter.

G. *The Allegations of Loss Causation are Adequate*

As stated above, the pleading of loss causation under Section 10(b) is governed by *Rule 8* notice pleading standards under which Plaintiffs must plead "a short and plain statement of the claim showing that the pleader is entitled to relief." *In re Tower Auto. Sec. Litig.,* 483 F.Supp.2d at 348, *quoting* Fed.R.Civ.P. 8. A complaint need only provide the defendant with "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc.,* 544 U.S. at 347, 125 S.Ct. 1627. However, a complaint must allege that the Company's share price "fell significantly after the truth became known." *Id.*

The Second Circuit's decision in *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189 (2d Cir.2003), held that proximate cause—i.e., loss causation—exists when "damages suffered by plaintiff [are] a foreseeable consequence of any misrepresentation or material omission." *Id.* at 197 (citation omitted). The Second Circuit clarified the standard for pleading loss causation in *Lentell v. Merrill Lynch & Co.,* 396 F.3d 161 (2d Cir.2005):

[A] misstatement or omission is the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor....

Thus to establish loss causation, "a plaintiff must allege ... that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered," *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 95 (2d Cir.2001) (emphasis added) i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. Otherwise, the loss in question was not foreseeable.

*Id.* at 173 (emphasis and ellipsis in original, citation omitted); *see also id.* (loss causation "require[s] both that the loss be foreseeable *and* that the loss be caused by the materialization of the concealed risk") (emphasis in original); *id.* at 175 ("To plead loss causation, the complaint [ ] must allege facts that support an inference that [defendant's] misstatements and omissions concealed the circum-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

stances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud."); *Heller v. Goldin Restructuring Fund, L.P.*, 590 F.Supp.2d 603, 623–24 (S.D.N.Y.2008) (" 'Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss,' a plaintiff may plead that it is 'the **\*506** materialization of the undisclosed condition or event that causes the loss.' "), *quoting In re Initial Pub. Offering Sec. Litig.,* 544 F.Supp.2d 277, 289 (S.D.N.Y.2008).

[36] The Securities Complaint, as described above, has alleged that, throughout the Class Period, the market prices of Bear Stearns securities were artificially inflated as a direct result of the Bear Stearns Defendants' allegedly materially false and misleading statements and omissions. When the truth became known, the prices of Bear Stearns securities declined precipitously as the artificial inflation was removed from the prices of these securities, causing substantial damage to Lead Plaintiff and members of the Class. The chart contained in the Complaint shows the fluctuation of the price of Bear Stearns common stock leading up to and during the Class Period. During the Class Period, Bear Stearns' common stock traded as high as $171.57 per share as recently as January 12, 2007. (Sec. Compl. ¶¶ 795–796.)

By early March 2008, Bear Stearns common stock was trading at above $60 per share and its management was vigorously denying rumors that Bear Stearns had any liquidity problems. On March 10, 2008, Bear Stearns common stock fell $7.78, or 11%, to close the day at $62.30 on trading volume of 23 million shares. Despite the Company's attempts to reassure the market, Bear Stearns' stock price continued to fall by $5.30, or 8.5%, during the week as the rumors continued to intensify, eventually closing at $57.00 per share on March 13, 2008 on higher than normal volume. (Sec. Compl. ¶¶ 11, 797–798.)

On March 14, 2008, Bear Stearns announced that its liquidity position had significantly deteriorated, requiring the Company to seek financing via a secured loan facility from JPMorgan. In response to this news, Bear Stearns'

common stock price fell $27, or 47.3%, to close at $30.00 per share on particularly heavy trading volume of approximately 187 million shares (about eight times its three month average trading volume of 23 million shares), representing a 47% one day drop of approximately $3.5 billion of market capitalization. (Sec. Compl. ¶¶ 11, 798.)

On March 17, 2008, following Bear Stearns' announcement the day before that it would be acquired by JPMorgan for $2 per share, the Company's stock price dropped another 84% to close at $4.81 per share on trading volume of 166 million shares. The Securities Complaint alleges that JPMorgan's willingness to only pay $2 per share, together with the government's guarantee that it would assume $30 billion of Bear Stearns' toxic assets, revealed to all that the Company's asset values were much smaller than what the market had been led to believe. (Sec. Compl. ¶ 798.)

The Securities Complaint alleges that the drop in Bear Stearns' stock price was directly related to the company's liquidity crisis, about which it had misled investors, rather than general market conditions. (Sec. Compl. ¶¶ 797–99.)

The Securities Complaint further alleges that Bear Stearns' liquidity crisis and inaccurate asset valuations were tied to the Company's shortcomings in risk management and exposure to toxic assets, both of which are allegedly the subject of false and misleading statements by the Bear Stearns Defendants over the Class Period. (Sec. Compl. ¶ 802.)

The Bear Stearns Defendants contend that the drop in Bear Stearns' stock price was part of a market-wide downturn and not a consequence of the Company's disclosure of its liquidity position and exposure to toxic assets. Defs'. Mem. 61–62. However, the Securities Complaint has alleged that the banking indices were relatively **\*507** stable during this period and did not share in the stock price decline seen at Bear Stearns. Pl. Mem. at 58, *citing* Bloomberg records of well-publicized stock prices.[FN14] Furthermore, at the motion to dismiss stage, the Securities

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Complaint need not rule out all competing theories for the drop in Bear Stearns' stock price; that is an issue to be determined by the trier of fact on a fully developed record. *See In re Winstar Communications,* No. 01 Civ. 3014, 2006 WL 473885, at *16, 2006 U.S. Dist. LEXIS 7618, at *51–52 (S.D.N.Y. Feb. 24, 2006) (holding that plaintiffs adequately alleged loss causation by alleging a causal connection between alleged misrepresentations and stock price drop and that defendants' argument—that the stock price drop was due to the collapse of the telecommunications sector—was "a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss"), *quoting Emergent Capital,* 343 F.3d at 197; *In re Pronetlink Sec. Litig.,* 403 F.Supp.2d 330, 336 (S.D.N.Y.2005) ( "Defendants' contentions that intervening causes ... were to blame for the collapse of PNL's share price must await the trial"); *In re AIG,* 741 F.Supp.2d at 534 (rejecting argument that stock decline was part of decline of market, holding "the sharp drops of AIG's stock price in response to certain corrective disclosures, and the relationship between the risks allegedly concealed and the risks subsequently materialized, are sufficient to overcome this argument at the pleading stage" even where the declines may be due to a market-wide collapse); *In re Ambac,* 693 F.Supp.2d at 274 (finding that stock price drops following corrective disclosures were sufficient to establish causation at the pleading stage); *In re Fannie Mae,* 742 F.Supp.2d at 414 ("Although it may be likely that a significant portion, if not all, of Plaintiffs' losses were actually the result of the housing market downturn and not these alleged misstatements, at this stage of pleading, the Court need not make a final determination as to what losses occurred and what actually caused them, and need only find that Plaintiffs' allegations are plausible") (internal quotation marks and citation omitted).[FN15]

FN14. *See Ganino,* 228 F.3d at 166 n. 8 (noting that a "district court may take judicial notice of well-publicized stock prices") (citation omitted).

FN15. The exception to this general rule was set forth in *Lentell,* where the Second Circuit held that in cases where "substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosure alleged to conceal the very same risk a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud—rather than other salient factors—that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment." *Lentell,* 396 F.3d at 177. This exception does not apply here.

As set forth above, the Company's failure to maintain effective internal controls, its substantially lax risk management standards, and its failure to report its 2006–2007 financial statements in accordance with GAAP not only were material, but also triggered foreseeable and grave consequences for the Company. The financial reporting that was presented in violation of GAAP conveyed the impression that the Company was more profitable, better capitalized, and would have better access to liquidity than was actually the case. The price of Bear Stearns' securities during the Class Period was affected by those omissions and allegedly false statements and was inflated artificially as a result thereof. Thus, the precipitous declines in value of the securities purchased by the Class were a direct, foreseeable, and proximate result **\*508** of the corrective disclosures of the truth with respect to Defendants' allegedly materially false and misleading statements. (Sec. Compl. ¶¶ 800–802.)

The Securities Complaint allegations that the March 14 and March 17, 2008 stock price drops were foreseeable consequences of the disclosure of Bear Stearns' liquidity crisis and inaccurate asset valuations and, relatedly, its risk management practices and exposure to the subprime mortgage crisis, suffice to plead loss causation.

H. *The Securities Complaint Has Adequately Pleaded a § 20A Claim*

[37] Plaintiffs allege that the Bear Stearns Defendants are liable under Section 20A of the Exchange Act for sales of Bear Stearns stock while in possession of material,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

adverse, and nonpublic information. (Sec. Compl. ¶ 830). As noted above, in order to present a claim under Section 20A, a plaintiff must "plead a predicate insider trading violation of the Exchange Act" and that the defendant traded contemporaneously with the plaintiff. *Take–Two,* 551 F.Supp.2d at 309 (internal quotations and citations omitted); *see also Jackson Nat'l Life,* 32 F.3d at 703. Such allegations must meet the heightened pleading standards of Fed.R.Civ.P. 9(b) and the PSLRA. *Take–Two,* 551 F.Supp.2d at 310 n. 50.

It is undisputed that the 20A Defendants sold some of their Bear Stearns stock during the Class Period. As discussed above, Plaintiffs have also adequately alleged that the 20A Defendants made their sales while aware of material, adverse, and nonpublic information.

Also as discussed above, Plaintiffs fail to adequately allege that the Bear Stearns Defendants acted with the requisite intent to establish scienter in selling their Bear Stearns stock. *See* § II.F.1. *supra.* The Securities Complaint alleges that the 20A Defendants made suspiciously timed sales of over 800,000 shares for a total realized value of over $90 million during the Class Period, and average profits among these defendants were allegedly 86.3%. However, as set forth above, the 20A Defendants' sales corresponded to their pre-class period sales, occurred after announced losses, accounted for a minority of the Defendants' holdings, and were consistent with the legitimate purpose of paying tax liabilities. Furthermore, the 20A Defendants lost approximately $1.1 billion when Bear Stearns collapsed. Such facts were found to negate fraudulent intent.

However, it has also been concluded that Plaintiffs adequately alleged the 20A Defendants' recklessness and their scienter. *See* § II.F.2. *supra.* These allegations include the charge that the 20A Defendants had access to adverse, material, and nonpublic information about Bear Stearns, including its inadequate valuation and risk management models and heavy investment in high-risk securities tied to subprime mortgages, which did or should have alerted them to the falsity of their public statements. These sci-

enter allegations apply to the stock sales forming the basis of Plaintiffs' § 20A claims as well.

The remaining question is whether the 20A Defendants' sales of Bear Stearns stock were contemporaneous with Plaintiffs' purchases. This Court has held that a plaintiff has established contemporaneousness where the defendants' sales and the plaintiffs' purchases fall "within a reasonable period of time, usually limited to a few days, of each other." *Take–Two,* 551 F.Supp.2d at 311 n. 51 (S.D.N.Y.2008) (finding purchases within five days to be contemporaneous under this standing); *see also In re Pfizer Inc. Sec. Litig.,* 584 F.Supp.2d 621, 642 (S.D.N.Y.2008) (six days); **\*509** *S.E.C. v. McCaskey,* No. 98 Civ. 6153, 2002 WL 850001, at \*11 n. 15 (S.D.N.Y. Mar. 26, 2002) (holding that a week was contemporaneous); *Oxford Health Plans,* 187 F.R.D. at 144 (five days). In light of this precedent, five trading days appears to be a reasonable period of time within which sales and purchases will be considered contemporaneous.

To the extent that Plaintiffs' purchases fell within five trading days of the 20A Defendants' sales, Plaintiffs have established that their purchases were contemporaneous with those sales. Lead Plaintiff has alleged that its purchase on December 26, 2007 fell within five trading days of sales by the 20A Defendants, satisfying this standard.[FN16]

> FN16. To the extent that Plaintiffs allege purchases not occurring within five trading days of Defendants' sales, those purchases may not form the basis of a claim under § 20A.

I. *The Securities Complaint Has Adequately Pleaded Control Person Liability under § 20(a)*

Section 20(a) of the Exchange Act provides that anyone who "controls" a person liable under Section 10(b) is equally liable, subject only to the defense of "good faith." 15 U.S.C. § 78t(a). As noted above, "[i]n order to establish a prima facie case of liability under section 20(a), plaintiffs must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

that the controlling person was in some meaningful sense a culpable participant in the primary violation." *In re Ambac,* 693 F.Supp.2d at 274, *citing Boguslavsky,* 159 F.3d at 720.

Defendants contend that Plaintiffs fail to allege control person liability by virtue of their failure to plead a predicate violation of the Exchange Act. Defs'. Mem. at 65. However, as discussed above, Plaintiffs have adequately pleaded predicate violations of the Exchange Act by the Bear Stearns Defendants. Defendants present no other basis for dismissal of Plaintiffs' § 20(a) claims.

[38][39] Defendants do not challenge their status as "controlling persons." "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.' " *S.E.C. v. First Jersey Securities, Inc.,* 101 F.3d 1450, 1472–73 (2d Cir.1996), *quoting* 17 C.F.R. § 240.12b–2. Here, each of the Bear Stearns Defendants is a director or high-ranking officer of Bear Stearns. (Sec. Compl. ¶¶ 23–31.) Plaintiffs allege that each of the Individual Defendants are liable under § 20(a) of the Exchange Act as "controlling persons" of Bear Stearns "by reason of their positions as officers and/or directors of Bear Stearns, their ability to approve the issuance of statements, their ownership of Bear Stearns securities and/or by contract." (Sec. Compl. ¶ 825.) Such uncontested allegations are sufficient to establish that Individual Defendants were controlling persons. *See In re Ambac,* 693 F.Supp.2d at 274 (finding officers to be controlling persons based on similar allegations derived from their positions within the company); *Sgalambo v. McKenzie,* 739 F.Supp.2d 453, 473–75, 486–87 (S.D.N.Y.2010) (allegations that defendants were senior officers and board members and possessed the power to cause the direction of the company's management and policies suffice to satisfy the second element of pleading control person liability).

With regard to the third element of § 20(a) liability, culpable participation, Plaintiffs have met this requirement by adequately pleading scienter. *See* **\*510**\*AIG, 741 F.Supp.2d at 535–36; *see also In re AOL Time Warner, Inc. Sec. and ERISA Litig.,* 381 F.Supp.2d 192, 235 (S.D.N.Y.2004) ("allegations of scienter necessarily satisfy the [culpable participation] requirement").

Because, as described above, the Securities Complaint has adequately alleged the making of false and misleading statements, materiality, scienter, loss causation, Section 20A liability, and Section 20(a) liability, the motion of the Bear Stearns Defendants to dismiss the Securities Complaint is denied.

**III. THE MOTION BY DELOITTE TO DISMISS THE SECURITIES COMPLAINT IS DENIED**

The factual allegations of the Securities Complaint have been described above. It alleges that Deloitte, in issuing its audit opinion on the Bear Stearns November 30, 2007 Financial Statement (the "Statement"), failed to comply with GAAP and GAAS, recklessly disregarding "red flags" which would have alerted Deloitte to the falsity of the Statement. What follows is a description of the allegations of the Securities Complaint, the applicable standard, and conclusions upon which the motion of Deloitte to dismiss the Securities Complaint is denied.

A. *The Allegations*

The factual allegations relating to Bear Stearns and Deloitte have been described above as well as the financial statement misrepresentations alleged in the Securities Complaint. The Securities Complaint has alleged that "Deloitte issued a 'clean opinion' pursuant to each of its audits of Bear Stearns' financial statements for the fiscal years ended November 30, 2006 and November 30, 2007, and issued similar certifications for each of the Company's quarterly statements during the Class Period". (Sec. Compl. ¶ 527.) The Securities Complaint alleges that those "clean opinions" and "certifications" were "false and misleading" because, through them, Deloitte "knowingly and recklessly offered a materially misleading opinion as to the financial statements' accuracy." (*See* Sec. Compl. ¶¶ 629, 661, 695, 735, 781.) In the briefing exchange, any certification claims relating to the quarterly statements have been dropped.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

The Securities Complaint has further alleged that the Deloitte failure resulted from the fact that Deloitte "disregarded specific 'red flags' that would have placed a reasonable auditor on notice that the Company was engaged in wrongdoing." (Sec. Compl. ¶ 523.) Those alleged "red flags" included:

• "the fact that the Company had persisted in using mortgage valuation models that the SEC had repeatedly criticized as inaccurate or outmoded" (Sec. Compl. ¶ 523.);

• "the fact that by at least November of 2005 the Company had been warned by the SEC that its VaR models failed to reflect key indicators in the housing market" (Sec. Compl. ¶ 524);

• "the fact that the collateral the Company had received as a result of the bailout [of one of its Hedge Funds] was far less than the value of the loan Bear Stearns had offered" to the fund (Sec. Compl. ¶ 525);

• the fact that there were "multiple risk alerts that related to the Company's internal controls, internal audits, and disclosures" (Sec. Compl. ¶ 526); and

• the fact that Bear Stearns failed to disclose weaknesses in its pricing and risk models and its risk management processes and personnel (Sec. Compl. ¶ 566).

**\*511 B. *The Applicable Standard***
The standards to be applied to Deloitte's motion to dismiss the Securities Complaint are the same as those set forth above in discussing the Bear Stearns Defendants' motion to dismiss the Securities Complaint.

[40][41] In the context of an accounting firm's audits, the scienter requirement for a Section 10(b) claim is satisfied by alleging that "[t]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the

doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts." *In re Scottish Re Group Sec. Litig.,* 524 F.Supp.2d 370, 386 (S.D.N.Y.2007) (citation omitted) (alteration in original). *See also Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir.2000); *In re Oxford Health Plans, Inc. Sec. Litig.,* 51 F.Supp.2d 290, 294 (S.D.N.Y.1999). Moreover, "[a]llegations of 'red flags,' when coupled with allegations of GAAP and GAAS violations, are sufficient to support a strong inference of scienter." *In re Scottish Re,* 524 F.Supp.2d at 385, *citing In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.,* 381 F.Supp.2d 192, 240 (S.D.N.Y.2004). "A complaint might reach this 'no audit at all' threshold by-alleging that the auditor disregarded specific 'red flags' that 'would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors.' " *In re IMAX Sec. Litig.,* 587 F.Supp.2d at 483 (citation omitted).

C. *The Securities Complaint Has Adequately Alleged Deloitte's Misstatements and Scienter*
[42] Here, there is no allegation that Deloitte had motive and opportunity. The standard to be applied is the adequacy of the circumstantial allegations of recklessness.

The Securities Complaint has detailed the GAAP and GAAS provisions alleged to be applicable as described above. The issue presented is whether the Securities Complaint has sufficiently identified red flags, that is, particular facts, the disregard of which establishes recklessness sufficient to establish scienter.

The Securities Complaint has alleged specific facts underlying its alleged GAAS violation, "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak,* 216 F.3d at 307 (citations omitted); *In re Winstar Communications,* 2006 WL 473885, at *11, 2006 U.S. Dist. LEXIS 7618, at *37 ("An auditor's reckless disregard of red flags, coupled with allegations of GAAP and GAAS violations, is sufficient to support a strong inference of scienter."); *Jacobs v. Coopers & Lybrand, LLP,* No. 97 Civ. 3374, 1999 WL 101772, at

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

*15, 1999 U.S. Dist. LEXIS 2102, at *44 (S.D.N.Y. Feb. 26, 1999) ("Failing to adhere to one or two Auditing Interpretation [sic] may be only negligence, but Coopers is alleged to have disregarded many different Auditing Interpretations. Based on the facts as alleged, a trier of fact could find Coopers' audit so reckless that Coopers should have knowledge of the underlying fraud."). *See also In re AIG,* 741 F.Supp.2d at 540 ("According to federal regulations, '[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided.' "), *quoting* 17 C.F.R. § 210.4–01(a)(1).

**\*512** The Securities Complaint adequately alleges Deloitte's recklessness, if not actual knowledge, based on its awareness of red flags and its duty to investigate. *McCurdy v. SEC,* 396 F.3d 1258, 1261 (D.C.Cir.2005) ( "[P]rofessional auditing standards have come to recognize, through decades of experience, particular factors that arouse suspicion and call for focused investigation. These factors are the so called 'red flags' for which all auditors are trained to remain alert."). *See also AOL Time Warner,* 381 F.Supp.2d at 240 n. 51 (" 'Red Flags,' or audit risks, are the various 'risk factors' that auditors must consider under GAAS when performing an audit.").

[43][44] As the Supreme Court has stated, "[b]y certifying the public reports that collectively depict a corporation's financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client.... [T]he independent certified public accountant cannot be content with a corporation's representations that its [financial statements] are adequate; the auditor is ethically and professionally obligated to ascertain for himself as far as possible whether the corporation's [financial statements] have been accurately stated." *United States v. Arthur Young & Co.,* 465 U.S. 805, 817–18, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984) (emphasis in original).

*1. Valuation Models and Fair Value Measurements*

The Securities Complaint has alleged that "GAAS required" Deloitte to "test Bear Stearns' processes" for establishing the fair value of its assets and that, in doing this testing, "Deloitte was confronted with significant red flags" because, "[a]ccording to the 2008 OIG Report," "Bear Stearns failed to include crucial factors in its valuation models including, for example, inadequate consideration of default risk and scenarios of home price depreciation". (Sec. Compl. ¶¶ 542–545, 551.)

Bear Stearns' financial instruments (fair value) balance sheet line item was the largest asset on its balance sheet, comprising one third of the Company's total assets. (Sec. Compl. ¶ 412.) The Securities Complaint has alleged that Deloitte failed to perform targeted procedures to assess the internal controls over financial reporting of the fair value of financial instruments, as required by AS Nos. 2 and 5, resulting in Bear Stearns' disclosure of the fair value of financial instruments that were not valued in accordance with GAAP (Sec. Compl. ¶ 575). In violation of AS Nos. 2 and 5, it is alleged that Deloitte recklessly disregarded properly testing of (i) "Company-level controls" including Bear Stearns' risk management processes; (ii) internal controls of the Company's risk management processes; and (iii) varying pricing approaches by trading desks which enabled the Company's disclosure of its low VaR number. (Sec. Compl. ¶¶ 130–31, 342, 379, 582.) The VaR number was generated based on outdated variables, such as default rates and liquidity risk and did not accurately reflect current market conditions. (Sec. Compl. ¶¶ 123–28, 566.) In addition, it is alleged that Deloitte failed to test internal controls for potential abuses in Bear Stearns' mortgage origination business, thereby allowing the Company to continue to use lax underwriting and loan origination standards. (Sec. Compl. ¶¶ 53–63, 332–33, 579.)

According to the Securities Complaint, Bear Stearns' concentration of mortgage securities in excess of its internal policy limits constituted another red flag which left the Company very exposed to declines in the riskiest part of the housing market (Sec. Compl. ¶¶ 71, 76, 338, 581), **\*513** and represented reckless disregard for the guidance provided by the AICPA's Statement of Position 94–6,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Disclosure of Certain Significant Risks and Uncertainties ("SOP 94–6"). (Sec. Compl. ¶ 418.) Under SOP 94–6, Bear Stearns was required to disclose any vulnerability or risk inherent to its financial statements as a result of concentrations of risk in mortgage-related securities, specifically subprime and collateralized debt obligation ("CDO") related securities. (SOP 94–6 ¶ 20.) (Sec. Compl. ¶419). It is alleged that Deloitte recklessly failed to detect and require disclosure of the concentrations of risk Bear Stearns had in subprime and CDO related securities in light of the failures of the Hedge Funds audited by Deloitte, which focused on CDO and CDO-related investments. (Sec. Compl. ¶ 423.)

It is alleged that, throughout the Class Period, the SEC alerted the Company every year to the deficiencies in its model. A December 2, 2005 memorandum from OCIE, informed Farber, a former Deloitte partner, of the deficiencies in Bear Stearns' valuation and reiterated a comment TM made to Bear Stearns during the 2005 CSE application process that "it would be highly desirable for independent Model Review to carry out detailed review of Models in the mortgage area." (Sec. Compl. ¶¶ 102–03, 124–25, 345.) In 2005 and 2006, Bear Stearns was informed that (i) its "model review process lacked coverage of mortgage-backed and other asset-backed securities;" (ii) "sensitivities to various risks implied by the models did not reflect risk sensitivities consistent with price fluctuations in the market," and (iii) its pricing models for mortgage "focused heavily on prepayment risks" without any indication of "how the Company dealt with default risks." (Sec. Compl. ¶¶ 104–05.) In September 2007, the SEC Accounting Branch Chief John Cash sent a comment letter to Molinaro requesting that the Company provide the SEC with material information not included in its 2006 Form 10–K filing, such as the Company's exposure to subprime loans and special purpose entities, investments in subprime-backed securities, and risk management philosophy. (Sec. Compl. ¶¶ 314–18.)

As stated above, since "[f]inancial instruments owned, at fair value" was the largest balance sheet line item in Bear Stearns' financial statements. It is alleged that Deloitte was required to plan its audit to ensure proper disclosure of such a material item. (Sec. Compl. ¶ 412.) Another consequence of a deficient valuation model was a deficient risk assessment model, as the valuation models supplied one of the inputs into the VaR model, which was the Company's method of quantifying market risk. (Sec. Compl. ¶¶ 15–16.)

Given the fact that the Company's total Level 3 assets grew from 11% of its total financial assets in the fourth quarter of 2006 to 29% by the first quarter of 208, the Company was vulnerable and exposed to additional industry-specific fraud risk factors and audit risks, which it is alleged Deloitte was required to consider as part of its audit of Bear Stearns' financial statements. (Sec. Compl. ¶¶ 331–48, 532.) These risks factors are alleged to include: the estimation of the fair value of investments (AU 316.39) (Sec. Compl. ¶ 534); the risk of transactions with related parties that do not have the substance or the financial strength to support a transaction without assistance from the entity under audit (AU 316.67) (Sec. Compl. ¶ 534); the risk of management overriding internal controls (AU 316.08, 42, and 57–65) (Sec. Compl. ¶ 534); the risk that new regulatory requirements, such as the recently implemented CSE structure, may cause an incentive or pressure for fraudulent financial reporting (AU 316.85, A.2.a) (Sec. **\*514** Compl. ¶ 534); "changes in the institution's loan profile (for example, prime vs. subprime, secured vs. unsecured, direct lending vs. indirect lending)" related to "the institution's ability to identify, manage, and control the attendant risk for those credit profiles" (2005 AAM 8050.28) (Sec. Compl. ¶ 535); "specific collateral surrounding the client investment portfolio and potential impairment" (2006 AAM 8050.17) (Sec. Compl. ¶ 535); the potential for impairment for "products [that] assume a continued rise in home prices that may not continue" (AAM 8050.35) (Sec. Compl. ¶ 535); "the pressures financial institutions [faced] when planning and performing the audit engagement" (2007 AAM 8050.1) (Sec. Compl. ¶ 535); and the real estate climate (2007 AAM 8050.30) (Sec. Compl. ¶ 535).

The Securities Complaint has alleged that to properly

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

plan an audit in accordance with GAAS, Deloitte was required, among other things, to obtain a sufficient understanding of Bear Stearns' business and operating environment. (Sec. Compl. ¶ 531.) Deloitte was aware of the importance of accuracy in the Company's assessments of the value of its securities and the risks associated with potential declines in values. (Sec. Compl. ¶¶ 94–99, 112–22.) In accounting for its financial instruments at fair value, it is alleged that the Company violated SFAS No. 140, Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, 157, Fair Value Measurements. Deloitte allegedly relied on financial statements that were in violation of GAAP and issued an unqualified audit opinion on the financial statements which did not properly account for and disclose the fair value of Bear Stearns' assets, including Level 3 assets and residual interests, classified as Level 2 assets. (Sec. Compl. ¶¶ 389–401, 412–17.)

Failing to properly measure the fair value of its financial instruments allowed Bear Stearns to (i) overstate its financial instruments' line item on the balance sheet, which was the largest balance sheet item and (ii) manipulate the Principal Transaction revenue line item on its income statement. (Sec. Compl. ¶¶ 389, 403, 412–13.) The financial instruments made up one third of the Company's total assets and impacted the Company's revenue figures, requiring Deloitte to properly audit Bear Stearns' fair value disclosures in accordance with GAAS, in particular AU Section 431, AU Section 328, Auditing Fair Value Measurements and Disclosures, AU Section 322, The Auditor's Consideration of the Internal Audit Function in an Audit of Financial Statements, AU Section 411, and AU Section 316. According to the Securities Complaint, Deloitte failed to do the following:

• adequately disclose Bear Stearns' fair value information (AU Section 328.43) (Sec. Compl. ¶ 564);

• properly evaluate management's assumptions used in determining fair value and controls over the consistency, timeliness, and reliability of the data used in valuation models (Sec. Compl. ¶ 542);

• properly test Bear Stearns' method of classification of financial instruments as either Level 2 or Level 3 and processes for preparing fair value measurements and the reasonableness, relevance, and timeliness of the information, assumptions, inputs and models (AU 328.23–.24) (Sec. Compl. ¶¶ 543, 546);

• properly evaluate whether fair value measurements were (i) consistent with market information, (ii) determined using an appropriate model, and (iii) included relevant information that was **515 reasonably available at the time (AU 328.26) (Sec. Compl. ¶ 543);

• properly assess whether Bear Stearns' assumptions were reasonable and did not include contrary market data (AU 328.06) (Sec. Compl. ¶ 547);

• properly identify, stress test or analyze the sensitivity of the Company's assumptions on valuation, including market conditions that may affect the value, and determine whether any sensitive assumptions had been excluded from the valuation process (AU 328.34, 328.35) (Sec. Compl. ¶ 544);

• properly test whether Bear Stearns' reliance on historical financial information in the development of assumptions was justified (AU 328.37) (Sec. Compl. ¶ 545);

• incorporate information contained in the Center for Audit Quality's ("CAW") October 2007 audit alert entitled "Measurements of Fair Value in Illiquid (Or Less Liquid) Markets," namely that "[t]he level of defaults has, in many cases, exceeded the model-based projections originally used to structure and assign ratings to securities backed by subprime mortgage loans ... and holders of existing loans and mortgage-backed securities have experienced sharp declines in their value" (Sec. Compl. ¶¶ 548–59);

• correct the Company's insufficient disclosure of the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Company's fair value, which was subject to a high de-
gree of measurement uncertainty (AU 328.45) (Sec.
Compl. ¶ 565);

• adequately test the Company's internal audit function
related to Bear Stearns' valuation of its financial in-
struments at fair value which involved inherent and
control risks and a high risk of misstatement (Sec.
Compl. ¶ 585);

• properly account for and disclose the fair value of Bear
Stearns' Level 3 assets and residual interests, classified
as Level 2 assets, resulting in overstated asset value on
the Company's balance sheet and misleading income
statement line item for Principal Transaction revenue;
and

• incorporate risk factors disclosed in the American In-
stitute of Certified Public Accountants' ("AIPCA") Au-
dit Risk Alerts ("ARAs") (Sec. Compl. ¶¶ 346–48).

Deloitte has sought to counter these allegations by
noting that despite its comments, the SEC took no action
and that the conclusions of the OIG Report, relied upon in
the Securities Complaint, were challenged by TM. Deloitte
Mem. 3, 13, 15, 15, 17, 25.

Contrary to Deloitte's assertion, Deloitte Mem. at 4,
the fact that there was a dispute on these issues between
OIG and TM is a good reason why this Court should not
dismiss the Complaint. *Lonegan v. Hasty,* 436 F.Supp.2d
419, 429–30 (E.D.N.Y.2006) (where defendant argued, on
motion to dismiss, that portions of Justice Department's
Inspector General report contradicted plaintiff's allegations
that he acted with intent, "the veracity of contentions by
[the subjects of the Report contesting the Inspector Gen-
eral's findings] is an issue for the trier of fact to determine
at the appropriate stage of the litigation. The task of the
court in ruling on a *Rule 12(b)(6)* motion 'is merely to
assess the legal feasibility of the complaint, not to assay the
weight of the evidence which might be offered in support
thereof."), *citing Cooper v. Parsky,* 140 F.3d 433, 440 (2d

*Cir.1998).*

The OIG Report was highly critical of TM's oversight
of Bear Stearns and found "red flags" that TM was aware
of and which also should have put a conscientious **\*516**
auditor on notice. OIG Report at 17–18, 23, 25, 27, 34.
Deloitte's reliance on the SEC and TM is not dispositive.
*See ECA,* 553 F.3d at 200 n. 5 ("SEC charges simply are
not a prerequisite to pleading recklessness with regard to
accounting and financial reporting violations."); *In re New
Century,* 588 F.Supp.2d at 1234 ("The Court is not per-
suaded that the [bankruptcy] Examiner's finding that there
was no evidence of intentional misrepresentation [is] dis-
positive at the pleading stage.")

Certain of the events recounted in the Securities
Complaint are appropriately considered red flags which are
alleged to have required review of GAAP and GAAS with
respect to the financial statements. These include the June
2006 meltdown of the Bear Stearns U.K. subsidiary that
specialized in subprime originations (Sec. Compl. ¶ 579);
the collapse of the Hedge Funds in 2007, which Deloitte
audited (Sec. Compl. ¶¶ 188–216, 536, 558–63); and
HSBC's February 2007 announcement that it raised its
subprime loan loss reserves to $10.6 billion to cover an-
ticipated losses, that ARM resets were set to explode and
that subprime borrowers likely would not be able to make
their payments when rates rise. (Sec. Compl. ¶¶ 190–92.)

The Center for Audit Quality's October 2007 audit
alert, entitled Measurements of Fair Value in Illiquid (Or
Less Liquid) Markets, stated: "The level of defaults has, in
many cases, exceeded the model-based projections origi-
nally used to structure and assign ratings to securities
backed by subprime mortgage loans ... and holders of
existing loans and mortgage-backed securities have expe-
rienced sharp declines in their value. (Sec. Compl. ¶¶
548–49.) Critical variables, such as default rates, loans and
mortgage backed securities values in Bear Stearns' valua-
tion models and VaR models were drastically changing.

*2. The Hedge Funds*

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

The Securities Complaint has alleged that Deloitte failed to properly account for and disclose the loss contingencies regarding its related party loan transactions with the Hedge Funds, and in so doing violated auditing standards, including (i) AU Section 431; (ii) AU Section 334, Related Parties; and (iii) AU Section 411, The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles. (Sec. Compl. ¶¶ 37–78, 561.) The Securities Complaint identified as a red flag the fact that Deloitte knew or should have known, absent recklessness, the risk factors inherent in the industry, such as declining housing prices, relaxation of credit standards, excessive concentration of lending, and increasing default rates. Variables such as declining housing prices and increasing default rates were critical in assessing the Company's market risk and fair values of its assets (Sec. Compl. ¶ 537.), and Deloitte thereby failed to adequately disclose related party transactions (Sec. Compl. ¶¶ 382–88), to properly test and determine that the collateral provided by the High Grade Funds, which had "very little value left," was clearly insufficient to guarantee the value of the loans extended by Bear Stearns (Sec. Compl. ¶¶ 212, 214–15, 377, 560), to properly disclose the true economic substance of the related party loan transaction between Bear Stearns and the Hedge Funds and the outcome of the write-downs to the loans (Sec. Compl. ¶¶ 386–88, 537, 563), to properly audit the loan transaction with the required high degree of professional skepticism (Sec. Compl. ¶ 384), to adequately disclose the substance of the Hedge Fund transactions with Bear Stearns that Bear Stearns had guaranteed by absorbing the High Grade Fund's assets (Sec. Compl. ¶ 563), and to incorporate the loan value and related implications**517** on reported capital into Bear Stearns' financial statements (Sec. Compl. ¶¶ 441, 563).

*3. The Collapse of Bear Stearns Is Evidence Of Scienter*

"[T]he magnitude of the alleged fraud provides some additional circumstantial evidence of scienter." *Katz,* 542 F.Supp.2d at 273, citing *In re Scottish Re,* 524 F.Supp.2d at 394 n. 174. *See also In re Complete Mgmt. Inc. Sec. Litig.,* 153 F.Supp.2d 314, 327 (S.D.N.Y.2001) ("[T]he magnitude of the write-off rendered 'less credible' the proposition that defendants there were somehow surprised by their

sudden reversal of fortune."), *citing Rothman v. Gregor,* 220 F.3d 81, 92 (2d Cir.2000).

[45] Although the size of the fraud alone does not create an inference of scienter, "the enormous amounts at stake coupled with the detailed allegations regarding the nature and extent of [the client's] fraudulent accounting and [the accountant's] failure to conduct a thorough and objective audit create a strong inference that [the auditor] was reckless in not knowing that its audit opinions materially misrepresented [the company's] financial state." *In re Global Crossing,* 322 F.Supp.2d 319, 347 (S.D.N.Y.2004), *quoting In re WorldCom, Inc. Sec. Litig.,* No. 02 Civ. 3288, 2003 WL 21488087, at *7, 2003 U.S. Dist. LEXIS 10863, at *7 (S.D.N.Y. June 25, 2003). OIG's finding that information regarding Bear Stearns' exposure to subprime mortgage securities was "material information that investors could have used to make well-informed investment decisions" supports a strong inference of scienter. (OIG Report at 45; Sec. Compl. ¶¶ 212–16, 238–40, 323, 371–74, 377–78, 388, 412–17, 521, 773).

The Securities Complaint has alleged that JPMorgan discovered in the course of one weekend the overvaluation of assets and underestimation of risk exposure in Bear Stearns' financial statements. (Sec. Compl. ¶¶ 287, 292, 293). JC Flowers & Co., a leverage-buyout company, had also reviewed Bear Stearns' books the same weekend and made an unsuccessful proposal to buy 90% of the Company at a similar price between $2 and $2.60 per share. (Sec. Compl. ¶ 291 n. 4.) These allegations support an inference of Deloitte's scienter. *In re New Century,* 588 F.Supp.2d at 1231, 1236 ("[T]he fact that the new CEO ... discovered the accounting violations within months of taking the position is a strong indication that these accounting violations were obvious enough that a new officer found them quickly ... [T]he rapid discovery of the alleged accounting violations are further support for the several strong inferences that KPMG's audit contained deliberately reckless misstatements regarding New Century's accounting practices."); *Arnlund v. Deloitte & Touche LLP,* 199 F.Supp.2d 461, 483 (E.D.Va.2002) ("[I]t is alleged that Deloitte knew by May 30, that HM was in a state of severe

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

financial distress that became publically manifest only two months after Deloitte had blessed the Company as in good financial health.... The temporal proximity between financial viability on May 30 and financial expiration two or so months later supports an inference that can augment the other aspects of the scienter allegations here.")

The facts underlying the alleged accounting violations with respect to the valuation models and fair value measurements, the hedge funds and the inference from the events of the collapse establish the failure to consider the red flags and constitute an adequate allegation of reckless disregard sufficient to establish scienter.**518** FN17

> FN17. The Securities Complaint's specific allegations of GAAP and GAAS violations and specific red flags distinguish this case from *Fannie Mae,* 742 F.Supp.2d 382, where the plaintiffs failed to allege GAAS violations or misstatements by Deloitte in its audit opinions or any factual allegations sufficient to establish scienter. *Id.* at 412–13.

*4. Reckless Disregard Rather Than Hindsight*

The allegations in the Securities Complaint do not "simply seize[ ] upon disclosures made in later annual reports and allege[ ] that they should have been made in earlier ones." *Denny,* 576 F.2d at 470. *See Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.,* 523 F.3d 75, 90 (1st Cir.2008) ("Fraud by hindsight refers to allegations that assert no more than that because something eventually went wrong, defendants must have known about the problem earlier.").

The key distinction between cases relating to hindsight and the allegations here is that multiple GAAP and GAAS violations have been described and red flags alleged. Deloitte has relied upon *Hubbard v. BankAtlantic Bancorp, Inc.,* 625 F.Supp.2d 1267, 1290–91 (S.D.Fla.2008), in which the court ruled that plaintiffs failed to plead scienter as to the non-auditor defendants, because there were no "red flags" that should have alerted

the defendants to the fraud. Further, in *In re Downey Sec. Litig.,* No. CV 08–3261, 2009 WL 736802, at *12 (C.D.Cal. Mar. 18, 2009), the court held that plaintiffs failed to plead scienter against non-auditor defendants because plaintiffs provided "no reasonable basis for the Court to conclude that any of the purported accounting mistakes were anything other than innocent and unintentional." Here, the Securities Complaint has set forth specific GAAP and GAAS violations in addition to the red flags.

In rejecting a fraud by hindsight claim, the court in *Katz v. Image Innovations Holdings* stated that if a complaint goes beyond simply alleging violations of accounting principles, but instead points to "red flags" that alerted or should have alerted the auditor to the accounting violations, then plaintiffs allege facts that raise a strong inference of scienter. 542 F.Supp.2d 269, 275 (S.D.N.Y.2008). Similar to the auditors in *Katz,* it is alleged that Deloitte was "in a position at the time of the original audit" to detect the "red flags," as detailed above, that alerted or should have alerted a reasonable auditor, absent recklessness, to the various ongoing accounting violations at Bear Stearns, which Deloitte ignored. *Id.*

D. *The Securities Complaint Has Adequately Alleged Material Misstatements*

To state a claim alleging a false or misleading statement or omission under the PSLRA, the plaintiff must allege with particularity each statement alleged to be false or misleading, the reason or reasons why the statement was false or misleading, and, if those allegations are made on information and belief, all facts on which that belief is formed. *See* 15 U.S.C. § 78u–4(b)(1)(B); *Rombach v. Chang,* 355 F.3d 164, 170 (2d Cir.2004). As discussed above, the Securities Complaint has alleged the reasons why Deloitte's audit opinions were false and misleading. *See In re New Century,* 588 F.Supp.2d at 1234 (plaintiffs adequately alleged § 10(b) claim against auditor for sub-prime mortgage lender where complaint set forth particularized allegations of auditor's willful disregard for "red flags" concerning company's low discount rate and valuation model).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Deloitte has characterized the Security Complaint's allegations as "conclusory". **\*519** *See* Deloitte Mem. at 42. However, as discussed above, the Securities Complaint has alleged with particularity both the basis for alleging that Bear Stearns materially overvalued its illiquid assets and materially understated its risk exposure. *See, e.g.,* Sec. Compl. ¶¶ 48, 57, 79, 100, 107–08, 110, 111, 137, 143, 161, 163, 168, 205, 212, 215, 225, 232, 237–38, 240, 244–45, 291, 302, 371–74, 377–78, 388, 393, 395, 397, 401, 417, 422, 444–45, 561, 589–96, 606–09, 621–24, 740–48, 756–59, 773–75.

[46] Deloitte has also contended that to plead materiality, it is necessary to quantify the overstatements. *See ECA,* 553 F.3d at 203. However, *New Century* is to the contrary. 588 F.Supp.2d at 1234 ("[I]t is a matter for summary judgment whether the repurchase claims backlog was not material until 2006 as asserted by [New Century's outside auditor] KPMG."); *In re Moody's,* 599 F.Supp.2d at 510 (stating that, at the pleading stage, a complaint may be dismissed for failure to allege materiality if the alleged misstatement "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance," and finding misrepresentations reporting the defendant's ratings methodology to meet materiality standard), *citing Ganino,* 228 F.3d at 161. Here, as with the allegations against the Bear Stearns Defendants, the alleged misstatements address Bear Stearns' risk exposure and asset values, two pieces of information which investors would find material. Furthermore, the alleged misstatements are claimed to have led to the company's collapse. *See also In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 352 F.Supp.2d 429, 467 (S.D.N.Y.2005) (a plaintiff need not "precisely quantify the amount by which financial statements were overstated."); *In re Oxford Health Plans, Inc. Sec. Litig.,* 51 F.Supp.2d at 294 (despite the lack of a restatement, court held that complaint alleged Section 10(b) claim against auditor with specificity where it identified accounting irregularities, demonstrated that company's financial statements were false, and otherwise pleaded facts establishing that auditor issued a fraudulent audit). In *Schick v. Ernst & Young,* 141 F.R.D. 23, 27

(S.D.N.Y.1992), cited by Deloitte, while plaintiffs claimed it was "clear" that the complaint alleged an overstatement of $11,26,574, such allegation appeared nowhere on the face of the complaint and was simply plaintiff's extrapolation, which, moreover, was contradicted by other allegations in the complaint. In *In re Allied Capital Corp. Sec. Litig.,* No. 02 Civ. 3812, 2003 WL 1964184, at \*4–5, 2003 U.S. Dist. LEXIS 6962, at \*14 (S.D.N.Y. Apr. 25, 2003), the complaint failed to allege why the company's values were incorrect, how its accounting policy caused any overstatement, and the extent to which the company overvalued its investments. And, in *Caiafa v. Sea Containers Ltd.,* 525 F.Supp.2d 398, 411 (S.D.N.Y.2007), unlike here, the complaint failed to plead how defendant's $500 million write-down rendered its financial statements fraudulent or in what way its valuations were false and misleading, and failed to state the basis for its book-value allegations or specify the amounts by which the assets were overstated.

In section II.E. *supra,* Plaintiffs' allegations of misstatements by the Bear Stearns Defendants pertaining to the Company's VaR, levels of risk, and asset valuations (among others), and contained in the Company's SEC filings, were held to be material, as the qualitative significance of the misstatements "significantly altered the 'total mix' of information available to investors." *ECA,* 553 F.3d at 198. Deloitte is alleged to have made statements supporting and certifying Bear Stearns' material misstatements. By extension, the Securities Complaint has adequately alleged**\*520** the materiality of Deloitte's misstatements and omissions. *See* Deloitte Mem. at 43–44. *See, e.g., In re Regeneron Pharms.,* 2005 WL 225288, at \*21, 2005 U.S. Dist. LEXIS 1350, at \*61 ("Material facts include any fact that 'in reasonable and objective contemplation might affect the value of the corporation's stock or securities.' "), *quoting SEC v. Mayhew,* 121 F.3d 44, 52 (2d Cir.1997) (internal quotations omitted). *Accord Lormand v. U.S. Unwired,* 565 F.3d 228, 248 (5th Cir.) ("The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action.").

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

The misstatements with respect to valuation and risk have been adequately particularized and alleged, as established as material.

E. *The Securities Complaint Has Adequately Alleged Loss Causation*

As has been concluded above, the Securities Complaint adequately alleged loss causation against the Bear Stearns Defendants. The same reasoning applies to Deloitte.

*Lattanzio v. Deloitte & Touche LLP,* 476 F.3d 147, 157 (2d Cir.2007) (cited in Deloitte Mem. at 44), is distinguishable. In *Lattanzio,* Deloitte issued a going concern warning in its audit opinion for Warnaco Group, Inc.'s 2000 Form 10–K, whereas in this case, no such warning was issued. The Second Circuit held, therefore, that substantial indicia of the risk that Warnaco was heading for bankruptcy were apparent from the face of the 10–K. *See Id.* at 158. Here, in contrast, substantial indicia of the risk that materialized were not unambiguously apparent on the face of Bear Stearns' disclosures. As set forth above, the Bear Stearns Defendants repeatedly downplayed the risks, falsely asserted that they constantly checked and updated their VaR models to improve their accuracy, failed to disclose facts that would have alerted investors to grave problems with the Company's risk models, and did nothing to appraise the market of the true state of affairs. Deloitte's alleged failures as auditor allowed for these misstatements to go unchecked and mislead investors. Plaintiffs sufficiently allege that the risks which Deloitte was complicit in concealing materialized and caused Plaintiffs harm.

[47] The Securities Complaint alleged both the corrective disclosures that caused the alleged losses and facts to establish that the stock price dropped when the risks concealed by the Bear Stearns' Defendants materialized. Contrary to Deloitte's suggestion (Deloitte Mem. at 44), neither a restatement of financial statements nor an admission of wrongdoing is necessary to establish loss causation. *In re Winstar Commc'ns,* 2006 WL 473885, at *14,

2006 U.S. Dist. LEXIS 7618, at *45 (rejecting defendants' argument that plaintiffs failed to plead loss causation because the company did not issue a restatement); *Ross v. Abercrombie & Fitch Co.,* 501 F.Supp.2d 1102, 1117–9 (S.D.Ohio 2007) (same); *In re Coca–Cola Enters. Inc. Sec. Litig.,* 510 F.Supp.2d 1187, 1204–05 (N.D.Ga.2007) (same). *See also Lormand,* 565 F.3d at 264 ("To require that a plaintiff can successfully allege loss causation only by alleging the fact or evidence of a confession ... out of the defendant's own mouth would narrow the pleading requirement for loss causation in a way not authorized by Rule 8(a)(2) or anything contained in *Dura [Pharms., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) ] "). Deloitte's reliance on *In re Downey Sec. Litig.,* 2009 WL 736802, at *15 (Deloitte Mem. at 45 n. 24), requiring a "disclosure of wrongdoing," is not the law of this Circuit. Where, as here, information**521** is revealed to the market that establishes the falsity of Defendants' prior representations, a plaintiff has pleaded enough to show loss causation in this Circuit. *See Lentell,* 396 F.3d at 175 n. 4.

[48] Contrary to Deloitte's contention (Deloitte Mem. at 45–47), as set forth above, the Securities Complaint identified the risk that materialized and the false and misleading statements that led to the alleged losses. At the motion to dismiss stage, it is not necessary to "disentangle" or apportion losses resulting from the defendants' misstatements as opposed to losses resulting from the wider market downturn. *See In re Fannie Mae,* 742 F.Supp.2d at 414 ("Although it may be likely that a significant portion, if not all, of Plaintiffs' losses were actually the result of the housing market downturn and not these alleged misstatements, at this stage of pleading, the Court need not make a final determination as to what losses occurred and what actually caused them, and need only find that Plaintiffs' allegations are plausible") (internal quotation marks and citation omitted). Deloitte has relied on *Bastian v. Petren Res. Corp.,* 892 F.2d 680, 685 (7th Cir.1990) (Deloitte Mem. at 46 n. 26), but in that case, plaintiffs alleged only transaction causation—i.e., that but for defendants' misrepresentations and omissions, they would not have invested. They failed to plead loss causation and in fact

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

asserted that they had no idea why their investment was wiped out. *Id.* at 683. As the court explained, the plaintiffs "alleged the cause of their entering into the transaction in which they lost money but not the cause of the transaction's turning out to be a losing one. It happens that 1981 was a peak year for oil prices and that those prices declined steadily in the succeeding years." *Id.* at 684. In *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir.1994),* also cited by Deloitte, there was a five-year gap between the alleged misrepresentations and plaintiff's losses, which overlapped with a real estate market crash, prompting the court to observe that "[w]hen a significant period of time has elapsed between the defendant's actions and the plaintiff's injury, there is a greater likelihood that the loss is attributable to events occurring in the interim." *Id.* at 772. No such significant time lag between the disclosures and the losses occurred here. As discussed above, substantial indicia of the risk that materialized was not unambiguously apparent on the face of Bear Stearns' public filings, and the Company's boilerplate cautionary statements did nothing to alert the market to the truth about Bear Stearns' inadequate VaR models, improper valuation of illiquid assets, risk management practices, exposure to market risk, compliance with banking capital requirements, and internal controls.

[49] The Securities Complaint has alleged that the March 14 and 17, 2008 disclosures revealed to the market the falsity of, inter alia, the 2006 and 2007 Form 10–Ks audited by Deloitte and thereby established the connection between those false statements and Lead Plaintiff's losses. The Securities Complaint also identified the risks that were concealed by Deloitte's false audit opinions and the losses suffered when the risks materialized. *See, e.g.,* Plaintiffs' allegations regarding Bear Stearns' 2006 10–K (Sec. Compl. ¶ 161) (reporting a reassuring low VaR number, including an aggregate risk of just $28.8 million, which failed to reflect Company's exposure to declining housing prices and rising default rates); (Sec. Compl. ¶ 162) (2006 10–K falsely stated that Company regularly evaluated and enhanced its VaR models to more accurately measure risk of loss); (Sec. Compl. ¶ 163) (2006 10–K falsely assessed the value of Level 3 assets as **\*522** $12.1 billion, which

was materially misleading in that the models used to value the Level 3 mortgage-backed assets were badly out of date and did not reflect crucial data about housing prices and default rates); (Sec. Compl. ¶ 165) (due to failure to take appropriate losses on the Level 3 assets, the revenues and earnings per share reported in the 2006 10–K were false and misleading, thereby artificially inflating Bear Stearns' stock price); (Sec. Compl. ¶ 314) (SEC comment letter stated that "material information" was not disclosed in 2006 10–K, including a comprehensive analysis of Bear Stearns' exposure to subprime loans); (Sec. Compl. ¶¶ 319–20) (2007 10–K falsely asserted that there were no "unresolved staff comments," despite Company's failure to file its promised response to SEC's comment letter until after the 2007 10–K was filed); (Sec. Compl. ¶¶ 606–29, 755–81) (2006 and 2007 10–K's made misrepresentations regarding, inter alia, exposure to market risk, financial results, risk management practices, and internal controls). *Cf. In re AOL Time Warner, Inc. Sec. Litig.,* 503 F.Supp.2d 666, 678 (S.D.N.Y.2007) (concluding that plaintiffs failed to allege loss causation with regard to financial statements audited by Ernst & Young where the truth of the audit opinion was never called into question during the time that AOL's stock price dropped and where plaintiffs failed to identify what risk was concealed by the allegedly false audit opinion).

Accordingly, the Securities Complaint has properly alleged loss causation as to Deloitte.

Based upon the conclusions set forth above that under the applicable standard the Securities Complaint has adequately alleged Deloitte's scienter, its misstatements, and loss causation, the motion of Deloitte to dismiss the Securities Complaint is denied.

# IV. THE MOTION TO DISMISS THE DERIVATIVE COMPLAINT IS GRANTED

A. *The Parties*

Plaintiff Samuel T. Cohen ("Derivative Plaintiff") is a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

former shareholder of Bear Stearns stock and current shareholder of JPMorgan stock. He brings a hybrid shareholder derivative and class action on behalf of JPMorgan and holders of its common stock against certain officers and directors seeking to remedy those defendants' alleged violations of state and federal law, including breaches of fiduciary duties, corporate mismanagement, waste of corporate assets, unjust enrichment and violations of the Securities Exchange Act of 1934, that occurred beginning no later than March 2006 and continuing to the present (the "Relevant Period"). On behalf of JPMorgan, this action seeks, among other things, damages, corporate governance reforms, restitution and the declaration of a constructive trust to remedy defendants' violations of state and federal law. On behalf of the purported class, this action seeks relief against former Bear Stearns senior officers and directors arising out of their sale of Bear Stearns via an unfair process at an allegedly grossly inadequate and unfair price to JPMorgan (the "Acquisition"). (Deriv. Compl. ¶ 1.)

The derivative suit presents four sets of individual defendants, all of whom are also defendants in the Securities Action.

Defendants Cayne, Molinaro, Mayer, Farber, and Schwartz constitute the "Officer Defendants." Because of their positions with Bear Stearns, Derivative Plaintiff alleges that the Officer Defendants possessed the power and authority to control the contents of Bear Stearns' quarterly reports, and press releases and presentations**523** to securities analysts, money and portfolio managers and institutional investors, i.e., the market. They were provided with copies of the Company's reports and press releases alleged in the Derivative Complaint to be misleading prior to or shortly after their issuance and allegedly had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material non-public information, the Officer Defendants allegedly knew that adverse facts about Bear Stearns were being concealed from the public and that the positive representations being made about the Company were then materially false and misleading. The

Officer Defendants are also allegedly liable for the false statements. (Deriv. Compl. ¶ 54.)

Defendants Bienen, Cayne, Glickman, Goldstein, Greenberg, Harrington, Nickell, Novelly, Salerno, Schwartz, Tese, and Williams constitute the "Director Defendants." By reason of their positions as directors of Bear Stearns and because of their ability to control the business and corporate affairs of the Company, the Director Defendants allegedly owed the Company and its shareholders the fiduciary obligations to exercise a high degree of due care, loyalty, and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. Derivative Plaintiff claims that the Director Defendants were required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. As a result of these duties, Derivative Plaintiff alleges that the Director Defendants were obligated to use their best efforts to act in the interests of the Company and shareholders to ensure that no waste of corporate assets occurs. The Director Defendants, because of their positions of control and authority as directors and/or officers of the Company, allegedly were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of in the Derivative Complaint. (Deriv. Compl. ¶ 55.) The Officer Defendants and Director Defendants are collectively referred to as "Individual Defendants."

The Derivative Complaint further categorizes Defendants Cayne, Schwartz, Farber, Greenberg, Harrington, Novelly, Tese, Mayer, Glickman, Minikes, Molinaro, and Spector as the "Insider Selling Defendants" and Defendants Cayne, Schwartz, Bienen, Glickman, Goldstein, Greenberg, Harrington, Nickell, Novelly, Salerno, Tese and Williams as the "Acquisition Defendants." (Deriv. Compl. ¶ 56.)

Bear Stearns and JPMorgan are nominal defendants. (Deriv. Compl. ¶¶ 35–36.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

B. *Summary of the Derivative Complaint*

Derivative Plaintiff alleges that Bear Stearns maintained portfolios containing billions of dollars of subprime mortgage-related assets, including collateralized debt obligations ("CDOs"), and continued to acquire more of these risky assets under Individual Defendants' direction. Defendants allegedly failed to make appropriate reserves for the large amount of CDOs in Bear Stearns' portfolio and concealed the Company's failure to write down impaired securities tied to subprime debt. (Deriv. Compl. ¶¶ 4–5, 73, 83.)

The Derivative Complaint alleges that delinquency rates increased among subprime borrowers, and analysts predicted the collapse of the subprime market, unveiling the riskiness of Individual Defendants' actions. In 2006, the Bear Stearns' holdings of CDOs and high-risk home **\*524** loans and bonds suffered as the market for these securities began to erode. Derivative Plaintiff claims that, in spite of these red flags, Individual Defendants caused or allowed Bear Stearns to develop a scheme to conceal their risky subprime mortgage portfolio. The Company publicly touted its risk management procedures as a safeguard over the valuation of its financial instruments, but Individual Defendants allegedly misled investors by failing to fully disclose the true financial condition of Bear Stearns; namely, the effects that the increased exposure to risk in the subprime market was having on the Company. (Deriv. Compl. ¶¶ 72–73, 75–76.)

*1. Bear Stearns' Acquisition of Encore Credit Corp.*

Derivative Plaintiff alleges that, on October 10, 2006, Individual Defendants caused or allowed Bear Stearns to issue a press release announcing its acquisition of ECC Capital Corporation's ("ECC") subprime mortgage origination platform of ECC's subsidiary, Encore Credit Corp. ("Encore"). ECC was a mortgage finance real estate investment trust that originated and invested in residential mortgage loans. As part of the acquisition, Bear Stearns allegedly purchased ECC's subprime mortgage banking platform, which would provide, in part, over $1 billion in new loans per month. Derivative Plaintiff contends that the

acquisition further provided Defendants with information regarding the looming subprime mortgage crisis, and that the Company emphasized that the acquisition would give it a "substantial stake in the subprime lending business." The Derivative Complaint alleges that Bear Stearns acquired ECC at a time when ECC was experiencing dramatic losses, faced a rapidly-declining stock price, and had been notified by the New York Stock Exchange ("NYSE") that it had fallen below the continued listing standard relating to minimum share price requirements on March 1, 2007. On March 19, 2007, the NYSE suspended trading for ECC. (Deriv. Compl. ¶¶ 112–116.)

*2. The Hedge–Fund Collapse*

On July 17, 2007, Bear Stearns disclosed that it was closing two Company-managed hedge funds whose assets consisted of subprime mortgage-related assets and CDOs. The Derivative Complaint alleges that the collapse of these two funds resulted in over $1.8 billion in losses to investors. The Derivative Complaint also alleges that this collapse spawned several lawsuits, including the following: two former Bear Stearns Asset Management portfolio managers were charged by the SEC with fraudulently misleading investors about the financial state of the funds; the same portfolio managers were also charged with fraud and conspiracy by the U.S. Attorney's Office for the Eastern District of New York; Massachusetts securities regulators filed a complaint alleging that Bear Stearns had improperly traded mortgage-backed securities for its own account with the hedge funds without notifying the independent directors in advance; two investors in these funds sued Bear Stearns over the Company's management of the funds in December 2007; and numerous other government investigations and other lawsuits. (Deriv. Compl. ¶¶ 8, 81, 104–105.)

*3. Individual Defendants' Allegedly False and Misleading Statements Issued During the Relevant Period*

Derivative Plaintiff alleges that Individual Defendants failed to record impairment of debt securities which they knew or consciously disregarded to be impaired, causing the Company's financial statements to be false and misleading. The Derivative Complaint states that from early

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

2006 until June 14, 2007 Individual Defendants directed Bear Stearns to issue a series of improper statements proclaiming the Company's **\*525** record growth and sound risk management policies. Even after the hedge-fund fallout and Standard & Poor's decision to cut the Company's credit rating, Bear Stearns allegedly issued an August 3, 2007 press release stating that these issues were "isolated incidences and are by no means an indication of broader issues at Bear Stearns." Additionally, W Holding Co. received monthly price quotes from Bear Stearns going back to 2002 which Derivative Plaintiff claims inflated the value of the asset-backed securities in its $64 million portfolio, which allegedly lost $21 million seemingly overnight. (Deriv. Compl. ¶¶ 76–77, 79, 83–96, 98–99, 106.)

The Derivative Complaint alleges that on September 20, 2007 Individual Defendants caused or allowed Bear Stearns to issue a press release announcing its third fiscal quarter 2007 earnings. Although the Company reported earnings of $171.3 million, down 61% from the same quarter of the previous year, Derivative Plaintiff alleges that Defendant Cayne continued to reassure investors of "solid revenues in Investment Banking and record revenues in Global Equities and Global Clearing Services," and stated that he was "confident in the underlying strength of [the Company's] business and proud of the effort and determination displayed by [the Company's] employees during these challenging times." (Deriv. Compl. ¶ 101.)

### 4. The Improper Buyback and Insider Selling

The Derivative Complaint alleges that, at this time, the Company's Board increased the Company's share repurchase program to all employees and authorized the buyback of over $3.4 billion worth of Bear Stearns' shares while the stock was allegedly inflated due to Individual Defendants' improper statements. In authorizing the buyback, Derivative Plaintiff claims that the Board members failed to properly discuss and consider the Company's exposure to the subprime mortgage lending crisis. During the Relevant Period, while Individual Defendants were allegedly in possession of material, non-public information regarding Bear Stearns' true business prospects, Derivative Plaintiff alleges that Defendant Greenberg sold

$37,649,433.01 worth of stock, Defendant Cayne sold $84,349,600.45 worth of stock, Defendant Schwartz sold $9,867,000.76 worth of stock, Defendant Glickman sold $3,028,406.64 worth of stock, and Defendant Harrington sold $171,450.00 worth of stock in total. (Deriv. Compl. ¶¶ 101, 118, 158.)

### 5. Bear Stearns' Subprime Disclosures and Their Aftermath

Derivative Plaintiff alleges that during the Relevant Period the Company's statements failed to disclose and misrepresented that Bear Stearns' exposure to the subprime market crisis was substantial, that its portfolio of billions of dollars in subprime mortgage-related assets and CDOs would eventually be written down by billions of dollars, and that, as a result of the foregoing, the Company's reported earnings and business prospects were inaccurate. (Deriv. Compl. ¶ 118.)

The Derivative Complaint alleges that, on September 20, 2007, Bear Stearns announced earnings that were lower by 61% due to challenging market conditions affecting its mortgage and credit business. Derivative Plaintiff claims that, on November 14, 2007, Bear Stearns was forced to reveal the extent of its overvaluation of its mortgage-backed debt instruments and announced that it would write down its mortgage inventory by $1.2 billion, equal to 9% of the Company's equity at the time. Soon after, the Company's credit rating was cut by Standard & Poor's. On December 20, 2007, Bear Stearns allegedly made further disclosures of its exposure to the subprime mortgage crisis, reporting its first ever **\*526** loss in its 84–year history stemming from the mortgage-related assets. On January 8, 2008, Defendant Cayne resigned from his position as CEO of the Company. The Derivative Complaint states that the following day Bear Stearns announced that it was closing a third hedge fund that had invested in mortgage-backed securities. The collapse of this fund is alleged to have represented hundreds of millions of dollars worth of additional losses to investors. The Company also revealed that it had cut 1,400 jobs in the fourth quarter of 2007, incurring approximately $100 million of severance costs. The Derivative Complaint claims that, by February of 2008, the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Company's value had fallen 40%. (Deriv. Compl. ¶¶ 9–10, 12, 77, 79, 82, 102–103, 107–109.)

*6. The Acquisition of Bear Stearns by JPMorgan*

Derivative Plaintiff alleges that news of Bear Stearns' liquidity problems reached the market on March 10, 2008 and caused its stock to drop to $62.30 per share. Despite these issues, the Individual Defendants allegedly caused or allowed the Company to report that it was still strong and was maintaining a large liquidity cushion. The Derivative Complaint claims that, to this end, Defendant Schwartz announced days before the merger announcement that the Bear Stearns was maintaining a book value of $84 per share. (Deriv. Compl. ¶¶ 120–21.)

Derivative Plaintiff further alleges that, by March 12, 2008, a number of customers sought to withdraw their funds from Bear Stearns, and certain counterparties were expressing concerns regarding maintaining their ordinary course of exposure to the Company. On March 13, 2008, JPMorgan, the U.S. Treasury Department, the Federal Reserve Bank of New York, and the Federal Reserve Board agreed to a temporary Federal Reserve-backed loan facility (the "Loan Facility") pursuant to which for 28 days JPMorgan would fund Bear Stearns on a fully-secured basis, supported by a back-to-back Loan Facility which permitted JPMorgan to borrow similar funds from the Federal Reserve through its discount window on a non-recourse basis. (Deriv. Compl. ¶¶ 121, 123.)

The Derivative Complaint alleges that, on March 14, 2008, the Company announced the secured Loan Facility and noted that its "liquidity position in the last 24 hours had significantly deteriorated." These loans were to provide an unspecified amount of funding and were insured by the Federal Reserve, yet Derivative Plaintiff claims they did nothing to increase confidence in the Company. Speculation in the market allegedly began that Bear Stearns was collapsing and would face bankruptcy or sale. Bear Stearns' stock allegedly plummeted to $30 per share on March 14, 2008. Two days later, the Board announced that it had unanimously approved a stock-for-stock exchange with JPMorgan for approximately $2 per share. Derivative

Plaintiff contends that this announcement came after only *one* and a half days of due diligence by JPMorgan and an agreement by the Federal Reserve to fund $30 billion (later revised to $29 billion) of Bear Stearns' less-liquid assets on non-recourse terms. Additionally, on March 16, 2008, the Individual Defendants allegedly approved an amendment to Bear Stearns' bylaws to include an indemnification provision for Defendants themselves. After the announcement and media coverage of the transaction, the Derivative Complaint alleges that Bear Stearns stock plummeted to $4.81 per share, $2.81 higher than the proposed acquisition price. (Deriv. Compl. ¶¶ 124–26, 138.)

The Derivative Complaint alleges that, on March 24, 2008, faced with scrutiny and impending backlash from Bear Stearns' **\*527** shareholders, Defendants acted to guarantee the closure of the acquisition: JPMorgan agreed to increase its offer to approximately $10 per share, Bear Stearns agreed to a Stock Exchange Agreement that would give JPMorgan voting control over 39.5% of the Company's outstanding shares, and Individual Defendants agreed to vote their shares in favor of the acquisition. Derivative Plaintiff claims that Defendants sought to avoid the required shareholder approval of the issuance of new shares by relying on an NYSE exception which allows Audit Committee approval of the share issuance when a delay in securing shareholder approval would seriously jeopardize the financial viability of the enterprise. Derivative Plaintiff asserts that there is no evidence that any delay caused by seeking shareholder approval of the Stock Exchange Agreement would have jeopardized Bear Stearns' financial viability, but the Audit Committee expressly approved the agreement. Consequently, Derivative Plaintiff contends that the Company's ability to thwart the sale was diminished. (Deriv. Compl. ¶¶ 130–134.)

Derivative Plaintiff contends that JPMorgan sought to further protect itself from a termination of the proposed acquisition and entered into a Collateral Agreement with Bear Stearns and certain of its subsidiaries on March 24, 2008. Pursuant to this agreement, Bear Stearns allegedly agreed to guarantee its obligations to repay JPMorgan any loans or other advances of credit and any amounts paid by

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

JPMorgan to Bear Stearns' creditors and affiliates. The Derivative Complaint alleges that this guarantee was secured by granting a lien on substantially all of Bear Stearns' and its subsidiaries' assets, effectively giving JPMorgan control and ownership over almost all of Bear Stearns' assets regardless of whether the acquisition was ultimately approved by Bear Stearns' shareholders. (Deriv. Compl. ¶ 135.)

In response to the heavy involvement of the Federal Reserve in the proposed acquisition and the government's responsibility to taxpayers, the Senate Committee on Finance inquired into the terms of the acquisition. Testimony from Defendant Schwartz and JPMorgan Chairman and CEO James Dimon was taken by the Senate Committee on Banking, Housing and Urban Affairs on April 3, 2008. Further, Derivative Plaintiff alleges that there have been various other regulatory proceedings and investigations, as well as congressional hearings and testimonials, throughout late 2008 and early 2009 on the subprime crisis and the sale of Bear Stearns. (Deriv. Compl. ¶ 136.)

On May 30, 2008, the Acquisition was consummated. Each outstanding share of Bear Stearns common stock was converted into the right to receive 0.21753 shares of JPMorgan common stock, and Bear Stearns became a direct subsidiary of JPMorgan. The Derivative Complaint alleges that, had all of JPMorgan's shares been excluded, the acquisition would have failed with only 42.7% of the shareholder vote. (Deriv. Compl. ¶ 137.)

Derivative Plaintiff alleges that the terms of the agreement and plan of merger by and between Bear Stearns and JPMorgan (the "Merger Agreement") contained numerous restrictive and coercive provisions which tied the Company to the deal with JPMorgan. For example, under the "No Solicitation" clause of § 6.9 of the Merger Agreement, Plaintiff claims the Company was barred from soliciting alternative transactions. (Deriv. Compl. ¶ 139.)

Derivative Plaintiff also contends that, even if the deal had been rejected by shareholders, a "force-the-vote" style clause in § 6.3 of the Merger Agreement required the Company to "submit this **\*528** Agreement to its stockholders at the stockholder meeting even if its Board of Directors shall have withdrawn, modified or qualified its recommendation." Furthermore, pursuant to § 6.10, if shareholders had rejected the acquisition, the Company would have been bound to "negotiate a restructuring of the transaction" as long as the deal had not been terminated and "neither party shall have any obligation to alter or change the amount or kind of the Merger Consideration." Derivative Plaintiff alleges that JPMorgan could have locked up the Company for a year until the deal self-terminated. (Deriv. Compl. ¶ 139.)

The Derivative Complaint alleges that Individual Defendants, as fiduciaries, were obliged to manage and operate Bear Stearns and to get the best deal possible for stockholders in a change of control. It further alleges that, under § 5.1 of the Merger Agreement, the Individual Defendants nonetheless agreed that, until the deal was consummated, JPMorgan "shall be entitled to direct the business, operations and management of the Company and its subsidiaries in its reasonable discretion." The Individual Defendants allegedly further tied Bear Stearns' hands by granting JPMorgan a lock-up to the headquarters where Bear Stearns operated its business in New York. Under § 6.11 of the Merger Agreement, JPMorgan was allegedly granted the option to acquire Bear Stearns' headquarters in New York City, valued at between $1 billion and $1.5 billion. (Deriv. Compl. ¶¶ 141–42.)

### 7. The Counts

The Derivative Complaint contains 13 counts.

Count I is a double derivative claim brought on behalf of JPMorgan for Individual Defendants' violations of the Exchange Act § 10(b) and Rule 10b–5. Derivative Plaintiff alleges that, during the Relevant Period, Individual Defendants caused Bear Stearns to disseminate or approved dissemination of public statements that falsely portrayed Bear Stearns' business prospects, growth and margins. The Individual Defendants allegedly knew that the Company's public statements concerning its business prospects were misleading and intended to deceive, manipulate and/or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

defraud in connection therewith. (Deriv. Compl. ¶ 183.)

Count I further alleges that the Individual Defendants knew, consciously disregarded, and were reckless and grossly negligent in causing false and misleading statements to be made, and that Individual Defendants caused the Company's common stock to be inflated due to the improper reporting of the value of Bear Stearns' business prospects, especially concerning the Company's acquisition of ECC. This, in turn, further increased the risk and exposed the Company to the subprime mortgage crisis and its fire sale to JPMorgan for an allegedly unfair and inadequate price. (Deriv. Compl. ¶ 184.)

As such, the Individual Defendants allegedly violated § 10(b) of the Exchange Act and SEC Rule 10b–5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made not misleading; and/or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Bear Stearns and others during the Relevant Period. (Deriv. Compl. ¶ 185.)

Count I also alleges that, by virtue of causing Bear Stearns to disseminate false and misleading statements and omitting to state material facts, the Individual Defendants engaged in manipulative acts and devices that acted as a fraud upon Bear Stearns and deceived the Company and the members of the public who purchased **\*529** Bear Stearns common stock at inflated prices during the Relevant Period. (Deriv. Compl. ¶¶ 186–87.)

As a direct and proximate result of the wrongful conduct alleged at Count I, Bear Stearns allegedly has and will suffer damages in connection with Defendants' deceptive practices and contrivances in connection with causing Bear Stearns to violate the federal securities laws. (Deriv. Compl. ¶ 188.)

Count II is a double derivative claim brought on behalf of JPMorgan against the Director Defendants and Defendant Molinaro for violations of the Exchange Act § 10(b) and Rule 10b–5. The Derivative Complaint alleges that during the Relevant Period, at the same time the price of the Company's common stock was allegedly inflated due to the improper reporting of the value of Bear Stearns' business prospects and while the Insider Selling Defendants were selling stock into the market, the Director Defendants and Defendant Molinaro were causing Bear Stearns to repurchase over $3.4 billion worth of its own stock on the open market at an average inflated price of approximately $130.19 per share, which Derivative Plaintiff claims was substantially higher than Bear Stearns' true value. (Deriv. Compl. ¶ 191.)

As such, the Director Defendants and Defendant Molinaro allegedly violated § 10(b) of the Exchange Act and SEC Rule 10b–5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made not misleading; and/or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Bear Stearns and others in connection with their purchases of Bear Stearns common stock during the Relevant Period. (Deriv. Compl. ¶ 192.)

As a result of the Director Defendants' and Defendant Molinaro's misconduct alleged in Count II, Bear Stearns allegedly suffered damages in that it paid artificially inflated prices for Bear Stearns common stock it purchased on the open market during the Relevant Period. Count II further alleges that Bear Stearns would not have purchased its common stock at the prices it paid had the market previously been aware that the true price of the Company's stock was artificially and falsely inflated by Defendants' misleading statements. (Deriv. Compl. ¶¶ 193–95.)

Count III is a double derivative claim brought on behalf of JPMorgan against Individual Defendants for violations of the Exchange Act § 10(b) and Rule 10b–5. It alleges that all Defendants participated in the planning, approval and execution of the March 24, 2008 stock exchange between Bear Stearns and JPMorgan, and that the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

March 24, 2008 stock exchange was a device, scheme and artifice to defraud Bear Stearns' shareholders and to deprive them of their equity interest in Bear Stearns at an inadequate and coerced price, and to manipulate the vote in favor of the merger with JPMorgan. (Deriv. Compl. ¶ 198–99.)

As such, Count III alleges that Defendants violated § 10(b) of the Exchange Act and SEC Rule 10b–5 in that they: (a) employed devices, schemes and artifices to defraud; and/or (b) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Bear Stearns and others in connection with accomplishing the merger between JPMorgan and Bear Stearns and depriving shareholders of Bear Stearns from pursuing claims against Defendants for their pre-merger misconduct. (Deriv. Compl. ¶ 200.)

Count III further alleges that the March 24, 2008 stock exchange was a purchase **\*530** and sale of securities by Bear Stearns by and between JPMorgan which was approved and accomplished by the Bear Stearns Board and the JPMorgan Board in violation of § 10(b) of the Exchange Act and SEC Rule 10b–5. As a result of the stock exchange, Bear Stearns allegedly received shares of JPMorgan in exchange for shares of JPMorgan common stock at an inadequate and artificially deflated exchange rate, and Bear Stearns overpaid for the JPMorgan common stock it received. (Deriv. Compl. ¶ 201–02.)

As a direct and proximate result of Defendants' wrongful conduct alleged in Count III, Bear Stearns is alleged to have suffered damages through its purchase of JPMorgan common stock at artificially high prices. (Deriv. Compl. ¶ 203.)

Count IV is a double derivative claim brought on behalf of JPMorgan against Individual Defendants for violations of the Exchange Act § 20A. The Derivative Complaint states that, during the Relevant Period, the Individual Defendants acted as controlling persons of Bear Stearns within the meaning of § 20A of the Exchange Act

and that, by reasons of their positions with the Company, and their ownership of Bear Stearns stock, the Individual Defendants had the power and the authority to cause Bear Stearns to engage in the wrongful conduct alleged in the Derivative Complaint, including causing Bear Stearns to violate § 10(b) of the Exchange Act and SEC Rule 10b–5. (Deriv. Compl. ¶¶ 206–07.)

Count V is a double derivative claim brought on behalf of JPMorgan against the Insider Selling Defendants for violations of the Exchange Act § 10(b) and Rule 10b–5. Derivative Plaintiff alleges that, at the time of their sales of Bear Stearns stock, the Insider Selling Defendants knew information concerning the Company's financial condition and future business prospects, and sold their Bear Stearns common stock on the basis of such information. This information was proprietary non-public information concerning the Company's financial condition and future business prospects which belonged to the Company. Insider Selling Defendants allegedly misappropriated this information for their own benefit and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold Bear Stearns stock without disclosing the information alleged to have been concealed. (Deriv. Compl. ¶¶ 210–12.)

Count V further alleges that, at the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. As such, the Insider Selling Defendants allegedly violated § 10(b) of the Exchange Act and SEC Rule 10b–5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made not misleading; and/or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Bear Stearns and others in connection with their purchases of Bear Stearns common stock during the Relevant Period. The Derivative Complaint alleges that Insider Trading Defendants' conduct also constitutes a manipulative and descriptive device and contrivance in violation of § 10(b) of the Exchange Act and SEC Rule 10b–5. (Deriv. Compl. ¶¶ 213–15.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Count V alleges that Bear Stearns suffered damages in connection with the Insider Trading Defendants' deceptive practices and contrivances in the sale of Bear Stearns common stock during the Relevant Period. (Deriv. Compl. ¶ 216.)

Count VI is a derivative suit brought on behalf of JPMorgan against the Insider Selling Defendants for violation of Exchange**531** Act § 20A. The Derivative Complaint alleges that, at the time of their sales of Bear Stearns stock, the Insider Selling Defendants knew information concerning the Company's financial condition and future business prospects, and sold their Bear Stearns common stock on the basis of such information. This information was proprietary non-public information which belonged to the Company. Insider Selling Defendants allegedly misappropriated this information for their own benefit and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold Bear Stearns stock without disclosing the information alleged to have been concealed. (Deriv. Compl. ¶¶ 219–21.)

Count VI further alleges that, at the time that the Insider Selling Defendants were selling their personal holdings of Bear Stearns common stock, they knew that the Company's revenues were materially overstated and that Bear Stearns was omitting to publicly disclose material non-public information, and they also caused Bear Stearns to contemporaneously purchase Bear Stearns common stock in the open market. (Deriv. Compl. ¶¶ 222–23.)

The Derivative Complaint states that, as a direct and proximate result of the wrongful conduct alleged in Count VI, the Insider Trading Defendants are liable to Bear Stearns for disgorgement of the profits from their sales of Bear Stearns common stock realized during the time shares of Bear Stearns common stock were purchased contemporaneously by Bear Stearns. (Deriv. Compl. ¶ 224.)

Count VII is a double derivative claim brought on behalf of JPMorgan against the Insider Selling Defendants for breach of their fiduciary duties through insider selling and misappropriation of information. Derivative Plaintiff alleges that at the time of their sales of Bear Stearns stock, the Insider Selling Defendants knew information concerning the Company's financial condition and future business prospects, and sold their Bear Stearns common stock on the basis of such information. This information was proprietary non-public information which belonged to the Company, and which the Insider Selling Defendants used for their own benefit when they sold Bear Stearns common stock. (Deriv. Compl. ¶¶ 227–28.)

At the time of their stock sales, the Derivative Complaint alleges that the Insider Selling Defendants knew that the Company's revenues were materially overstated, and that the Insider Selling Defendants' sales of Bear Stearns common stock while in possession and control of this material adverse nonpublic information was a breach of their fiduciary duties of loyalty and good faith. (Deriv. Compl. ¶ 229.)

Since the alleged use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby. (Deriv. Compl. ¶ 230.)

Count VIII is a double derivative claim brought on behalf of JPMorgan against Individual Defendants for waste of corporate assets. The Derivative Complaint states that each of the Individual Defendants owed to Bear Stearns the obligation to protect Bear Stearns' assets from loss or waste, and that the Individual Defendants' alleged failure to adequately evaluate and monitor Bear Stearns' risk in the CDOs market constituted a waste of Bear Stearns' corporate assets and was grossly unfair to the Company. Derivative Plaintiff further contends that no person of ordinary, sound business judgment could conclude that the Individual Defendants' **532** decision to become so overextended in the risky CDOs market was a sound exercise of business judgment. (Deriv. Compl. ¶ 232.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Count VIII further alleges that, as a result of their alleged misconduct, the Individual Defendants wasted corporate assets by failing to properly consider the interests of the Company and its public shareholders in failing to conduct proper supervision, paying $3.4 billion to repurchase the Company' stock and paying bonuses to certain of its executive officers. (Deriv. Compl. ¶ 233.)

Under Count VIII, Plaintiff claims to have no remedy at law. (Deriv. Compl. ¶ 235.)

Count IX is a double derivative claim brought on behalf of JPMorgan against Individual Defendants for abuse of control. Derivative Plaintiff alleges that the Individual Defendants' misconduct constituted an abuse of their ability to control and influence Bear Stearns, for which they are legally responsible. In particular, the Derivative Complaint states that the Individual Defendants abused their positions of authority by causing or allowing Bear Stearns to violate its publicly disclosed risk management procedures and issue statements that improperly portrayed Bear Stearns' business prospects. (Deriv. Compl. ¶ 237.)

Count IX further alleges that, as a direct and proximate result of the Individual Defendants' abuse of control, Bear Stearns sustained significant damages. These damages include, but are not limited to, Bear Stearns' severe loss of market credibility, as reflected in its eventual forced sale and $3.4 billion paid to repurchase the Company's stock. (Deriv. Compl. ¶ 238.)

Count X is a double derivative claim brought on behalf of JPMorgan against Individual Defendants for breach of their fiduciary duties through gross mismanagement. The Derivative Complaint states that the Individual Defendants, either directly or through aiding and abetting, abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets, risks and business of Bear Stearns in a manner consistent with the operations of a publicly held corporation. (Deriv. Compl. ¶ 241.)

Count X further alleges that, as a direct and proximate result of Individual Defendants' gross mismanagement and breaches of their fiduciary duties, Bear Stearns sustained significant damages in excess of $1 billion dollars. (Deriv. Compl. ¶ 242.)

Count XI is a double derivative claim brought on behalf of JPMorgan against Individual Defendants for unjust enrichment. The Derivative Complaint alleges that, by their wrongful acts and omissions, the Individual Defendants were unjustly enriched to the detriment of Bear Stearns. Derivative Plaintiff, as a shareholder and representative of JPMorgan and Bear Stearns, seeks restitution from Individual Defendants, and seeks disgorgement of all profits, benefits, and other compensation obtained by these defendants from their allegedly wrongful conduct and fiduciary breaches. (Deriv. Compl. ¶¶ 245–46.)

Count XII is a double derivative claim brought on behalf of JPMorgan against Individual Defendants for breach of their fiduciary duties. Derivative Plaintiff alleges that each of the Individual Defendants had a duty to Bear Stearns and its shareholders to, amongst other things, ensure that the Company operated in a diligent, honest, and prudent manner. The Individual Defendants allegedly breached their fiduciary duties of care, loyalty, and good faith owed to Bear Stearns and its stockholders. (Deriv. Compl. ¶¶ 248, 250.)

Count XII further alleges that each of the Individual Defendants had actual or **\*533** constructive knowledge that they had caused the Company to improperly misrepresent its financial results and failed to correct the Company's publicly reported financial results and guidance. The Derivative Complaint states that these actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests. (Deriv. Compl. ¶ 251.)

By reason of the fiduciary breaches alleged in Count XII, Bear Stearns allegedly sustained serious damage and irreparable injury. (Deriv. Compl. ¶ 252.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Derivative Plaintiff purports to assert this Count XII derivatively on behalf of Bear Stearns against the Individual Defendants. Derivative Plaintiff further claims that he, JPMorgan and Bear Stearns have no adequate remedy at law. (Deriv. Compl. ¶¶ 249, 253.)

Count XIII is a direct claim brought by Derivative Plaintiff and the Class for breach of fiduciary duties against the Acquisition Defendants.

Derivative Plaintiff purports to bring this count on his own behalf and as a class action under Federal Rule of Civil Procedure Rule 23 on behalf of all holders of Bear Stearns stock who have been harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any defendant. (Deriv. Compl. ¶ 255.)

Derivative Plaintiff contends that this action is properly maintainable as a class action based on the following: (a) the Class is so numerous that joinder of all members is impracticable; (b) there are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member; (c) Derivative Plaintiff's claims are typical of the claims of the other members of the Class; (d) Derivative Plaintiff does not have any interests adverse to the Class; (e) Derivative Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class; (f) the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; (g) Derivative Plaintiff anticipates that there will be no difficulty in the management of this litigation; (h) a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and, (i) Defendants have acted on grounds generally applicable to the Class with respect to the matters alleged in the Derivative Complaint, thereby making appropriate the relief sought in the Complaint with respect to the Class as a whole. (Deriv. Compl. ¶¶ 256–63.)

Count XIII makes the following allegations against Individual Defendants:

• Individual Defendants violated their fiduciary duties of care, loyalty, candor, good faith, and independence owed to the public shareholders of Bear Stearns and acted to put their personal interests ahead of the interests of Bear Stearns' shareholders. (Deriv. Compl. ¶ 264.)

• Defendants, individually and acting as a part of a common plan, unfairly deprived Derivative Plaintiff and other members of the Class of the true value inherent in and arising from Bear Stearns. (Deriv. Compl. ¶ 265.)

• Individual Defendants violated their fiduciary duties by entering Bear Stearns into the Merger Agreement **\*534** without regard to the effect of the transaction on Bear Stearns' shareholders. (Deriv. Compl. ¶ 266.)

• Individual Defendants, particularly, Defendants Tese, Bienen, Glickman, Goldstein, Novelly, Salerno, and Williams, violated their fiduciary duties by entering Bear Stearns into the Stock Exchange Agreement and expressly approving it without first seeking shareholder approval, thereby disregarding the effect of that agreement on Bear Stearns shareholders. (Deriv. Compl. ¶ 267.)

• Individual Defendants failed to take steps to maximize the value of Bear Stearns to its public shareholders and they took steps to avoid competitive bidding, to cap the value of Bear Stearns' stock and to give the Individual Defendants an unfair advantage, by, among other things, agreeing to the coercive deal terms alleged the in the Derivative Complaint and failing to adequately solicit other potential acquirers or alternative transactions. (Deriv. Compl. ¶ 268.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

• Individual Defendants failed to properly value Bear Stearns and its various assets and operations. (Deriv. Compl. ¶ 268.)

• Individual Defendants acted to negotiate and agree to unfair terms in an attempt to extinguish the Company as a separate entity and so that the Individual Defendants may escape liability for their breaches of fiduciary duties. (Deriv. Compl. ¶ 268.)

• Individual Defendants ignored or did not protect against the numerous conflicts of interest resulting from the directors' own inter-relationships or connections with the Acquisition. (Deriv. Compl. ¶ 268.)

• Because the Individual Defendants dominated and controlled the business and corporate affairs of Bear Stearns, and were in possession of private corporate information concerning Bear Stearns' assets, business and future prospects, there existed an imbalance and disparity of knowledge and economic power between them and the public shareholders of Bear Stearns which made it inherently unfair for them to pursue and recommend any transaction wherein they would reap disproportionate benefits to the exclusion of maximizing stockholder value. (Deriv. Compl. ¶ 269.)

• Individual Defendants failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Derivative Plaintiff and the other members of the Class. (Deriv. Compl. ¶ 270.)

• Individual Defendants caused Bear Stearns to exclude the members of the Class from their fair share of the Company's valuable assets and operations to unfairly benefit themselves, all to the irreparable harm of the Class. (Deriv. Compl. ¶ 271.)

• Individual Defendants engaged in self-dealing, did not act in good faith toward Plaintiff and the other members of the Class, and breached their fiduciary duties to the

members of the Class. (Deriv. Compl. ¶ 272.)

• As a result of Individual Defendants' allegedly unlawful actions, Derivative Plaintiff and the other members of the Class have been irreparably harmed in that they did not receive the value to which they were entitled for their shares or their fair portion of the value of Bear Stearns' assets and operations. (Deriv. Compl. ¶ 273.)

• Individual Defendants breached their fiduciary duties owed to Plaintiff and the members of the Class, did not **\*535** engage in arm's-length negotiations on the Acquisition terms, and did not supply to Bear Stearns' minority stockholders sufficient information to enable them to cast informed votes for or against adoption of the Merger Agreement, all to the irreparable harm of the members of the Class. (Deriv. Compl. ¶ 273.)

Derivative Plaintiff contends that he and the members of the Class have no adequate remedy at law under Count XIII. (Deriv. Compl. ¶ 274.)

C. *Derivative Plaintiff Does Not Have Standing*

Derivative Defendants contend that Derivative Plaintiff lacks standing to assert his derivative claims (Counts I through XII) because he no longer owns Bear Stearns stock, does not come under the fraud exception to the continuous ownership rule, and fails to allege a double derivative claim as Plaintiff does not sufficiently allege harm to JPMorgan. Deriv. Defs'. Mem. 16.

Derivative Plaintiff responds that, while he does not own Bear Stearns stock anymore, he has standing under the fraud exception to the continuous ownership rule. Deriv. Pl. Mem. 11. Derivative Plaintiff contends that this suit was brought against Bear Stearns' officers and directors before the merger with JPMorgan was contemplated, and that the merger was a "fire-sale deal" effectuated in exchange for indemnity and to escape shareholder derivative litigation and liability. Deriv. Pl. Mem. 11–12, *quoting* Deriv. Compl. ¶¶ 19, 24, 246–47.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Derivative Plaintiff also asserts that he has standing to pursue a double derivative claim on behalf of JPMorgan. Derivative Plaintiff contends that he maintains a financial interest in JPMorgan and has an incentive to vigorously pursue his claims. He cites *Blasband v. Rales,* 971 F.2d 1034 (3rd Cir.1992) for the proposition that a plaintiff may maintain his derivative claims against the officers and directors of a company which has been acquired through his ownership of shares in the purchasing company. Deriv. Pl. Mem. 14–15, *citing Blasband,* 971 F.2d at 1038–1044. In *Blasband,* the court looked to the underlying purpose of the continuous ownership rule and double derivative actions and found that the plaintiff there had a worthy, if indirect, financial interest to maintain his suit. Deriv. Pl. Mem. 15–16, *citing Blasband,* 971 F.2d at 1038–1044.

Derivative Plaintiff further contends that Derivative Defendants are urging the court to mechanically and literally apply Delaware corporation law when it should place more weight on "equitable considerations." Deriv. Pl. Mem. 17. Derivative Plaintiff does not dispute that he fails to allege any harm to JPMorgan, but asserts that misconduct has taken place and that equity demands a remedy. Deriv. Pl. Mem. at 18.

*1. Derivative Plaintiff Does Not Come within the "Fraud Exception"*

[50] The parties do not dispute that the "continuous ownership rule" requires that a shareholder-plaintiff own stock in the corporation continuously from the time of the alleged wrong until the termination of the litigation in order to assert a single derivative claim. *Lewis v. Ward,* 852 A.2d 896, 900–01 (Del.2004); *Lewis v. Anderson,* 477 A.2d 1040, 1049 (Del.1984). The merger between JPMorgan and Bear Stearns, rendering the latter a subsidiary of the former, ended Derivative Plaintiff's ownership of Bear Stearns stock. *Ward,* 852 A.2d at 900–01.

*In re Merrill Lynch & Co. Sec., Deriv. & Erisa Litig.,* 597 F.Supp.2d 427 (S.D.N.Y.2009), presented similar derivative*536 claims. In that case, Merrill Lynch shareholders brought a derivative suit against the company alleging breach of fiduciary duties for investing in mort-

gage-backed securities. *Id.* at 429. Merrill Lynch was subsequently acquired by Bank of America in a stock-for-stock transaction. *Id.* The Court dismissed the plaintiffs' claims for lack of standing, finding that the continuous ownership rule was to be "rigorously applied" and that the merger had ended plaintiffs' ownership of Merrill Lynch stock. *Id.* at 429–31.

[51][52] Derivative Plaintiff contends that this suit fits within the fraud exception to the continuous ownership rule. The fraud exception provides that the continuous ownership rule does not require dismissal where the merger was "perpetrated merely to deprive shareholders of standing to bring a derivative action." *Ward,* 852 A.2d at 899, 902; *see also Merrill Lynch,* 597 F.Supp.2d at 431 (holding that a plaintiff must show that the merger was "perpetrated merely to deprive shareholders of standing to bring a derivative action") (citation omitted); *Scattergood v. Perelman,* 945 F.2d 618, 626 (3rd Cir.1991) (dismissing derivative claims for lack of standing because complaint failed to sufficiently allege that "[t]he sole or at least dominant motive of the merger [was] to deprive shareholders of standing to bring the derivative suit").[FN18] Furthermore, the fraud exception is "narrow" and must "be pled with particularized facts pursuant to Rule 9(b)." *Globis,* 2007 WL 4292024, at *5, *citing Ward,* 852 A.2d at 905.

FN18. Derivative Plaintiff cites *Ash v. McCall,* No. Civ. A. 17132, 2000 WL 1370341 (Del.Ch. Sept. 15, 2000), for the proposition that a merger only needs to be designed "in part" to avoid derivative liability. Deriv. Pl. Mem. 11. However, this statement in *Ash* was dicta without a citation. *Ash,* 2000 WL 1370341, at *13. Cases before and after *Ash* have followed the more restrictive holding that a merger must be perpetrated "merely to deprive" shareholders of standing to bring a derivative action. *See Kramer v. W. Pac. Indus., Inc.,* 546 A.2d 348, 354 (Del.1988), *citing Anderson,* 477 A.2d at 1046 n. 10; *Globis Partners, L.P. v. Pluntree Software, Inc.,* No. Civ. A. 1577–VCP, 2007 WL 4292024, at *5 (Del.Ch.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Nov. 30, 2007).

[53] Derivative Plaintiff supports his contention by asserting (1) that Bear Stearns was purchased for a low price (Deriv. Compl. ¶¶ 1, 14, 15, 22), and (2) that JPMorgan agreed to indemnify Bear Stearns' officers and directors (Deriv. Compl. ¶¶ 19, 24, 146–47). *See also* Deriv. Pl. Mem. 11–12, *quoting* Deriv. Compl. ¶¶ 19, 24, 246–47. These assertions parallel those which were rejected in *In re Merrill Lynch.* In that case, the plaintiffs alleged that the defendants had agreed to sell the company at an "extreme discount" to "eliminate their personal liability" and, also to that end, the defendants had obtained indemnification from Bank of America. *In re Merrill Lynch,* 597 F.Supp.2d at 430. The Court noted that indemnification of an acquired company's directors is standard practice in a merger. *Id.* The Court then held that the plaintiffs' assertions did not "provide the particularized allegations necessary to substantiate this claim of fraud" and were "patently inadequate" to satisfy the fraud exception to the continuous ownership rule. *Id.; see also Globis,* 2007 WL 4292024, at *8 (allegation that merger was consummated at "too cheap a price" was insufficient to show that merger was "not entered for any valid purpose.") Furthermore, Derivative Plaintiff's allegations that, in the days preceding the sale to JPMorgan, Bear Stearns was facing a severe liquidity crisis, a plummeting stock price, and an "alarming" loss of confidence on the part of investors, clients, and trading counterparties, plus the "heavy involvement" of the Federal **537** Reserve in the sale, contradict any assertion that the sale was accomplished "merely to deprive" shareholder-plaintiffs of standing. (Deriv. Compl. ¶¶ 121, 124, 136). Derivative Plaintiff does not explain why the Federal Reserve would participate in a fraudulent sale.[FN19]

> FN19. Derivative Defendants also note that Bear Stearns's officers and directors were indemnified before the merger pursuant to the Bear Stearns Restated Certificate of Incorporation, undermining that motivation for the sale. Defs. Mem. in Opp. at 8.

Derivative Plaintiff has not adequately alleged that the purpose of the merger was to deprive him of a derivative action in order to fall within the fraud exception to the continuous ownership rule.

### 2. Derivative Plaintiff Fails to Establish a Double Derivative Suit

Derivative Defendants contend that Derivative Plaintiff cannot establish double derivative standing because of the continuous ownership rule and because he fails to allege that JPMorgan was harmed by the alleged wrongdoing. Derivative Plaintiff survives the continuous ownership rule as applied in the double derivative context, but he fails to allege harm to JPMorgan.

In *Lambrecht v. O'Neal,* 3 A.3d 277 (Del.2010), the Delaware Supreme Court addressed the following certified question:

> Whether plaintiffs in a double derivative action under Delaware law, who were pre-merger shareholders in the acquired company and who are current shareholders, by virtue of a stock-for-stock merger, in the post-merger parent company, must also demonstrate that, at the time of the alleged wrongdoing at the acquired company, (a) they owned stock in the acquiring company, and (b) the acquiring company owned stock in the acquired company.

*Id.* at 281. The Court answered both questions in the negative. *Id.* at 293.

[54] The Court in *Lambrecht* held that its "precedents not only validate but also encourage the bringing of double derivative actions in cases where standing to maintain a standard derivative action is extinguished as a result of an intervening merger," and that *Blasband,* upon which Derivative Plaintiff relies, was not inconsistent with Delaware law "insofar as it recognizes the availability of a double derivative action as a post-merger remedy." *Id.* at 288, 292 n. 56 (emphasis omitted).[FN20] The Court explained that once a company acquires another company, the ac-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

quiror/parent obtains the right to bring suit on behalf of the acquired company, meaning that a shareholder of the acquiring company obtains the ability to bring such a suit double derivatively. *Lambrecht,* 3 A.3d at 288–89; *see also Lewis v. Ward,* 852 A.2d at 901 (rejecting a plea for equitable standing and holding that "derivative claims pass by operation of law to the surviving corporation, which then has the sole right and standing to prosecute the action").

> FN20. In *Lambrecht,* the Court also expressly overruled *Saito v. McCall,* No. Civ. A. 17132, 2004 WL 3029876 (Del. Ch. Dec. 20, 2004). *Lambrecht,* 3 A.3d at 293. *Saito* had held that where the plaintiffs were not shareholders of the parent at the time of the alleged misconduct (as they were shareholders of the acquired subsidiary at that time), they could not satisfy the continuous ownership rule. 2004 WL 3029876, at *9, 11.

The Delaware Supreme Court in *Lambrecht* provided requirements for post-merger double derivative suits to survive. It held that "[j]ust as [the parent company] is not required to have owned [the subsidiary's] shares at the time of the alleged wrongdoing, neither are the plaintiffs required to have owned [the parent's] **\*538** shares at that point in time. It suffices that the plaintiffs own shares of [the parent] at the time they seek to proceed double derivatively on its behalf." 3 A.3d at 298. In *Lambrecht,* the plaintiffs "easily satisfied this requirement because they acquired their [parent company] shares in the merger, and their double derivative claim [was] based on post-merger conduct by the [parent's] board, *viz.,* its failure to prosecute [the subsidiary's] pre-merger claim, which [the parent] now (indirectly) owns." *Id.*

[55] In light of the holding in *Lambrecht,* it appears that Derivative Plaintiff, as a current JPMorgan shareholder who also held JPMorgan stock at the time he filed the Derivative Complaint, can bring double derivative claims based on the JPMorgan Board of Directors' failure to prosecute Bear Stearns' pre-merger claims.

However, Derivative Plaintiff's double derivative suit fails because he does not sufficiently allege that JPMorgan was harmed by Derivative Defendants' misconduct. As discussed above, Derivative Plaintiff does not dispute this fact, but claims that it would be inequitable to dismiss his case. Deriv. Pl. Mem. 18.

[56][57] A double derivative suit is based upon the "injury suffered indirectly by the parent corporation, in which the shareholder does have an interest, as a result of injury to the subsidiary." Ralph C. Ferrara et al., *Shareholder Derivative Litigation: Besieging the Board,* 4–32 (27th Release 2009). It is a fundamental requirement of a double derivative suit that the injury to the subsidiary must also cause injury to the parent. *See Blasband,* 971 F.2d at 1043 (recognizing that "[i]n a 'double derivative' action, the shareholder is effectively maintaining the derivative action on behalf of the subsidiary, based upon the fact that the parent or holding company has derivative rights to the cause of action possessed by the subsidiary. The wrong sought to be remedied by the complaining shareholder is not only that done directly to the parent corporation in which he or she owns stock, but also the wrong done to the corporation's subsidiaries which indirectly, but actually, affects the parent corporation and its shareholders. Notwithstanding that the recognition of double derivative suits relaxes the plaintiff's contemporaneous ownership requirement, the acceptance of the action acknowledges the realities of the changing techniques and structures of the modern corporation. The ultimate beneficiary of a double derivative action is the corporation that possesses the primary right to sue."), *quoting* 13 Charles R.P. Keating, Gail A. O'Gradney, *Fletcher Cyclopedia of Corporations §* 5977, at 240 (rev. ed.1991). Without such a requirement, double derivative plaintiffs could bring suits against the interests of the parent company, whose stock they hold, for alleged wrongs to a subsidiary which did not harm, and may have benefitted, the parent and its shareholders.

Derivative Plaintiff here alleges pre-merger injury to the subsidiary, Bear Stearns, but he does not allege harm to JPMorgan, the parent under whose right he brings suit. Rather, he alleges benefit to JPMorgan. The Derivative

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Complaint states that "JPMorgan reaped huge benefits from this Acquisition" (Deriv. Compl. ¶ 142), that it "acquired divisions of Bear Stearns that are still profitable and strong," and that it did so "without paying a reasonable consideration to Bear Stearns' shareholders." (Deriv. Compl. ¶ 143.) It also alleges that "JPMorgan received all the benefits of owning one of the largest and strongest investment banking companies for next to nothing." (Deriv. Compl. ¶ 145.) Thus, JPMorgan, along **\*539** with Derivative Plaintiff as a JPMorgan shareholder, is alleged to have benefitted from the alleged misconduct, and Derivative Plaintiff cannot bring a double derivative claim.

Derivative Plaintiff's appeal to equitable considerations is to no avail, as the equitable considerations here weigh against a conferral of standing to Derivative Plaintiff. As discussed above, the alleged wrong here has a remedy because JPMorgan has the right to pursue such claims if it is in the interests of JPMorgan and its shareholders to do so. Also, Delaware law seeks to preserve the right of the board of directors to guide the business of a corporation, which favors deferring to a board's judgment in determining whether to bring a suit so as to avoid usurping the board's control over actions of the corporation. *See Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 366 (Del.2006) (noting that "[i]t is a fundamental principle of the Delaware General Corporation Law that '[t]he business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors ....' "), *quoting* Del.Code Ann. tit. 8, § 141(a) (2006); *Lewis v. Ward*, 852 A.2d at 903 (recognizing "the statutory mandate that the management of every corporation is vested in its board of directors, not in its stockholders"), *citing* Del.Code Ann. tit. 8, § 141(a) (2001); *Aronson v. Lewis*, 473 A.2d 805, 811 (Del.1984). To allow a JPMorgan shareholder to sue derivatively alleging harm to a subsidiary which he concedes benefitted JPMorgan on the whole, and its shareholders by extension, would expose boards to excessive interference and go beyond the limits of derivative litigation.

Derivative Plaintiff's contention that denial of his standing will inequitably allow a wrong to go without remedy also ignores the other approaches available to, and being used by, Bear Stearns' former shareholders. As discussed above, a derivative or double derivative suit is not the appropriate means to redress Individual Defendants' alleged misconduct. The securities laws and other avenues offer adequate remedies better tailored to the circumstances of this dispute.

D. *The Derivative Claims Fail to Satisfy Rule 23.1(b)(3)'s Demand Requirement*

[58][59] Derivative Plaintiff's derivative claims (Counts I through XII) are also dismissed on the independent ground that Plaintiff did not make a demand on JPMorgan's Board of Directors and has failed to plead particularized facts demonstrating that the demand is excused. *See* Fed.R.Civ.P. 23.1(b)(3) (derivative complaint must "state with particularity" either that plaintiff made demand or the reasons for failing to do so). Under Delaware law, the decision whether to pursue litigation on behalf of a corporation belongs to the corporation's board of directors.[FN21] *See, e.g., Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del.1990); *see also In re Citigroup, Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 120 (Del.Ch.2009), *citing* 8 Del. C. § 141(a). Accordingly, before asserting a derivative claim, the shareholder must either (1) make a pre-suit demand, presenting the allegations to the corporation's directors and requesting that they bring suit; or else (2) plead facts showing that a demand upon the board would have **\*540** been futile. *See Stone*, 911 A.2d at 366–67. It is undisputed that Derivative Plaintiff did not make a pre-suit demand, and the issue presented is whether such a demand would have been futile.

FN21. The law of Delaware, where JPMorgan, Bear Stearns LLC, and Bear Stearns are incorporated, governs the demand requirement of Rule 23.1 *See Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir.2004) ( "The substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief.") The parties do not disagree on this point.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

[60] A plaintiff need not make a demand on a corporation's board of directors where he alleges facts demonstrating that demand would have been futile. *Aronson v. Lewis,* 473 A.2d 805, 808 (Del.1984), *overruled on other grounds by Brehm,* 746 A.2d 244. Until recently, to properly assert futility for a "double derivative" claim, a plaintiff was required show that the demand would have been futile on the boards of both the parent and subsidiary companies. *Blasband,* 971 F.2d at 1050; *see also Fagin v. Gilmartin,* 432 F.3d 276, 283 (3d Cir.2005), *citing Rales v. Blasband,* 634 A.2d 927, 934 (Del.1993).

[61] However, in *Lambrecht,* 3 A.3d 277, the Delaware Supreme Court rejected the conceptualization of double derivative suits as a "two derivative lawsuits in one." *Id.* at 287–88. Instead, the Court recognized that a parent company enforcing the rights of its wholly-owned subsidiary "is not required to proceed derivatively; it may enforce that claim by the direct exercise of its 100 percent control." *Id.* at 288. As explained in *Hamilton Partners, L.P. v. England,* C.A. No. 4476–VCL, 2010 WL 5233010, at *17 (Del.Ch. Dec. 15, 2010), "[t]he *Lambrecht* opinion openly rests on the practical ability of the sole stockholder to exercise control over the subsidiary." "Because the parent corporation determines, through its 100 percent control, whether or not the subsidiary will sue, 'there is no basis in law or logic' to require a separate demand futility analysis at the subsidiary level." *Id.* at *18, *quoting Lambrecht,* 3 A.3d at 288–89. Therefore, "the *Lambrecht* Court repeatedly observed that in a double derivative action involving a wholly owned subsidiary, a stockholder plaintiff only must plead demand futility (or otherwise satisfy Rule 23.1) at the parent level." *Id., citing Lambrecht,* 3 A.3d at 249 n. 29, 282, 289 n. 40, 290. Plaintiff here must establish the futility of a demand on the JPMorgan Board only, which he fails to do.

[62][63] The complaint must plead facts with particularity showing that demand would have been futile.[FN22] Fed.R.Civ.P. 23.1(b)(3); Del. Ch. Ct. R. 23.1(a); *see also Stone,* 911 A.2d at 367 & n. 9; *Brehm v. Eisner,* 746 A.2d 244, 254 (Del.2000). The plaintiff may not rely on mere

conclusory allegations. *In re infoUSA, Inc. S'holders Litig.,* 953 A.2d 963, 985 (Del.2007); *Brehm,* 746 A.2d at 267 (dismissing complaint which it described as a "blunderbuss of mostly conclusory pleading" for failure to adequately plead demand futility); *Richardson v. Graves,* C.A. No. 6617, 1983 WL 21109, at *2 (Del.Ch. Mar. 7, 1983) ("Generalities, artistically ambiguous, all-encompassing conclusory allegations are not enough."). a plaintiff must provide particularized allegations raising a reasonable doubt as to whether (1) a majority of the directors are disinterested and independent, or (2) where a specific decision of the Board is challenged, the decision was the product of a valid exercise of business judgment. *See Aronson v. Lewis,* 473 A.2d at 814 (establishing the two-pronged test); **\*541***In re J.P. Morgan Chase & Co. S'holder Litig.,* 906 A.2d 808, 824 (Del.Ch.2005) (finding that demand was not excused because plaintiff could not prove "that a majority of the board of JPMC was either interested or not independent"); *Beam v. Stewart,* 845 A.2d 1040, 1048–50 (Del.2004) (describing the first prong); *Brehm,* 746 A.2d at 256; *Rales,* 634 A.2d at 933. It should be noted that Fed.R.Civ.P. 23.1(b)(3) presents a high hurdle for plaintiffs to clear. *McPadden v. Sidhu,* 964 A.2d 1262, 1269 (Del.Ch.2008) (noting that the pleading burden imposed by Rule 23.1 "is more onerous than that demanded by Rule 12(b)(6).")

> FN22. To the extent that Derivative Plaintiff cites *Rales* for the proposition that "all that must be shown is that 'the board [JPMorgan] that would be addressing the demand' could not 'impartially consider its merits without being influenced by improper considerations,' " (Deriv. Pl. Mem. at 18–19, *quoting Rales,* 634 A.2d at 934), it should be noted that *Rales* does not establish any lesser standard for pleading demand futility in the context of alleged subsidiary liability. *See Rales,* 634 A.2d at 934.

[64][65] In order to establish that a demand should be excused as futile, a complaint may allege facts that create "a reasonable doubt that a majority of the Board would be disinterested or independent in making a decision on a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

demand." *Rales,* 634 A.2d at 930. Specific factual allegations that a director faces a "substantial likelihood of liability" establish a reasonable doubt as to a director's disinterestedness. *Aronson,* 473 A.2d at 815; *Rales,* 634 A.2d at 936; *Seminaris v. Landa,* 662 A.2d 1350, 1354 (Del.Ch.1995). Allegations of facts supporting a reasonable inference that a director is so beholden to an interested party that his "discretion would be sterilized" also establish a reasonable doubt as to the director's independence. *Rales,* 634 A.2d at 936, *citing Aronson,* 473 A.2d at 815; *Levine v. Smith,* 591 A.2d 194, 205 (Del.1991); *Kaplan v. Centex Corp.,* 284 A.2d 119, 123 (Del.Ch.1971); *see also Beam,* 845 A.2d at 1050. A plaintiff is not required to prove success on the merits to show that a demand upon the board would have been futile. *See Rales,* 634 A.2d at 934.

*1. Derivative Plaintiff Fails to Establish the Futility of a Demand on the JPMorgan Board*

Derivative Plaintiff contends that JPMorgan's Board was not independent or disinterested for demand purposes for four reasons: (i) the JPMorgan Board pre-judged the merits of this action (Deriv. Compl. ¶ 177); (ii) the JPMorgan Board agreed to indemnify and hold harmless the former directors and officers of Bear Stearns from liability for matters arising at or prior to the completion of the merger to the fullest extent provided by applicable law (Deriv. Compl. ¶ 178); (iii) filing suit for the wrong alleged in this action is a breach of the JPMorgan Board's fiduciary duties and the securities laws as it would constitute an admission that JPMorgan underpaid for the shares of Bear Stearns (Deriv. Compl. ¶ 179); (iv) there are significant ties between the JPMorgan Board and the pre-merger Bear Stearns Board (Deriv. Compl. ¶ 180).

Derivative Defendants contend that "directors are entitled to a *presumption* that they were faithful to their fiduciary duties," *Beam,* 845 A.2d at 1048–49 (emphasis in original), and that Derivative Plaintiff fails to allege facts sufficient to establish that JPMorgan's Board is not independent and disinterested with regard to the claims presented here. Significantly, JPMorgan's directors are independent of Bear Stearns and its directors and officers who are alleged to have perpetrated the misconduct detailed in the Derivative Complaint. Furthermore, Derivative Plaintiff accuses no JPMorgan Board members of misconduct, and they face no personal liability in this action.

Derivative Defendants next contend that Derivative Plaintiff's first basis for futility "is circular, and would render demand automatically futile in any contested derivative action." Deriv. Def. Mem. at 25, *citing Lewis v. Aronson,* 466 A.2d 375, 381 (Del.Ch.1983) ("The fact that the Board moved to dismiss this lawsuit after it was **\*542** filed cannot be considered as evidence that a demand prior to suit would have been no more than a futile gesture."), *overruled on other grounds by Aronson v. Lewis,* 473 A.2d 805 (Del.1984). Derivative Plaintiff notes that JPMorgan's Board stated that they believed this derivative suit to be without merit not through a motion to dismiss, but through a Form 424B3 filed with the SEC on April 28, 2008. Deriv. Pl. Mem. at 21. As a result, he claims that this statement was made prior to when Derivative Plaintiff could have made a demand on JPMorgan's board. *Id.*

The original complaint in this action was filed November 19, 2007, with an amended complaint filed on March 4, 2008, and a second amended complaint filed on April 10, 2008. Had JPMorgan moved to dismiss any of these complaints, they could have asserted that this action was meritless at a date earlier than the date on which they filed the relevant Form 424B3. Just as a demand on the JPMorgan Board could not be declared futile based on such a motion to dismiss, JPMorgan's statements that it will defend Bear Stearns against this suit likewise do not bring into question the independence and disinterestedness of the Board and cannot render a demand futile.

The Derivative Complaint's second grounds for futility is that JPMorgan agreed to indemnify Bear Stearns' former officers and directors, the alleged wrongdoers here, as part of the merger agreement. (Deriv. Compl. ¶ 178.) However, as was discussed above, such agreements are standard practice and do not render a Board unable to elect to sue the indemnified parties in good faith. *See* 8 Del. C. § 102(b)(7); *see Grobow v. Perot,* 526 A.2d 914, 925 n. 14 (Del.Ch.1987) ("Indemnification as an adjunct to a busi-

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

ness transaction is not illegal or necessarily imprudent"); *Brehm,* 746 A.2d at 257 n. 34 ("It is no answer to say that demand is necessarily futile because ... the directors 'would have to sue themselves ....' "), *quoting Aronson v. Lewis,* 473 A.2d at 817–18; *see also Jacobs v. Yang,* No. Civ. A. 206–N, 2004 WL 1728521, at *6 n. 31 (Del.Ch. Aug. 2, 2004) ("Demand is not *per se* futile merely because directors would be suing themselves."), *aff'd,* 867 A.2d 902 (Del.2005), *citing Richardson,* 1983 WL 21109, at *3.

Derivative Plaintiff concedes that indemnification alone does not establish that a demand on the JPMorgan Board would be futile, but he maintains that the indemnification provisions, when taken together with Plaintiff's other allegations, establish that the JPMorgan Board is interested for purposes of considering a demand. Deriv. Pl. Mem. at 21.

Derivative Plaintiff's third basis for futility, that JPMorgan's Board does not wish to admit to underpaying for Bear Stearns (Deriv. Compl. ¶ 179), does not establish that JPMorgan's Board cannot act independently and disinterestedly. It merely supports the conclusion that this suit is not in JPMorgan's interests.

Derivative Plaintiff emphasizes that JPMorgan's Form 424B3 recommends that Bear Stearns stock holders vote in favor of the merger on the grounds that it is fair, and that for JPMorgan to bring suit alleging that it underpaid for Bear Stearns would contradict this prior statement. Deriv. Pl. Mem. at 22. However, Derivative Plaintiff fails to explain how asserting Plaintiff's claims of mismanagement would constitute an admission by JPMorgan's Board that the acquisition of Bear was not financially fair to Bear Stearns' shareholders.

Finally, the "significant ties" between the JPMorgan Board and the pre-merger Bear Stearns Board consist of business relationships between two of the twelve **\*543** JPMorgan Board members and two of the pre-merger Bear Stearns Board members who are defendants in this action. (Deriv. Compl. ¶ 180.) Such allegations do not put into

question the independence of the entire JPMorgan Board, much less the two members alleged to have business relationships with two of the defendants. *See Beam,* 845 A.2d at 1051 (allegations that directors have general business relationships, without more, are insufficient to rebut the presumption of independence); *In re J.P. Morgan Chase,* 906 A.2d at 822 (same); *Fink v. Weill,* No. 02 Civ. 10250, 2005 WL 2298224, at *2–3 (S.D.N.Y. Sept. 19, 2005) (allegations that directors "had numerous business dealings with each other, sat on the boards of other corporations together, were business partners, and were acquainted in various social and political settings" did not show lack of independence).

Derivative Plaintiff does not allege that the JPMorgan Board members are subject to personal liability in this action, that they are beholden to interested parties, or that their independence and disinterest are otherwise doubtful. Furthermore, the Derivative Complaint offers little to overcome the "presumption that the directors were faithful to their fiduciary duties." *Beam,* 845 A.2d at 1048–49. Therefore, Derivative Plaintiff has failed to meet the demands of Rule 23.1(b)(3).

E. *The Class Claim is Dismissed on Res Judicata and Collateral Estoppel Grounds*

Derivative Defendants contend that Justice Cahn's 2008 decision in *In re Bear Stearns Litigation,* 23 Misc.3d 447, 870 N.Y.S.2d 709 (N.Y.Sup.2008) (the "State Court action"), in New York State Supreme Court precludes the class claim (Count XIII) in this derivative action. In that decision, Justice Cahn granted defendants' motion for summary judgment against the plaintiffs' claims. *Id.* at 741. Justice Cahn held, on the undisputed evidence, that the approval of the merger by the Bear Stearns Board was protected by the business judgment rule, and that "[t]here is no evidence that the board-comprised of a majority of non-management, non-employee directors and assisted by teams of financial and legal advisers-acted out of self-interest or in bad faith." *Id.* at 730.

*1. Count XIII is Dismissed Under Res Judicata*

[66][67] *Res judicata* "gives 'binding effect to the

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

judgment of a court of competent jurisdiction and prevents the parties to an action, and those in privity with them, from subsequently relitigating any questions that were necessarily decided therein.' " *Ferris v. Cuevas,* 118 F.3d 122, 126 (2d Cir.1997), *quoting Watts v. Swiss Bank Corp.,* 27 N.Y.2d 270, 277, 317 N.Y.S.2d 315, 265 N.E.2d 739 (1970). Under New York law, "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." *O'Brien v. City of Syracuse,* 54 N.Y.2d 353, 357, 445 N.Y.S.2d 687, 429 N.E.2d 1158 (1981); *Ferris,* 118 F.3d at 126.

[68][69] Derivative Plaintiffs do not appear to dispute that the judgment dismissing the plaintiffs' claims in the State Court action is final for purposes of *res judicata.* It is "long settled in this Court and in New York State courts that a summary judgment dismissal is considered a decision on the merits for *res judicata* purposes." *Yeiser v. GMAC Mortgage Corp.,* 535 F.Supp.2d 413, 421 (S.D.N.Y.2008); *accord Weston Funding Corp. v. Lafayette Towers, Inc.,* 550 F.2d 710, 715 (2d Cir.1977); ***544** Kinsman v. Turetsky,* 21 A.D.3d 1246, 1247, 804 N.Y.S.2d 430 (N.Y.App.Div.2005), *leave to appeal denied,* 6 N.Y.3d 702, 810 N.Y.S.2d 416, 843 N.E.2d 1156 (N.Y.2005). And, under New York law, a judgment entered by a trial court is "final" for purposes of *res judicata,* even where an appeal is pending from the trial court's judgment. *See McGoldrick v. Baldwin Gardens,* 283 A.D. 897, 898, 130 N.Y.S.2d 166 (N.Y.App.Div.1954) ("In our opinion, the final order in the article 78 proceedings, between the same parties and involving the same question is *res judicata* and conclusive upon the parties ... not withstanding that an appeal has been taken from that order."); *Petrella v. Siegel,* 843 F.2d 87, 90 (2d Cir.1988) ("Of course, the determination of the state supreme court ... is entitled to *res judicata* effect, even though the city may be appealing that determination.").

[70][71][72][73] Derivative Plaintiffs also do not challenge Defendants' contention that they should be deemed to have authorized the plaintiffs in the New York

State court action to litigate on their behalf. "New York law provides that privity extends to parties 'who are successors to a property interest, those who control an action although not formal parties to it, those whose interests are represented by a party to the action, and possibly co-parties to a prior action.' " *Yeiser,* 535 F.Supp.2d at 423, *quoting Watts,* 27 N.Y.2d at 277, 317 N.Y.S.2d 315, 265 N.E.2d 739. As Judge Kram has noted:

> There is no bright line rule for determining when parties are in privity. Rather, privity is a legal determination for the trial court as to whether the relationship between the parties is sufficiently close to support [claim] preclusion. In general, if the interests of a non-party are represented by a party to the litigation who is vested with the authority of representation, the non-party may be bound by the judgment.

*In re Marsh & McLennan Co., Sec. Litig.,* 536 F.Supp.2d 313, 317 (S.D.N.Y.2007), *quoting and citing Phillips v. Kidder, Peabody & Co.,* 750 F.Supp. 603, 607 (S.D.N.Y.1990) (emphasis added).

In *Grossman v. Axelrod,* 466 F.Supp. 770 (S.D.N.Y.1979), the plaintiff was not a party to the prior litigation, but the court held that the plaintiff had a "substantial identity of interest" with the plaintiff in the prior litigation and that *res judicata* applied. *Id.* at 775–76. The Court so held on the ground that (1) plaintiff was a member of an association that was the plaintiff in the prior action; (2) the association sought to sue on behalf of its members; (3) the association made the same claims as plaintiff; (4) plaintiff never attempted to distance himself from the prior litigation; and (5) the association was adequately represented. *Id.* Even though the plaintiff in *Grossman* did not formally authorize the association to represent him, the court found that "sufficient authority to bind [the plaintiff] can be inferred from the instant facts," including the fact that plaintiff was a member of the association and did not object to the representation. *Id.* at 776. Here, as in *Grossman,* Plaintiffs' interests were "at stake" and represented in the State Court action. The plaintiffs in that action purported to represent the very same class of Bear

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Stearns shareholders as do Derivative Plaintiffs here. Plaintiffs in the State Court action were adequately represented by several law firms who engaged in extensive discovery and summary judgment motion briefing. Derivative Plaintiffs did not make a timely effort to litigate those claims in this Court or express an intent not to be bound by any judgment in the State court action.

Derivative Plaintiffs also do not dispute that the plaintiffs in the State Court action **\*545** had a full and fair opportunity to litigate their claims.

[74][75] The Derivative Plaintiffs oppose Defendants' invocation of *res judicata* solely on the basis that the claims presented in the State Court action were not the "same" as those presented here. A claim is the "same" as a claim adjudicated in a prior action for preclusion purposes when it "arises from the same set of facts and seeks the same remedy, despite the different legal theory advanced," *Ferris,* 118 F.3d at 126, or arises "out of the same transaction or series of transactions," *O'Brien,* 54 N.Y.2d at 357, 445 N.Y.S.2d 687, 429 N.E.2d 1158. Defendants focus on the second, transactional basis for res judicata.

Both the State and Federal actions arise out of the negotiation and consummation of JPMorgan's acquisition of Bear Stearns. In both cases the plaintiffs have alleged that Bear Stearns was sold at an extreme discount due to self-dealing and violations of the duties of loyalty, good faith, due care, and candor by Bear Stearns' directors. *Compare* Deriv. Compl. ¶¶ 67, 258 with State Court Complaint ¶ 112 (attached as Exhibit 9 to the April 24, 2009 Declaration of Eric S. Goldstein). Furthermore, both complaints have alleged that the defendants used onerous and restrictive terms in order to prevent Bear Stearns from obtaining a better deal for its shareholders. *Compare* Deriv. Compl. ¶ 139 with State Court Complaint ¶ 113. As a result of the alleged misconduct, both sets of plaintiffs have alleged that they were deprived of the full value of their Bear Stearns stock in JPMorgan's acquisition of the Company. *Compare* Deriv. Compl. ¶ 24 with State Court Complaint ¶ 115.

Derivative Plaintiffs note that this action has five more defendants than the State Court action. Deriv. Pl. Mem. at 56. In the State Court action, the plaintiffs only allege misconduct by Bear Stearns' Directors. Derivative Plaintiffs also allege misconduct by certain officers of the Company, adding Molinaro, Mayer, and Farber as defendants. However, the doctrines of *res judicata* and collateral estoppel bar claims against parties not named in the prior suit. *See Cameron v. Church,* 253 F.Supp.2d 611, 623 (S.D.N.Y.2003) ( "*Res judicata* operates to preclude claims, rather than particular configurations of parties; Plaintiff's addition of new defendants, in the context of allegations of their involvement in the series of alleged deprivations, does not entitle him to revive the previously-dismissed claims."); *B.R. DeWitt, Inc. v. Hall,* 19 N.Y.2d 141, 147, 278 N.Y.S.2d 596, 225 N.E.2d 195 (N.Y.1967) ("[W]e are saying that the 'doctrine of mutuality' is a dead letter.").

Derivative Plaintiffs also contend that they raise "additional breaches arising from a different set of facts than those in the New York State action." Deriv. Pl. Mem. at 57. Derivative Plaintiffs assert that their suit involves allegations of breaches of the duty of candor and bad faith based on the Derivative Defendants' failure to disclose all material information about the merger between JPMorgan and Bear Stearns and misstatements made regarding the health of Bear Stearns leading up to the merger. *Id.* Derivative Plaintiffs further assert that their allegations of misstatements are spread out over a greater period of time than the window described in the State Court Complaint. *Id.* at 58. Derivative Plaintiffs also add an unjust enrichment claim against Bear Stearns' officers and directors and more detailed allegations of self-dealing. *Id.* Yet, all of these claims still arise out of the same transaction, the negotiation and consummation of JPMorgan's acquisition of Bear Stearns, as the State Court action. **\*546** *O'Brien,* 54 N.Y.2d at 357, 445 N.Y.S.2d 687, 429 N.E.2d 1158.

Both the Derivative and State Court Complaints alleged breaches of the duties of loyalty, due care, and candor, citing onerous merger terms which prevented

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

competing bids and failed to maximize shareholder value. *See, e.g.,* Deriv. Compl. ¶¶ 24, 67, 139. 258; State Court Compl. ¶¶ 112, 113, 115. While the state court action may not have aggressively pursued a claim of bad faith, Justice Cahn held that there was no evidence that the Bear Stearns Board "acted out of self-interest or in bad faith." *Bear Stearns,* 870 N.Y.S.2d at 730. Furthermore, as stated above, the State and Federal actions at issue here may be considered the "same" for preclusion purposes despite offering differing legal theories of liability arising out of the same transaction. *O'Brien,* 54 N.Y.2d at 357, 445 N.Y.S.2d 687, 429 N.E.2d 1158 ("[O]nce a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy."). This rule also applies to Derivative Plaintiffs' additional unjust enrichment claim against Bear Stearns' officers and directors.

Finally, despite Derivative Plaintiffs' statements to the contrary, the State Court Complaint alleges statements made by the defendants in an effort to quell concerns over Bear Stearns' liquidity and financial health. *See* State Court Compl. ¶¶ 36–38. Furthermore, the fact that Derivative Plaintiffs point to misstatements about Bear Stearns' financial health dating back two years does not render its claims that shareholders received insufficient information regarding the merger materially different from those presented in the State Court action.

*2. Count XIII is Dismissed through Collateral Estoppel*
[76][77][78] "The doctrine of collateral estoppel may be invoked where the issue of law or fact in the subsequent proceeding has been litigated and determined by a valid and final judgment." *Collard v. Inc. Village of Flower Hill,* 604 F.Supp. 1318, 1322 (E.D.N.Y.1984), *citing Wilson v. Steinhoff,* 718 F.2d 550, 552 (2d Cir.1983). *See Yeiser,* 535 F.Supp.2d at 421; *Deutsch v. Integrated Barter Int'l, Inc.,* 700 F.Supp. 194, 196 (S.D.N.Y.1988), *citing Murphy v. Gallagher,* 761 F.2d 878, 879 (2d Cir.1985). New York State law applies in determining the effects of collateral estoppel here. *Hoblock v. Albany County Bd. of Elections,* 422 F.3d 77, 93 (2d Cir.2005) ("Because the Full Faith and

Credit Act, 28 U.S.C. § 1738, requires federal courts to accord state judgments the same preclusive effect those judgments would have in the courts of the rendering state, New York preclusion law applies."). Under New York law, collateral estoppel " 'may be invoked to preclude a party from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate,' " and (3) when " 'the issue that was raised previously ... [is] decisive of the present action.' " [FN23] *Curry v. City of Syracuse,* 316 F.3d 324, 331 (2d Cir.2003), *quoting Fuchsberg & Fuchsberg v. Galizia,* 300 F.3d 105, 109 (2d Cir.2002); *LaFleur v. Whitman,* 300 F.3d 256, 271 (2d Cir.2002).

> FN23. Derivative Plaintiffs do not challenge Defendants' assertion that the state court plaintiffs had a full and fair opportunity to litigate their claims.

[79] As discussed above when referring to *res judicata,* Derivative Plaintiffs are relitigating issues which were decided in the State Court action. Justice Cahn's **\*547** decision in that action found that the business judgment rule protected the decision of the Bear Stearns Directors to merge with JPMorgan under the terms through which they merged, defeating the plaintiffs' claims that the directors breached their fiduciary duties. *Bear Stearns,* 870 N.Y.S.2d at 730–31, 734–35. It held that the defendants did not act out of self-interest, and that they did not violate their duties of candor or loyalty. *Id.* at 730, 734. Justice Cahn's decision also held that the defendants had not failed to get proper value for Bear Stearns' stock and did not fail to provide adequate information to Bear Stearns' shareholders in advance of their vote on the merger. *Id.* at 732, 736–38. These holdings preclude Derivative Plaintiffs' allegations in Count XIII to the contrary. Without such contentions, Derivative Plaintiffs' Count XIII fails to state a claim for breach of fiduciary duty.

*F. The Derivative Defendants' Motion to Dismiss the § 10(b), § 20A, § 20(a), and Common Law Claims Is Not Reached*
Because the Derivative Complaint is dismissed on

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

standing (dismissing Counts I through XII), Rule 23.1(b)(3) demand (dismissing Counts I through XII), and res judicata and collateral estoppel grounds (dismissing Count XIII), the Derivative Defendants' motion to dismiss on the merits of the individual claims brought under Exchange Act §§ 10(b), 20A, 20(a) and the common law breach of fiduciary duty, unjust enrichment, corporate waste claims will not be reached.

# V. THE MOTION TO DISMISS THE ERISA COMPLAINT IS GRANTED

A. *The Parties*

Plaintiff Shelden Greenberg ("Greenberg") is a resident of Staten Island, New York. He worked for Bear Stearns beginning in 1981 and left the Company in 2003. He is a participant in the Bear Stearns Companies, Inc. Employee Stock Ownership Plan (hereinafter, the "Plan" or the "ESOP") within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), and held Bear Stearns shares in the Plan during the Class Period. (ERISA Compl. ¶ 28.)

Plaintiff Aaron Howard ("Howard") is a resident of Los Angeles, California. He began working for Bear Stearns in 1995 and ended his employment on October 29, 2007. He is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held Bear Stearns stock in the Plan during the Class Period. (ERISA Compl. ¶ 29.)

Pursuant to this Court's Order dated January 5, 2009 (Dkt. 24), Greenberg and Howard were appointed Interim Co-Lead Plaintiffs (the "ERISA Plaintiffs") in this consolidated ERISA class action. (ERISA Compl. ¶ 30)

The ERISA Complaint divides the fiduciary-Defendants into five categories: Bear Stearns; the Director Defendants; the Executive Committee Defendants; the ESOP Committee Defendants; and Doe Defendants. Plaintiffs allege that each Defendant was a fiduciary with respect to the Plan and owed fiduciary duties to the

Plan Participants to the extent of the fiduciary discretion and authority assigned to or exercised by each of them, and Plaintiffs' claims against each Defendant are based on such specific discretion and authority. (ERISA Compl. ¶¶ 31–61, 93.)

Bear Stearns was the named sponsor of the ESOP within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B). The ERISA Complaint alleges that Bear Stearns chose to assign the appointment and removal of fiduciaries to itself and others and that these persons and entities, in turn, selected Bear Stearns' employees, **\*548** officers and agents to perform most fiduciary functions and that Bear Stearns had effective control over the activities of its officers and employees, including over their ESOP-related activities and the authority to hire and fire all officers and employees as well as appoint, monitor, and remove individual officers and employees from their individual fiduciary roles with respect to the ESOP. It is further alleged that those officer and employee fiduciaries breached their duties to the ESOP and its participants, and the Company is liable for these imputed actions under the doctrine of *respondeat superior* and also through its exercise of de facto authority and control with respect to the responsibilities of the other Defendants, which renders it responsible for the fulfillment of those responsibilities assigned by the Plan documents to those Defendants. It is also alleged that the Company is imputed with the knowledge of its officers and employees, whether or not such knowledge was communicated to the Company and that Bear Stearns was a fiduciary of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), during the Class Period. (ERISA Compl. ¶¶ 32–34, 94–100.)

The Director Defendants are Bear Stearns' Board of Directors, namely, Bienen, Cayne, Glickman, Goldstein, Greenberg, Harrington, Nickell, Novelly, Salerno, Schwartz, Spector, Tese, and Williams. The ERISA Complaint has alleged that the Board of Directors was responsible for the overall administration of the ESOP, for determining the amount of discretionary Company contributions to the ESOP, and for appointing and monitoring the performance of members of various committees

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

charged with the management and operation of the Plan, including appointment of the members of the ESOP Committee and Executive Committee. It is further alleged that the Board members could allocate their fiduciary duties under the Plan among themselves, or they could designate other persons to carry out their duties, and that the Board assigned some or all of its fiduciary duties to the Executive Committee. The ERISA Complaint has alleged that the power to delegate fiduciary responsibilities brings with it the fiduciary duty to monitor the performance of the delegate and replace the delegate as needed, and that the Director Defendants served on various key committees in addition to the Board and were fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), because they exercised discretionary authority or control over ESOP management and/or authority or control over management or disposition of Plan assets. (ERISA Compl. ¶¶ 36–50, 101–105.)

The Executive Committee members were Mayer, Molinaro, Cayne, Greenberg, Schwartz, and Spector. The Executive Committee Defendants include both Board and non-Board members, and it is alleged that the Committee had authority to take action on all matters delegated to it by the Board, that the Board charged the Executive Committee with fiduciary responsibilities related to the ESOP, including the appointment of members to the ESOP Committee, and that this responsibility included the fiduciary responsibility to monitor such individuals and replace then as needed. Therefore, the ERISA Complaint alleges that the Executive Committee Defendants were fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21). (ERISA Compl. ¶¶ 51–55, 106–108.)

The Employee Stock Ownership Plan Committee (hereinafter, "ESOP Committee") administered the Plan during the Class Period and was the named fiduciary of the Plan for purposes of ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2). Its three-person membership of Cavallo, Lacoff,**549** and Steinberg was appointed by the Executive Committee. It is alleged that the ESOP Committee had all of the powers and discretion necessary or helpful for the carrying out of its responsibilities, including the exclusive

right to determine any question arising from the interpretation, application, and administration of the Plan. The ESOP Committee also allegedly monitored the Plan's investment policy and the performance of the Plan's assets, and therefore the ESOP Committee Defendants were de facto fiduciaries of the ESOP within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21), as well as direct fiduciaries under ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). (ERISA Compl. ¶¶ 56–60, 109–114.)

The Doe Defendants consist of individuals, including members of the ESOP fiduciary committees and other Company officers, directors, employees, or other appointees or designees who were fiduciaries of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period. (ERISA Compl. ¶ 61.)

B. *The Plan*

The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). It was adopted and became effective on October 28, 1985. The ERISA Complaint alleges that it is designed to invest primarily, but not exclusively, in employer stock. (ERISA Compl. ¶¶ 62–63, 66.)

Bear Stearns designed the Plan "to provide [Participants] with benefits to meet [their] future financial needs," and ERISA § 403(a), 29 U.S.C. § 1103(a), and requires the assets of an employee benefit plan to be "held in trust by one or more trustees." During the Class Period, Custodial Trust Company acted as Plan trustee pursuant to a written trust agreement. (ERISA Compl. ¶¶ 65–66.)

Prior to January 1, 2005, eligible employees became Plan Participants on the first day of the plan year immediately on or after their first day of active employment. As of January 1, 2005, however, no new employees of the Company were permitted to become participants in the Plan. Accordingly, during the Class Period, no employees

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

of the Company became newly eligible under, or were admitted as new Participants to, the Plan. (ERISA Compl. ¶ 68.)

Prior to January 1, 2005, a Plan Participant's account would not become fully vested and non-forfeitable until the Participant had (a) completed five years of service, (b) become totally and permanently disabled, or (c) died while actively employed by the Company. However, as of January 1, 2005, all Plan Participants actively employed by the Company became fully vested in their Plan accounts. Accordingly, during the Class Period, all Plan Participants had a fully vested interest in the Plan. (ERISA Compl. ¶ 74.)

A Participant was eligible to receive an allocation to his or her account in the Plan for any plan year that the participant had (a) completed 1,000 hours of service and was actively employed by the Company on the last day of the plan year, (b) become totally and permanently disabled, or (c) died while actively employed by the Company. A Participant's share of the annual allocation was generally based on ratio of the participant's compensation to the total compensation of all eligible Plan Participants for that given year. Plan Participants who received dividends on Bear Stearns stock allocated to their accounts in the Plan could choose to reinvest those funds and purchase additional shares of **550** Bear Stearns stock through the Plan. (ERISA Compl. ¶¶ 71–73.)

Under the Plan, the Company borrowed money to acquire Bear Stearns common stock. As the loans were repaid, shares of Bear Stearns common stock were released to the Plan and allocated to the accounts of eligible Participants on an annual basis. Bear Stearns had discretion to make additional contributions to the Plan either in cash or in its common or preferred stock, as determined by the Company. (ERISA Compl. ¶¶ 69–70.)

According to the ERISA Complaint, the 2002 Plan Document authorized the Committee to establish a date by which any Plan Participant could sell up to 100% of his or her account in the Plan once each calendar quarter and transfer the proceeds of such sale to his or her account in the 401(k) Plan. The Committee established such a date and, prior to the start of the Class Period, allowed Plan Participants to sell up to 100% of their accounts in the Plan and transfer the proceeds of such sale to their accounts in the 401(k) Plan. (ERISA Compl. ¶¶ 75–76.)

By at latest January 1, 2007, the Plan authorized a Participant to sell the entirety of his or her account in the Plan and transfer the proceeds of such sale to his or her interest in the 401(k) Plan, where it would be invested in the options selected by the Participant. On March 24, 2008, the Plan mandated that the Committee establish uniform rules allowing Participants to sell up to 100% of their accounts in the Plan once each calendar week. Accordingly, throughout the entirety of the Class Period or, at least by no later than January 1, 2007, the Plan expressly allowed any Plan Participant to sell up to 100% of his or her interest in the Plan and transfer the proceeds of the sale to his or her account in the 401(k) Plan. The ERISA Complaint alleges that Participants were not provided with information necessary to make fully informed decisions regarding such sale and transfer. (ERISA Compl. ¶¶ 77–79.)

During the Class Period, the 401(k) Plan did not offer any investment in Bear Stearns stock. (ERISA Compl. ¶ 80.)

The ERISA Complaint has alleged that fiduciaries of an ESOP remain bound by core ERISA fiduciary duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants. Accordingly, if the fiduciaries know, or if an adequate investigation would reveal, that company stock no longer is a prudent investment for the ESOP, the fiduciaries must disregard plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other suitable investments. (ERISA Compl. ¶¶ 81–82.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

It is alleged that nothing in the Plan documents limited Bear Stearns or the ESOP Committee from liquidating all or a portion of the Plan's investment in Bear Stearns stock. Furthermore, the ERISA Plaintiffs allege that the Plan did not require exclusive investment in Company stock, further justifying liquidation of the investment in Bear Stearns stock. (ERISA Compl. ¶¶ 83–84.)

During the Class Period, Bear Stearns stock represented a significant portion of the Plan's assets. As of December 31, 2006, the market value of assets in the Plan was approximately $370.2 million. Accordingly, the Plan held approximately 2.27 million shares of Bear Stearns stock. (ERISA Compl. ¶¶ 85–86.)

The ERISA Complaint has alleged that the Plan has incurred substantial losses as a result of the Plan's investment in Bear Stearns stock, following revelations of the Company's serious mismanagement and improper business practices including, among others: (a) continuing to concentrate**551** its business on high-risk mortgage origination and ABS, MBS, CDOs, and CMOs, despite clear indicators of an unstable, illiquid market for these investment products; (b) failing to adequately manage the Company's liquidity and capital position despite increased risks and exposures; (c) maintaining an overly leveraged position that prevented the Company from securing cash infusions on credit; (d) developing and relying on faulty asset-valuation models and risk assessment models that overvalued ABS, MBS, CDO, and CMO positions and underestimated the risk to which the Company was exposed; (e) relying on tenuous financing and becoming wholly dependent on overnight repo loans to continue daily operations; and (f) projecting the appearance of using sound risk management practices, while making false and misleading statements about the Company's risks, exposures, and risk management practices. It is further alleged that Bear Stearns stock declined approximately 93 percent between the beginning of the Class Period and the acquisition by JPMorgan, that consequently, the value of the Plan was decimated as a result of Defendants' alleged fiduciary breaches, that Defendants knew or should have known by December 14, 2006 that the foregoing risks

made the Company vulnerable to collapse and the Plan vulnerable to significant losses, and that by December 14, 2006, Bear Stearns stock had become an imprudent investment for the Plan. (ERISA Compl. ¶¶ 87–88.)

C. *Summary of the ERISA Complaint*
*1. The Counts*
The ERISA Complaint consists of 556 paragraphs in 195 pages with four exhibits.[FN24]

> FN24. Exhibit A, the 2006 Annual Return/Report of the Bear Stearns Companies Inc. Employee Stock Ownership Plan; Exhibit B, the Bear Stearns Employee Stock Ownership Plan effective May 1, 2002, 2007 Summary Plan Description; Exhibit C, the Bear Stearns Companies Inc. Employee Stock Ownership Plan of May 1, 2002; and Exhibit D, The Bear Stearns Companies Inc. Employee Stock Ownership Plan effective January 1, 2007.

The ERISA Complaint brings three causes of action: Count I alleges that Bear Stearns and the ESOP Committee Defendants breached their fiduciary duties to faithfully and prudently monitor the ESOP and assets of the Plan in violation of ERISA § 404; Count II alleges that all Defendants breached their fiduciary duties to avoid conflicts of interest in violation of § 404; and Count III alleges that Bear Stearns, the Director Defendants, and the Executive Committee Defendants breached their fiduciary duties to monitor other fiduciaries in violation of ERISA §§ 404 and 405. The ERISA action Class Period is December 14, 2006 to March 24, 2008. (ERISA Compl. ¶¶ 4, 510–538.)

With regard to Count I, it is alleged that Bear Stearns and the ESOP Committee Defendants were fiduciaries within the meaning of ERISA and responsible for ensuring that all Plan investments in Bear Stearns stock were prudent and consistent with the purpose of the Plan and therefore are liable for losses incurred as a result of such investments being imprudent. (ERISA Compl. ¶ 512.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Bear Stearns and the ESOP Committee are alleged to have breached their duties to prudently and loyally manage the Plan's assets by allowing the Plan to invest in and hold Bear Stearns stock because they knew or should have known that Bear Stearns stock was not a suitable and appropriate Plan investment. Bear Stearns and the ESOP Committee allegedly further breached their duties of loyalty and prudence by failing to take any meaningful steps to protect Plan Participants from the **\*552** losses that they knew would ensue as a result of the Company's mismanagement and improper business practices, and by failing to divest the Plan of Bear Stearns stock when they knew or should have known that it was not a suitable and appropriate Plan investment. Through these alleged breaches, Bear Stearns and the ESOP Committee allegedly caused significant monetary losses to the Plan Participants' retirement savings. (ERISA Compl. ¶¶ 513, 516, 517.)

It is alleged that because Plan Participants had the right to liquidate their accounts in the Plan, sell their Bear Stearns stock, and transfer the sale proceeds to their accounts in the 401(k) Plan, the Defendants had the following fiduciary responsibilities: to ensure that Plan Participants had full, complete and accurate information such that Participants could make informed decisions about how to manage their accounts; to provide all such necessary information to Participants; or, alternatively, to take all necessary steps to protect the financial interests of Plan Participants in light of Defendants' knowledge that the Participants lacked such knowledge. (ERISA Compl. ¶¶ 514, 515.)

Plaintiffs further allege that Bear Stearns and the ESOP Committee Defendants breached their duties of loyalty and prudence by failing to ensure that Participants liquidated their accounts in the Plan. With actual or constructive knowledge that Plan Participants did not have full and complete information about the Company's mismanagement and improper business practices, Bear Stearns and the ESOP Committee Defendants had the fiduciary obligation to either inform Plan Participants of the need to take action to protect their financial interests or, if necessary, to liquidate the Plan on Participants' behalf to ensure that they

did not suffer a financial loss. (ERISA Compl. ¶ 518.)

Had the Count I Defendants taken appropriate steps to comply with their fiduciary obligations, it is alleged that Participants could have liquidated some or all of their holdings in the Plan and thereby eliminated, or at least reduced, losses to the Plan. (ERISA Compl. ¶ 519.)

It is alleged that, as a direct and proximate result of the breaches of fiduciary duties alleged in the ERISA Complaint, the Plan suffered losses in the hundreds of millions of dollars, and the Plan Participants indirectly lost a significant portion off their retirement investment and therefore, pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a), the Bear Stearns and the ESOP Committee Defendants are allegedly liable to restore all such losses to the Plan caused by their breaches of fiduciary duties. (ERISA Compl. ¶¶ 520–21.)

Count II alleges that, at all relevant times, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and bound by the duties of loyalty, exclusive purpose and prudence and required to discharge their duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries. (ERISA Compl. ¶¶ 523–24.)

Plaintiffs allege that Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, inter alia, failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities, and by otherwise placing their own or the Company's interests above the interests of the Participants with respect to the Plan's investments in Bear Stearns stock. This breach allegedly resulted in Plan losses of **\*553** hundreds of millions of dollars, which could have been minimized or avoided had Defendants discharged their fiduciary responsibility to loyally manage and invest the Plan's assets. (ERISA Compl. ¶¶ 525–26.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

It is further alleged that, pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants are liable to restore all such losses to the Plan caused by their alleged breaches of fiduciary duties. (ERISA Compl. ¶¶ 527–28.)

Count III alleges that, at all relevant times, Bear Stearns, the Director Defendants and the Executive Committee Defendants (collectively, the "Count III Defendants") were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). (ERISA Compl. ¶ 530.)

It is further alleged that the scope of the fiduciary responsibility of the Count III Defendants, included the responsibility to appoint, evaluate and monitor other fiduciaries as follows:

| Monitoring Fiduciary | Monitored Fiduciary | Reference |
|---|---|---|
| Bear Stearns | Executive Committee, ESOP Committee | ¶¶ 95, 98 |
| Director Defendants | Executive Committee, ESOP Committee | ¶ 101 |
| Executive Committee | ESOP Committee | ¶ 106 |

According to the ERISA Complaint, the duty to monitor requires the periodic review of the actions and performance of the monitored fiduciaries to ensure that the fiduciary appointees are properly performing their responsibilities and a concomitant obligation on the part of the appointing party to ensure that the fiduciary appointee has all material information necessary for the appointee to properly exercise his or her fiduciary responsibilities including the duty to ensure that their appointees:

a) possessed the necessary credentials and experience to fulfill their duties;

b) were provided with adequate financial resources to do their job;

c) had adequate information to do their job of overseeing the Plan's investments;

d) had ready access to outside, impartial advisors when needed;

e) maintained adequate records of the information on which they were basing their decisions and analysis with respect to the Plan's investment; and

f) reported regularly to the Company, the Director Defendants and/or the Executive Committee Defendants.

(ERISA Compl. ¶¶ 531–32.)

It is alleged that the Count III Defendants breached their fiduciary duties by, among other things, (a) failing to ensure that their appointees had access to knowledge about the Company's alleged mismanagement and improper business practices, which made Bear Stearns stock an imprudent investment for the Plan; (b) failing to ensure that their appointees appreciated the risk of investing and maintaining the Plan's assets in Bear Stearns stock; (c) failing to monitor the performance of their appointees; and (d) failing to replace their appointees once it became clear that their appointees were not taking all necessary steps to protect the interests of the Plan Participants. (ERISA Compl. ¶ 533.)

It is further alleged that the Count III Defendants knew or should have known that the ESOP Committee Defend-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

ants were allowing the Plan to remain invested **\*554** in Bear Stearns stock and were not taking any necessary steps to protect the interests of Plan Participants, and that the Count III failed to take any action to protect the Plan or Plan Participants from the consequences of the ESOP Committee's failures. (ERISA Compl. ¶ 534.)

The Count III Defendants, in connection with their monitoring and oversight duties, are alleged to have been required to disclose to their appointees complete and accurate information about the financial condition of Bear Stearns that they allegedly knew or should have known that their appointees needed in order to make sufficiently informed decisions for the Plan, but remained silent and continued to conceal such information from their appointees in breach of their monitoring duties under the Plan and ERISA. (ERISA Compl. ¶ 535.)

It is alleged that the Count III Defendants are also liable for the breaches of their co-fiduciaries pursuant to ERISA § 405(a), 29 U.S.C. § 1105(a), as they enabled the fiduciary breaches of the ESOP Committee Defendants by failing to monitor their performance, provide them with all necessary and material information, and take all necessary steps to protect the interests of the Plan Participants. Plaintiffs claim that the Count III Defendants were aware of the numerous fiduciary breaches committed by the ESOP Committee Defendants but took no steps to remedy those breaches or otherwise protect the interests of the Participants during the Class Period. (ERISA Compl. ¶ 536.)

Plaintiffs further alleged that, as a direct and proximate result of the breaches of fiduciary duties alleged in the ERISA Complaint, the Plan suffered losses in the hundreds of millions of dollars, and Plaintiffs and the Participants indirectly lost a significant portion off their retirement investment. The Defendants are allegedly liable to restore all such losses to the Plan caused by their alleged breaches of fiduciary duties pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), and ERISA § 409(a), 29 U.S.C. § 1109(a). (ERISA Compl. ¶¶ 537–38.)

The ERISA Plaintiffs' Complaint also alleged Bear Stearns' downfall due to excessive risk-taking, accounting manipulations, and poor risk management, as alleged the Securities Complaint described above. (ERISA Compl. ¶¶ 115–493.)

The ERISA Complaint in addition has alleged the failure of Defendants to act solely in the interest of the Bear Stearns employees who participated in the Plan, and whose savings were severely affected by the collapse of the Company's stock price, and the failure to act with the requisite skill, care, prudence, loyalty, and diligence in administering and protecting the Plan's assets. The ERISA Plaintiffs cite in support of their claims Schwartz's statement to employees on January 8, 2008 to "put your head[s] down and work and go about your day, and ignore the stock price as best you can." Similarly, on March 14, 2008, the day on which Bear Stearns announced $30 billion in funding from JPMorgan, Schwartz broadcast a video message to Bear Stearns employees urging them not to lose faith. (ERISA Compl. ¶¶ 4, 389, 407, 409–12, 421.)

According to the ERISA Complaint, because of their high-level positions within the Company in the areas of risk management, compliance, accounting, and internal controls, the Bear Stearns Defendants, along with the Company, knew or should have known that Bear Stearns stock was an imprudent investment for the ESOP. (ERISA Compl. ¶¶ 31–61, 235, 436–46, 466.)

**\*555** *2. Bear Stearns Stock was an Imprudent Investment*
According to the ERISA Complaint, Bear Stearns turned out to be a "flimsy enterprise" based on faulty business practices. It was overleveraged, insufficiently capitalized, and deeply mired in a risky mortgage-dependent origination and securitization business, churning out and retaining on its books increasing amounts of "toxic assets," which it overvalued with "self-serving valuation models" and used to understate risk to the entire entity. (ERISA Compl. ¶ 461.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Bear Stearns collapsed in March of 2008, but the ERISA Plaintiffs allege that collapse could have come any day during the Class Period because the conditions and practices in place in March 2008 were in place long before then. Furthermore, warning signs abounded beginning with the subprime housing decline in late 2006, and they only grew from there. (ERISA Compl. ¶ 462.)

The ERISA Complaint has alleged that prudent risk management practices, internal controls, and common sense by the Plan fiduciaries and Company officers and directors could have and should have prevented the disaster that occurred, and that the collapse of Bear Stearns was accompanied by a growing global financial crisis does not make the ERISA Defendants any less accountable for their reckless behavior. (ERISA Compl. ¶ 463.)

It is further alleged that Bear Stearns' problems grew directly and predictably from poor leadership, strategy, and execution at the most senior level. Instead of heading off a disaster, Bear Stearns executives and its Board of Directors—alleged Plan fiduciaries—pursued risky investments and a deeply flawed business model and ignored numerous and persistent red flags over the course of 16 months while all indicators, real and projected, would have led any prudent fiduciary to change course and protect Plan assets. (ERISA Compl. ¶ 465.)

The ERISA Plaintiffs allege that, based on their positions within the Company, Defendants Cayne, Greenberg, Mayer, Molinaro, Schwartz, Spector, and Steinberg—as well as Bear Stearns—knew, and based on their positions within the Company the remaining individual Defendants knew or should have known, that Bear Stearns stock was an imprudent investment for the Plan because the Company was plagued by severe structural problems, including overexposure to subprime and Alt–A mortgages, overexposure to mortgage-backed and collateralized debt securities, insufficient capitalization and liquidity, overleveraging, dependence on overnight repurchase financing, use of flawed and misleading models to value assets and estimate risk, failures in risk management, and a lack of sound leadership. These practices are alleged to have caused Bear

Stearns' financial statements to be misleading and artificially inflated the value of shares of Bear Stearns' stock and the Bear Stearns Stock Fund in the Plan, resulting in the collapse of the Company. (ERISA Compl. ¶ 466.)

*3. Notice of Excessive Risk*

The ERISA Complaint alleges that all Defendants had substantial warnings of the impending subprime crisis because, as early as 2006, the imminent collapse of the subprime lending industry was widely documented. To the extent that some of Defendants did not have actual knowledge of the riskiness of Bear Stearns' stock, those Defendants were on notice of several "red flags" that should have caused them to investigate the risks posed by Bear Stearns' business model, but failed to conduct any such investigation. (ERISA Compl. ¶ 467.)

**\*556** According to the ERISA Complaint ¶ 468, the red flags include:

• In early 2005, foreclosures began to jump dramatically, signifying a "national trend";

• In May 2005, bank regulators issued their first-ever guideline for credit-risk management for home-equity lending and, in December 2005, new guidelines for mortgage lenders were issued as well;

• Risks of subprime mortgage securitization were the subject of researchers at the *Center for Economic and Policy Research* in July 2005;

• In September 2005, the *Wall Street Journal* reported that bank regulators were sounding "alarm bells" about rising risks in the mortgage market, and then Federal Reserve Chairman Greenspan testified about the risks of "exotic" mortgages such as "interest-only" loans and ARMS;

• By October 2005, delinquencies on subprime mortgage payments were double their level a year earlier;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

• Prior to November 2005, the OCIE found that the Company did not periodically evaluate its VaR models, nor did it timely update inputs to its VaR models, and found that the Company used outdated models to value mortgage derivatives;

• By December 2005, the housing bubble had "burst" in the U.S. mortgage bond market, and industry analysts expected the situation to deteriorate;

• In 2005 and 2006, interest rate hikes, coupled with declines in home values, made delinquencies and fore-closures rise considerably, particularly as to subprime and Alt–A mortgages with "interest-only" or ARM features;

• In August 2006, J. Kyle Bass, a former salesman for Bear Stearns, warned of the looming mortgage securities meltdown;

• Bear Stearns boasted that during the nine months ending in August 2006, it was the number-one under-writer of U.S. MBS, and during the third quarter of 2006 earnings conference call the mortgage platform was as-serted as an opportunity it would aggressively pursue;

• On September 25, 2006, Reuters reported that "rising delinquencies and forecasts of a deepening deterioration in housing have prompted big investors, including hedge funds, to bet against the securities since late 2005";

• In October 2006, in the midst of the developing mort-gage crisis, Bear Stearns announced that Bear Res would purchase subprime originator Encore Credit, which specialized in "nonconforming" borrowers and focused on Alt–A and subprime loans, including "interest-only" loans and ARMS;

• In the third quarter of 2006, Bear Stearns hired hun-dreds of people to build its subprime and Alt–A mort-gage origination platform;

• On October 4, 2006, the Federal Reserve and other banking agencies issued their final guidelines, *Inter-agency Guidance on Nontraditional Mortgage Product Risks,* in response to the loosened underwriting stand-ards and general lax risk management practices of sub-prime lenders;

• In November 2006, the SEC's TM remained concerned about the lack of adequate model review processes for MBS and other ABS;

• In early December 2006, Ownit Mortgage Solutions, Inc. closed its doors and filed for Chapter 11 bankruptcy just a few weeks later;

**\*557** • In December 2006, the subprime crisis began to affect the U.S. in terms of large drops in market prices and large asset write-downs on mortgage-backed securi-ties, according to the OIG Report;

• On December 14, 2006, Bear Stearns announced "record" net revenues of $9.2 billion and net earnings of $2.1 billion, much of it due to Fixed Income and the mortgage origination and securitization platform;

• Also on December 14, 2006, Bear Stearns downplayed concerns about the subprime mortgage market, mini-mized risks related thereto, and reaffirmed its intent to aggressively pursue profits in the subprime and Alt–A origination and securities markets;

• On December 20, 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modern mortgage market;

• In 2006, Bear Stearns' risk managers did not have skill sets to match Bear Stearns' structured finance business model;

• In 2006, Bear Stearns' subsidiary EMC Mortgage Corporation bought approximately $69.2 billion in sub-prime and Alt–A loans, and throughout 2006 and 2007,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Bear Stearns sought to continually expand its origination and securitization platforms;

• On January 3, 2007, Consumer Affairs warned that "as the housing market slows to a crawl, many subprime lenders are collapsing faster than homes made of sub-standard materials, and the signs point to even more pain in the housing market as a result";

• On February 8, 2007, HSBC, the largest originator of subprime loans during 2006, raised its subprime loan loss reserves to $10.6 billion to cover anticipated losses from its subprime lending, making the scale of subprime risks widely apparent and precipitating further and severe contraction in subprime origination;

• In February 2007, the ABX index, which tracks CDOs on certain risky subprime loans, materially declined from above 90 to below 70;

• By the first quarter of 2007, more than one third of Bear Stearns' mortgage securitizations stemmed from its own subprime and Alt–A originations;

• In March 2007, the head of the Company's model validation resigned, and it took several months for the Company to replace the senior risk manager "precisely when the subprime crisis was beginning to hit and the first large write-downs were being taken";

• On March 11, 2007, the New York Times reported that more than two dozen subprime mortgage lenders had failed or filed for bankruptcy;

• On March 15, 2007, Bear Stearns minimized subprime risks and said it was "well positioned to benefit from this environment as our organic origination platforms mature and gain market share," and touted its increased reliance on its own originations for its securitizations;

• In late March of 2007, Moody's Investors Services warned that defaults and downgrades of subprime MBS could have "severe" consequences for CDOs invested in that sector;

• In March 2007, multiple top executives at Bear Stearns publicly downplayed concerns related to MBS and CDO markets;

• On April 2, 2007, New Century Financial Corp., the largest U.S. subprime lender at the time, filed for Chapter 11 bankruptcy;

**\*558** • On April 17, 2007, the Company's Senior Managing Director, Head of ABS & CDO Research testified before the Senate that "[w]ithout doubt, the rise in defaults and delinquencies has had a significant impact on the nonprime securitization market. At this juncture, we are witnessing a significant correction in the MBS market for subprime loans";

• On May 11, 2007, Bear Stearns attempted to foist billions of dollars in worthless assets onto the public through its IPO of Everquest Financial, a company formed by Bear Stearns in which two-thirds of the assets were purchased from BSAM's highly leveraged hedge funds;

• On June 15, 2007, Bear Stearns again minimized subprime concerns and disclosed that the market shake-ups had not caused the Company to think any differently about origination of risky mortgages, and instead it was hiring more employees to boost originations;

• On June 20, 2007, Merrill Lynch seized $800 million in assets from two Bear Stearns hedge funds that were involved in securities backed by subprime loans, which Merrill Lynch then sold;

• In June 2007, under the supervision of Spector, Bear Stearns hedge fund managers Cioffi and Tannin allegedly misled investors despite their own concerns about the hedge funds' viability;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

• On June 26, 2007, the Company announced that it was bailing out one of its collapsing massive hedge funds, and effectively taking onto its own books nearly $2 billion of the hedge fund's subprime-backed assets, which became worthless within weeks;

• On June 27, 2007 Bear Stearns' Everquest IPO fell apart;

• In June 2007, Cayne insisted that Bear Stearns was "doing really well";

• On July 17, 2007, Bear Stearns Asset Management reported that its Bear Stearns High–Grade Structured Credit Fund had lost more than 90% of its value, while the Bear Stearns High–Grade Structured Credit Enhanced Leveraged Fund had lost virtually all of its investor capital. The larger Structured Credit Fund had around $1 billion, while the Enhanced Leveraged Fund, which was less than a year old, had nearly $600 million in investor capital;

• In July 2007, the two Bear Stearns subprime hedge funds collapsed, filing for bankruptcy on July 31, 2007;

• Bear Stearns added nearly $2 billion in illiquid MBS and CDOs to its balance sheet when its hedge funds collapsed, but kept a write-down of these assets off of its books for a period of time, insisting that its losses were small;

• On August 5, 2007, Spector was ousted in an effort to restore confidence in the Company's management and to distance itself from the collapse of the hedge funds;

• On August 6, 2007, American Home Mortgage filed for Chapter 11 bankruptcy;

• On August 9, 2007, BNP Paribas froze three of its funds exposed to United States subprime mortgages, blaming "a complete evaporation of liquidity";

• On August 16, 2007, Countrywide Financial Corporation, the largest U.S. mortgage lender, narrowly avoided bankruptcy by taking out an emergency loan of $11 billion from a group of banks;

• On August 31, 2007, President Bush announced a limited bailout of U.S. **559** homeowners unable to pay the rising costs of their debts;

• On August 31, 2007, Ameriquest, the largest subprime lender in the United States in 2005, announced it was going out of business;

• At the end of August 2007, Bear Stearns held $50 billion in mortgage and asset-backed inventory;

• In September 2007, the Congressional Research Service reported that defaults and foreclosures were likely to rise even higher in 2007 and the first half of 2008;

• On September 20, 2007, Bear Stearns continued to view mortgages, MBS, and CDOs as an "attractive investment opportunity," and Defendant Molinaro said the Company thought "the worst is largely behind us";

• On September 27, 2007, the SEC sent Bear Stearns a comment letter related to its 2006 Form 10–K asking for more details on its exposure to subprime mortgage securities, but Bear Stearns did not respond until January 31, 2008, after it had filed its 2007 Form 10–K;

• On November 14, 2007, Moody's put the Company on negative watch;

• Also on November 14, 2007, the Company continued to tout its financial success and plans to opportunistically gain from the mortgage market;

• On December 20, 2007, Bear Stearns had announced the first loss in its eight decade history, stating it lost

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

approximately $854 million, or $6.90 a share, for the fourth quarter, compared to a profit of $563 million, or $4 a share, for the same time the previous year. In interim reports, the firm also said it had written down $1.9 billion of its holdings in mortgages and mortgage-based securities, up from the $1.2 billion it had anticipated the month before, but that $1.9 billion figure grew to $2.3 billion by the time the Company filed its Form 10–K in January 2008;

• On December 20, 2007, Moody's downgraded Bear Stearns, and the Company remained on negative watch;

• Also on December 20, 2007, Defendant Molinaro said that Bear Stearns "understood the nature of our risks," and that it made "poorly timed and bad decisions" related to MBS and CDOs;

• On December 22, 2007, *The Economist* estimated subprime defaults would reach a level between $200 and $300 billion;

• By 2007, Bear Stearns' retained interests in illiquid MBS and CDOs had grown further, and it had to hold such interests longer than in 2005 or 2006. Bear Stearns' exposure to related losses grew steadily over this time period as well;

• In 2007, Bear Stearns' model review group was understaffed, often operated in "crisis mode," and failed to take into account a mortgage market meltdown in risk and valuation modeling. During the same period, Bear Stearns' CFO and CEO were directly responsible for risk management, yet failed to address known concerns about risk and valuation modeling;

• By the end of 2007, Bear Stearns' leverage ratio was at least 33:1, an increase from the already high ratio of 27:1 at the end of 2006;

• In 2007, Bear Stearns needed $102 billion in short-term repo lending just to maintain daily operations, an in-

crease from $70 billion in 2006;

• On January 8, 2008, Cayne was forced to resign;

• On January 11, 2008, Bank of America made an agreement to bail out Countrywide**560** for $7.16 per share, approximately 16% of its value of $44.55 per share less than a year before;

• On February 8, 2008, Bear Stearns announced that it had increased its short subprime position from $600 million in November 2007 to $1 billion in an effort to hedge its trading positions in subprime mortgages;

• Between April 2006 and March 2008, Bear Stearns' capital reserves decreased, at the same time it was increasing leverage;

• On March 10, 2008, Rabobank Group told the Company it would not roll over a $500 million loan coming due later that week and was unlikely to renew a $2 billion line of credit coming due the following week;

• Also on March 10, 2008, Moody's downgraded portions of mortgage bonds underwritten by Bear Stearns;

• On March 11, 2008, ING Groep NV pulled $500 million in financing and other banks were reluctant to grant "novation" requests from Bear Stearns' counterparties;

• On March 12, 2008, hedge funds and other clients began withdrawing their funds out of Bear Stearns;

• Throughout early 2008, the cost of insuring Bear Stearns' debt in credit default swaps surged;

• Throughout the Class Period, Bear Stearns violated Accounting Standards. Bear Stearns' Internal Controls were materially deficient, and the Company violated Banking Regulations;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

• On March 13, 2008, Schwartz made phone calls to the Federal Reserve and to JPMorgan CEO Dimon in an effort to negotiate a rescue package;

• Also on March 13, 2008, Bear Stearns informed the SEC and the Federal Reserve that it would have to file for bankruptcy the next day;

• On March 14, 2008, the Company announced $30 billion in funding provided by JPMorgan and backstopped by the federal government;

• Also on March 14, all three rating agencies downgraded Bear Stearns;

• On March 15 and 16, 2008, Bear Stearns and JPMorgan hammered out an acquisition deal;

• On March 17, 2008, JPMorgan offered to acquire Bear Stearns at a price of $236 million, or $2 per share. The Company's share prices tumbled to $4.81, a drop of 84%;

• Investor outrage followed, and the terms of the acquisition deal were renegotiated, with the final purchase price of $10 per share announced on March 24, 2008; and

• On May 30, 2008, JPMorgan completed its acquisition of Bear Stearns at the renegotiated price of $10 per share.

Given the size of the Plan's investment in Bear Stearns stock, the turmoil faced by the high-risk loan market, and the precipitous decline in the price of Bear Stearns stock, the ERISA Complaint has alleged that prudent Plan fiduciaries would have fully investigated the risks faced by the Company, carefully monitored the Plan's investment in Company stock, taken appropriate actions to protect the Plan Participants, would not have ignored the numerous red flags described above, and would not have allowed the risk of loss to the Plan's participants and beneficiaries to increase to unacceptable levels. The ERISA Complaint has alleged that the Count I Defendants did nothing to protect Plan Participants from enormous losses. (ERISA Compl. ¶¶ 469, 472.)

**\*561** The ERISA Complaint has thereby alleged that Bear Stearns stock was an imprudent investment for the Plan as it posed an inordinate risk of significant loss, that this risk was not one that should have been borne by the participants and beneficiaries of the Plan, that the Plan's fiduciaries allegedly disregarded the Company's deteriorating financial circumstances when it came to managing the Plan's investment in Bear Stearns stock, and that the Plan fiduciaries were allegedly unwilling or unable to act prudently to rescue the Plan's investments. Under the circumstances, the continued investment of hundreds of millions of dollars of Participants' retirement savings in Bear Stearns stock is alleged to be reckless and imprudent, contrary to the best interests of the Plan's participants and beneficiaries, and an abuse of Defendants' discretion as fiduciaries. (ERISA Compl. ¶ 478.)

The ERISA Complaint has also alleged that the Defendants failed to conduct an appropriate investigation into whether Bear Stearns stock was a prudent investment for the Plan and failed to provide the Participants with information regarding Bear Stearns' risky business plan so that the Participants could make informed decisions regarding their investments in Company stock in the Plan. It is further alleged that an adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Bear Stearns stock, under these circumstances, was imprudent, and that a prudent fiduciary acting under similar circumstances would have acted to protect Participants against unnecessary losses and would have made different investment decisions. (ERISA Compl. ¶¶ 474–75.)

*4. Concealment of Risk*

The ERISA Complaint alleges that several Defendants, including Cayne, Greenberg, Molinaro, Schwartz, and Spector compounded the problem and losses to the Plan by downplaying the risks faced by the Company, both

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

to the market and directly to Plan Participants, thereby allegedly falsely assuring Participants that their retirement savings in Bear Stearns stock were not imperiled. Defendants' failure to disclose the true risks posed to the Plan as a result of its investment in Bear Stearns stock resulted in the Plan holding large amounts of unduly risky Company stock at inflated prices. (ERISA Compl. ¶¶ 470–71.)

It is further alleged that as a result of the Defendants' alleged knowledge of, and implication in, creating and maintaining public misconceptions concerning the Company's true financial condition, any generalized warnings of market and diversification risks that Defendants made to the Plan's Participants regarding the Plan's investment in Bear Stearns stock did not effectively inform the Participants of the past, immediate, and future dangers of investing in Company stock. (ERISA Compl. ¶ 473.)

The ERISA Complaint has alleged that several statements made by individual Defendants confirm their knowledge that Bear Stearns was an imprudent investment. These include the following:

• Paul Friedman, a Senior Managing Director and COO of Fixed Income said, "[W]e're the bad guys. We did this to ourselves. We put ourselves in a position where this could happen. It is our fault for allowing it to get this far, and for not taking any steps to do anything about it. It's a classic case of mismanagement at the top. There's just no question about it." (ERISA Compl. ¶ 423.)

• Cayne said, "You're vulnerable to it being over at any time when you're leveraged. You didn't have a chance. So, that same lesson that we learned **\*562** today, Long–Term Capital Management had back then [in 1998] and the tulip people had it back in the 1400s [sic]." (ERISA Compl. ¶ 425.)

• Cayne "now admits" that the "blame for the firm's failure to diversify" its business model rests "squarely on his shoulders." (ERISA Compl. ¶ 139.)

• At an April 3, 2008 hearing, Senator Christopher Dodd (Chairman of Senate Banking Committee) addressed Defendant Schwartz and reminded him that months—or even a year-prior to that time, Schwartz had inquired about opening the Federal Reserve's "discount window" to Bear Stearns, thus evidencing that Schwartz knew about Bear Stearns' dire situation months prior to its collapse, if not an entire year. (ERISA Compl. ¶ 449.)

It is alleged that ERISA Defendants knew or, due to the many red flags listed above, should have known that Bear Stearns stock was not a prudent investment option for the Plan, and had an obligation to protect the Plan and its Participants from unreasonable and predictable losses incurred as a result of the Plan's continued investment in Company stock, and it was imprudent for the Plan's fiduciaries to invest in and continue holding Bear Stearns stock in the Plan during the Class Period. (ERISA Compl. ¶¶ 476–77.)

It is further alleged that Defendants had available to them several different options for satisfying their duties, including:

• making disclosures to co-fiduciaries;

• making appropriate public disclosures as necessary;

• discontinuing or limiting further investment in Bear Stearns stock under the Plan;

• consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants and beneficiaries of the Plan;

• divesting the Plan of Company stock;

• informing Participants of the risks of holding their investment in the Plan and/or requiring Participants to liquidate their accounts and transfer the proceeds to their accounts in the separate 401(k) Plan; and/or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

• resigning as fiduciaries of the Plan to the extent that, as a result of their employment by Bear Stearns, they could not loyally serve the Plan and its Participants in connection with the Plan's acquisition and holding of Bear Stearns stock.

(ERISA Compl. ¶ 479.)

It is alleged that, despite the availability of these and other options, the ERISA Defendants failed to take any meaningful action to protect Participants from losses as a result of the Plan's investment in Bear Stearns stock. (ERISA Compl. ¶ 480.)

*5. Failure to Provide Complete and Accurate Information*
The ERISA Complaint has also alleged that ERISA mandates that plan fiduciaries have a duty of loyalty to the Plan and its Participants, which includes the duty to speak truthfully to the Plan Participants when communicating with them and to not materially mislead or knowingly allow others to materially mislead Plan Participants and beneficiaries. During the Class Period, the ERISA Defendants allegedly made direct and indirect communications with Plan Participants which included statements regarding investments in Company stock. These communications included, but were not limited to, SEC filings, annual reports, and press releases in which Defendants failed to disclose that Company stock was not a prudent retirement investment. The Company regularly communicated**563** with employees, including Plan Participants, about the performance and future financial and business prospects of the Company's common stock, which was the single largest asset of the Plan. (ERISA Compl. ¶¶ 481–82.)

It is alleged that as late as March 10, 2008, when the Company's stock traded at the allegedly artificially-inflated price of $62.30 per share, the Company affirmatively misled the Plan Participants and the investing public regarding the Company's financial condition. On that date, the Company issued a press release which stated:

The Bear Stearns Companies Inc. today denied market rumors regarding the firm's liquidity. The company stated that there is absolutely no truth to the rumors of liquidity problems that circulated today in the market.

Alan Schwartz, President and CEO of The Bear Stearns Companies Inc., said, "Bear Stearns' balance sheet, liquidity and capital remain strong."

(ERISA Compl. ¶ 483.)

The ERISA Complaint alleges that Schwartz in particular (as well as other top-ranking officers of the Company and the Company itself) communicated directly with employees and Plan Participants regarding the Company's stock price and the risks presented to the Company but aggressively and falsely downplayed those risks. On January 8, 2008, Schwartz allegedly stated the following to Bear Stearns employees: "You need to put your head down and work and go about your day, and ignore the stock price as best you can." (ERISA Compl. ¶ 389, 484.)

ERISA Plaintiffs allege that, even though Defendants knew of the high concentration of the Plan's funds in Company stock during the Class Period, Defendants allegedly failed to provide Participants with complete and accurate information regarding the true financial condition of the Company. (ERISA Compl. ¶¶ 485–86.)

It is alleged that Defendants failed to provide the Plan Participants with complete and accurate information regarding the Company's serious mismanagement and improper business practices, including, among other practices: overexposure to subprime and Alt–A mortgages, overexposure to mortgage-backed and collateralized debt securities, insufficient capitalization and liquidity, overleveraging, dependence on overnight repurchase financing, use of flawed and misleading models to value assets and estimate risk, failures in risk management, and a lack of sound leadership. Therefore the Participants in the Plan could not appreciate the true risks presented by in-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

vestments in Company stock and could not make informed decisions regarding their investments in Company stock in the Plan. (ERISA Compl. ¶ 487.)

### 6. Conflicts of Interest

The ERISA Complaint alleges that as ERISA fiduciaries, the ESOP Committee Defendants were required to manage the Plan's investments, including the investment in Bear Stearns stock, solely in the interest of the Participants and for the exclusive purpose of providing benefits to them. This constituted a duty of loyalty requiring the Plan fiduciaries to avoid conflicts of interest and to resolve them promptly when they arise. Plaintiffs allege that conflicts of interest exist when a company that invests plan assets in company stock collapses because, as the situation deteriorates, plan fiduciaries are torn between their duties as officers and directors for the company on the one hand, and to the plan and plan participants on the other. (ERISA Compl. ¶¶ 488–89.)

ERISA Plaintiffs allege that Defendants chose not to investigate whether to take appropriate and necessary action to protect **564 the Plan, and put the interests of the Company over those of the Plan by continuing to offer Bear Stearns stock as an investment option and continuing to maintain investments in Bear Stearns stock in the Plan. Plaintiffs note that executive compensation was tied to Bear Stearns' performance and its inflated stock price. (ERISA Compl. ¶ 490.)

The ERISA Plaintiffs further allege that Bear Stearns executives engaged in stock trading that enriched them during the Class Period, yet did nothing to preserve Participants' retirement savings in the Plan. Specifically, Plaintiffs allege the following defendants sold shares during the Class Period for Realized Values as set forth below:

| Name | Shares | Realized Value |
|------|--------|----------------|
| Cayne, James E. | 219,036 | $23,010,474 |
| Greenberg, Alan C. | 257,275 | $34,594,027 |
| Mayer, Jeffrey | 102,408 | $ 9,115,336 |
| Molinaro, Samuel L. Jr. | 38,552 | $ 4,230,828 |
| Schwartz, Alan D. | 91,233 | $ 9,867,001 |
| Spector, Warren J. | 116,255 | $19,066,373 |

(ERISA Compl. ¶ 491.)

It is further alleged that Defendants Greenberg, Molinaro, Cayne, and Spector sold Bear Stearns stock valued at more than $57 million before the hedge fund crisis and saved themselves almost $16 million. Then, in December 2007, Bear Stearns executives Cayne, Greenberg, Schwartz, and Molinaro sold significant holdings in Bear Stearns Stock, valued at $15.4 million, $8.8 million, $6 million, and $2.5 million, respectively. (ERISA Compl. ¶¶ 492–93.)

### 7. Causation

The ERISA Complaint has alleged that the Plan suffered approximately $300 million in losses because the Plan's assets were imprudently invested by Defendants in Bear Stearns stock during the Class Period, in alleged breach of Defendants' fiduciary duties. (ERISA Compl. ¶ 539.)

It is alleged that ERISA Defendants are liable for the Plan's losses in this case because the Plan's investment in Bear Stearns stock was the result of the Count I Defendants' decision to maintain the assets of the Plan in Bear Stearns stock and not inform Plan Participants of the need to protect their financial interests. ERISA Plaintiffs allege that, had Defendants informed Plan Participants of the risks of investment in Bear Stearns stock, the Plan Partic-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

ipants could have made informed decisions about their retirement funds. The Count III Defendants' are also liable for their alleged failure to monitor and provide full and complete information to the ESOP Committee Defendants. (ERISA Compl. ¶ 540.)

It is further alleged that, had the Defendants properly discharged their fiduciary and co-fiduciary duties, including the monitoring and removal of fiduciaries who failed to satisfy their ERISA-mandated duties of prudence and loyalty, elimination of Bear Stearns stock as an investment alternative when it became imprudent, and divestiture of Bear Stearns stock in the Plan when maintaining such an investment became imprudent, the Plan would have avoided some or all of the losses that it and the Plan Participants suffered. (ERISA Compl. ¶ 541.)

D. *The Applicable Standard*

The applicable standard has been stated above in connection with the motion to dismiss the Securities Complaint.

E. *The ERISA Complaint Fails to State a Prudence Claim in Count I*

[80][81][82] To state a claim for breach of fiduciary duty under ERISA, at minimum the Complaint must allege 1) that the defendant**565** was a fiduciary who, 2) was acting within his capacity as a fiduciary, and 3) breached his fiduciary duty. *See* ERISA § 409, 29 U.S.C. § 1109; *In re Morgan Stanley ERISA Litigation,* 696 F.Supp.2d 345, 353 (S.D.N.Y.2009). The threshold question in every case alleging breach of an ERISA fiduciary duty thus is "whether [the defendant] was acting as a fiduciary ... when taking the action subject to complaint." *Pegram v. Herdrich,* 530 U.S. 211, 226, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000). After all, "ERISA liability arises only from actions taken or duties breached in the performance of ERISA obligations." *In re WorldCom, Inc. ERISA Litig.,* 263 F.Supp.2d 745, 760 (S.D.N.Y.2003), *citing Pegram,* 530 U.S. at 225–26, 120 S.Ct. 2143.

[83] Fiduciary status can be determined as a matter of

law at the motion to dismiss stage based on a plaintiff's allegations that the defendants were ERISA fiduciaries. *See Mortgage Lenders Network USA, Inc. v. CoreSource, Inc.,* 335 F.Supp.2d 313, 317 (D.Conn.2004), *quoting LoPresti v. Terwilliger,* 126 F.3d 34, 39 (2d Cir.1997) (" '[W]here the facts are not in question, whether a party is an ERISA fiduciary is purely a question of law.' "); *In re Lehman Bros. Sec. and ERISA Litig.,* 683 F.Supp.2d 294, at 298–300 (S.D.N.Y.2010); *In re Citigroup ERISA Litig.,* 2009 WL 2762708, at *7–9 (S.D.N.Y. Aug. 31, 2009).

ERISA provides for both named and de facto fiduciaries. ERISA requires every employee benefit plan to provide for one or more named fiduciaries that possess the "authority to control and manage the operation and administration of the Plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). A de facto fiduciary is a fiduciary to the extent that he or she "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets," or "has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

Defendants contend that the Count I Defendants, Bear Stearns and the ESOP Committee, are not fiduciaries with respect to the Plan's investment in Bear Stearns stock and had no discretionary authority or responsibility to liquidate the Plan's holdings of that stock. ERISA Defs'. Mem. at 19.

The ERISA Plaintiffs do not allege that they paid inflated prices for their shares or that the initial purchase of Bear Stearns stock was imprudent, as their Plan shares were purchased before the Class Period. They seek holder damages, as opposed to purchaser damages, under the "make whole" theory of damages provided for under ERISA § 409(a), 29 U.S.C. § 1109(a) and allege that they are entitled to recover the Plan's losses suffered as a result of the Plan's continued imprudent investment in Bear Stearns stock, plus the return on investment that would have been earned had the assets been prudently invested. Thus, the question at issue is whether Defendants are liable

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

for the retention of Bear Stearns stock. ERISA Pl. Mem. at 40, *citing Donovan v. Bierwirth,* 754 F.2d 1049, 1056 (2d Cir.1985).

*1. The Plan Agreement Does Not Establish a Duty to Divest the Plan of Bear Stearns Stock*

[84] The Plan documents are appropriate for consideration on a Rule 12(b)(6) motion as those documents are "integral to the complaint and are specifically referenced in that pleading." *In re Avon Products Securities Litigation,* 2009 WL 848083, at *7, n. 12 (S.D.N.Y. Mar.3, 2009); *see also Levy v. Southbrook Int'l Invs., Ltd.,* 263 F.3d 10, 13, n. 3 (2d Cir.2001).

**\*566** Article VI of The Bear Stearns Companies Inc. Employee Stock Ownership Plan (as amended and restated effective as of January 1, 2007) ("2007 Plan Agreement" or "Plan Agreement") [FN25] addresses "Diversification of Investments." This article lays out the procedures which must be followed in order to divest Plan accounts of Bear Stearns stock or diversify investments, and it provides that "[e]xcept as provided in this Article VI and Section 10.8, no distribution from a Participant's Account may occur prior to a Participant's Separation from Service." 2007 Plan Agreement, § 6.4. Under Article VI and § 10.8, only Plan Participants may order their accounts divested or diversified. [FN26] The ESOP Committee and Bear Stearns are given no authority to diversify or divest plan assets.

> FN25. The 2007 Plan Agreement was in effect for all but a few weeks of the class period. The predecessor to the 2007 Plan Agreement, The Bear Stearns Companies, Inc. Employee Stock Ownership Plan (Amended and Restated Effective as of May 1, 2002) ("2002 Plan Agreement"), was in effect for those remaining weeks. The 2002 Plan Agreement is materially the same as the 2007 Plan Agreement with regard to the powers of Defendants and the Plan Participants over the diversification and divestiture of Plan assets. *See* 2002 Plan Agreement Art. VI, XI.

> FN26. Section 10.8 of the 2007 Plan Agreement allows for a disabled Plan Participant to receive a lump sum distribution from his or her account upon his or her request.

Article XI of the 2007 Plan Agreement designates the ESOP Committee as the Plan's administrator and provides the Committee "all powers and discretion necessary or helpful for the carrying out of its responsibilities, including the discretion and exclusive right to determine any question arising in connection with the interpretation, application or administration of the Plan." 2007 Plan Agreement, § 11.4. The Plan Agreement then proceeds to list 10 duties over which the ESOP Committee had "power and complete discretion," including the duty to "determine all questions arising out of" Plan provisions or administration; "make rules and regulations for the administration of the Plan which are not inconsistent with the terms and provisions of the Plan"; "construe all terms, provisions, conditions, and limitations of the Plan"; determine who is eligible to receive Plan benefits; compute retirement income and other benefits payable; "compromise or settle claims against the Plan"; and "employ such persons and assign to them the performance of such duties as the Committee shall deem necessary or desirable to assist in the administration of the Plan." 2007 Plan Agreement, § 11.4(a-d, f, j, i). The citation of these specific powers was "not intended to be complete or exclusive" or to take away from the general grant of administrative powers, and the Committee had "such powers and discretion as it may determine to be necessary for the performance of its duties under the Plan and the Trust Agreement." 2007 Plan Agreement, § 11.4.

*2. The ESOP Committee Does Not Have the Fiduciary Duty to Diversify or Divest Plan Investments*

[85] The fact that the ESOP Committee is named as plan administrator in the Plan Agreement does not make it a fiduciary for all purposes. *See Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.,* 302 F.3d 18, 28 (2d Cir.2002) (a person or entity "may be an ERISA fiduciary with respect to certain matters but not others") (internal quotation marks omitted). Where a plan administrator has

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

no authority to diversify or divest plan assets, it cannot be held liable for failing to take that action. *See Citigroup,* 2009 WL 2762708, at *9 (dismissing claims against **\*567** administrative and investment committees where the plan gave them no discretion over investment in employer stock); *Pedraza v. Coca–Cola Co.,* 456 F.Supp.2d 1262, 1273 (N.D.Ga.2006) (dismissing prudence claim against certain defendants that had "no prerogatives regarding selection of the Plan's investments"); *Smith v. Delta Air Lines, Inc.,* 422 F.Supp.2d 1310, 1326 (N.D.Ga.2006) (dismissing claims against administrative committee that had "no discretion to discontinue investment into the [company stock fund] or alter or modify the ESOP" even though the committee was responsible for the general "operation and administration of the Plan").

None of the ESOP Committee duties enumerated in § 11.4 of the Plan Agreement expressly granted or related to the duties to diversify the Plan's investments or divest the Plan of Bear Stearns stock. When Article XI's general grant of authority to the ESOP Committee is considered in light of Article VI, which expressly and exclusively gives the Plan Participants the authority to order their accounts divested of Bear Stearns stock or diversified, it is appropriate to conclude that the ESOP Committee did not have the authority, discretion or duty to divest or diversify Plan assets.

The ERISA Plaintiffs contend that the ESOP Committee's authority "to allocate responsibilities among its members" and "right to designate others to carry out such of its responsibilities under the Plan as the Committee deems appropriate, including responsibilities related to the control and management of Plan assets," along with its possession of "all powers and discretion necessary or helpful for the carrying out of its responsibilities, including the discretion and exclusive right to determine any question arising in connection with the interpretation, application or administration of the plan," establish that the Committee has the power to diversify and divest the Plan's assets. ERISA Pl. Mem. 41–42. This broad language does not explicitly grant the ESOP Committee this power, nor does any language in the Plan Agreement.[FN27] Further-

more, Article VI of the Plan Agreement provides that the power to diversify and divest plan assets was given exclusively to the Plan Participants. The ESOP Committee's retention of "all powers and discretion necessary or helpful for the carrying out of its responsibilities" does not include the diversification and divestiture of Plan assets. The ERISA Plaintiffs' allegations have not established that diversification and divestiture are among the Committee's responsibilities.

> FN27. The ESOP Committee's "responsibilities related to the control and management of Plan assets" include the responsibility for executing the Plan Participant's revests to diversify or divest their Plan accounts. 2007 Plan Agreement, § 6.5. Plaintiffs do not allege a breach of this duty.

### 3. Bear Stearns is Not a Fiduciary of the Plan

Defendants argue that Bear Stearns established the ESOP exclusively to allow employees to invest in Bear Stearns stock and acted as a settlor, not a fiduciary. Defendants contend that the Company had no role in administering the established Plan and no authority over its assets. Furthermore, Defendants refute Plaintiffs' claim that Bear Stearns was a de facto fiduciary, arguing that the Second Circuit does not recognize such fiduciaries where there is a named fiduciary, in this case the ESOP Committee. Defendants also contend that they cannot be liable through the doctrine of respondeat superior because this Court has rejected the application of that doctrine in the ERISA context. ERISA Defs'. Mem. at 19–22.

**\*568** The ERISA Plaintiffs respond that Bear Stearns is a fiduciary on four grounds: (1) Bear Stearns had discretion to make additional contributions to the Plan either in cash or stock; (2) Bear Stearns was a de facto fiduciary through its agents and employees and the Company's chain of command; (3) Bear Stearns was not prohibited from acting to preserve Plan assets or divesting the Plan of Bear Stearns stock, and Plan documents specifically require Bear Stearns to take corrective action to prevent erosion of Plan assets in circumstances such as those at issue. ERISA Pl. Mem. at 42–43.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

a) Bear Stearns' Ability to Make Contributions to the Plan in Stock or Cash Does Not Establish a Duty of Prudence

[86] Even if, as the ERISA Plaintiffs claim in their first argument, Bear Stearns' ability to make contributions to the Plan in either cash or stock established that the Company was a fiduciary for the Plan through its control over the management of the ESOP, the ERISA Plaintiffs do not allege that Bear Stearns breached its duty of prudence in its use of this power. In fact, the ERISA Plaintiffs do not allege that Bear Stearns used this power during the Class Period because the Plan was closed and no new contributions were made during that Period.

The ERISA Plaintiffs cite *In re Pfizer, Inc. ERISA Litigation,* 2009 WL 749545, at *7 (S.D.N.Y.2009), and *Morgan Stanley,* 696 F.Supp.2d 345, 356 (S.D.N.Y.2009), for the proposition that a company is a fiduciary where it funds employer contributions in company stock rather than cash. In *Pfizer,* the Court held that "[b]ecause Pfizer and Pharmacia are not named as fiduciaries in the Plan documents, they are fiduciaries only if they have acted as fiduciaries in matters relevant to Plaintiffs' claims." *Pfizer,* 2009 WL 749545, at *6, *citing Siskind v. Sperry Ret. Program Unisys,* 47 F.3d 498, 505 (2d Cir.1995). The plaintiffs in *Pfizer* had alleged that the Company had the authority and discretion to "suspend, eliminate, or reduce any of the Pfizer Plans' investments, including investments in Company Stock" and "day-to-day discretionary authority over Company Stock investments." *Id.* at *7.   *Pfizer's* facts are thus different from those presented here, where the ESOP Agreement indicates that Bear Stearns had no such authority to divest plan assets or manage investments day-to-day, and the ERISA Plaintiffs fail to adequately allege otherwise. Furthermore, *Pfizer* supports, not refutes, Defendants' claim that Bear Stearns' ability to make contributions to the Plan does not render it a fiduciary responsible for the unrelated duty to divest the Plan of Bear Stearns stock.

In *Morgan Stanley,* the Court held that "Morgan Stanley exercised the necessary control over the Plans in determining whether to fund Employer Contributions in

Company Stock rather than cash, and by establishing rules regarding the transfer of Company Stock into other forms of investment in the Plans." 696 F.Supp.2d at 356. However, in *Morgan Stanley,* the Court found that the Company had actually funded employer contributions for significant sums of money during the class period. *Id.* Here, the Plan was closed during the Class Period, and Plaintiffs do not allege that Bear Stearns ever made the decision to fund the Plan with Bear Stearns stock as opposed to cash. Therefore, unlike in *Morgan Stanley,* Bear Stearns' duty in this regard is irrelevant to Plaintiffs' claims because the Company cannot be held liable for an election it is not alleged to have made.

b) Bear Stearns is Not Liable as an ERISA Fiduciary Through the Fiduciary Duties of its Employees

The ERISA Plaintiffs also contend that Bear Stearns was a de facto fiduciary **569** through the doctrine of *respondeat superior* or other laws of agency.

The application of *respondeat superior* in the ERISA context is not established in light of the split of authority on this issue. *Morgan Stanley,* 696 F.Supp.2d at 355 (recognizing split of authorities and declining to extend doctrine to ERISA context).

[87] The ERISA Plaintiffs further allege that, independently of *respondeat superior,* companies are de facto fiduciaries by virtue of New York agency law rendering them responsible for the actions and knowledge of their employees. In this Circuit, an employer cannot be a de facto plan administrator where it has named an administrator. *Crocco v. Xerox Corp.,* 137 F.3d 105, 107 (2d Cir.1998).[FN28] *Crocco* is in line with the weight of precedent, which provides that a company is liable for its own fiduciary duties under ERISA, not those designated to its employees. Among the cases the ERISA Plaintiffs cite in support of their contention is *Gelardi v. Pertec Computer Corp.,* 761 F.2d 1323, 1325 (9th Cir.1985), in which the Court takes a position in line with *Crocco* and opposite to that which the ERISA Plaintiffs seek to support. It held that "[a]lthough employees of Pertec serve on the Employee Benefits Committee and the Committee has a fiduciary

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 144

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

responsibility in determining claims, this does not make the employer a fiduciary with respect to the Committee's acts. ERISA anticipates that employees will serve on fiduciary committees but the statute imposes liability on the employer only when and to the extent that the employer himself exercises the fiduciary responsibility allegedly breached." *Id., citing* 29 U.S.C. §§ 1105(c), 1108(c); 29 C.F.R. § 2560.503–1(g)(1); 29 C.F.R. § 2509.75–8 (FR–16).

>      FN28. ERISA Plaintiffs correctly note that *Crocco* dealt with a party seeking to recover benefits under ERISA § 502(a)(1)(B) and not to claims for breach of a fiduciary duty under ERISA § 502(a)(2). ERISA Pl. Mem. at 42, n. 61, *citing Crocco,* 137 F.3d at 107, n. 2. However, there is nothing in the *Crocco* holding to suggest that a company is liable as a de facto fiduciary for the expressly designated fiduciary duties of its employees. In fact, the Court in *In re Bausch & Lomb, Inc. ERISA Litigation,* 2008 WL 5234281, at *11 (W.D.N.Y. Dec. 12, 2008), extended *Crocco's* holding to the ERISA fiduciary context. ERISA Plaintiffs rely on *In re Sprint Corp. ERISA Litigation,* 388 F.Supp.2d 1207, 1221 (D.Kan.2004), in which the court found the company to be a fiduciary by virtue of its discretion with regard to plan investments. Such discretion on the part of Bear Stearns is not established here.

The ERISA Plaintiffs' other cited cases fail to support their position.[FN29] In several cases, the companies were found liable for their own fiduciary duties, not those expressly-delegated to their employees.[FN30] In **\*570** others, plaintiffs establish that knowledge by directors and officers is passed to the company, but not fiduciary liability.[FN31]

>      FN29. The only case cited by Plaintiffs which appears to support their position is *Nilles v. Sears, Roebuck & Co.,* 1997 WL 610339, at *8 (N.D.Ill. Sept. 29, 1997). There, the court held, without citation, that Sears was a fiduciary because the

plan administrator was an employee through whom it wielded discretion. *Id.* This case does not stem the flow of precedent holding that a company is not liable as an ERISA fiduciary for the duties held by its employees.

>      FN30. In *Hogan v. Metromail,* 107 F.Supp.2d 459, 475 (S.D.N.Y.2000), the Court found that the company did not relinquish control of the plan and may have maintained discretion rendering it responsible for the plaintiffs' injuries. In *Hamilton v. Allen–Bradley Co.,* 244 F.3d 819, 826–27 (11th Cir.2001), the Court found that the company was a named plan administrator and did not dispute the fact that it had discretion rendering it a plan fiduciary. In *Dall v. Chinet Co.,* 33 F.Supp.2d 26, 39 (D.Me.1998), aff'd, 201 F.3d 426 (1st Cir.1999), the Court found that Chinet was liable for actions involving amendment of the plan because it was expressly given the duty to amend the plan in the plan agreement. In *Leigh v. Engle,* 727 F.2d 113, 133 (7th Cir.1984), the Court held that a company's authority to appoint fiduciaries rendered them fiduciaries for the selection and retention of their appointees but not for the appointee's investment decisions. This holding supports the position that Bear Stearns is responsible for its duties but not those of its fiduciary employees. In *Adamczyk v. Lever Bros. Co.,* 991 F.Supp. 931, 937 (N.D.Ill.1997), there was no clear delegation of administrative authority to other fiduciaries and neither party had presented the plan agreement, unlike in this case. The court found that the company was a plan fiduciary based on the limited record.

>      FN31. *Bourns, Inc. v. Wells Fargo Bank, N.A.,* 1994 WL 36998, at *3 (N.D.Cal. Feb. 2, 1994) held that "a corporation has knowledge of all matters known to any of its officers or directors." *Bourns* does not stand for the proposition that a company also has all fiduciary duties given to its employees, and the court found Bourns's fiduci-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

ary duties to arise from explicit terms of the plan agreement. *Id.* at *4. *Center v. Hampton Affiliates, Inc.,* 66 N.Y.2d 782, 497 N.Y.S.2d 898, 488 N.E.2d 828, 829 (1985),* was cited for the same proposition as *Bourns,* and stands for nothing else related to this action and has nothing to do with ERISA fiduciary duties.

Here, Bear Stearns, as settlor, delegated administrative powers to the ESOP Committee and power over diversification and divestiture to the Plan Participants. ERISA Plaintiffs do not adequately allege that Bear Stearns retained these duties, and the Company is not liable for the ERISA fiduciary duties of its designated fiduciary employees.

### 4. Bear Stearns Had No Discretion and Duty to Divest the ESOP of Bear Stearns Stock

The ERISA Plaintiffs also contend that Bear Stearns could have acted to preserve Plan assets and divest the Plan of Bear Stearns stock because it was not expressly prohibited from doing so. They cite no authority for the proposition that Bear Stearns held a power by virtue of the fact that it was not expressly denied that power. Furthermore, this contention runs counter to the contents of the Plan Agreement, which exclusively granted the power to divest and diversify to the Plan Participants.

The ERISA Plaintiffs' assertion that Bear Stearns was obligated to divest the Plan of Bear Stearns stock or otherwise protect plan assets under the terms of the Plan is not established by The Bear Stearns Companies Inc. Employee Stock Ownership Trust Agreement ("Trust Agreement"). The ERISA Plaintiffs cite the Trust Agreement's provision that "[t]he Company accepts full responsibility under the Plan and this Agreement for any investment in Company Stock in the Fund." Trust Agreement § 21(c). However, they do not address the remainder of that provision, under which Bear Stearns agreed with the trustee alone to bear liability for ESOP investments in Bear Stearns stock. This acceptance of liability from the trustee did not create an affirmative duty to act to prevent erosion of the ESOP's assets.

### 5. The ERISA Complaint Fails to Overcome the Moench Presumption

Even if the ESOP Committee and Bear Stearns had the power to divest or diversity Plan assets, the ERISA Complaint is dismissed on the independent ground that Defendants cannot be held liable on the facts as pleaded due to the *Moench* presumption.

[88][89][90] The *Moench* presumption of prudence arises when a plan is designed to be invested in company stock and is invested in that stock. *Moench v. Robertson,* 62 F.3d 553, 571 (3rd Cir.1995) ("In a case such as this, in which the fiduciary is not *571 absolutely required to invest in employer securities but is more than simply permitted to make such investments, while the fiduciary presumptively is required to invest in employer securities, there may come a time when such investments no longer serve the purpose of the trust, or the settlor's intent. Therefore fiduciaries should not be immune from judicial inquiry, ... but also should not be subject to the strict scrutiny that would be exercised over a trustee only authorized to make a particular investment. Thus, a court should not undertake a de novo review of the fiduciary's actions.... Rather, the most logical result is that the fiduciary's decision to continue investing in employer securities should be reviewed for an abuse of discretion.") The presumption provides that "an ESOP fiduciary who invests the assets in employer stock is entitled to a presumption that it acted consistently with ERISA by virtue of that decision. However, the plaintiff may overcome that presumption by establishing that the fiduciary abused its discretion by investing in employer securities." *Id.* The plaintiff must allege "that the ERISA fiduciary could not have believed reasonably that continued adherence to the ESOP's direction was in keeping with the settlor's expectations of how a prudent fiduciary would operate." *Id.*

The Second Circuit has yet to adopt the *Moench* presumption, though it has been applied at the motion to dismiss stage by district courts within the Circuit. *See Citigroup,* 2009 WL 2762708 at *15–16; *In re Bausch & Lomb, Inc. ERISA Litig.,* No. 06 Civ. 6297, 2008 WL

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 146

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

5234281, at *5–6 (W.D.N.Y. Dec. 12, 2008). This Court has also previously refused to apply the *Moench* presumption at the motion-to-dismiss stage. *See Morgan Stanley,* 696 F.Supp.2d at 359; *see also Veera v. Ambac Plan Administrative Order Committee,* No. 10 Civ. 4191, 2011 WL 43534, at *2–5 (S.D.N.Y. Jan. 6, 2011) (holding that ERISA duties take supremacy over plan terms, that the plan language at issue supported compliance with ERISA duties, and that ERISA's underlying purpose, to establish a comprehensive regulatory structure to protect private retirement benefits, would be thwarted by allowing plan documents to obviate ERISA duties). However, the weight of authority appears to favor the application of the *Moench* presumption. *See, e.g., Fisher v. JP Morgan Chase & Co.,* 703 F.Supp.2d 374, 383 (S.D.N.Y.2010) (presumption "applies to any allegations of fiduciary duty breach for failure to divest an ... ESOP of company stock" and applies at motion-to-dismiss stage) (internal quotation omitted); *Herrera v. Wyeth,* 2010 WL 1028163, at *6 (S.D.N.Y. Mar. 17, 2010) ("the Court concludes that a presumption of prudence ... applies"); *Gearren v. McGraw–Hill Companies, Inc.,* 690 F.Supp.2d 254, 269–70 (S.D.N.Y.2010) ("When the terms of the plan agreements require or strongly encourage a fiduciary to take a certain action, and that action is the congressionally approved step of facilitating employee ownership of employer stock, the action should be presumed to be reasonable."); *Lehman,* 683 F.Supp.2d at 301 ("While the Second Circuit has not specifically addressed the *Moench* decision, *Moench* is persuasive, and many courts in this district have adopted it, as have I."); *Citigroup,* 2009 WL 2762708, at *16; *Avon,* 2009 WL 848083, at *10; *Bausch & Lomb,* 2008 WL 5234281, at *5–6. These authorities, and particularly the reasoning contained in *Gearren,* to be discussed further below, compel the conclusion that the Court's holding in *Morgan Stanley,* 696 F.Supp.2d at 359, is no longer appropriate.

As noted in *Citigroup,* since the Supreme Court's ruling in *Twombly,* 550 U.S. 544, 127 S.Ct. 1955, "courts have regularly **\*572** applied *Moench* at the motion-to-dismiss stage." *Citigroup,* 2009 WL 2762708 at *16, citing *Edgar v. Avaya, Inc.,* 503 F.3d 340, 349 (3rd Cir.2007); *Bausch & Lomb,* 2008 WL 5234281, at *4–6; *Graden v. Conexant Systems, Inc.,* 574 F.Supp.2d 456, 462–64 (D.N.J.2008); *Halaris v. Viacom, Inc.,* No. 3:06–CV–1646–N, 2008 WL 3855044, at *2 (N.D.Tex. Aug. 19, 2008); *In re Dell, Inc. ERISA Litig.,* 563 F.Supp.2d 681, 692–93 (W.D.Tex.2008); *In re RadioShack Corp. ERISA Litig.,* 547 F.Supp.2d 606, 614 (N.D.Tex.2008). In *Avaya,* the Court explained that "if a plaintiff does not plead all of the essential elements of his her legal claim, a district court is required to dismiss the complaint pursuant to Rule 12(b)(6)," and there is "no reason allow [a] case to proceed to discovery when, even if the allegations are proven true," the plaintiff "cannot establish that defendants abused their discretion." *Avaya,* 503 F.3d at 349.

As Judge Sullivan explained in *Gearren,* the *Moench* presumption is not so much an evidentiary presumption, but rather a "standard of review" which can be applied at the motion-to-dismiss stage. 690 F.Supp.2d at 269. The presumption is the standard under which a court reviews fiduciary behavior under ERISA. Judge Sullivan went on to explain:

> At least post-*Iqbal,* it is not enough simply to make a conclusory allegation that the defendants breached their fiduciary duties. Instead, a plaintiff must allege facts that make it plausible that a breach of fiduciary duty actually occurred. The applicability of the presumption of prudence directly affects the plausibility of an allegation that a particular action was imprudent. When the presumption applies, the factual allegations in the complaint must make it plausible that the defendants could not have reasonably believed that continued adherence to the terms of the plan "was in keeping with the settlor's expectations of how a prudent trustee would operate."

> *Id.* at 270, quoting *Moench,* 62 F.3d at 571. The *Moench* presumption does not allow plan documents to immunize fiduciaries from ERISA liability, but represents a compromise between the pleading requirements under *Iqbal* and the need to protect both fiduciaries and benefi-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

ciaries under ERISA. Based on this logic, the *Moench* presumption is applicable at the motion-to-dismiss stage.

Here, the "fiduciary presumptively is required to invest in employer securities" through language in the Plan Agreement providing that the Plan is "designed to invest primarily but not exclusively in employer stock." (ERISA Compl. ¶ 63, *citing* Plan Agreement at 53.) Therefore, the Plan comes under the *Moench* presumption.

[91][92] The remaining question before the Court is whether ERISA Plaintiffs successfully overcome the *Moench* presumption. They do not. The *Moench* presumption is a "substantial shield" which requires plaintiffs to plead "persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest," and not merely that defendants were aware of "circumstances that may impair the value of company stock." *Kirschbaum,* 526 F.3d at 256. Courts in this district have held that plaintiffs must allege "the fiduciary's knowledge at a pertinent time of 'an imminent corporate collapse or other 'dire situation' sufficient to compel an ESOP sell-off.' " *Lehman,* 683 F.Supp.2d at 301, *quoting Avon,* 2009 WL 848083, at *11. In other words, "[w]hen the presumption applies, it can only be overcome by allegations that the company's stock was at risk **573** of being rendered effectively worthless." *Morgan Stanley,* 696 F.Supp.2d at 359.

In *Moench,* the allegations were sufficient to survive the presumption, but the alleged circumstances were materially more extreme than those here: "the price of employer stock had suffered a precipitous decline and ... the plan fiduciaries had had knowledge of its impending collapse.... [A] 'precipitous decline' in stock price meant that the stock lost ninety-eight percent of its value over a two-year period, dropping from $18.25 per share to $0.25 per share. An 'impending collapse' meant that 'federal regulators informed the company's Board of Directors that they had concerns about the company's financial condition and had uncovered various regulatory violations; the Federal Deposit Insurance Corporation eventually took over control of one of the company's subsidiaries; and, ulti-

mately, the company filed for Chapter 11 bankruptcy.' " *Citigroup,* 2009 WL 2762708, at *17, *quoting Avaya,* 503 F.3d at 348 (*summarizing Moench,* 62 F.3d at 557).

[93] The facts presented here more closely resemble those presented in *Citigroup.* There, the plaintiffs alleged that Citigroup invested heavily in high-risk mortgage-backed securities, concealed its liabilities, and originated and purchased risky loans, all leading to losses of tens of billions of dollars and a stock price decline of 52%. *Id.* at *18. The Court held that such losses were not sufficient to require the defendant fiduciaries to override the plan terms and divest the plan of Citigroup stock. *Id.* at *18. Citigroup's losses were very large, but it was a large company whose viability as a going concern was not threatened. *Id.* at *19.

Here, ERISA Plaintiffs allege that (1) Bear Stearns stock precipitously declined from over $171 to under $5 per share during the Class Period (though Bear Stearns was acquired by JPMorgan for approximately $10 per share); (2) Bear Stearns stock was artificially inflated by misrepresentations and omissions; (3) the Company was seriously, and, indeed, grossly mismanaged and faced dire financial circumstances as a result; (4) the Defendants were conflicted; and, (5) the Company both faced imminent collapse and, indeed, collapsed during the Class Period. ERISA Pl. Mem. at 27, *citing* ERISA Compl. ¶¶ 312, 321, 416–19, 488–93, 506.

Regarding the fall in Bear Stearns' stock price, ERISA Plaintiffs fail to take into account the nature of the stock's decline. On March 13, 2008, the Company's stock price closed at $57. (ERISA Compl. ¶ 405.) This 66% decline is not enough to overcome the *Moench* presumption. *See Kuper v. Iovenko,* 66 F.3d 1447, 1451, 1459 (6th Cir.1995) (eighty percent drop not enough to overcome presumption); *Wright v. Oregon Metallurgical Corp.,* 360 F.3d 1090, 1096, 1098 (9th Cir.2004) (seventy-five percent drop); *In re Duke Energy ERISA Litig.,* 281 F.Supp.2d 786, 795 (W.D.N.C.2003) (fifty-five percent drop); *Crowley v. Corning, Inc.,* 234 F.Supp.2d 222, 227 (W.D.N.Y.2002) (eighty percent drop). Bear Stearns announced $30 billion

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

in government funding (via JPMorgan) on March 14, 2008, and saw its price drop to $30 in the day's trading, though the credit line meant that Bear Stearns' viability should not have been threatened and was not facing collapse. (ERISA Compl. ¶¶ 409, 411.) Once the markets had closed for the weekend, Bear Stearns agreed to be acquired by JPMorgan for $2 per share. (ERISA Compl. ¶ 415.) The markets were closed while these events unfolded. On Monday, March 17, 2008, Bear Stearns' stock price fell to $4.81 (ERISA Compl. ¶ 416), though it rebounded over the following weeks to $11.25 and was ultimately **\*574** acquired by JPMorgan for $10 per share. (ERISA Compl. ¶ 419.) Had the Count I Defendants divested the Plan of Bear Stearns stock on March 17, 2008 in light of the impending take over, they would have deprived Plan members of that rebound. Under such circumstances, Defendants' decision not to divest the Plan of Bear Stearns stock was not so extreme as to be contrary to "the settlor's expectations of how a prudent fiduciary would operate." [FN32] *Moench,* 62 F.3d at 571.

> FN32. In *Veera,* 2011 WL 43534, at \*5–6, in dicta, the Court found that the plaintiffs' claims satisfied the *Moench* presumption. However, in that case, unlike here, the employer reported massive losses, saw large stock price drop-offs, and was known to be under investigation by two different regulatory bodies several months before the class period ended. *Id.* Here, ERISA Plaintiffs' presented a less extreme set of facts and have failed to establish when ERISA Defendants should have divested the plan of Bear Stearns stock.

ERISA Plaintiffs' contention that Bear Stearns' stock was artificially inflated during the Class Period does not support their claim. Because the Plan was fully vested and purchased no stock during the Class Period, ERISA Plaintiffs were not harmed, and may have benefitted, from the alleged inflation.

ERISA Plaintiffs' third point, that Bear Stearns was allegedly mismanaged, does not establish that Bear Stearns

and the ESOP Committee abused their discretion when they did not divest the Plan of Bear Stearns stock. As in *Citigroup:*

> If true, those allegations would constitute evidence supporting the position that Citigroup adopted imprudent and risky business strategies that resulted in substantial losses to the company. But they would not suggest the type of dire situation that would have caused defendants to believe that continued adherence to the Plans' mandate regarding Citigroup stock was no longer in keeping with the settlor's expectations of how a prudent trustee would operate.

2009 WL 2762708 at \*18 (citations omitted). While ERISA Plaintiffs' have adequately alleged mismanagement, they do not reach the degree required to overcome the *Moench* presumption.

ERISA Plaintiffs' fourth argument is that the ERISA Defendants suffered conflicts of interest. However, as discussed below, ERISA Plaintiffs fail to establish this claim.

ERISA Plaintiffs' final contention is that Bear Stearns faced imminent collapse, and in fact collapsed. However, Bear Stearns was acquired by JPMorgan for $1.2 billion. It did not collapse, and its stock did not become "effectively worthless." *Morgan Stanley,* 696 F.Supp.2d at 359. Rather, it was valued at $10 per share when purchased. Furthermore, ERISA Plaintiffs do not allege with precision when Bear Stearns became subject to "imminent collapse." *See Lehman,* 683 F.Supp.2d at 302 (finding that "[t]he fact that [Lehman declared bankruptcy] means that a corporate collapse was 'imminent' at some prior point in time. The CAC, however, fails to allege facts that permit a determination of when Lehman's financial condition reached that point. Instead, the CAC alleges, in conclusory terms only, that there 'were clear warning signs' of collapse and that defendants 'knew or should have known' about Lehman's true financial state throughout the class period.") Based on ERISA Plaintiffs' allegations, the Court is unable to find a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

time when the Count I Defendants should have divested the Plan of Bear Stearns stock "in keeping with the settlor's expectations of how a prudent fiduciary would operate," despite the Plan's terms mandating investment in that stock. *Moench,* 62 F.3d at 571.

**\*575** While the ERISA Complaint alleges that Bear Stearns was mismanaged, experienced a substantial decline in its stock price, and was at risk of collapse, it does not carry the heavy burden required to establish that the Count I Defendants abused their discretion under *Moench* when they did not divest the Plan of Bear Stearns stock.

*6. Defendants Had No Duty to Disclose and No Liability for Misleading Statements*

Defendants seek dismissal of the ERISA Plaintiffs' claims that they failed to disclose material information to the Plan Participants and that certain Defendants affirmatively misled the Plan Participants. These claims appear to be included within Count I, the ERISA Plaintiffs' claim for failure to prudently and loyally manage the Plan. Defendants contend that ERISA imposes no duty to disclose company financial information to plan participants and that the alleged misleading communications were not ERISA communications made in a fiduciary capacity.

The ERISA Plaintiffs respond to Defendants' arguments by stating that they did not plead an independent count for Defendants' alleged failures to disclose, but will do so "if discovery bears out facts supporting such a claim." ERISA Pl. Mem. 34. ERISA Plaintiffs also concede that they make no claim alleging that Defendants disclosed inaccurate information. ERISA Pl. Mem. 37. Thus, The ERISA Plaintiffs claim that Defendants failed to provide complete and accurate information to the Plan Participants in violation of their duties of loyalty and prudence under ERISA § 404.

a) Defendants Had No Duty to Disclose Bear Stearns' Financial Condition

**[94]** Where an ERISA fiduciary communicates information to plan participants, it must be truthful.

*Citigroup,* 2009 WL 2762708, at \*20; *see also Varity Corp. v. Howe,* 516 U.S. 489, 506, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996) ("[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in ... 29 U.S.C. 1104(a)(1)." (quotation omitted)). However, ERISA provides no affirmative duty to disclose material non-public information and the Second Circuit has not established such a duty. *In re Polaroid ERISA Litigation,* 362 F.Supp.2d 461, 478 (S.D.N.Y.2005). Where no duty is expressly provided, "the law of trusts often will inform, but will not necessarily determine the outcome of, an effort to interpret ERISA's fiduciary duties." *Id., quoting Varity Corp. v. Howe,* 516 U.S. 489, 497, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996).

The ERISA Plaintiffs rely on *Polaroid,* where the Court noted that "[c]ourts are in disagreement concerning the contours of this duty" but went on to find that "an ERISA fiduciary has both a duty not to make misrepresentations to plan participants, and 'an affirmative duty to inform when the [fiduciary] knows that silence might be harmful.' " *Id., quoting Bixler v. Cent. Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1300 (3d Cir.1993). The Court in *Polaroid* derived this duty from the law of trusts, under which a trustee "is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection." *Id., quoting* Restatement (Second) of Trusts § 173, cmt. d.

In *Board of Trustees of CWA/ITU Negotiated Pension Plan v. Weinstein,* 107 F.3d 139 (2d Cir.1997), the Second Circuit addressed the claim of a plan participant that plan fiduciaries had violated ERISA by failing to disclose "actuarial valuation reports" in response to the participant's request. The Court found that ERISA **\*576** § 104(b)(4) provided a precise list of documents which plan fiduciaries were required to disclose, and that "actuarial valuation reports" were not on that list. *Id.* at 142–46. The plaintiffs alleged that the general fiduciary duties of prudence and loyalty required the fiduciaries to disclose the valuation reports irrespective of ERISA not explicitly requiring such

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

disclosures. The Court disagreed, holding that "Congress intentionally fashioned § 104(b)(4) to limit the categories of documents that administrators must disclose on demand of plan participants," and that it was "inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that say nothing about disclosure." *Id.* at 147.

The Second Circuit has espoused a limited fiduciary duty to disclose in the ERISA context, requiring that plan fiduciaries disclose changes in the terms of a benefit plan and complete and accurate information about the administration of the plan. *Devlin v. Empire Blue Cross and Blue Shield,* 274 F.3d 76, 88–89 (2d Cir.2001), *citing In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.,* 57 F.3d 1255, 1264 (3d Cir.1995) (concluding that Unisys had breached its fiduciary duty where it "affirmatively and systematically represented to its employees that once they retired, their medical benefits would continue for life-even though, as the district court concluded in rejecting the retirees' contract claim, the plans clearly permitted the company to terminate benefits"); *Becher v. Long Island Lighting Co. (In re Long Island Lighting Co.),* 129 F.3d 268, 271 (2d Cir.1997) ("An ERISA fiduciary has an obligation to provide full and accurate information to the plan beneficiaries regarding the administration of the plan.").

More recently, this Court has confirmed the existence of an ERISA fiduciary's duty to disclose plan and benefit terms but has refused to go further and require disclosure of non-public information about the company's finances. In *Citigroup,* 2009 WL 2762708, at *20, the Court addressed similar claims to those before the Court here. There, the plaintiffs alleged that "defendants knew of the true magnitude of the Company's involvement in subprime lending but failed to disclose what they knew to plan participants" and "when defendants did communicate with plan participants, they breached their fiduciary duties by providing materially false and misleading information." *Id.* (internal citations omitted). The Court noted that 29 U.S.C. §§ 1021–31 provides a comprehensive set of disclosure obligations for ERISA plan fiduciaries which does not include disclosures regarding the employer's financial condition. *Id.* at *21. Therefore, following the Second Circuit's

guidance in *Weinstein,* the Court found that "it is inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that say nothing about disclosure" and dismissed the plaintiffs' claim that the duties of loyalty and prudence required disclosure of the employer's financial health. *Id., quoting Weinstein,* 107 F.3d at 147 (internal quotations omitted).

*Citigroup* distinguishes *Devlin* and other cases relied upon by *Polaroid* as having involved the duty to disclose information about plan benefits, not the investments themselves. *Id.* Unlike with the proposed duty to disclose information about the employer's finances, the duty to disclose information about plan benefits derives directly from the ERISA fiduciary's obligation to "discharge his duties ... 'for the exclusive purpose' of providing benefits to them." *Id.* at *22, *quoting Devlin,* 274 F.3d at 88.

The ERISA Plaintiffs' position would require an ERISA fiduciary to disclose financial**\*577** information about the companies in which the plan is invested. As the Court pointed out in *Citigroup,* such a holding would "transform fiduciaries into investment advisors" despite that fact that fiduciaries have no duty to "give investment advice" or "opine on the stock's condition." *Id., citing Avaya,* 503 F.3d 340.

*Citigroup* has been recently followed by the Court's decision in *Gearren,* 690 F.Supp.2d at 271–72, which also found that ERISA fiduciaries have no duty to disclose information about the financial condition of the companies the plans are invested in.

Therefore, Defendants' fiduciary duties of loyalty and prudence did not require them to disclose information about Bear Stearns' financial condition.

b) Defendants Were Not Acting as Plan Fiduciaries When They Allegedly Made Affirmative Misrepresentations

[95] As noted above, "lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in ... 29 U.S.C. 1104(a)(1)." *Varity Corp.,* 516 U.S. at 506, 116

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

S.Ct. 1065 (quotation omitted). Therefore, where a fiduciary voluntarily discloses information, ERISA mandates that such disclosures are made truthfully. *See WorldCom,* 263 F.Supp.2d at 766. The ERISA Plaintiffs allege that Defendants "affirmatively misled" the Plan Participants about Bear Stearns' financial condition in violation of their duties of loyalty and prudence.

[96] The "threshold question" in assessing whether a defendant breached his or her ERISA duty is whether the defendant "was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Pegram,* 530 U.S. at 226, 120 S.Ct. 2143. The ERISA Plaintiffs must sufficiently allege that Defendants were acting in their fiduciary capacity when they made allegedly misleading statements regarding Bear Stearns' financial health. Specifically, "statements concerning a company's financial condition become subject to ERISA fiduciary duties only if they are made in an ERISA fiduciary capacity, which means that the statements are made by the plan administrator and are intentionally connected to statements regarding a plan's benefits." *Gearren,* 690 F.Supp.2d at 272, *quoting Bausch & Lomb,* 2008 WL 5234281, at *7.

A similar claim was raised in *Citigroup.* There, the Court found that the defendants who made allegedly misleading statements were not responsible for "administering the plans or communicating with plan participants" under the terms of the plan agreement. *Citigroup,* 2009 WL 2762708, at *23. Therefore, "even if [the defendants] 'regularly' provided Plan participants with misleading information about Citigroup's financial condition, those communications were not subject to ERISA's duty to speak truthfully. They were, instead, corporate communications from an employer to its employees, not ERISA communications from a fiduciary to participants." *Id.* (internal citations omitted).

Turning specifically to SEC filings, persons "who prepare SEC filings do not become ERISA fiduciaries through those acts" and, "consequently, do not violate ERISA if the filings contain misrepresentations." *World-Com,* 263 F.Supp.2d at 767. As stated in *Citigroup,* "SEC filings do not, standing alone, have anything to do with ERISA. Thus, if Citigroup filed 'materially false and misleading' 8–Ks, 10–Qs, and 10–Ks—and if Prince signed those filings knowing them to be false—Citigroup and Prince may have run afoul of the federal securities laws, but Citigroup and Prince did not violate ERISA." ***578****Citigroup,* 2009 WL 2762708, at *23 (internal citation omitted). *See also Gearren,* 690 F.Supp.2d at 272–73 (finding that defendants prepared SEC filings in a corporate, not fiduciary, capacity where those filings were incorporated by reference in the summary plan document.)

*Citigroup* distinguished the holding in *Varity Corp.,* where a company was both the employer and the administrator of the benefits plan and where, as a result of the plan's design and the intentional conduct of the company, corporate officers wore both corporate and fiduciary "hats" and thus acted as a fiduciary when speaking to employees about the company's financial health. *Varity Corp.,* 516 U.S. at 498, 503, 505, 116 S.Ct. 1065. In *Citigroup,* as here, the plan agreement established a committee to serve as plan administrator and left limited fiduciary roles for the company and its directors. *Citigroup,* 2009 WL 2762708, at *24. Because of this separation of roles, the defendants' statements in Citigroup were unambiguously made in their corporate "hat." *Id.*

The allegations presented here closely resemble those in *Citigroup.* Article XI of the Plan Agreement establishes the ESOP Committee as the plan administrator responsible for the general operation of the plan. Bear Stearns and its directors and executive committee members have limited fiduciary roles which do not include the general administration of the plan or communications with the Plan Participants regarding the plan. Therefore, statements made by the Company and these persons, be they SEC filings, press releases, or speeches, are not statements made while "acting as a fiduciary" for which they are liable under ERISA. *See Gearren,* 690 F.Supp.2d at 273 (noting that similarly situated defendants are liable under the securities laws, but not ERISA).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Had the ESOP Committee, as plan administrator, made false or misleading statements regarding plan terms, it would violate its duty of loyalty under ERISA. *World-Com,* 263 F.Supp.2d at 765. However, Plaintiffs do not allege that the ESOP Committee affirmatively misled the Plan Participants.

F. *The ERISA Complaint Fails to State a Claim for Conflicts of Interest in Count II*

In Count II, the ERISA Plaintiffs allege that all Defendants breached their duty to avoid conflicts of interest in administering the ESOP. They allege that Defendants failed to use independent fiduciaries and that the fiduciaries were motivated by loyalty to Bear Stearns in direct conflict with their duties to protect the Plan Participants.

[97] An adequate claim for breach of the fiduciary duty of loyalty is a necessary predicate for a claim alleging conflicts of interest. *Herrera,* 2010 WL 1028163, at *7 ("In the absence of a valid claim for a breach of the duty of loyalty, allegations that Defendants placed themselves into a conflict situation are not independently actionable.") *See also In re McKesson HBOC, Inc. ERISA Litig.,* 391 F.Supp.2d 812, 834–35 (N.D.Cal.2005) ("[T]he duty of loyalty requires fiduciaries to refrain from actual disloyal conduct, not simply running the risk that such behavior will occur.... No case of which the court is aware has held that ERISA fiduciaries breach their duty of loyalty simply for 'placing themselves in a position' where they might act disloyally."). Without pointing to an underlying breach of the duty of loyalty, ERISA Plaintiffs cannot establish that the alleged conflict of interest had adverse consequences. Independently of that basis for dismissal, the ERISA Plaintiffs fail to establish a claim for conflicts of interest on the part of Defendants.

**\*579** Defendants contend that the ERISA Plaintiffs fail to establish how fiduciaries' ownership of Bear Stearns stock prejudiced their actions in a way which harmed Plaintiffs. According to Defendants, fiduciaries which held Bear Stearns stock would have had the same interests as ESOP Participants. Furthermore, to claim that a Bear Stearns stock holder cannot be an ESOP fiduciary runs

contrary to ERISA's intention to have company officers and directors serve as fiduciaries for such plans. ERISA Defs'. Mem. at 43–44.

Defendants also reject the ERISA Plaintiffs' contention that the sale by six senior officers at Bear Stearns of $90 million worth of Bear Stearns stock during the class period supports a claim for breach of loyalty. According to Defendants, selling personal stock is not a fiduciary act. Furthermore, the six senior officers were members of the Board or Executive Committee, with limited powers to appoint and remove fiduciaries. Defendants assert that the ERISA Plaintiffs fail to allege how these stock sales demonstrate a conflict with their roles as fiduciaries and ignore the fact that these sales totaling $90 million represented a small fraction of the officers' holdings of Bear Stearns stock. Defendants claim that those six defendants suffered a loss of over $1 billion when Bear Stearns' stock price collapsed. ERISA Defs'. Mem. at 44–45.

In their Opposition, the ERISA Plaintiffs do not defend their contention that the sale of $90 million worth of Bear Stearns stock signified a breach of Defendants' fiduciary duties. Rather, they focus on their claim that the Defendant fiduciaries were impermissibly conflicted by their stock ownership and maintain that the stock sales were evidence of that conflict, which made Defendants act to protect their investments by inflating Bear Stearns' stock price at the expense of the Plan participants.

[98] Under ERISA, "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." ERISA § 404(a)(1). However, an ERISA fiduciary "may have financial interests adverse to beneficiaries" and may act in ways that harm beneficiaries when not acting in his or her fiduciary role. *Pegram,* 530 U.S. at 225, 120 S.Ct. 2143. Therefore, the question "is whether the defendant took an action to affect plan participants adversely while performing a fiduciary function." *WorldCom,* 263 F.Supp.2d at 768, quoting *Pegram,* 530 U.S. at 226, 120 S.Ct. 2143.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

In *WorldCom,* the Court was presented with a claim alleging that the defendant "breached the ERISA duty of loyalty by allowing WorldCom stock to be offered as a Plan investment while he was participating in compensation programs that gave him a personal interest in maintaining a high price for WorldCom stock." *Id.* at 768. The Court found that "Plaintiffs' allegations that [the defendant's] holding of WorldCom stock and participation in its compensation program created a conflict of interest are insufficient by themselves to state a claim under ERISA. Plaintiffs do not allege that [the defendant's] personal investments caused him to take or fail to take any actions detrimental to the Plan *while* he was wearing his 'fiduciary hat.' " *Id.* (emphasis in original).

The ERISA Plaintiffs here present a similar claim to that in *WorldCom,* alleging that Defendants acted against Plan Participants' interests in order to keep Bear Stearns' stock price high due to their own stock ownership. They do not adequately allege that Defendants' conflict caused them to take actions adverse to the Plan Participants' interests, as shown by their **\*580** failure to state a claim for breach of the duties of prudence and loyalty.

[99] In fact, as the Court pointed out in *In re Huntington Bancshares Erisa Litig.,* 620 F.Supp.2d 842, 849, n. 6 (S.D.Ohio 2009), "compensation in the form of company stock aligns the interests of plan fiduciaries with those of plan participants." Furthermore, if company stock ownership or compensation through company stock alone presented a conflict of interests, ERISA's statutory scheme allowing company officers and directors, who are often stock holders and are compensated with stock, to serve as fiduciaries would be contradictory. ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3).

Plaintiffs rely on *Morgan Stanley* and *Pfizer* in attempting to support their conflict of interests claim. However, the plaintiffs whose conflict of interests claims were upheld in *Pfizer* pleaded specific facts alleging that the defendants acted against the plan's interests. *Pfizer,* 2009 WL 749545, at \*13 ("[t]he Complaint ... alleges that Defendants engaged in a pattern of deception concerning

problems with Celebrex and Bextra and failed to obtain independent advice when conflicts of interest were present"). In *Morgan Stanley,* 696 F.Supp.2d 345, 366 (S.D.N.Y.2009), the plaintiffs' claims survived by virtue of their allegation that the defendants took the affirmative step of increasing the plan's investments in company stock in order to inflate the stock price. This sort of action directed against the plaintiffs' interests is lacking here, where the Plan was closed during the Class Period.

The ERISA Plaintiffs also contend that Defendants were required to engage independent fiduciaries because of their alleged conflict of interests. ERISA Pl. Mem. 45. However, Plaintiffs have failed to adequately allege a conflict of interests, and ERISA does not require Bear Stearns retain independent fiduciaries. *See* 29 U.S.C. § 1108(c)(3).

### G. *There Is No Liability for Defendants' Duty to Monitor and No Co–Fiduciary Liability*

[100] A claim for breach of the duty to monitor requires an antecedent breach to be viable. *Citigroup,* 2009 WL 2762708, at \*26 (dismissing the duty to monitor claim "because plaintiffs have failed to cite any instance of misconduct that the Monitoring Defendants failed to detect"); *Avon,* 2009 WL 848083, at \*16 (S.D.N.Y. Mar. 3, 2009) (where claim for breach of duty of prudence failed, "[i]t necessarily follows that no appointing fiduciary can be deemed liable for failing to monitor the conduct of her appointees"); *see also Pugh v. Tribune Co.,* 521 F.3d 686, 702 (7th Cir.2008) (same). With no antecedent breach by the monitored parties in this case, Defendants' alleged failure to monitor, even if true, could not have harmed the plaintiffs. Therefore, the ERISA Plaintiffs' duty to monitor claim fails.

Plaintiffs contend that the duty to monitor is an independent duty which does not require an underlying breach of a fiduciary duty. They rely upon *In re JDS Uniphase Corp. Erisa Litig.,* 2005 WL 1662131, at \*3–4 (N.D.Cal. Jul. 14, 2005). However, in *JDS Uniphase,* the prudence claims against the appointed fiduciaries were found to be sufficient to survive the motion to dismiss, enabling the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

monitoring claims against the appointing fiduciaries to survive as well. *Id. at \*10.*

[101] The ERISA Plaintiffs' claims for co-fiduciary liability require antecedent breaches of fiduciary duties by a co-fiduciaries to be viable. *See Izzarelli v. Rexene Prods. Co.,* 24 F.3d 1506, 1525, n. 34 (5th Cir.1994) ( "Because there was no **\*581** breach of fiduciary duty on the part of the Rexene defendants, it goes without saying that the Bank cannot be liable as a co-fiduciary for the same conduct"); *Citigroup,* 2009 WL 2762708, at \*27 (same); *Avon,* 2009 WL 848083 (same). No such breach is sufficiently alleged here.

# VI. LEAD PLAINTIFF'S MOTIONS TO MODIFY THE STAY AND STRIKE EXTRANEOUS DOCUMENTS ARE DENIED

A. *Lead Plaintiff's Motion to Modify the Stay of Discovery is Denied as Moot*

On June 11, 2009, the Michigan Retirement System, Lead Plaintiff in the Securities Action, moved the court to modify the automatic stay of discovery imposed by the PSLRA, 15 U.S.C. § 78u–4(b)(3)(B), in order to (a) allow Lead Plaintiff to promulgate limited discovery requests for documents Defendants had previously produced in other, related litigation; and (b) allow Lead Plaintiff to submit non-party subpoenas for the preservation of evidence.

The PSLRA provides, in relevant part, that "[i]n any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. § 78u–4(b)(3)(B). Upon the issuance of this opinion, no motion to dismiss will be pending, and the stay will automatically be lifted. Therefore, Lead Plaintiff's motion to modify the stay is denied as moot.

B. *Lead Plaintiff's Motion to Strike Extraneous Documents is Denied*

On May 29, 2008, Lead Plaintiff Michigan Retirement System moved to strike pursuant to Federal Rule of Civil Procedure 12(f) extraneous documents submitted by the Bear Stearns Defendants and Deloitte with their motions to dismiss the Securities Complaint.

[102] Federal Rule of Civil Procedure 12(f) allows a party to strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous material." A motion to dismiss is not a pleading. See Fed.R.Civ.P. 7(a) (stating that "pleadings" include only complaints, counterclaims, and answers); *Granger v. Gill Abstract Corp.,* 566 F.Supp.2d 323, 335 (S.D.N.Y.2008) ("Motions, declarations and affidavits are not pleadings"); *Fox v. Michigan State Police Dept.,* 173 Fed.Appx. 372, 375 (6th Cir.2006) ("Exhibits attached to a dispositive motion are not 'pleadings' within the meaning of Fed.R.Civ.P. 7(a) and are therefore not subject to a motion to strike under Rule 12(f).")

[103] Lead Plaintiff also relies upon the Court's "inherent authority to strike any filed paper which it determines to be abusive or otherwise improper under the circumstances." *Sierra v. United States,* No. 97 Civ. 9329, 1998 WL 599715, at \*9, 1998 U.S. Dist. LEXIS 14135, at \*27 (S.D.N.Y. Sept. 9, 1998).

[104] A fact capable of judicial notice is one "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b). On a motion to dismiss, courts may take judicial notice of, *inter alia,* "the *fact* that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents." **\*582***Staehr v. Hartford Fin. Servs. Group, Inc.,* 547 F.3d 406, 425 (2d Cir.2008) (emphasis in original).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

Here, Lead Plaintiff has challenged the Bear Stearns Defendants' submission of the Declaration of David Gross and its supporting documents and the exhibits attached to the Declaration of Eric Goldstein. Lead Plaintiff also contests six documents submitted by Deloitte. With the exception of the Gross Declaration and its attached charts and tables, the challenged documents include "(1) various Securities and Exchange Commission ("SEC") filings and other communications related to companies other than Bear Stearns; (2) general news articles; (3) several journal and industry reports; [and] (4) congressional testimony and speeches." Pl. Mem. in Supp. of Mot. to Str. 1–2.

With regard to the exhibits attached to the Goldstein Declaration and the six documents submitted by Deloitte, the Court takes judicial notice of the fact that these documents contain certain information, but it does not accept these documents for the truth of the matters asserted in them. *See Staehr,* 547 F.3d at 424–25 (taking judicial notice of regulatory filings and media reports for their contents, but not for the truth of the matter asserted); *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991) (taking judicial notice of regulatory filings); *Take–Two,* 551 F.Supp.2d at 276 (taking judicial notice of SEC filings to review trading activity); *Garber v. Legg Mason, Inc.,* 537 F.Supp.2d 597, 612, n. 4 (S.D.N.Y.2008) (taking judicial notice of newspaper articles for the fact of their publication). It is undisputed that the Court may take notice of these documents for this purpose,[FN33] and the Bear Stearns Defendants and Deloitte contend that this is the purpose for which these documents were offered.[FN34]

> FN33. In its brief, Lead Plaintiff asserts that it "does not object to the Court taking judicial notice of the publication or existence of statements in documents that are routinely and properly judicially noticed." Pl. Mem. in Supp. of Mot. to Str. 2, *citing Staehr,* 547 F.3d at 424–26. Lead Plaintiff objects to Defendants offering the disputed documents for the truth of the matters asserted in those documents. *Id.*

> FN34. *See* Bear Stearns Defs. Mem. in Opp. to

Mot. to Str. 11–12; Deloitte's Mem. in Opp. to Mot. to Str. 1, 4.

Lead Plaintiff alleges that the Gross Declaration, along with its attached charts and tables, is an expert report which is inappropriate for consideration at the motion to dismiss stage. Pl. Mem. in Supp. of Mot. to Str. 17–19. The Bear Stearns Defendants contend that the Gross Declaration is not an expert report, but a compilation of voluminous data on the Bear Stearns Defendants' stock trades, which is admissible under Federal Rule of Evidence 1006. Bear Stearns Defs. Mem. in Opp. to Mot. to Str. 5–6.

The Gross Declaration and its attached charts and tables expressly summarize SEC Forms 3, 4, and 5, proxy statements that Bear Stearns filed with the SEC, and stock prices for the Bear Stearns Companies, Inc. *Id.* at 5; Gross Declaration ¶ 3. As a compilation of data, rather than an expert report, consideration of the Gross Declaration does not require the Court to make any finding of fact or inquiry into Gross's qualifications as an expert or his methodology. Furthermore, courts may use information from SEC filings regarding a defendant's stock sales to determine whether such sales were "unusual" or "suspicious." *See Take–Two,* 551 F.Supp.2d at 276 (taking judicial notice of stock sales and finding "no grounds for finding that the relevant stock sales ... were sufficiently unusual to support an **\*583** inference of scienter"); *In re Bristol–Myers Squibb Sec. Litig.,* 312 F.Supp.2d 549, 561 (S.D.N.Y.2004) (citing the defendant's Forms 4 and 5 that "show a consistent pattern of trading undertaken primarily to make payments required for the exercise of stock options or to pay taxes"); *In re WorldCom, Inc. Sec. Litig.,* 294 F.Supp.2d 392, 419, n. 15 (S.D.N.Y.2003) (taking judicial notice of the defendant's Form 4 in determining whether stock sales were sufficient to allege scienter.) The Gross Declaration and its attached charts and tables are properly considered at this stage as compilations of voluminous data. *See Malin v. XL Capital, Ltd.,* 499 F.Supp.2d 117, 134 (D.Conn.2007) (summaries of information are admitted along with underlying documents under Fed.R.Evid. 1006).[FN35]

> FN35. The court in *Malin* noted that the compi-

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

lation was accompanied by the underlying documents. *Id.* at 134. Pursuant to Fed.R.Evid. 1006, the Bear Stearns Defendants need only make those documents available upon request or court order, neither of which is present here. *See* Fed.R.Evid. 1006 ("The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.") The Gross Declaration adequately states where it obtained its data in its third paragraph.

The data sources used to gather the information summarized in the Gross Declaration and the exhibits attached to it are also properly considered on a motion to dismiss. The Forms 3, 4, and 5 are required SEC disclosures and may be considered for the truth of their contents. *See Malin,* 499 F.Supp.2d at 133 ("SEC Forms 3, 4 and 5, which are required to be filed with the SEC under penalty of perjury, are used by officers of public corporations to publicly disclose their transactions in company stock. These documents are routinely accepted by courts on motions to dismiss securities fraud complaints and are considered for the truth of their contents"), *citing In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 540–41 (3d Cir.1999) (considering the Form 4 as evidence of how much stock was sold and how much stock the defendants continued to hold); *In re Sina Corp. Sec. Litig.,* No. 05 Civ. 2154, 2006 WL 2742048, at *11 (S.D.N.Y. Sept. 26, 2006) (granting motion to dismiss while taking judicial notice of the defendants' filings with the SEC "to conclusively determine that the Individual Defendants' trading activity during the Class Period was not at all unusual when compared with their prior activity"); *Bristol–Myers Squibb,* 312 F.Supp.2d at 561 (relying on the Forms 4 and 5 filed by the individual defendants, which recorded changes in beneficial ownership of the securities held, as evidence of the individual defendants' stock sales); *In re Keyspan Corp.,* 383 F.Supp.2d at 383 n. 12 (relying on publicly filed records of the individual defendants' trading activity as evidence of how much stock was sold during the relevant time period); *In re Vantive Corp. Sec. Litig.,* 110

F.Supp.2d 1209, 1219 (N.D.Cal.2000) ("In considering whether the stock sales are unusual or suspicious, the court may consider ... SEC filings ...."), *aff'd,* 283 F.3d 1079 (9th Cir.2002); *Ressler v. Liz Claiborne, Inc.,* 75 F.Supp.2d 43, 57 (E.D.N.Y.1998) (considering SEC disclosure documents as evidence of stock transactions), *aff'd,* 189 F.3d 460 (2d Cir.1999); *In re Hunter Envtl. Servs., Inc. Sec. Litig.,* 921 F.Supp. 914, 917–19 (D.Conn.1996) (finding it proper to consider the defendant's relevant filings with the SEC).

The Securities Complaint also incorporates the Bear Stearns Form 4s filed during the Class Period by reference. *See* Sec. Compl. ¶ 517 ("To evaluate the selling activity of Defendants Cayne, Greenberg, Molinaro, Schwartz, Spector and Farber, **\*584** Lead Plaintiff used publicly available trading data required to be reported to the SEC on Form 4.... The Bear Stearns' [sic] Form 4s filed during the Class Period and Control Period are hereby incorporated herein by reference"). The incorporated Form 4s are admissible. *See Roth,* 489 F.3d at 509 ("Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered.")

The proxy statements that Bear Stearns filed with the SEC during the Class Period, which are among the exhibits to the Gross Declaration, are explicitly relied upon in the Securities Complaint and are thus properly considered on a motion to dismiss. *See* Sec. Compl. ¶ 518 (noting that the Securities Complaint "referenc[ed] Bear Stearns' Class Period annual proxy statements").

Bear Stearns' published stock price is also judicially noticeable. As stated in *Malin,* "[i]t is clear that courts 'may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment.' " *Malin,* 499 F.Supp.2d 117, 134, *quoting Ganino,* 228 F.3d at 167, n. 8 (considering New York Stock Exchange data which was not attached to the complaint as an exhibit or incorporated by reference into the complaint); *Frazier v. VitalWorks, Inc.,* 341 F.Supp.2d 142, 162, n. 9 (D.Conn.2004) ("The Court takes judicial notice of ... published stock prices").

763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581
**(Cite as: 763 F.Supp.2d 423)**

For the foregoing reasons, Lead Plaintiff's motion to strike is denied.

## VII. CONCLUSION

For the reasons set forth above, the motions to dismiss the Securities Complaint are denied, the motion to dismiss the Derivative Complaint is granted, the motion to dismiss the ERISA Complaint is granted, the motion to modify the stay of discovery is denied, and the motion to strike is denied.

The parties to the Securities Action will meet and confer on a discovery schedule, including a pretrial conference during the week of March 21, 2011, to be approved by the Court.

It is so ordered.

S.D.N.Y.,2011.
In re Bear Stearns Companies, Inc. Securities, Derivative, and ERISA Litigation
763 F.Supp.2d 423, 50 Employee Benefits Cas. 2581

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.